IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 01-cv-1451-REB-CBS
(Consolidated with Civil Action Nos. 01-cv-1472-REB-CBS, 01-cv-1527-REB-CBS, 01-cv-1616-REB-CBS, 01-cv-1799-REB-CBS, 01-cv-1930-REB-CBS, 01-cv-2083-REB-CBS, 02-cv-0333-REB-CBS, 02-cv-0374-REB-CBS, 02-cv-0507-REB-CBS, 02-cv-0658-REB-CBS, 02-cv-755-REB-CBS, 02-cv-798-REB-CBS and 04-cv-0238-REB-CBS)

In re QWEST COMMUNICATIONS INTERNATIONAL, INC. SECURITIES LITIGATION

---

**LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS**

---

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    THE STANDARDS FOR JUDICIAL APPROVAL OF CLASS ACTION
       SETTLEMENTS ................................................................................................ 4

III.   THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE ......................... 7

       A.    The Settlement Was Fairly and Honestly Negotiated ................................ 7

       B.    Serious Questions of Law and Fact Exist, Placing the Ultimate
             Outcome of the Litigation in Doubt ........................................................... 9

       C.    The Value of an Immediate Recovery Outweighs the Mere
             Possibility of Future Relief ..................................................................... 14

       D.    The Recommendation of Experienced Counsel and Court
             Appointed Lead Plaintiffs Strongly Favor Approval of the Settlement ...... 18

IV.    THE NOTICE PROGRAM MEETS THE REQUIREMENTS OF THE
       PSLRA, DUE PROCESS AND RULE 23 OF THE FEDERAL RULES OF
       CIVIL PROCEDURE ....................................................................................... 19

V.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE ........................... 21

VI.    CONCLUSION ................................................................................................ 22

## TABLE OF AUTHORITIES

**Page**

*Aks v. Southgate Trust Co.,*
No. 92-2193-JWL, 1992 U.S. Dist. LEXIS 20442
(D. Kan. Dec. 24, 1992) ................................................................................. 5, 6

*Alvarado Partners, L.P. v. Mehta,*
723 F. Supp. 540 (D. Colo. 1989) ................................................................. 6, 14

*Anixter v. Home-State Prod. Co.,*
77 F.3d 1215 (10th Cir. 1996) .......................................................................... 11

*Armstrong v. Bd. of Sch. Dirs.,*
616 F.2d 305 (7th Cir. 1980) ............................................................................ 18

*Backman v. Polaroid Corp.,*
910 F.2d 10 (1st Cir. 1990) .............................................................................. 10

*Beecher v. Able,*
575 F.2d 1010 (2d Cir. 1978) ........................................................................... 21

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
603 F.2d 263 (2d Cir. 1979) ............................................................................. 10

*Bryant v. Dupree,*
252 F.3d 1161 (11th Cir. 2001) .......................................................................... 9

*Carson v. Am. Brands, Inc.,*
450 U.S. 79 (1981) ............................................................................................. 5

*Chatelain v. Prudential-Bache Sec., Inc.,*
805 F. Supp. 209 (S.D.N.Y. 1992) ................................................................. 8, 15

*City of Philadelphia v. Flemings Cos.,*
264 F.3d 1245 (10th Cir. 2001) ........................................................................ 12

*Class Plaintiffs v. Seattle,*
955 F.2d 1268 (9th Cir. 1992) ....................................................................... 7, 21

*Cotton v. Hinton,*
559 F.2d 1326 (5th Cir. 1977) ............................................................................ 5

**Page**

*Diaz v. Romer*,
   801 F. Supp. 405 (D. Colo. 1992),
   *aff'd*, 9 F.3d 116 (10th Cir. 1993) ........................................................................ 5

*Gottlieb v. Wiles*,
   11 F.3d 1004 (10th Cir. 1993) ........................................................... 5, 6, 14

*Grady v. de Ville Motor Hotel, Inc.*,
   415 F.2d 449 (10th Cir. 1969) .................................................................. 5

*Grunin v. Int'l House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) ................................................................. 20

*In re Chicken Antitrust Litig. Am. Poultry*,
   669 F.2d 228 (5th Cir. 1982) ................................................................ 21

*In re Equity Funding Corp. of Am. Sec. Litig.*,
   603 F.2d 1353 (9th Cir. 1979) .............................................................. 20

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
   142 F.R.D. 588 (S.D.N.Y. 1992) ........................................................... 21

*In re Ikon Office Solutions, Inc.*,
   194 F.R.D. 166 (E.D. Pa. 2000) ......................................................... 9, 21

*In re King Res. Co. Sec. Litig.*,
   420 F. Supp. 610 (D. Colo. 1976) ..................................................... 6, 18

*In re New Mexico Natural Gas Antitrust Litig.*,
   607 F. Supp. 1491 (D. Colo. 1984) ........................................................ 6

*In re Petro-Lewis Sec. Litig.*,
   No. 84-C-326, 1984 U.S. Dist. LEXIS 24881
   (D. Colo. Dec. 28, 1984) ........................................................................ 6

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
   396 F. Supp 2d 1178 (D. Colo. 2004) ................................................... 11

*In re Rent-Way Sec. Litig.*,
   305 F. Supp. 2d. 491 (W.D. Pa. 2003) .................................................. 20

**Page**

*In re Warner Commc'ns Sec. Litig.,*
    618 F. Supp. 735 (S.D.N.Y. 1985),
    *aff'd,* 798 F.2d 35 (2d Cir. 1986) ...................................................................... 17

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,*
    720 F. Supp. 1379 (D. Ariz. 1989), *aff'd sub nom.*
    *Class Plaintiffs v. Seattle,* 955 F.2d 1268 (9th Cir. 1992) ..................................... 7

*Jones v. Nuclear Pharmacy, Inc.,*
    741 F.2d 322 (10th Cir. 1984)............................................................... 5, 6, 9, 14

*Kaufman v. Motorola, Inc.,*
    No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627
    (N.D. Ill. Sept. 19, 2000) ....................................................................................... 16

*Lopez v. City of Santa Fe,*
    206 F.R.D. 285 (D.N.M. 2002)............................................................................... 19

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.,*
    708 F.2d 1081 (7th Cir. 1983)............................................................................... 10

*Miller v. Republic Nat'l Life Ins. Co.,*
    559 F.2d 426 (5th Cir. 1977)................................................................................. 20

*Mullane v. Cent. Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950) .............................................................................................. 20

*Officers for Justice v. Civil Serv. Comm'n,*
    688 F.2d 615 (9th Cir. 1982).............................................................................. 5, 6

*Piper v. Chris-Craft Indus.,*
    430 U.S. 1 (1977) .................................................................................................. 10

*Protective Comm. for Indep. Stockholders of TMT*
*Trailer Ferry v. Anderson,*
    390 U.S. 414 (1968) ................................................................................................ 5

*Reynolds v. NFL,*
    584 F.2d 280 (8th Cir. 1978)................................................................................. 20

**Page**

*Robbins v. Koger Props.*,
    116 F.3d 1441 (11th Cir. 1997)......................................................................14

*Rubenstein v. Republic Nat'l Life Ins. Co.*,
    74 F.R.D. 337 (N.D. Tex. 1976)....................................................................14

*Semerenko v. Cendent Corp.*,
    223 F.3d 165 (3d Cir. 2000).........................................................................16

*Torrisi v. Tucson Elec. Power Co.*,
    8 F. 3d 1370 (9th Cir. 1993)...................................................................8, 15

*Van Bronkhorst v. Safeco Corp.*,
    529 F.2d 943 (9th Cir. 1976)..........................................................................4

*White v. NFL*,
    822 F. Supp. 1389 (D. Minn. 1993) ..............................................................21

*Wilkerson v. Martin Marietta Corp.*,
    171 F.R.D. 273 (D. Colo. 1997)...............................................................5, 17

*Williams v. First Nat'l Bank*,
    216 U.S. 582 (1910) ......................................................................................4


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §77k......................................................................................................11, 16
    §77z-1(a)(7) .................................................................................................20
    §78j(b) ...........................................................................................11, 12, 16
    §78u-4(a)(7)..................................................................................................20

Federal Rules of Civil Procedure
    Rule 23 .........................................................................................1, 19, 20, 21
    Rule 23(e)..................................................................................................1, 5

## I.   INTRODUCTION

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs submit this motion in support of their request for final approval of the settlement on the terms contained in the Stipulation of Partial Settlement dated as of November 21, 2005 (the "Stipulation") and approval of the Plan of Allocation of settlement proceeds.[1] This partial settlement resolves all claims against the Settling Defendants but does not resolve the claims against Joseph P. Nacchio (former Chief Executive Officer of Qwest) and Robert S. Woodruff (former Chief Financial Officer of Qwest) who are not parties to the settlement.[2]

---

[1]   All capitalized terms not defined herein shall have the same meanings as set forth in the Stipulation.

[2]   Pursuant to Local Rule 7.1, Lead Counsel has conferred with counsel for all parties. Defendants Nacchio and Woodruff oppose the terms of the proposed partial settlement and have stated their express intention to oppose final approval of the proposed partial settlement based on their contention that, among other things, the proposed partial settlement unfairly and improperly purports or seeks to extinguish, impair or affect their rights to indemnification (whether pursuant to law, contract or Qwest governance instruments) or their other claims, and otherwise prejudice their rights or their claims with respect to adjudication or resolution of the claims asserted against them. Defendants Nacchio and Woodruff respectfully reserve all of their rights, objections and remedies with respect to final approval of the proposed partial settlement. Furthermore, defendants Nacchio and Woodruff reserve all of their rights as to the claims asserted against them, including their opposition to class certification, which incorporated by reference the briefs of other defendants. The Settling Defendants do not oppose the Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds. While Settling Defendants do not oppose Lead Plaintiffs' motion, they specifically deny many of the factual allegations asserted in the Dowd Declaration. The Settling Defendants take no position with regard to Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses.

The settlement provides for the payment of $400,000,000 in cash for the benefit of the Class.[3] The settlement represents one of the larger cash settlements of a securities class action and is believed to be in the top 15 settlements achieved after the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA") which has made it more difficult for plaintiffs to successfully prosecute a securities class action. Lead Plaintiffs and their counsel believe that the settlement is an outstanding result and merits the approval of the Court.

This case has been vigorously litigated for the last four and one-half years.[4] At every stage of the litigation, counsel for the Settling Defendants asserted aggressive defenses and expressed their belief that Lead Plaintiffs would not prevail on the claims asserted. By the time the settlement was reached, Lead Plaintiffs had reviewed and analyzed some nine million pages of documents produced by defendants and third parties, interviewed dozens of witnesses, deposed, defended or attended the depositions of some 60 witnesses, engaged in extensive motion practice, and successfully negotiated the

_____

[3]   Qwest has also agreed to pay $250 million cash to the Securities and Exchange Commission ("SEC"). Lead Counsel has proposed to the SEC that the monies recovered by the SEC be distributed to the Class in accordance with the proposed Plan of Allocation in this case. To date, the SEC has not reached a final determination as to whether it will agree with this proposal.

[4]   A detailed description of the history of the litigation and the factors bearing on the reasonableness of the settlement and Plan of Allocation, including the claims asserted, the proceedings during the course of the litigation , the investigation and discovery undertaken, the settlement negotiations and the substantial risks of continued litigation is set forth in the Declaration of Michael J. Dowd in Support of Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds, and Award of Attorneys' Fees and Reimbursement of Expenses (the "Dowd Declaration").

settlement.   The negotiations that led to the settlement were arduous, protracted and included a number of mediation sessions with former Judges Layn R. Phillips and Daniel Weinstein.  During these negotiations, Lead Counsel met with Qwest regarding its financial capability to fund a settlement or judgment after trial.  Lead Counsel also retained an expert who assisted them in analyzing Qwest's financial condition.

In reaching the determination to settle this action against the Settling Defendants, Lead Counsel have carefully considered the substantial risks and obstacles of achieving a better result after continued litigation.  As discussed herein and in the Dowd Declaration, Lead Plaintiffs faced numerous factual and legal issues, including disputed issues of falsity, scienter and damages that created the risk that Lead Plaintiffs would not be able to prove their claims and establish significant damages at trial.  For example, while Lead Counsel believe that they had developed substantial evidence to support Lead Plaintiffs' allegations and establish liability at trial, they were aware that the Settling Defendants believed that certain testimony and documents undercut those allegations and supported their defenses. As a result, Lead Plaintiffs faced the risk that the trier of fact would favor the Settling Defendants' arguments and interpretations of the evidence and absolve them of liability. Lead Plaintiffs also faced the risk that portions of the litigation (more than a third of the 80 depositions Lead Plaintiffs sought to take) would be stayed for years as a result of the United States Attorney's Office for the District of Colorado pending criminal cases and/or investigations.  Finally, even if Lead Plaintiffs had prevailed at trial as to both liability and damages, there was a substantial risk that it would prove to be a Pyrrhic victory.  Put simply, Qwest's financial condition and the potential financial impact upon the Company

that would accompany a large judgment at trial, including the real prospect of bankruptcy, were major risks facing the Class.

Lead Counsel, who are well respected and have extensive experience in prosecuting securities class actions, have concluded that the settlement is an outstanding result and clearly in the best interest of the Class.  This conclusion is based on, among other things, a complete analysis of the evidence, the legal and factual issues presented, the risk, expense and delay of proceeding to trial, counsel's past experience in litigating complex actions similar to the present action, and Qwest's financial condition.  Significantly, the Lead Plaintiffs who were appointed by the Court, and have been actively involved in the litigation and the settlement process, support Lead Counsel's conclusion and believe the settlement represents an outstanding recovery on behalf of the Class.

For all the reasons discussed herein and in the Dowd Declaration, it is respectively submitted that the settlement is eminently fair, reasonable and adequate to the Class and should be approved by the Court.  Moreover, the Plan of Allocation was developed by Lead Plaintiffs' damage expert and tracks the theory of damages asserted and is necessarily fair, reasonable and adequate.  See generally Declaration of Bjorn I. Steinholt, CFA ("Steinholt Declaration") submitted herewith.

## II.   THE STANDARDS FOR JUDICIAL APPROVAL OF CLASS ACTION SETTLEMENTS

An "overriding public interest" exists "in settling and quieting litigation," and this is "particularly true in class action suits."  *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976) (footnote omitted).  Courts have long held that the settlement of disputed claims is favored as a matter of public policy.  *Williams v. First Nat'l Bank*, 216 U.S. 582,

595 (1910); *Grady v. de Ville Motor Hotel, Inc.*, 415 F.2d 449, 451 (10th Cir. 1969);

*Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 284 (D. Colo. 1997); *Aks v. Southgate

Trust Co.*, No. 92-2193-JWL, 1992 U.S. Dist. LEXIS 20442, at *29 (D. Kan. Dec. 24, 1992).

This is especially true in the context of class action litigation. *See, e.g., Officers for Justice

v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982), *Cotton v. Hinton*, 559 F.2d 1326,

1331 (5th Cir. 1977); *Diaz v Romer*, 801 F. Supp. 405, 407 (D. Colo. 1992) (in approving

class action settlement, court explained that a "consensual resolution of a dispute is always

preferred"), *aff'd*, 9 F.3d 116 (10th Cir. 1993).

In deciding whether to approve a proposed settlement of a stockholders' class action

under Federal Rule of Civil Procedure 23(e), this Court must find that the proposed

settlement is "fair, reasonable and adequate." *Gottlieb v. Wiles*, 11 F.3d 1004, 1014 (10th

Cir. 1993). The United States Supreme Court has stressed that:

> [T]he judge should form an educated estimate of the complexity, expense,
> and likely duration of such litigation, the possible difficulties of collecting on
> any judgment which might be obtained, and all other factors relevant to a full
> and fair assessment of the wisdom of the proposed compromise. Basic to
> this process in every instance, of course, is the need to compare the terms of
> the compromise with the likely rewards of litigation.

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414,

424-25 (1968).

The district court must exercise its "sound discretion" in approving a settlement.

*Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984). But, as the Supreme

Court has instructed, courts should not adjudicate the merits of the action, nor substitute

their judgment for that of the parties who negotiate the settlement. *Carson v. Am. Brands,

Inc.*, 450 U.S. 79, 88 n.14 (1981). As a district court in this Circuit has stated:

> "[T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole is fair, reasonable and adequate to all concerned. Therefore, the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits."

*In re New Mexico Natural Gas Antitrust Litig.*, 607 F. Supp. 1491, 1497 (D. Colo. 1984)

(quoting *Officers for Justice*, 688 F.2d at 625).

In *Jones*, the Tenth Circuit established factors for courts to consider in assessing the fairness of a settlement:

> In exercising its discretion, the trial court must approve a settlement if it is fair, reasonable and adequate. In assessing whether the settlement is fair, reasonable and adequate the trial court should consider:
>
> (1) whether the proposed settlement was fairly and honestly negotiated;
>
> (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
>
> (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protected and expensive litigation; and
>
> (4) the judgment of the parties that the settlement is fair and reasonable.

741 F.2d at 324; *see also Gottlieb*, 11 F.3d at 1014. *Accord Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 546 (D. Colo. 1989); *In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610 (D. Colo. 1976); *Aks*, 1992 U.S. Dist. LEXIS 20442, at *29; *In re Petro-Lewis Sec. Litig.*, No. 84-C-326, 1984 U.S. Dist. LEXIS 24881 (D. Colo. Dec. 28, 1984). As discussed, the proposed settlement easily satisfies each of the factors articulated by the Tenth Circuit in *Jones*.

The *Jones* factors require the Court to decide whether the proposed settlement falls within the range of reasonable settlements, taking into account that settlements are

- 6 -

compromises between the parties reflecting subjective, unquantifiable judgments concerning the risks and possible outcomes of litigation. *See In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1387 (D. Ariz. 1989) ("[T]he essence of settlement is compromise. Compromise involves the moderation of lofty and idealized hopes and the relinquishment of unyielding and absolute positions."), *aff'd sub nom. Class Plaintiffs v. Seattle*, 955 F.2d 1268 (9th Cir. 1992).

## III.   THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

### A.   The Settlement Was Fairly and Honestly Negotiated

The first factor the Tenth Circuit considers critical to any assessment of the merits of a class action settlement—whether the proposed settlement was fairly and honesty negotiated —fully supports the conclusion that the settlement here merits this Court's approval. Here, highly experienced counsel on both sides, each with a comprehensive understanding of the strengths and weaknesses of each party's respective claims and defenses, negotiated this settlement. The settlement discussions took place over a number of years, dealt with a myriad of complicated issues and included numerous in-person and telephonic meetings as well as mediation efforts with former Judges Layn R. Phillips and Daniel Weinstein. At the time of settlement, Lead Counsel were able to effectively and critically evaluate the litigation and the propriety of the settlement, as counsel had reviewed and analyzed some nine million pages of documents, conducted dozens of detailed witness interviews, took or attended some 60 depositions and consulted with experts. Moreover, Lead Counsel had a firm understanding of the Settling Defendants' positions through the extensive settlement discussions, the arguments appearing in the numerous motions to

dismiss filed by defendants, oppositions to class certification and other briefs as well as the issues raised at deposition.

An important issue during settlement negotiations was the financial ability of Qwest to fund a settlement with the Class or satisfy a significant judgment after trial and appeals. Throughout settlement discussions, Qwest maintained that it had a limited ability to fund any settlement with the Class. To this end, Lead Counsel met with Qwest on a number of occasions to discuss the financial limitations faced by Qwest. Lead Plaintiffs also retained an expert who assisted Lead Counsel in analyzing Qwest's ability to fund a settlement or significant judgment after trial. As a result, Lead Plaintiffs and their counsel had to seriously consider that even if they overcame the many obstacles to succeeding at trial and a large judgment was entered against Qwest, the Company would likely have to file for bankruptcy resulting in the very real possibility of no recovery for the Class. *See Torrisi v. Tucson Elec. Power Co.*, 8 F. 3d 1370, 1376  (9th Cir. 1993) (a company's precarious financial condition "predominates" over all other factors in approving a class action settlement); *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("'The "prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures"'") (citations omitted).

As a result of the extensive settlement negotiations, there can be no legitimate question that the proposed settlement was fairly and honestly negotiated. Indeed, Lead Counsel who have extensive experience in securities class action litigation have made a considered judgment that the proposed settlement is not only fair and reasonable, but is an excellent result for the Class.

- 8 -

### B.     Serious Questions of Law and Fact Exist, Placing the Ultimate Outcome of the Litigation in Doubt

The second factor considered by the Tenth Circuit is whether there were "serious questions of law and fact . . . [that] plac[ed] the ultimate outcome of the litigation in doubt." *Jones*, 741 F.2d at 324.  In assessing the settlement, the Court should balance the benefits of the substantial certain recovery for the Class, against the risks of continued litigation.  A balance of these factors strongly supports the approval of the settlement.  Lead Plaintiffs would face difficult factual and legal hurdles with no guarantee of greater success if the litigation were to continue.  This case is no exception to the reality that securities class action litigation involves complex issues of fact and law.[5]  The future course of the litigation undoubtedly would have proven to be complex, uncertain and time-consuming.  Defendants vehemently deny any wrongdoing and have raised numerous factual and legal defenses to Lead Plaintiffs' claims.  The Settling Defendants have demonstrated a commitment to defend the case through and beyond trial, if necessary, and are represented by well-respected and highly capable counsel.

Lead Counsel firmly believe – after conducting an extensive investigation and substantial discovery – that Lead Plaintiffs had developed sufficient evidence to prove their claims at trial.  Notwithstanding this belief, Lead Counsel were aware that the Settling

---

[5]     While courts have long recognized that shareholder litigation is notably difficult, since the enactment of the PSLRA, "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA." *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000); *see also Bryant v. Avado Brands, Inc.*, 100 F. Supp. 2d 1368, 1377 (M.D. Ga. 2000), *rev'd and remanded on other grounds sub nom. Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001).

Defendants had differing interpretations of the evidence and had asserted strong defenses to their claims. As discussed in greater detail in the Dowd Declaration, counsel recognized there were numerous factual and legal issues, including disputed issues of falsity, scienter, materiality and damages that created the risk that Lead Plaintiffs would not be able to establish liability or damages at trial.[6] Moreover, counsel were well aware that many other class actions have been prosecuted in the belief they were meritorious, only to lose on motions for summary judgment, at trial or on appeal.[7]

The crux of Lead Plaintiffs' case is that defendants caused the price of Qwest's securities to be artificially inflated by making false or misleading statements about its business and engaging in a series of improper accounting manipulations in violation of GAAP in an effort to make Qwest appear to be more profitable and valuable. Lead Plaintiffs allege that defendants concealed these accounting manipulations from the investing public by issuing various false and misleading statements concerning Qwest's business and financial condition in Qwest's SEC filings, press releases, communications with the financial media, and in analyst reports about the Company. Lead Plaintiffs'

---

[6]     The risks of establishing damages is discussed in Section III.C pages 16-18.

[7]     Plaintiffs have won huge judgments at trial, only to lose on appeal. *See, e.g.*, *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (en banc) (action dismissed following 11 years of litigation and a $30 million judgment for plaintiffs following trial that was largely affirmed by the first appellate panel); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979); *Piper v. Chris-Craft Indus.*, 430 U.S. 1 (1977) (reversing Second Circuit's award of damages under Williams Act in amount of $25,793,365 after eight years of litigation).

principal claims against the Settling Defendants are under §10(b) of the Securities Exchange Act of 1934 and §11 of the Securities Act of 1933. To establish liability under §10(b), Lead Plaintiffs would bear the burden of proving, *inter alia*, that the Settling Defendants made an untrue statement of material fact or failed to state a material fact, in connection with the purchase or sale of a security, that the information impacted the market price of the securities, that plaintiffs reliance on defendants' actions caused damage and that the Settling Defendants acted with scienter. *Anixter v. Home-State Prod. Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996). While proof of fraud is not necessary for Lead Plaintiffs to prevail under their §11 claims, the Settling Defendants are entitled to a "market decline" defense. Further litigation to establish liability and damages posed a potential threat to any recovery.

The accounting manipulations at issue are complex and Lead Plaintiffs would have to prove that the Settling Defendants recklessly violated GAAP. Because GAAP is not "'a canonical set of rules that will ensure identical accounting treatment of identical transactions by all accountants'" the determination of many of the accounting issues would be subject to expert testimony. *See In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 396 F. Supp 2d 1178, 1186 (D. Colo. 2004) (citation omitted). Indeed, "GAAP generally tolerates a range of reasonable treatments, leaving the choice among reasonable treatments to management." *Id.* Each side's expert would give persuasive testimony supporting their respective positions. Assuming that Lead Plaintiffs survived the anticipated motions for summary judgment, presenting these complex issues to a jury posed a particular risk to Lead Plaintiffs' hopes for success at trial.

Even if Lead Plaintiffs proved that the alleged improper accounting manipulations were improper and violated GAAP, Lead Plaintiffs would have to prove that each Settling Defendant acted recklessly to succeed on their §10(b) claims, a difficult standard to meet.[8] Indeed, convincing a jury of the Settling Defendants' intent to make material misrepresentations and/or omissions, which they adamantly deny is subject to considerable uncertainty. This would be especially true with respect to some of the individual defendants, who would have argued that they did not participate in the fraudulent accounting, were not aware of the fraudulent conduct of the primary wrongdoers, and therefore did not posses the requisite scienter. Some of the defendants would also argue that they reasonably relied on the advice from various experts, including, Arthur Andersen LLP and various law firms, and that, at best, their misstatements and/or omissions were made accidentally, mistakenly or negligently, thus absolving them of liability. Defendant Arthur Andersen would argue that it received false and misleading information from its audit client, Qwest, and did everything a reasonable auditor could do to determine the veracity of Qwest's financial information before signing off on the audit reports. There is no question that the Settling Defendants would have raised every available argument and presented evidence in support of their contentions that there were no material misstatements or

---

[8]     A defendant acts recklessly when his or her conduct amounts to an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *City of Philadelphia v. Flemings Cos.,* 264 F.3d 1245, 1258 (10th Cir. 2001).

- 12 -

omissions, that they had a reasonable good faith belief in their actions at the time and that they did not act with scienter.

While Lead Plaintiffs believe that ultimately they would prevail on their claims, it is very possible that a jury may be swayed by testimony of the Settling Defendants' witnesses and find no liability. The risks of establishing liability posed by conflicting testimony and evidence would be exacerbated by the following risks inherent in all shareholder litigation - the unpredictability of a lengthy and complex jury trial; the risk that witnesses could suddenly become unavailable or jurors could react to the evidence in unforeseen ways; the risk that the jury would find that some or all of the misrepresentations and omissions were not material during part or all of the Class Period; and the risk that the jury would find that defendants reasonably believed in the appropriateness of their actions at the time and that, as to certain claims, plaintiffs failed to prove that the Settling Defendants acted with scienter. By contrast, the amount of settlement is large by any measure and eliminates all these risks.

In short, there is no guarantee of success at trial in complex class action cases. For example, some of the same plaintiff lawyers involved in this litigation tried a tobacco class action entitled *Iron Workers Local Union No. 17 Insurance Fund, et al. v. Phillip Morris Incorporated, et al.*, to verdict in March 1999. Despite what plaintiffs in that case believed was very strong evidence of culpable conduct, the jury found for defendants. Even if Lead Plaintiffs prevailed at trial, it is almost certain given the competing legal precedent and the differing views of the evidence that the Settling Defendants would appeal the verdict and award. The appeals process would have spanned several years, during which time

members of the Class would receive no distribution from the awarded damages. Moreover, an appeal of the verdict would carry the risk of reversal, in which case the Class would receive nothing after having prevailed on their claims at trial. *See Robbins v. Koger Props.,* 116 F.3d 1441 (11th Cir. 1997) (reversing plaintiff's jury verdict of $81 million for securities fraud).

### C.   The Value of an Immediate Recovery Outweighs the Mere Possibility of Future Relief

The third factor for evaluating the adequacy of a class action settlement, *i.e.,* whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, strongly supports approval of the settlement. *Gottlieb,* 11 F.3d at 1014; *Jones,* 741 F.2d at 324; *see also Alvarado Partners,* 723 F. Supp. at 546. This factor weighs the value of an immediate recovery "against the possibility of some greater relief at a later time, taking into consideration the additional risks and costs that go hand in hand with protracted litigation." *Gottlieb,* 11 F.3d at 1015. As many courts have noted, "'[t]he bird in the hand is to be preferred to the flock in the bush and a poor settlement to a good litigation.'" *Rubenstein v. Republic Nat'l Life Ins. Co.,* 74 F.R.D. 337, 347 (N.D. Tex. 1976) (citation omitted); *see also Alvarado Partners,* 723 F. Supp. at 547. This principle resonates here, where obtaining the substantial immediate benefit for the Class was of great importance because of the strong possibility of a number of factors, including Qwest's financial condition, how long the Court would stay discovery as a result of the United States Attorney's pending criminal investigation and the risks of continued litigation described herein and in the Dowd Declaration.

- 14 -

One of the overriding factors in reaching the settlement was Qwest's financial condition and the fact that any large judgment entered against Qwest would likely result in the Company filing for bankruptcy.  To this end, Lead Counsel met with Qwest on a number of occasions to discuss the various financial limitations faced by Qwest and also retained an expert who assisted in analyzing Qwest's financial condition.  As noted above, courts have held that a company's financial condition and plaintiffs' ability to collect a large judgment is a significant factor in the court's approval of a proposed settlement.  *See Torrisi*, 8 F.3d at 1376; *Chatelain*, 805 F. Supp. at 214.

Another major risk facing the Class was the potential delay of this litigation pending the outcome of the ongoing Qwest criminal investigation.  On August 3, 2005 the United States Attorney's Office for the District of Colorado moved to stay more than a third of the 80 depositions Lead Plaintiffs sought to take in this action while it considered whether to bring criminal charges.  While the motion has not yet been decided, under the local rules of the District of Colorado, discovery is stayed while the motion is on file.  Further, the United States Attorney's Office has indicated in court that its request to delay the depositions may be further extended.  Indeed, the delay could continue until Mr. Nacchio's criminal trial.  An extended stay would not benefit the Class and would adversely affect Lead Plaintiffs' ability to successfully prove their claims.

Moreover, as discussed above and in the Dowd Declaration, Lead Plaintiffs faced significant risks in proving liability.  Even if Lead Plaintiffs were able to overcome the risks in proving liability, they would still face the risks of proving loss causation and damages.  The determination of damages is a complicated and uncertain process, involving the

- 15 -

analysis of many subjective factors.  Damages in a §10(b) action are measured by "the difference between the purchase price and the 'true value' of the security [i.e., value absent the fraud] at the time of purchase."  *Semerenko v. Cendent Corp.*, 223 F.3d 165, 184 (3d Cir. 2000).  Plaintiffs must also show that the alleged false statements caused the damages.  Settling Defendants would assert that the Class's losses were caused by factors other than the alleged fraud, such as the decline in the price of all stocks in the telecommunications industry during the latter part of the Class Period.[9]

Because of the complex nature of damages and loss causation in a §10(b) action, expert testimony is almost always necessary to establish the amount – and indeed the existence – of actual damages.  Lead Plaintiffs would have likely faced a motion *in limine* by the Settling Defendants to preclude Lead Plaintiffs' damage expert's testimony under the *Daubert* test.  Lead Plaintiffs would have been forced to counter defendants' claims that plaintiffs' expert's valuation model should not be admissible in evidence.  *See, e.g.*, *Kaufman v. Motorola, Inc.*, No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627 (N.D. Ill. Sept. 19, 2000) (granting defendants' motion in limine to strike testimony of plaintiffs' expert) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Even if Lead Plaintiffs' survived the *Daubert* motion, at trial the loss causation and damage assessments of Lead Plaintiffs' and defendants' experts were sure to vary substantially, and in the end, this

---

[9]     Section 11 damages are also subject to a "market decline" defense, thus defendants' argument that the decline in Qwest's securities was the result of market factors, such as the decline in all stocks in the telecom industry, would be equally applicable to Lead Plaintiffs' §11 claims.

crucial element at trial would be reduced to a "battle of experts." A jury might be swayed by

defense experts seeking to establish that damages were caused by factors other than

defendants' wrongdoing, or, alternatively, trying to minimize the amount of losses suffered

by the Class. *See, e.g., In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129

(S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997). Expert testimony on damages could rest on

many subjective assumptions, any one of which could be rejected by a jury as speculative

or unreliable. As one judge has observed:

> Undoubtedly, expert testimony would be needed to fix not only the amount, but the existence, of actual damages. In this "battle of experts," it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions.

*In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985), *aff'd*, 798

F.2d 35 (2d Cir. 1986) (citations omitted); *see also Wilkerson*, 171 F.R.D. at 286 ("It is clear

that a fact finder, when confronted with diverging opinions from experts of this caliber, could

adopt the approaches used by one expert, or the other; could reject both; or could arrive at

a middle ground between the two."). Conceivably, a jury could find that there were no

damages or that the damages were only a small fraction of the amount that Lead Plaintiffs

contended.

While Lead Plaintiffs believe that the evidence at trial would establish that the

aggregate damages exceed the amount of settlement, that assumes that most of the

significant liability and damages issues would have been resolved in the Class's favor.

Given the financial condition of Qwest, the prospect that a portion of this litigation could be

stayed for years, as well as the uncertain outcome of continued litigation against the

Settling Defendants, the settlement provides the Class with a substantial immediate recovery that is more than it might otherwise obtain even if Lead Plaintiffs had succeeded at trial.

### D.    The Recommendation of Experienced Counsel and Court Appointed Lead Plaintiffs Strongly Favor Approval of the Settlement

The fourth factor considered by the Tenth Circuit, the judgment of the parties that the settlement is fair and reasonable also strongly supports approval of the settlement[10]. Here, experienced and well-respected Lead Counsel who are actively involved in the prosecution of securities and other complex class actions and have negotiated numerous other substantial class action settlements throughout the country have concluded that the settlement is an excellent result for the Class.  This conclusion is based, among other factors, on a careful review and analysis of all the evidence, the likelihood of prevailing on the claims asserted, the likely appeals and subsequent proceedings necessary if Lead Plaintiffs prevailed at trial as well as the financial condition of Qwest. "[T]he court is entitled to rely heavily on the opinion of competent counsel." *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 325 (7th Cir. 1980).  *See also King Res.*, 420 F. Supp. at 625 ("Courts have consistently refused to substitute their business judgment for that of counsel, absent

---

[10]    Over 1.3 million notices have been mailed to potential Class Members. The deadline for objections is March 23, 2006 and to date, counsel has not received any objections to the settlement, Plan of Allocation or request for an award of attorneys' fees. The Court received one letter from a Class Member who was confused over the instructions for the Proof of Claim and Release form.  His letter is addressed in Section IV, footnote 10. If any objections are received, counsel will address those objections in a subsequent filing with the Court.

evidence of fraud or overreaching."); *Lopez v. City of Santa Fe*, 206 F.R.D. 285, 292 (D.N.M. 2002) (same).   Importantly, the Court appointed Lead Plaintiffs, New England Healthcare Employees Pension Fund, Clifford Mosher, Tejinder Singh, and Satpal Singh who were actively involved in the prosecution of the litigation and involved in the settlement process also support the settlement and believe that it is in the best interest of the Class. *See*, the declarations of Robert Tessier, on behalf of New England Healthcare Employees Pension Fund; Clifford Mosher; Tejinder Singh; and Sat Pal Singh, concurrently filed.

## IV.   THE NOTICE PROGRAM MEETS THE REQUIREMENTS OF THE PSLRA, DUE PROCESS AND RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

An extensive notice program, by mail and publication has been completed by Lead Plaintiffs' counsel.  Counsel selected and the Court appointed a qualified and experienced claims administrator, Gilardi & Co. LLC ("Gilardi"), to administer the notice process.  Gilardi mailed the Court approved Notice of Pendency and Partial Settlement of Class Action ("Notice") to over 1.3 million potential Class Members.  In addition, the summary notice was published in the national edition of *Investor's Business Daily*.  The Stipulation and all of its exhibits (including the Notice and Proof of Claim form) were also posted on Gilardi's website.

The Notice informed Class Members of the terms of the partial settlement; the nature and history of the litigation; the Plan of Allocation; the attorney fee and expense request; and the date, time and place of the hearing on final approval.  In addition, the Notice described the Class Members' rights as well as the procedure for them to request exclusion from the Class or object to any aspect of the settlement, Plan of Allocation or counsel's

request for an award of attorneys' fees and expenses as well as the procedure for filing a

Proof of Claim and Release form.  The Notice also explained how to obtain additional

information regarding the settlement or litigation, whom to contact if they had questions,

including a toll-free number to contact Lead Counsel.[11]  The published summary notice

clearly and concisely provides information concerning the settlement and the means to

obtain a copy of the Notice.  The extensive notice program complies with the requirements

of Rule 23, due process principles and the pertinent provisions of the PSLRA (see 15

U.S.C. §77z-1(a)(7) and 15 U.S.C. §78u-4(a)(7)) and is similar to procedures approved in

other cases.[12]

---

[11]   On February 9, 2006, the Court received a letter from a Class Member who did not understand the instructions for the Proof of Claim form.  Lead Counsel contacted this Class Member and quickly cleared up his confusion. The Notice and Proof of Claim form sent to Class Members in this case are similar to notices and claim forms that have been approved by courts and sent to class members in countless other securities class action settlements. Importantly, the Notice mailed to Class Members in this case provided a toll-free number and address to contact Lead Counsel with any questions regarding the settlement.

[12]   *See Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 429 (5th Cir. 1977). *See also In re Equity Funding Corp. of Am. Sec. Litig.*, 603 F.2d 1353, 1361 (9th Cir. 1979) (found notice sufficient where it informed class members of the subject matter of the litigation, the terms of the proposed settlement and the proposed plan of allocation of the settlement proceeds); *Reynolds v. NFL*, 584 F.2d 280, 285 (8th Cir. 1978) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) and *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975)). *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d. 491, 510-11 (W.D. Pa. 2003) ("'In order to satisfy due process, notice to class members must be "reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."'") (citations omitted).

## V.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

Lead Plaintiffs also seek approval of the Plan of Allocation of the settlement proceeds. The Plan of Allocation was set forth in the Notice mailed to Class Members. As discussed more fully in the accompanying Steinholt Declaration, the Plan of Allocation reasonably distributes the settlement proceeds to those Class Members who suffered economic losses as a result of the alleged fraud, as opposed to losses caused by market, industry or other non-fraud related Company specific factors. Assessment of a plan of allocation in a class action under Federal Rule of Civil Procedure 23 is governed by the same standards of review applicable to the settlement as a whole – the plan must be fair and reasonable. See *Ikon*, 194 F.R.D. at 184; *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992).    District courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members . . . equitably." *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978); *accord In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982). An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class counsel. *White v. NFL*, 822 F. Supp. 1389, 1420 (D. Minn. 1993); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992).

The objective of a plan of allocation is to provide an equitable basis upon which to distribute the settlement fund among eligible class members. Here, the Plan of Allocation was developed by Lead Counsel's damage expert and it reflects an assessment of the damages that could have been recovered under the theories asserted in the case. The

- 21 -

Plan of Allocation will result in a fair and equitable distribution of the proceeds among Class

Members who submit valid claims and it should be approved.

## VI.    CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court approve

the settlement and the Plan of Allocation as fair, reasonable and in the best interests of the

Class.

DATED:  February 27, 2006                          Respectfully submitted,

                                                   LERACH COUGHLIN STOIA GELLER
                                                     RUDMAN & ROBBINS LLP
                                                   MICHAEL J. DOWD
                                                   SPENCER A. BURKHOLZ
                                                   THOMAS E. EGLER
                                                   JEFFREY D. LIGHT
                                                   SCOTT H. SAHAM
                                                   X. JAY ALVAREZ
                                                   TRIG R. SMITH
                                                   TED MINAHAN
                                                   ANDREA N. SALOW


                                                        s/ MICHAEL J. DOWD
                                                   _____
                                                        MICHAEL J. DOWD

                                                   655 West Broadway, Suite 1900
                                                   San Diego, CA  92101
                                                   Telephone:  619/231-1058

                                                   LERACH COUGHLIN STOIA GELLER
                                                     RUDMAN & ROBBINS LLP
                                                   MICHELLE M. McCARRON
                                                   9601 Wilshire Blvd., Suite 510
                                                   Los Angeles, CA  90210
                                                   Telephone:  310/859-3100
                                                   310/278-2148 (fax)

                                                   **Lead Counsel for Plaintiffs**

- 22 -

DYER & SHUMAN, LLP
ROBERT J. DYER III
KIP B. SHUMAN
JEFFREY A. BERENS
801 East 17th Avenue
Denver, CO  80218-1417
Telephone:  303/861-3003

**Liaison Counsel**

S:\Settlement\Qwest.set\BRF SETTLEMENT 00028304.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2006, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify

the foregoing document or paper has been mailed via the United States Postal Service to

the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ KIP B. SHUMAN
KIP B. SHUMAN

DYER & SHUMAN, LLP
801 East 17th Avenue
Denver, CO  80218-1417
Telephone:  303/861-3003
303/830-6920 (fax)
E-mail:  kshuman@dyershuman.com

# Mailing Information for a Case 1:01-cv-01451-REB-CBS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X. Jay Alvarez**
  JayA@lerachlaw.com

- **Timothy Granger Atkeson**
  Tim_Atkeson@aporter.com
  jeffrey_lewis@aporter.com;shelby_hunt@aporter.com;john_freedman@aporter.com;scott_schreiber@aporter.com

- **Michael James Barry**
  mbarry@gelaw.com mhartman@gelaw.com;gfpulver@handf.com

- **Jeffrey Allen Berens**
  jberens@dyershuman.com

- **Terry W. Bird**
  twb@birdmarella.com dh@birdmarella.com

- **David Robert Boyd**
  dboyd@bsfllp.com jmessner@bsfllp.com

- **Jessica Brody**
  jessica_brody@aporter.com jeffrey_lewis@aporter.com;susan_cole@aporter.com;roleen_johnson@aporter.com

- **Spencer A. Burkholz**
  SpenceB@lerachlaw.com e_file_sd@lerachlaw.com

- **John K. Carroll**
  john.carroll@cliffordchance.com

- **Kwame A. Clement**
  Kwame_Clement@aporter.com kclement8688@comcast.net

- **David Lawrence Cook**
  david.cook@cliffordchance.com

- **Jennifer Lynn Coon**
  jlc@birdmarella.com lak@birdmarella.com

- **Michael J. Dowd**
  MikeD@lerachlaw.com CHaney@lerachlaw.com

- **Mark T. Drooks**
  mtd@birdmarella.com shg@birdmarella.com

- **Stephanie Erin Dunn**
  sdunn@perkinscoie.com sdunn-efile@perkinscoie.com

- **Thomas E. Egler**
  TomE@lerachlaw.com HeatherH@lerachlaw.com

- **Kevin D. Evans**
  kdevans@s-elaw.com tbaksay@s-elaw.com

- **Clyde A. Faatz, Jr**
  cafaatz@handf.com gfpulver@handf.com;kjscholet@handf.com

- **Christopher James W. Forrest**
  cjforrest@handf.com gfpulver@handf.com;kjscholet@handf.com

- **Joshua David Franklin**
  jdf@denverda.org

- **John A. Freedman**
  john_freedman@aporter.com

- **Walter W. Garnsey, Jr**
  wgarnsey@khgk.com smiller@khgk.com

- **Terence C. Gill**
  tgill@sah.com efiling@sah.com;dsikes@sah.com

- **Marcy Marie Heronimus**
  mheronim@sah.com efiling@sah.com;peckman@sah.com

- **Michael James Hofmann**
  michael.hofmann@hro.com jackie.delay@hro.com

- **Kevin Brent Huff**
  khuff@khhte.com jbartlow@khhte.com

- **Shelby Hunt**
  shelby_hunt@aporter.com

- **Roberta A. Kaplan**
  rkaplan@paulweiss.com

- **Gary Michael Kramer**
  gkramer@bw-legal.com amcarrillo@bw-legal.com

- **William J. Leone**
  William.Leone@usdoj.gov USACO.ECFCivil@usdoj.gov;Dorothy.Burwell@usdoj.gov

- **Alfred P. Levitt**
  alevitt@bsfllp.com jmessner@bsfllp.com

- **Vincent J. Marella**
  lak@birdmarella.com

- **David Meister**
  david.meister@cliffordchance.com

- **James D. Miller**
  james.miller@cliffordchance.com
  damien.morris@cliffordchance.com;salvatore.dziekan@cliffordchance.com;david.cook@cliffordchance.com

- **Robert Nolen Miller**
  rmiller@perkinscoie.com rmiller-efile@perkinscoie.com

- **Barbara C. Moses**
  bmoses@magislaw.com jlaing@magislaw.com

- **Edward S. Nathan**
  enathan@sgklaw.com lspecter@sgklaw.com

- **James E. Nesland**
  neslandje@cooley.com foutsdl@cooley.com;inghramjl@cooley.com

- **Sharan Nirmul**
  snirmul@gelaw.com dlohinetz@gelaw.com

- **Robin Lee Nolan**
  rnolan@handf.com gfpulver@handf.com;kjscholet@handf.com

- **Elissa J. Preheim**
  Elissa.Preheim@aporter.com

- **Kimberly Wolf Price**
  kimberly.wolf@cliffordchance.com

- **Thomas Vincent Reichert**
  tvr@birdmarella.com shg@birdmarella.com

- **John M. Richilano**
  jmr@rglawoffice.net gmiller@rglawoffice.net

- **Eric Tolentino Rillorta**
  Eric_Rillorta@aporter.com

- **Kenneth F. Rossman, IV**
  krossman@bsfllp.com

- **Ashley Elizabeth Rupp**
  arupp@magislaw.com

- **Scott Saham**
  scotts@lerachlaw.com

- **Scott B. Schreiber**
  scott_schreiber@aporter.com

- **Paul Howard Schwartz**
  schwartzph@cooley.com vrush@cooley.com;colitigation@cooley.com;inghramjl@cooley.com

- **David L. Schwarz**

dschwarz@khhte.com

- **Joel M. Silverstein**
  jsilverstein@sgklaw.com

- **Jeffrey Allen Smith**
  jsmith1@cooley.com foutsdl@cooley.com;inghramjl@cooley.com

- **Jeffrey Speiser**
  jspeiser@sgklaw.com

- **Herbert J. Stern**
  dpenna@sgklaw.com

- **Jesus Manuel Vazquez, Jr**
  jvazquez@rothgerber.com tclanahan@rothgerber.com

- **James Gregory Waller**
  gregwaller@andrewskurth.com amyprasad@akllp.com;kpiccolo@akllp.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Fredric C. Clodius
11015 Millbank Road
King George, VA 22485

Geoffrey C. Jarvis
Grant & Eisenhofer, P.A.
1201 North Market Street
#2100
Wilmington, DE 19801

William R. Melgaard

C. Mylett
P.O. Box 1031
Coleman, FL 33521

Cleo J. Rauchway
Rothgerber, Johnson & Lyons, LLP
United States District Court Box 11
1200 - 17th Street
#3000
Denver, CO 80202

William M. Rogers
606 S. Military Trail
Deerfield Beach, FL 33442
```

Manual Notice List

Holly Stein Sollod
Jennifer H. Weddle
Holland & Hart
555 Seventeenth Street, Suite 3200
Denver, CO 80202
　　303/295-8000
　　303/295-8261(Fax)

Neil Peck
James D. Kilroy
Snell & Wilmer, LLP
One Tabor Center, SUite 1900
1200 Seventeenth Street
Denver, CO 80202
　　303/634-2000
　　303/634-2020(Fax)

Charles A. Stillman
Diana Nehro
Stillman & Friedman, P.C.
425 Park Avenue
New York, NY 10022
　　212/223-0200
　　212/223-1942(Fax)

Michelle M. McCarron
Lerach Coughlin Stoia Geller Rudman &
　Robbins LLP
9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
　　310/859-3100
　　310/278-2148(Fax)