**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 01-cv-1451-REB-PAC

(Consolidated with Civil Action Nos. 01-cv-1472-REB-CBS, 01-cv-1527-REB-CBS, 01-cv-1616-REB-CBS, 01-cv-1799-REB-CBS, 01-cv-1930-REB-CBS, 01-cv-2083-REB-CBS, 02-cv-0333-REB-CBS, 02-cv-0374-REB-CBS, 02-cv-0507-REB-CBS, 02-cv-0658-REB-CBS, 02-cv-755-REB-CBS, 02-cv-798-REB-CBS, AND 04-cv-0238-REB-CBS)

In re:  QWEST COMMUNICATIONS INTERNATIONAL INC. SECURITIES LITIGATION

---

**BRIEF OF DEFENDANTS NACCHIO AND WOODRUFF IN OPPOSITION TO FINAL APPROVAL OF PARTIAL CLASS ACTION SETTLEMENT**

---

**<u>Preliminary Statement</u>**

Defendants Joseph Nacchio and Robert Woodruff, the only two defendants excluded from the proposed partial class action settlement (the "Excluded Defendants"), submit this brief in opposition to Lead Plaintiffs February 27, 2006, Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds. (Doc. 928).  The Excluded Defendants oppose the proposed partial settlement because it would bar forever – without their consent or receipt of adequate compensation – their contractual and statutory claims for indemnification from Qwest and for contribution from the Settling Defendants.  Rather than fully protect those claims or their value to the Excluded Defendants, as required by federal and state statutes and settled caselaw, the proposed partial settlement confiscates them and misappropriates their value to the benefit of the Settling Parties.

The proposed partial settlement should also be rejected because Lead Plaintiffs irresponsibly failed to explore with the Excluded Defendants the potential for a complete settlement of this action.  Plaintiffs' papers in support of final approval of their proposed settlement are *devoid* of any explanation as to how excluding these defendants alone

from the settlement, and not even attempting to negotiate with them toward a global settlement, serves the interests of the putative Class.  It plainly does not.  In fact, it will necessitate a trial of claims against the Excluded Defendants which, as compared with the claims that Lead Plaintiffs have opted to settle, would offer far less potential reward while posing a far greater risk of non-recovery.  Further, failing even to attempt to negotiate with the Excluded Defendants toward a settlement of those claims flouted the "bird in hand" logic and the "overriding public interest in settling and quieting litigation" upon which Lead Plaintiffs urge the Court to approve their proposed partial settlement. (Doc. 928, pp. 4, 14).  As we will show, the Settling Parties opted instead for a settlement that smacks of unlawful, collusive self-dealing between Qwest and Lead Plaintiffs and their counsel, at the expense of the Excluded Defendants, the putative Class, and the just, speedy, and inexpensive resolution of this action.

Accordingly, the proposed partial settlement should be rejected, without prejudice to resubmission for approval in a revised form that cures its multiple defects.

## **Factual Background**

Qwest's bylaws, Delaware law, and separate employment, severance, and other agreements, require Qwest to indemnify Nacchio and Woodruff for, among other things, any reasonable amounts each may pay in settlement of the claims against him in this and other lawsuits.[1]

---

[1] *See* Ex. A (Declaration of David L. Cook) ¶¶ 2-5 & Exs. A1-A4 (Amended and Restated Bylaws of Qwest from 2-17-99 through present – Art. VI of each governs indemnification); *id.* ¶¶ 6-10 & Exs. A5-A7 (Nacchio and Woodruff Releases specifically reserving all indemnification rights against Qwest, and related Insurance Agreement); Ex. B (Resignation and Consulting Agreement by and between Nacchio and Qwest, dated as of June 16, 2002) ¶ 2 (incorporating by reference and continuing in effect according to its terms Paragraph 3(j) of the Employment Agreement between Qwest and Nacchio, dated October 24, 2001 (the "Nacchio Employment Agreement") Ex. C (Nacchio Employment Agreement) ¶ 3(j) (footnote cont.)

The proposed partial settlement would resolve plaintiffs' claims against Qwest, which will pay $400 million, and against twelve present or former officers and directors of Qwest who, though they allegedly received multiple tens of millions of dollars from the alleged fraud, are fully covered by Qwest's settlement payment, and will pay nothing personally. In contrast, the proposed settlement would permanently bar Nacchio's and Woodruff's statutory and contractual rights, as former officers and directors of Qwest, to indemnification from Qwest, most immediately, for amounts *they* might pay to settle the claims in this case or in other factually "related" present or future cases.[2] The proposed settlement would also bar these defendants' recovery of indemnification from Qwest for amounts paid in settlement by (1) mandating that any future settlement of the claims against them in this action be conditioned on waiver of their indemnification rights,[3] and

---

(providing Nacchio with indemnification "[t]o the fullest extent permitted by the indemnification provisions of the articles of incorporation and bylaws of the Company in effect as of the date of this Agreement and the indemnification provisions of the corporation statute of the jurisdiction of the Company's incorporation"); Del. Code Ann., Tit. 8, § 145 (authorizing indemnification of corporate officers and directors for, among other things, "amounts paid in settlement").

[2] Under the "Stipulation of Partial Settlement" (Doc. 886 hereafter the "Stipulation"), among the lead plaintiffs, Qwest and certain other defendants Nacchio and Woodruff are "Non-Settling Parties" and are not "Released Persons" (Stipulation §§1.27, 1.30), while Qwest is a "Settling Party" and a "Released Person" (Stipulation §§ 1.20, 1.27). The Stipulation requires, and the proposed Partial Final Judgment and Order of Partial Dismissal with Prejudice (Doc. 886, Ex. B hereafter the "Proposed Judgment") imposes, a "Complete Bar Order," which provides in pertinent part as follows:

> The Non-Settling Defendants ... are… permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting any claim, if any, however styled, whether for indemnification, contribution, or otherwise and whether arising under state, federal, or common law (sic), against the Released Persons based upon, arising out of, or relating to the Released Claims ….

Stipulation § 11.2 (emphasis added); Proposed Judgment § 12 (emphasis added).

[3] Stipulation § 11.4 and Proposed Judgment § 14 each provide, in pertinent part:

> The Class will not settle any claim or judgment against a Non-Settling Defendant without obtaining from the Non-Settling Defendant the release of any and all claims the Non-Settling Defendant may have against any of the Released Persons based upon, arising out of, relating to or in connection with the Released Claims or the subject matter thereof....

(2) requiring plaintiffs to reduce the amount of any future settlement with the Excluded Defendants by whatever portion thereof the Excluded Defendants may recover from Qwest in an action for indemnification, thereby eliminating any incentive for plaintiffs to settle with the Excluded Defendants in the first place.[4]

In addition, the proposed "PSLRA Bar Order" neither accords the Excluded Defendants the contribution credit mandated by 15 U.S.C. § 78u-4(f)(7)(B), nor limits the contribution claims barred to those that are both "arising out of this action" and against the Settling Defendants, as required by 15 U.S.C. §§ 78u-4(f)(7)(A) & 78u-4(f)(10(C)(i)). *See* Doc. 886, Stipulation § 11.1; Doc. 88, Ex. B, Proposed Judgment § 11.

### Argument

Where, as here, "the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval." *In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1026 (2d Cir.1992). "'There is consensus that a nonsettling defendant has standing to object to a partial settlement which purports to strip it of a legal claim or cause of action, an action for indemnity or contribution for example,' or to invalidate its

---

[4] Stipulation § 11.3 and Proposed Judgment § 13 each provides, in pertinent part:

[T]he Lead Plaintiffs, on behalf of themselves and the Class, further agree that they will reduce or credit any settlement or judgment (up to the amount of such settlement or judgment) they may obtain against a Non-Settling Defendant by an amount equal to the amount of any settlement or final, non-appealable judgment that a Non-Settling Defendant may obtain against any of the Released Persons based upon, arising out of, relating to, or in connection with the Released Claims or the subject matter thereof....

contract rights." *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995) (*citing Waller v. Fin. Corp. of Amer.,* 828 F.2d 579, 583 (9th Cir. 1987) (citations omitted).

In the proposed partial settlement, Qwest, Lead Plaintiffs, and Lead Counsel have agreed to enrich themselves by unilaterally extinguishing Nacchio's and Woodruffs' statutory and contractual rights, and appropriating the value of those rights to the Settling Parties, without any compensation whatsoever to Nacchio and Woodruff. Under their proposed settlement, Qwest gets judicial bars against claims by the Excluded Defendants that it meet its corporate indemnification obligations to its directors and officers. The twelve individual Settling Defendants – including Qwest's controlling shareholder and co-chairman throughout the class period, who plaintiffs allege to be a billionaire and by far the largest individual beneficiary of the alleged financial fraud (Doc. 315, ¶¶ 38(b), 59) – get released from all liability without paying a penny. The plaintiffs get what Qwest claims is its available cash, and their counsel get $96 million in attorney's fees, as well as the prospect of continued litigation and yet a further attorney's fee award. In a case in which discovery is far from complete, and in which there has been no evidence and no established fact, the result Lead Plaintiffs propose is not just unfair, it is unlawful. Accordingly, the Court should reject the proposed partial settlement without prejudice to the submission of an alternative settlement that cures the multiple deficiencies of this one.

**I.  THE PROPOSED PARTIAL SETTLEMENT SHOULD BE REJECTED BECAUSE IT WOULD IMPERMISSIBLY BAR THE EXCLUDED DEFENDANTS' UNADJUDICATED CLAIMS AGAINST QWEST FOR CONTRIBUTION AND FOR CORPORATE INDEMNIFICATION AGAINST FUTURE SETTLEMENT PAYMENTS**

**A.  A Court Approving A Partial Settlement May Not Bar Colorable Unadjudicated Claims Of Nonsettling Parties Without Protecting The Value Of The Claims**

A district court has no power to foreclose colorable potential claims that it does not adjudicate.  Even if the claimant is before the Court, due process prohibits the Court from simply nullifying colorable unadjudicated claims without fully protecting their value.  Nor does the fact that barring one party's claims purportedly helps other parties to settle give the court power to impose the bar.

A cause of action is "property" protected by the Due Process Clauses.  *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428-29 (1982); *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971).  Unless the Court fully protects its value by other arrangements, it may not take away a claim that the claimant has had no opportunity to litigate.[5]

More pointedly, a court may not nullify a party's claims by imposing settlement terms to which the party has not agreed.  The Supreme Court has repeatedly so stated.  *See, e.g., Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986) ("Of course, parties who choose to resolve litigation through settlement may not

---

[5] *See Lujan v. G&G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001); *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950) (due process requires "opportunity for hearing appropriate to the nature of the case"); *Hansberry v. Lee*, 311 U.S. 32, 42 (1940) ("failure of due process... where it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are to be bound by it"); *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 480-81 (1982) (collateral estoppel improper "when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate the claim or issue"); *Blonder-Tongue Labs., Inc. v. Univ. of Ill Found.*, 402 U.S. 313, 329 (1971) (same).

dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement."); *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986) ("[T]he power to approve or reject a settlement... does not authorize the court to require the parties to accept a settlement to which they have not agreed.").

The Tenth Circuit has broadly confirmed this principle in the context of a securities class action, both as to contribution claims and as to non-contribution state law claims. *TBG, Inc. v. Bendis*, 36 F.3d 916, 929 (10th Cir. 1994) ("We…VACATE the district court's order approving the... settlement… insofar as it impermissibly bars federal statutory contribution claims… independent state law claims, and [a] potential malpractice claim without providing adequate compensation."). The Court specifically concluded that "the interest in settlement does not justify depriving third parties of their statutory rights." *TBG*, 36 F.3d at 925 (*citing United States Fidelity & Guar. v. Patriot's Point Dev. Auth.*, 772 F.Supp. 1565, 1575 (D.S.C. 1991) ("To the extent there is tension between the goal of promoting settlements and fundamental fairness to litigants, the latter must prevail."); *In re Sunrise Sec. Litig.*, 698 F.Supp. 1256, 1261 (E.D.Pa.1988); *United States v. Reliable Transfer Co.*, 421 U.S. 397, 408 (1975) ("Congestion in the courts cannot justify a legal rule that produces unjust results in litigation simply to encourage speedy out-of-court accommodations.")).

In balancing the due process interests of nonsettling parties in the preservation of their unadjudicated potential claims with the reality that partial settlements are only possible if settling defendants can be protected against later enlargement of their own liability on the plaintiff's claims, the law clearly establishes two fundamental principles: (a) a court may not bar a nonsettler's colorable unadjudicated claims without imposing

arrangements that protect their value; and (b) a court may bar only claims that would effectively enlarge the settling defendant's liability on the plaintiffs claims, <u>not</u> independent rights that a nonsettler may have against a settler or third parties.  Both principles are reflected in the statutes and caselaw here at issue, to wit: the Private Securities Litigation Reform Act ("PSLRA"), the Delaware Joint Tortfeasor Statute, and the pertinent caselaw of this Circuit.

<u>*The PSLRA.*</u>   The PSLRA provides that a "covered person who settles any private [securities] action... shall be discharged from all claims for contribution brought by other persons. Upon entry of the settlement by the court, the court shall enter a bar order constituting the final discharge of all obligations to the plaintiff of the settling covered persons arising out of the action. The order shall bar future claims for contribution...." 15 U.S.C. § 78u-4(f)(7)(A).  At the same time, the PSLRA fully protects the nonsettling defendants by providing that any later verdict against them "shall be reduced by the greater of (i) an amount that corresponds to the percentage of responsibility of [the settling] covered person[s]; or (ii) the amount paid to the plaintiff by [the settling] covered person[s]." *Id.* § 78u-4(f)(7)(B) (emphasis added).  *First*, Congress granted a settling corporate defendant protection only against enlargement (by way of a contribution claim) of its *own* liability to the plaintiff; Congress did <u>not</u> relieve corporate settlers of their distinct corporate promises to indemnify their directors and officers with respect to claims against them, and the legislative history clearly reflects that Congress

intended this distinction.[6]  *Second*, Congress insured that a nonsettling defendant is left at least as well off as if his contribution claim were not barred: the value of his right to contribution is fully protected.  *See, e.g., Eichenholtz v. Brennan*, 52 F.3d 478, 487 (3d Cir. 1995), *citing McDermott, Inc. v. AmClyde*, 511 U.S. 202, 210-11 (1994).

<u>The Delaware Joint Tortfeasor Statute</u>.  Delaware law, which governs the Excluded Defendants' potential corporate indemnification claims against Qwest, a Delaware corporation, also reflects these dual principles.  The Delaware joint tortfeasor statute provides in pertinent part as follows:

> A release by the injured person of one joint tort-feasor does not relieve the one joint tort-feasor from liability to make contribution to another joint tort-feasor unless the release... provides for a reduction, to the extent of the pro-rata share of the released tort-feasor, of the injured person's damages recoverable against all other tort-feasors.

Del. Code Ann., Tit. 10, § 6304(b).  Like the PSLRA, this statute authorizes only a release of "contribution" liability of the settling defendant. It does not authorize barring a settler's distinct corporate obligation to indemnify its nonsettling directors and officers. And it *fully* protects the nonsettling defendants by requiring a reduction, from any

---

[6] The legislation presented in both the House and the Senate originally provided that partial settlements would be accompanied by bar orders covering both contribution and indemnity claims.  *See* H.R. 1058 March 1, 1995 – Version 1, § 3(f) (3/1/95) & S. 240 – Version 1 § 203(f) (1/22/95) (each providing in pertinent part that "the order shall bar all future claims for contribution <u>or indemnity</u> arising out of the action.") (emphasis added).  In order to clarify that settlement bar orders would <u>not</u> bar corporate indemnification claims, Congressman Fields, the Bill's House sponsor, offered an amendment to Version 1 of the House Bill that omitted from the above-quoted language the words "or indemnity."  <u>In offering this amendment, he explained that the amendment would "prevent settlement discharge bar orders from prohibiting a defendant from using an indemnification agreement.</u>" Cong. Rec., Mar. 7, 1995, at H2779 (emphasis added). The Amendment passed unanimously (*id.*), and the amended language – "[t]he order shall bar all future claims for contribution arising out of the action" (H.R. 1058 March 10, 1995 – Version 2, Sec. 3(f)) – remains unchanged in the PSLRA as enacted.  *See* 15 U.S.C. § 78u-4(f)(7)(A) ("The order shall bar all future claims for contribution arising out of the action"); *see also In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 201 (S.D.N.Y. 2005) ("The PSLRA's settlement discharge provision both mandates a mutual bar order and limits the scope of that bar order to contribution claims.  This Court has no authority to deviate from the express wording of the statute.").

damages awarded against nonsettlers, of the settler's share of the liability.  *See Farrall v. AC & S. Co.*, 586 A.2d 662, 668 (Del. Super. Ct. 1990) (the Delaware courts construe § 6304(b) to require an offset for the "greater" of the actual payments by the settling defendants or their "share... as determined by the verdict" of the liability).

        *Tenth Circuit Caselaw*.  Finally, both principles are established in the caselaw of this Circuit.  In *TBG,* 36 F.3d at 923, the Tenth Circuit confirmed both in the context of a securities class action.  *First*, the Court held that "orders barring contribution claims are permissible only because a court or jury has or will have properly determined proportional fault and awarded the equivalent of a contribution claim…. Since the [district] court did not decide the settling defendants' proportional fault and order a credit in that amount, the court had no power to bar the nonsettling defendants' contribution claims." *Id.* at 923.  *Second*, the Court broadly rejected a bar, similar to the "Complete Bar Order" proposed in this case (Doc. 886, § 11.2; Doc. 886, Ex. B, § 12), against non-contribution claims by a nonsettler against a settler.  Treating the issue as one of state law, the court said, "[w]e think Kansas would permit barring only claims for which the court provided adequate compensation through a judgment credit or other means." *TBG*, 36 F.3d at 929.  Noting that "[n]o court has authorized barring claims with independent damages," and that the proposed bar order enjoined "'all claims... that... relate to any claim... based in whole or in part on any of the... facts... connected in any manner with this action," the Tenth Circuit rejected the order because it could bar claims for damages independent of the nonsettler's liability to the plaintiff.  *Id.* at 928- 29.

**B.    As It Would Impermissibly Bar The Excluded Defendants' Unadjudicated Claims Against Qwest For Indemnification Against Future Settlement Payments, The Proposed Partial Settlement Should Be Rejected**

The proposed settlement deliberately attempts exactly what is forbidden by the statutes and cases described above: It would bar the Excluded Defendants' unadjudicated colorable claims against Qwest for corporate indemnification based on Qwest's bylaws, Delaware law, and their contracts with Qwest, without protecting the value of those claims.[7]  The "Complete Bar Order" (Doc. 886, Ex. B, ¶ 12) permanently enjoins and restrains the Excluded Defendants "from commencing, prosecuting, or asserting any claim… for indemnification… whether arising under state, federal, or common law, against… [Qwest] based upon, arising out of, or relating to the Released Claims."  None of these potential claims are before the Court in this case.

Further, these claims are not merely colorable; they have substantial potential value.   Delaware law authorizes and makes enforceable the determination of a Delaware corporation such as Qwest to indemnify its directors and officers against judgments, amounts paid in settlement, and litigation expenses, in actions brought by third parties, "if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation." Del. Code

---

[7] A recurring confusion in the caselaw is caused by two distinct uses of the term "indemnification."  The distinction is explained in *In re Masters Mates & Pilots Pen. Plan Litig.*, 957 F.2d at 1028 ("[T]he common law...provided a right of indemnity - the shifting of an entire loss to one who more justly deserved it.... It is important to distinguish this form of indemnity – based on differences in relative fault – from contractual indemnity….") (*quoting* W. Page Keeton et al., Prosser & Keeton on Torts § 50, at 341-42 (5th ed. 1984)).

What is critical for present purposes is that there is no reason why a corporation settling a claim against it should be relieved of its distinct, non-fault-based, obligation to indemnify its nonsettling directors and officers. That statutory and contractual obligation would exist even if the corporation had not been sued or accused of wrongdoing, and the corporation has no right to be relieved of it in an agreement to which the indemnified directors and officers were not parties.

Ann., Tit. 8, § 145(a). The statute states that even a "judgment, order, settlement [or criminal] conviction... shall not, of itself, create a presumption that the [good-faith and reasonable-belief tests are not met]." *Id.* Delaware law also provides that "[t]he indemnification and advancement of expenses [under § 145] shall not be deemed exclusive of any other rights to which [directors and officers] may be entitled under any bylaw [of the corporation]." *Id.* § 145(f).  The purpose of these broad provisions is to induce qualified persons to serve: "Commentators and jurists alike have noted the salutary effect of the indemnification provisions in encouraging capable individuals to serve as officers and directors of corporations." *Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578, 593 (Del. Ch. 1994); *see also Mooney v. Willys-Overland Motors, Inc.*, 204 F.2d 888, 898 (3d Cir. 1953); *Merritt-Chapman & Scott Corp. v. Wolfson*, 321 A.2d 138,141 (Del. Super. Ct. 1974).

As previously demonstrated, the Excluded Defendants, as former officers and directors of Qwest, are entitled to corporate indemnification under Qwest's bylaws, Delaware law, and their separate employment, severance, and other agreements with Qwest.  *See* n. 1, *supra*, and accompanying text.[8]  Moreover, since the Excluded

---

[8] Even in *In re Rite Aid*, *supra*, where the district court generally side-stepped the issue of whether the nonsettling parties' potential claims, including claims for "indemnification," were barred by the proposed partial settlement's bar order, the court did explicitly confirm the necessity of excluding from the bar order "any" claim of the nonsettling former Rite Aid executives under their severance agreements with Rite Aid, *and those agreements included provisions continuing these executives' rights to corporate indemnification from Rite Aid.*

First, the broadly worded bar orders of the proposed Rite Aid settlement expressly "d[id] not bar, extinguish or otherwise affect or apply to... any claim of Noonan or Bergonzi [the nonsettling former COO and CFO] under their respective separation agreements" (146 F.Supp.2d at 721 (emphasis added)). Significantly, Noonan's and Bergonzi's written separation agreements both contained provisions in which Rite Aid agreed to continue their rights to corporate indemnification.  *Id.* at 723 (referencing indemnification rights in Noonan's severance agreement); Exhibit D (Bergonzi agreement, pages JA1079-86 from Volume III of Joint Appendix on Appeal in *In re Rite Aid Sec. Lit.*, Nos., U.S. Ct. of App., 3d Cir., (footnote cont.)

Defendants have not admitted or been adjudicated to have committed any securities violations, or to have acted with "fault," neither public policy nor federal preemption precludes their state law corporate indemnification claims.[9]

Of most immediate concern, the proposed Complete Bar Order would preclude the Excluded Defendants from exercising their statutory and rights to attempt to settle the claims against them in this action and obtain from Qwest indemnification for reasonable amounts paid in order to do so.  In this regard, the Complete Bar Order is not only unlawful, but it contravenes the public policy in favor of encouraging capable individuals to serve as corporate officers and directors, and, ironically, thwarts the very

---

Nos. 01-3546, 01-3547, 01-3562, 01-3563) ¶5 (last sentence).  Further, the court held that the claims of Grass, the nonsettling former CEO, based on an alleged *oral* separation agreement, were also properly excluded from the bar orders. *Id.* at 731 ("Grass's claims relating to his separation from Rite Aid should be excluded from the Bar Order…. [We] cannot see how any claim regarding Grass's separation is "related" to the Settled Claims within the meaning of the Complete Bar Order.").  Accordingly, insofar as Nacchio's indemnification claims are based upon his Severance Agreement with Qwest, they would not have been barred under the *Rite Aid* bar orders or decision.

[9] *See Koch Indus., Inc. v. Vosko*, 494 F.2d 713, 725 (10th Cir. 1974) (affirming accountants' right to indemnification for cost of successfully defending federal securities claims: "As to federal law relating to the Securities Act claims, we find no policy contrary to an award to a party for legal expenses in successfully defending. *Globus v. Law Research Service, Inc.*, 418 F.2d 1276 (2d Cir.), is not contrary. The court there said: 'Thus it is important to emphasize at the outset that at this time we consider only the case where the underwriter has committed a sin graver than ordinary negligence.'"); *In re Cendant Corp. Sec. Litig.*, 109 F.Supp.2d 273, 284 (D.N.J. 2000) (affirming propriety of corporate indemnification for settlement payments and defense costs of individual director defendants who did not admit liability in settling the underlying suit, where the indemnification provisions of the Delaware corporation's bylaws allowed for reimbursement absent "an adjudication of intentional wrongdoing"); *Commodity Futures Trading Commission v. Richards*, 1996 WL 199729 (N.D. Ill. 1996) (Denying Delaware corporation's motion to dismiss former officer's claim for indemnification under bylaws from a $200,000 SEC civil penalty, where officer "did not admit or deny the administrative complaint's allegations," and "[t]he commission's order was made '[s]olely on the basis of the consent evidenced by the Offer [of Settlement], and without any adjudication on the merits.'") (Unpublished: Exhibit E); *Raychem Corp. v. Federal Ins. Co.,* 853 F.Supp. 1170, 1176-77 (N.D. Cal 1994) (corporate indemnification of individual directors, permissible under Delaware law, was not preempted by federal law where defendants did not admit liability in settling the underlying suit); *Cambridge Fund, Inc. v. Abella*, 501 F.Supp. 598, 618-19 (S.D.N.Y. 1980) (the federal policy against indemnification for securities violations was inapplicable where there was "no adjudication of willfulness – only the entry of a consent order with such findings" and the imposition of a civil penalty).

policy favoring settlements on the basis of which Lead Plaintiffs ask the Court to approve their proposed partial settlement.

Further, the Stipulation and the Proposed Judgment achieve the same result – barring the Excluded Defendants receipt from Qwest of indemnification for amounts they may pay to settle this case – by obligating Lead Plaintiffs to condition any future settlement of their claims against the Excluded Defendants on these defendants' "release of any and all claims [they] may have against any of the Released Persons based upon, arising out of, relating to or in connection with the Released Claims or the subject matter thereof."   (Doc. 886, Stipulation § 11.4; Doc. 886, Ex. B, Proposed Judgment § 14).   This provision – the inclusion of which in the Proposed Judgment Qwest expressly identifies as "material to Settling Defendants' decision to participate in this Stipulation" (Doc. 886, Stipulation § 11.4) – is equally impermissible: Given the Excluded Defendants' contractual rights to corporate indemnification from Qwest for amounts they may pay in settlement of this action, Qwest's insistence on this provision, which directly frustrates those rights, is a brazen repudiation of Qwest's contractual obligations, and a breach of its obligation of good faith and fair dealing in the performance of those obligations.   Thus, in asking the Court to approve the proposed settlement, Lead Plaintiffs are asking the Court to bless Qwest's breach of contract.

Finally, while preclusion of the Excluded Defendants' rights to indemnification for a settlement of this case is of most immediate concern, it is by no means the only concern raised by the proposed "Complete Bar Order" (Doc. 886, Ex. B, ¶12), which sweeps *far* more broadly.   That paragraph purports to preclude "any claim… however styled, whether for indemnification, contribution, <u>or otherwise</u> against the Released

Persons based upon, <u>arising out of, or relating</u> to the Released Claims." *Id.* (emphasis added). Critically, the Stipulation defines both "Released Persons" and "Released Claims" with *extraordinary* breadth.[10] Consequently, the Complete Bar Order appears to bar not only the Excluded Defendants' claims for corporate indemnification from Qwest in this case, and in several other pending cases brought by different plaintiffs that are factually "related" to this case, but also an infinite variety of "unknown" and "unmatured" independent claims by the Excluded Defendants against Qwest, the other Settling Defendants, and each of the Settling Defendants' broadly defined "Related Parties." The sheer inability to foresee all of the potential claims that might arise should prevent this Court from imposing this sweeping, ill-defined bar. *See, e.g., Comeau v. Rupp*, 810 F.Supp. 1127, 1165 (D. Kan. 1992) ("The absence of an actual, live controversy implicating the restriction of rights that are not being asserted in either this action or any other action deprives the court of any power to address these issues.").

---

[10] "Released Persons" includes, in addition to the Settling Defendants, their "Related Parties," which includes *numerous nonparties to this action*, for example, each Settling Defendant's "controlling shareholders, attorneys, accountants or auditors, banks or investment banks, insurers, reinsurers… any partnership in which a Settling Defendant has a controlling interest, any member of an Individual Settling Defendant's immediate family…" etc. *See* Doc. 886, Stipulation ¶¶ 1.27 ("Released Persons") & 1.25 ("Related Parties").

"Released Claims," in turn, is defined in Stipulation ¶ 1.26 to include, among other claims, "all claims… of every nature and description whatsoever…whether known or unknown… accrued or not accrued, foreseen or unforeseen… that were asserted or that could have been asserted directly [or] indirectly… at any time, in any forum, by Lead Plaintiffs, the Class Members, or the successors or assigns of any Lead Plaintiff or Class Member... against the Release Persons arising out of, based upon, or related to in any way" the plaintiffs' "acquisition" or "disposition" of Qwest securities by Lead Plaintiffs', the Class, and/or the Released Parties, and "the allegations that were or could have been made in the Litigation."

**C. The Proposed Partial Settlement Should Be Rejected Because, In Its Scope and Its Failure to Provide For The Judgment Credit Mandated By 15 U.S.C. § 78u-4(f)(7)(B), The "PSLRA Bar Order" Violates the PSLRA**

While the PSLRA authorizes issuance of a contribution bar order in a partial settlement of a private securities action 15 U.S.C. § 78u-4(f)(7)(A), Proposed Judgment ¶ 11 violates the PSLRA. *__First__*, ¶ 11 fails to provide the nonsettling defendants with the contribution judgment credit mandated by 15 U.S.C. § 78u-4(f)(7)(B). *Compare* Doc. 886, Ex. B, ¶ 11 *with* the PSLRA bar order approved in *In re Rite Aid Corp. Sec. Lit.*, 146 F.Supp.2d 706, 721, 723 n. 22 and accompanying text (E.D.Pa. 2001). *__Second__*, notwithstanding the bar order exceptions set forth in Stipulation ¶ 12, Proposed Judgment ¶ 11 exceeds the scope of the contribution bar permitted under 15 U.S.C. § 78u-4(f)(7)(A). The PSLRA authorizes discharge only of a settling "<u>covered person</u>"[11] through an order barring those "future contribution claims <u>arising out of the action</u>." *Id.* (emphasis added). Paragraph 11, however, would discharge not only the Settling Defendants, as permitted, but also their broadly defined "Related Parties." (Doc. 886, ¶¶ 1.27, 1.25). Further, it would bar not only contribution claims "arising out of the action," as permitted, but rather "all claims for contribution… <u>based upon, relating to, or arising out of</u> the "Released Claims" – the same term that broadly defines the scope of the Settling Parties' mutual releases, and includes, for instance, claims that were or could have been asserted "at any time, in any forum." (Doc. 886, Ex. B, ¶¶ 9, 1; Doc. 886 ¶ 1.26) (emphasis added). Without more, these flat violations of 15 U.S.C. § 78u-4(f)(7), should require rejection of the proposed partial settlement.

---

[11] "Covered Person" is defined as "a defendant in any private [securities] action." 15 U.S.C. § 78u-4(f)(10(C)(i)).

II. **THE PROPOSED SETTLEMENT SHOULD BE REJECTED BECAUSE, LEAD PLAINTIFFS HAVING FAILED EVEN TO *ATTEMPT* A COMPLETE SETTLEMENT, THE PARTIAL SETTLEMENT PROPOSED IS NOT "FAIR, REASONABLE, OR ADEQUATE," EITHER TO THE NONSETTLING DEFENDANTS OR TO THE CLASS, AND WOULD THWART THE "JUST, SPEEDY, AND INEXPENSIVE DETERMINATION" OF THIS ACTION**

Lead Plaintiffs made no genuine effort to achieve a global settlement that would include the Excluded Defendants. They never once invited the Excluded Defendants or their counsel to negotiate for their inclusion in the settlement, and when, after word of the proposed partial settlement reached them, counsel for the Excluded Defendants approached them, plaintiffs' counsel declined to engage in any meaningful negotiations. *See* Ex. F (Declaration of Scott M. Himes) ¶¶ 2-5; Ex. G (Declaration of David Meister) ¶¶ 3-5.[12] Not surprisingly, the resulting proposed partial settlement is unfair, unreasonable, and inadequate, and would thwart, rather than promote, the just, speedy, and inexpensive determination of this action.

A. **Unlike A Complete Settlement, Which Would Avoid A Lengthy, Costly, And Complex Trial, The Proposed Partial Settlement Necessitates One**

Though, as detailed in Point I, *supra*, ¶¶ 11.2 and 11.4 of the Stipulation are unlawful and should require rejection of the proposed partial settlement, if implemented, those provisions would necessitate a trial by depriving the Excluded Defendants of corporate indemnification for amounts paid to settle the plaintiffs' claims against them.

Quite apart from Sections 11.2 and 11.4, however, and even were they deleted, Stipulation § 11.3 and Proposed Judgment § 13 (*quoted* in n. 4, *supra*) effectively preclude a settlement of plaintiffs' claims against the Excluded Defendants. By exacting

---

[12] In this regard, it is also noteworthy that Lead Counsel's statement pursuant to Local Rule 7.1 (Doc. 928, p. 1 n. 2) conspicuously fails to represent that counsel ever satisfied the essential requirement of the rule – that "before filing the motion, [counsel] has conferred or made reasonable, good-faith efforts to confer with opposing counsel… *to resolve the disputed matter.*" *Id.* (emphasis added).

plaintiffs' agreement to reduce the amount of the settlement by whatever amount the Excluded Defendants may recover from Qwest in an action for indemnification, these provisions eliminate any incentive for plaintiffs to settle with the Excluded Defendants.

Moreover, because defendants assert against the Excluded Defendants all of the claims asserted against the settling defendants (Doc. 315, ¶¶ 404-428), the trial necessitated by the proposed settlement promises to be as complex, costly, and time-consuming as the trial that would be required if there were no settlement at all. Thus, in stark contrast to a complete settlement, which the plaintiffs cavalierly failed to explore with the Excluded Defendants, the partial settlement which they propose will not avoid, but rather insure the necessity of a trial and further "protracted and expensive litigation." (Doc. 928, p. 14).

**B. The Lead Plaintiffs' Unexplained Election to Pursue A Partial Rather Than A Global Settlement Unnecessarily Exposes The Class To The Same Costs, Delays, And Risks Of Continued Litigation On The Basis Of Which Plaintiffs Urge The Court To Approve The Proposed Settlement**

In electing, without any explanation, to pursue a partial rather than a global settlement, the Lead Plaintiffs are unnecessarily exposing the Class to the very delays, costs, and risks of continued litigation based on which they urge the Court to approve the proposed partial settlement:

1. By pursuing, rather than settling, their claims against the Excluded Defendants, the Lead Plaintiffs have exposed the Class to the same substantial delays, and attendant risks, on the basis of which they ask that the Court approve the proposed partial settlement. Lead Plaintiffs expressly acknowledge the "major risk facing the Class" from "the potential delay of this litigation pending the outcome of the ongoing

Qwest criminal investigation," and particularly the stay of discovery in this action requested by the United States Attorney's Office for the District of Colorado, a stay that "could continue until Mr. Nacchio's criminal trial," and that "would adversely affect Lead Plaintiffs' ability to successfully prove their claims."  (Doc. 928, p. 18) (emphasis added). Lead Plaintiffs further acknowledge that "[e]ven if Lead Plaintiffs prevailed at trial, it is almost certain that the… Defendants would appeal the verdict and award.  The appeals process would have spanned several years, during which time members of the Class would receive no distribution from the awarded damages.  Moreover, an appeal of the verdict would carry with it the risk of reversal, in which case the Class would receive nothing after having prevailed on their claims at trial." *Id.* at 13-14.

2.  Any future recovery by the absent class members against the Excluded Defendants would be subject to an award to Lead Counsel of substantial additional attorneys fees over and above the approximately $96 million (plus more than $2 million in litigation expenses) Lead Counsel are asking the Court to pay them now.

3.  Quite apart from the risks attendant to the delays Lead Plaintiffs acknowledge they would encounter in pursuing their claims against the Excluded Defendants, those unsettled claims – which are identical to the claims Lead Plaintiffs assert against the settling defendants (Doc. 315, ¶¶ 404-428) – would be subject to all the other risks of continued litigation on the basis of which plaintiffs urge the Court to approve the proposed partial settlement, as well as substantial additional risks.  Notable among these admitted and additional risks are the following:

a.  "[N]umerous factual and legal issues, including disputed issues of falsity, scienter, materiality and damages that create[] the risk that Lead Plaintiffs would not be

able to establish liability or damages at trial." (Doc. 928, pp. 10-13).  Indeed, were the proposed partial settlement approved, the PSLRA would significantly increase these risks as to any potential recovery by the Class against the Excluded Defendants.  The PSLRA provides that where, as under the Stipulation, a nonsettling defendant is barred from later seeking contribution from settling defendants, the nonsettler is then entitled to an offset for the greater of the settling defendants' share of liability or the amount they paid in fact. 15 U.S.C. § 78u-4(f)(7); *see* Point I.C., *supra.*  As a result, were the proposed partial settlement approved, the Class's claims against the Excluded Defendants would be subject to the additional risk that, even if Lead Counsel could prove liability and damages, they would be unable to prove that those damages exceeded the dollar amount of the proposed partial settlement payment – some $400 million to $650 million (*see* Doc. 886, ¶¶ 2.1, 2.2, & 2.3) – in which case the Class would recover *nothing*.  For example, assuming that the amount of the proposed partial settlement turned out to be $650 million, if Lead counsel proved liability and damages of $650 million, the class would recover nothing.  If Lead counsel proved liability and damages of $660 million, the class would recover only $10 million.

b.  "[T]he following risks *inherent in all shareholder litigation* – the unpredictability of a lengthy and complex jury trial; the risk that witnesses could suddenly become unavailable or jurors could react to the evidence in unforeseen ways; the risk that the jury would find that some or all of the misrepresentations and omissions were not material during part or all of the Class Period; and the risk that the jury would find that defendants reasonably believed in the appropriateness of their actions at the time and

that, as to certain claims, plaintiffs failed to prove that the… Defendants acted with scienter." (Doc. 928, p. 13) (emphasis added).

c.  Given the existence of numerous class action lawsuits and the SEC's separate enforcement action naming both Nacchio and Woodruff as defendants, each seeking damages of a magnitude comparable to those Lead Plaintiffs seek here, and the admitted delays facing Lead Counsel in pursuing their claims in this case, there is the further risk that, even if Lead Counsel could prove liability and damages substantially in excess of the proposed settlement payment, by the time they completed the litigation process, there would be nothing left to satisfy their judgment.  Among other things, in its criminal case against Joseph Nacchio, which will certainly be tried before any trial against the Excluded Defendants in this action, the Government is seeking more than $100 million from Mr. Nacchio by way of "forfeiture."[13]

---

[13] The Rite Aid securities litigation in the Eastern District of Pennsylvania is a cautionary tale of the risks to the Class's interests from a partial settlement predicated on an attempt to extinguish the indemnification rights of former nonsettling officers and directors against a settling corporate defendant. In 2001, the district court approved a $193 million partial class action settlement of claims with "potential damages… of approximately $2 billion." *In re Rite Aid Sec. Lit.*, 146 F.Supp.2d at 715.  That initial settlement excluded three nonsettling former corporate executives – Rite Aid's former CEO (Grass), CFO (Bergonzi), and COO (Noonan) – as well as KPMG, the company's accountants. Except for Bergonzi, the nonsettling individual defendants all appealed from the order approving the partial settlement. *In re Rite Aid Corporate Sec. Lit.*, 269 F.Supp.2d 603, 605 (E.D.Pa. 2003), *vacated and remanded* (as to amount of attorney's fee award), 96 F.3d 294 (3d Cir. 2005).

Before the appeal could be heard, however, the plaintiffs agreed to a settlement of their claims against these nonsettling defendants. *Id.* at 605.  Apart from their agreements to withdraw their appeal from the district court's order approving the initial partial settlement, Noonan contributed $157,454, and Grass contributed $1,450,000 to the settlement; Bergonzi contributed nothing. *Id.* at 606.

The court's decision approving the plaintiffs' settlement on these terms bespeaks the genuine risks to the Class of a partial settlement such as that proposed here.  The court relied heavily on the "incalculable value to the class" of the withdrawals of these defendants' appeals, given (1) that their pendency had prevented distribution to the Class of the $193 million partial settlement approved by the court two years earlier (*id.* at 605) and (2) the risk that the court's approval of the prior partial settlement – which involved "many issues… of first impression" – would be reversed, "undermining any settlement the class might ultimately receive." *Id.* at 605, 607.  The Court also stressed that, due to the pendency of other criminal (footnote cont.)

**C. The Terms Of The Proposed Partial Settlement And Plaintiffs' Unexplained Failure To Include The Excluded Defendants Or Their Counsel In Its Negotiation Belie The Fairness And Honesty Of The Negotiations**

Lead Plaintiffs premise their contention that the proposed partial settlement "was fairly and honestly negotiated" upon "the extensive settlement negotiations" they say occurred "over a number of years" between "highly experienced counsel on both sides, each with a comprehensive understanding of the strengths and weaknesses of each party's respective claims and defenses." (Doc. 928, pp. 7-8). Yet Lead Plaintiffs fail to mention that during this multi-year negotiation process plaintiffs' counsel never initiated or engaged in negotiations with counsel for the Excluded Defendants, never sought their views as to the strengths and weaknesses of the parties' respective claims and defenses, and never included them in the mediation sessions with former Judges Layn R. Phillips and Daniel Weinstein. *See* Ex. F (Declaration of Scott M. Himes) ¶¶ 2-5; Ex. G (Declaration of David Meister) ¶¶ 3-5. *By plaintiffs' own measure, then,* their unexplained failure ever to explore with counsel for the Excluded Defendants the potential for a global settlement before opting for the partial settlement they now propose belies the fairness and honesty of the negotiations leading to that proposed partial settlement.

So too do several terms of the proposed partial settlement previously discussed, which, on their face, display self-serving collusion between Qwest and the Lead Plaintiffs and their counsel at the expense both of the Excluded Defendants (*see* pp. 11-16, *supra*) and of the absent class members (*see* pp. 17-21, *supra*).

---

and civil proceedings against these defendants, Bergonzi and Noonan had only "limited financial assets" and Grass had little "motivation to contribute serious funds to settle this matter." *Id.* at 609.

It is telling that Lead Plaintiffs offer no explanation for their exclusion from the settlement of Nacchio and Woodruff, but inclusion in the settlement of twelve other individual defendants, several of whom plaintiffs charge with reaping multiple tens of millions of dollars from the alleged securities violations.[14]  For instance, while plaintiffs opted to exclude from the partial settlement defendant Joseph Nacchio, Qwest's CEO and Co-Chairman during the class period, they have included, and propose to release from any further liability in this matter, defendant Phillip Anschutz, who plaintiffs describe as Qwest's "founder" and "controlling shareholder," and who hired Nacchio as CEO and served with him as Co-Chairman of Qwest throughout the class period. (Doc. 315, ¶ 38(b)).  Any pretense that the Lead Plaintiffs' decision to exclude Nacchio but include Anschutz in the proposed settlement was "fair and honest," much less in the best interests of the Class, is belied by Lead Plaintiffs' own allegations: (1) plaintiffs allege that Anschutz reaped more than seven times more proceeds from sales of Qwest stock during the class period than did Nacchio (*id.*  ¶59; *compare* ¶ 38(b) *with* ¶ 38(a)); (2) Lead counsel "firmly believe," based on "extensive investigation and substantial discovery," that they have "developed sufficient evidence" to prove at trial their claims against Anschutz (Doc. 928, p. 9); and (3) while plaintiffs make much of Qwest's purported inability to pay more than the $400 million payment that plaintiffs have

---

[14]  Lead Counsel's only reference to this election in their voluminous submissions in support of the proposed partial settlement is cryptic and unilluminating.  It states only: "After reviewing and analyzing the discovery in this case, Lead Plaintiffs and their counsel believe that the evidence against the non-settling defendants, Nacchio and Woodruff, is strong and determined to continue the litigation against them." Dowd Decl. ¶ 12.  But Lead Counsel describe the evidence against the *Settling* Defendants in remarkably similar terms, representing to the Court that they "firmly believe – after conducting an extensive investigation and substantial discovery – that Lead Plaintiffs had developed sufficient evidence to prove their claims at trial."  (Doc. 928, p. 9).

accepted to terminate and release their claims against Qwest and all of the individual Settling Defendants (*Id.* at 3-4, 15), they propose to release Anschutz without requiring him to personally contribute one cent to the settlement payment, notwithstanding plaintiffs' own allegations that he reaped proceeds of <u>more than $1.5 billion</u> from sales of Qwest stock during the class period (*Id.* ¶¶ 38(b) & 59), has, by orders of magnitude, the deepest pockets of any individual defendant in the case, and is worth many times the $400 million for which plaintiffs agreed to settle with Qwest.  Qwest's motivation in favoring Anschutz over Nacchio is as obvious as its motivation to eliminate its obligations to Nacchio.

Similarly, while plaintiffs have opted to exclude from the partial settlement defendant Robert Woodruff, Qwest's CFO from the beginning of the class period through March 2, 2001, they have included in the settlement, and propose to release from any further liability in this matter, defendant Robin Szeliga, Woodruff's subordinate from the beginning of the class period until he stepped down as CFO, then his successor as CFO for the remainder of the class period. The fairness and honesty of plaintiffs' decision to include Szeliga, but exclude Woodruff, is also suspect, as Szeliga has pled guilty to criminal insider trading charges based on conduct that post-dated Woodruff's departure from Qwest, whereas Woodruff is not facing criminal charges.

Under the circumstances, Lead Plaintiffs' unexplained decision to exclude Nacchio and Woodruff from the proposed settlement can only be seen as selectively punitive, an attempt to misappropriate to the Settling Parties the value of the Excluded Defendants' barred potential claims, or both.  Either way, the resulting proposed partial settlement violates the Excluded Defendants' Due Process rights and tortiously

interferes with their statutory and contractual rights to settle claims against them and be indemnified by Qwest for the reasonable costs of doing so.   *Cf. FDIC v. Geldermann,* 975 F.2d 695, 698 (10th Cir. 1992) ("It does not take too much imagination to see why the FDIC in the Settlement Agreement desired to negotiate away the Defendants' possible right to claim contribution or indemnity from the Settlors. The FDIC obviously could enhance the attractiveness of the settlement to the Settlors if it were able to bargain away not only its claims against the Settlors, but also the claims that other entities… might have against the Settlors. However, the Defendants' potential rights of contribution and indemnity against the Settlors were not the FDIC's to settle.").  By the same token, the recommendation of the Lead Plaintiffs and Lead Counsel that the Court approve the proposed partial settlement (Doc. 928, pp. 18-19) is not credible.

## Conclusion

For all the foregoing reasons, Defendants Nacchio and Woodruff respectfully request that the Court reject the proposed partial settlement, without prejudice to submission of a proposed settlement that cures the many defects of the current one.

Respectfully submitted this 22nd day of March, 2006.

s/John M. Richilano
John M. Richilano
Marci A. Gilligan
Richilano & Gilligan PC
633 17th St., Ste. 1700
Denver, CO 80202
(303) 893-8000
(303) 893-8055 (fax)

*Attorneys for Joseph Nacchio*

s/Herbert J. Stern
Herbert J. Stern
Jeffrey Speiser
Joel M. Silverstein
Stern & Kilcullen
75 Livingston Ave.
Roseland, NJ 07068
(973) 535-1900
(973) 535-9664 (fax)

s/David Meister
David Meister
James Miller
David Cook
Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019-6131
(212) 878-8000
(212) 878-8375 (fax)

*Attorneys for Robert Woodruff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of March, 2006, a true and correct copy of the foregoing **BRIEF OF DEFENDANTS NACCHIO AND WOODRUFF IN OPPOSITION TO FINAL APPROVAL OF PARTIAL CLASS ACTION SETTLEMENT** was served on the following via the USDC CM/ECF system:

X. Jay Alvarez
JayA@lerachlaw.com

Timothy Granger Atkeson
Tim_Atkeson@aporter.com; jeffrey_lewis@aporter.com; shelby_hunt@aporter.com; john_freedman@aporter.com; scott_schreiber@aporter.com

Michael James Barry
mbarry@gelaw.coml; mhartman@gelaw.com; gfpulver@handf.com

Jeffrey Allen Berens
jberens@dyershuman.com

Terry W. Bird
twb@birdmarella.com; dh@birdmarella.com

David Robert Boyd
dboyd@bsfllp.com; jmessner@bsfllp.com

Jessica Brody
jessica_brody@aporter.com; susan_cole@aporter.com; roleen_johnson@aporter.com

Spencer A. Burkholz
SpenceB@lerachlaw.com; e_file_sd@lerachlaw.com

John K. Carroll
John.carroll@cliffordchance.com

Kwame A. Clement
Kwame_Clement@aporter.com; kclement8688@comcast.net

David Lawrence Cook
david.cook@cliffordchance.com

Jennifer Lynn Coon
jlc@birdmarella.com; lak@birdmarella.com

Michael J. Dowd

MikeD@birdmarella.com; shg@birdmarella.comm

Stephanie Erin Dunn
sdunn@perkinscoie.com; sdunn-efile@perkinscoie.com

Thomas E. Egler
TomE@lerachlaw.com; HeatherH@lerachlaw.com

Kevin D. Evans
kdevans@s-elaw.com; tbaksay@s-elaw.com

Clyde A. Faatz, Jr.
cafaatz@handf.com; kjscholet@handf.com

Christopher James W. Forrest
cjforrest@handf.com

Joshua David Franklin
jdf@denverda.org

John A. Freedman
john_freedman@aporter.com

Walter W. Garnsey, Jr.
wgarnsey@khgk.com; smiller@khgk.com

Terence C. Gill
tgill@sah.com; efiling@sah.com; dsikes@sah.com

Marcy Marie Heronimus
mheronim@sah.com; efiling@sah.com; peckman@sah.com

Michael James Hofmann
michael.hofmann@hro.com; jackie.delay@hro.com

Kevin Brent Huff
khuff@khhte.com; jbartlow@khhte.com

Shelby Hunt
shelby_hunt@aporter.com

Roberta A. Kaplan
rkaplan@paulweiss.com

Gary Michael Kramer

gkramer@bw-legal.com; amcarillo@bw-legal.com

William J. Leone
William.Leone@usdoj.gov; USACO.ECFCivil@usdoj.gov; Dorothy.Burwell@usdoj.gov

Alfred P. Levitt
alevitt@bsfllp.com; jmessner@bsfllp.com

Vincent J. Marella
lak@birdmarella.com

David Meister
david.meister@cliffordchance.com

James D. Miller
james.miller@cliffordchance.com; damien.morris@cliffordchance.com;
salvatore.dziekan@cliffordchance.com; david.cook@cliffordchance.com

Robert Nolen Miller
rmiller@perkinscoie.com; rmiller-efile@perkinscoie.com

Barbara C. Moses
bmoses@magislaw.com; jlaing@magislaw.com

James E. Nesland
neslandje@cooley.com; foutsdl@cooley.com; ingrahamjl@cooley.com

Sharan Nirmul
snirmul@gelaw.com; dlohinetz@gelaw.com

Robin Lee Nolan
rnolan@handf.com; gfpulver@handf.com; kjscholet@handf.com

Elissa J. Preheim
Elissa.Preheim@aporter.com

Kimberly Wolf Price
kimberly.wolf@cliffordchance.com

Thomas Vincent Reichert
tvr@burdmarella.com

Eric Tolentino Rillorta
Eric_Rillorta@aporter.com

Kenneth F. Rossman, IV
krossman@bsfllp.com

Ashley Elizabeth Rupp
arupp@magislaw.com

Scott Saham
scotts@lerachlaw.com

Scott B. Schreiber
scott_schreiber@aporter.com

Paul Howard Schwartz
schwartzph@cooley.com; vrush@cooley.com; colitigation@cooley.com;
ingrahamjl@cooley.com

David L. Schwarz
dschwarz@khhte.com

Jesus Manuel Vasquez, Jr.
jvasquez@rothgerber.com; tclanahan@rothgerber.com

Gregory James Waller
gregwaller@andrewskurth.com; amyprasad@akllp.com; kpiccolo@akllp.com

I hereby certify that I served the same on this 16th day of December, 2005, via U.S. Mail, postage prepaid, on the following:

Frederic C. Clodius
11015 Millbank Road
King George, VA 22485

Geoffrey C. Jarvis
Grant & Eisenhofer PA
1201 N. Market St., #2100
Wilmington, DE 19801

C. Mylett
P.O. Box 1031
Coleman, FL 33521

Cleo J. Rauchway
Rothgerber, Johnson & Lyons, LLP
United States District Court, Box 11
1200 – 17th Street

#3000
Denver, CO 80202

William M. Rogers
606 S. Military Trail
Deerfield Beach, FL 33442

Holly Stein Sollod
Jennifer H. Weddle
Holland & Hart
555 17th Street, Suite 3200
Denver, CO 80202

Michelle M. McCarron
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210

s/Gwenn E. Miller
Gwenn E. Miller