March 22, 2006

**F I L E D**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**MAR 2 3 2006**

**GREGORY C. LANGHAM**
CLERK

Clerk of Court
District of Colorado
United States Courthouse
901 19th Street, Room A-105
Denver, CO 80294

Re: *In re Qwest Communications International, Inc. Securities Litigation* (Civil Action
No. 01-cv-1451-REB-CBS)

## Objections to Partial Settlement of Class Action

I am a member of the plaintiff class in the above-referenced matter. During the
class period, I purchased (or acquired through the merger between US West and Qwest)
and sold 249 shares of Qwest common stock.

I am objecting to the proposed settlement for the following reasons:

### 1. The requested attorney's fees are excessive.

Class counsel has requested to be paid 24% of the settlement for its time and
effort in this matter. Although this request is in line with the average fee percentage
awarded in class action settlements, this case is not the average class action settlement.

The amount of the settlement, $400 million, is much larger than most class action
settlements. Because the economies of scale of class actions generally increase as the
amount at stake increases, courts typically award class counsel a smaller fee percentage
in larger settlements. There are two thorough empirical studies in this area, and both
have shown that the fee requested in this case is out of line for a settlement of this size.

1

The most recent study found that in class action settlements of greater than $190 million the median fee awarded by the court was only 10.1% of the settlement. *See* Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27, 73 (2004). The older study found that in class action settlements over $190 million the median fee was only 17.6% of the settlement. *See id.* The fee requested in this case is much greater than the median fee found in either study.

If the court approves the fee as requested, it is very likely to result in a windfall to class counsel. This is not to say that class counsel—which is a very fine law firm—does not deserve to be well compensated for its work in this case, but an award in the 10-15% range—some $40 to $60 million—would still be a pretty good pay day.

**2. The extra payments to the lead plaintiffs are excessive.**

Like many Americans, I receive class action settlement notices all the time. I have never, however, seen a settlement notice that provides extra compensation to lead plaintiffs in the amount provided by this settlement: $40,000 for each lead plaintiff. This amount is more than the median amount an individual American earns in an entire year.

Indeed, empirical research confirms that the award to lead plaintiffs in this case is out of line. In a study to be published this fall in the UCLA Law Review, Professors Eisenberg and Miller show that the median additional compensation provided to lead plaintiffs in securities class action settlements is only $2900. *See* Theodore Eisenberg & Geoffrey Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, at 27

(Draft of Dec. 7, 2005) (attached as Exhibit A). The award in this case isn't even in the ball park.

This is an area in which I think the court should tread especially carefully because lead plaintiffs obviously do not adequately represent absent class members when they are deciding how much extra money to award themselves. Because absent class members are not adequately represented on this point, it may be that the settlement should not be approved without appointing separate counsel to represent absent class members on this issue.

**3. Class Counsel should not be paid before the class is paid.**

The settlement notice in this case does not disclose to class members what is perhaps the most troubling aspect of this settlement: class counsel has inserted a provision into the settlement whereby it is paid immediately by the defendants if this court approves the settlement, while class members must wait until all appeals of the settlement have been exhausted to receive their payments from the defendants. *See* Stipulation of Partial Settlement, §IV.7.2.

Although I understand (anecdotally) that these early-distribution provisions have become quite popular among class action lawyers, they are also quite self-serving. Traditional contingency-fee lawyers are not normally paid before their clients are; it is doubtful many clients would agree to such an arrangement. There is no more reason class action contingency-fee lawyers should be paid before their clients. This provision does not benefit the class; it only benefits class counsel. It should be struck.

**4. The notice of the settlement is inadequate.**

The notice in this case is inadequate for two reasons.

First, as noted above, the settlement in this case provides that class counsel is to be paid before their clients are. But this provision was not disclosed to class members in the notice. This should render the notice to the class inadequate. The early-distribution provision is self-serving, and class members were not accorded a fair chance to object to the settlement on this basis. If this provision is to remain in the proposed settlement, this court should order a new round of notice to class members before approving the settlement.

Second, although the notice discloses the amount of the settlement, the notice does not disclose to class members what class counsel estimates the value of their claims to be. It is impossible for a class member—not to mention this court—to assess whether the settlement is a fair deal to the class without providing some way to estimate what the expected value of the claims are at trial. For example, if class counsel believes that the damages to the class may have been as high as $4 billion, then the $400 million settlement gives class members only 10 cents for every dollar of possible damages. Class members might think their chances of prevailing past the motions stage and at trial are greater than 10%, and that this settlement is a bad deal. On the other hand, class counsel might believe that the damages to the class may only run to $800 million. In this case, class members are receiving 50 cents for every dollar of damages, and this might exceed the chances of prevailing at trial, making the settlement a good deal. Without the crucial information of what class counsel presently expects to ask the jury for in terms of damages, class members and this court cannot fairly assess the settlement. Accordingly,

before approving the settlement, new notice to class members should be ordered that includes this information.

## 5. The lead plaintiffs may not adequately represent all class members given the plan of allocation.

The proposed settlement in this case leaves some class members without any recovery at all from the defendants. Those class members who did not suffer a "net loss" on their trades receive no compensation from the settlement, even though there is nothing in the securities law that per se prevents such class members from recovering. *See Dura Pharmaceuticals, Inc. v. Broudo*, 125 S.Ct. 1627, 1632 (2005) (suggesting that the securities laws permit recovery on a "claim that a share's higher price is lower than it would otherwise have been"). Nor do class members who bought and sold between certain dates assigned a "claim per share" of "$0" in the plan of allocation recover anything.

I am not here challenging the substantive conclusion that some class members should recover nothing from the defendants. I am only expressing concern that the class members who would receive nothing were not adequately represented by the lead plaintiffs. It is unclear from the notice whether any of the lead plaintiffs fall into the category of class members who would receive nothing under the plan of allocation. If they did not, then it is hard to see how they could possibly adequately represent the subclass of class members who are scheduled to receive nothing. Rather, it raises the specter that they may have selected a plan of allocation that would benefit them at the expense of class members not similarly situated.

It may very well be, however, that one or more of the lead plaintiffs is scheduled to receive nothing from the plan of allocation. If this is the case, then I think absent class members may have been adequately represented.

But I don't think the settlement should be approved without finding out. I am requesting that the court order class counsel to submit documentation detailing the trading dates and transaction amounts of the lead plaintiffs. If this documentation shows that no lead plaintiff will recover zero under the plan of allocation, then the plan should not be approved until separate counsel is appointed to represent class members who are scheduled to receive nothing under the plan.

Respectfully submitted,

Brian Fitzpatrick

87 Barrow St. Apt 6H
New York, NY 10014

703-216-3499

CC:
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
Keith F. Park
655 West Broadway, Suite 1900
San Diego, CA 92101-3301

Boies, Schiller & Flexner LLP
Alfred Levitt
5301 Wisconsin Ave, N.W., Suite 800
Washington, DC 20015

Arnold & Porter LLP

John Freedman
555 Twelfth Street NW
Washington, DC 20004

# EXHIBIT A

Draft of Dec. 7, 2005

**Incentive Awards to Class Action Plaintiffs: An Empirical Study**

*Theodore Eisenberg & Geoffrey P. Miller*[*]

Abstract

Incentive awards to representative plaintiffs in class action cases have been the focus of recent law reform efforts and generated inconsistent case law. But little is known about such awards. This study of 374 opinions from 1993 to 2002 finds that awards were granted in about 28% of settled class actions. Rate of awards varied by case category as follows: consumer credit actions 59%, employment discrimination cases 46%, antitrust cases 35%, securities cases 24% (before the PSLRA limited awards), corporate and mass tort actions, less than 10%. The decision to grant an incentive award was associated with increased awards of attorney costs and expenses (our proxy for representative plaintiff costs) in relation to median class member recoveries and with the case being in federal court. When given, incentive awards constituted, on average, 0.16% of the class recovery, with a median of 0.02%. Award levels varied by case category. Employment discrimination cases had large incentive awards compared to other categories. Award size was associated with the case's costs and expenses, the class recovery amount, the median recovery per class member, the case's risk, and the presence of objection to the settlement. Awards exhibited a scaling effect; their percentage of the class recovery decreased as the class recovery increased. We examine the data in light of four hypotheses about the function of incentive awards: (1) reimbursing class representatives for non-pecuniary litigation costs; (2) rewarding class representatives for superior service; (3) facilitating self-interested behavior by class counsel; and (4) achieving proportionality between awards and other outcomes in the case. We find support for the reimbursement and proportionality hypotheses and weaker support for the attorney self-interest and reward-for-service hypotheses. We find little evidence of systematic abuse in incentive awards. Given the modest frequency and size of awards, and their possible benefits, case-by-case adjudication may be more appropriate than fixed legislative or judicial rules banning awards.

## I. Introduction and Summary of Results

Class actions are useful procedures for achieving economies of scale in litigation, enhancing the enforcement of the laws, and deterring misconduct that adversely affects the interests of multiple parties.[1] As has long been recognized, these cases tend to be dominated by entrepreneurial attorneys who effectively control all phases of the litigation.[2] The "named" or "representative" plaintiff, who supposedly

---

[*] Eisenberg is Henry Allen Mark Professor of Law, Cornell Law School. Miller is Stuyvesant P. Comfort Professor of Law, New York University Law School.
[1] See Geoffrey P. Miller, Class Actions, in I New Palgrave Dictionary of Economics and the Law 257-262 (Peter Newman, ed., Macmillan Press 1998).
[2] See, e.g., John C. Coffee, Jr., The Regulation of Entrepreneurial Litigation: Balancing Fairness and

1

acts as the champion of the class, is sometimes little more than an eponym.[3] Yet despite suggestions that class action procedures should dispense with the named plaintiff as a meaningless figurehead,[4] at least in large-scale, small-claim cases,[5] the trend of the law, if anything, has been to the contrary. The named plaintiff remains an essential prerequisite in all class cases. And in one context – private federal securities fraud cases – the named plaintiff has been assigned a significantly enhanced role. In the Private Securities Litigation Reform Act of 1995 (PSLRA),[6] Congress greatly enhanced the role and responsibilities of the named plaintiff in the selection and monitoring of class counsel.

Named plaintiffs incur costs in performing their role. Even "figurehead" plaintiffs must display some familiarity with and responsibility for the case in order to satisfy the "adequacy" requirement of the relevant class action rule.[7] They incur the costs of learning about the case. Defendants also typically take the deposition of the named plaintiff – an experience that can be stressful to someone not familiar with the legal process. The named plaintiff may have to comply with burdensome or intrusive discovery requests. Named plaintiffs also run a slight, but potentially worrisome, risk of being saddled with sanctions if the litigation turns out badly.[8] These costs can be significantly greater when the named plaintiff assumes a more active role in selecting or supervising counsel, as in the case of private securities litigation. In some cases – "pattern or practice" employment discrimination actions being paradigmatic – the named plaintiff may also experience costs in the form of retaliation or loss of reputation.

Named plaintiffs also gain benefits from performing their role. These may include psychic benefits such as the pleasure of having their name on the "marquee," being catered to by counsel, or participating in an interesting and stimulating activity. The named plaintiff also benefits, along with other class members, from the recovery that the litigation generates. Unlike the psychic benefit, which the named plaintiff monopolizes, the benefit from the recovery is shared with other class members.

For class actions to be effectively litigated it is necessary that at least one plaintiff be willing to take on the role of class representative, and that, having assumed

---

Efficiency in the Large Class Action, 54 U. Chi. L. Rev. 877 (1987); John C. Coffee, Jr., Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Though Class and Derivative Actions, 86 Colum. L. Rev. 669 (1986); Jonathan R. Macey & Geoffrey P. Miller, The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 U. Chi. L. Rev. 1 (1991).
[3]  See Geoffrey P. Miller, Competing Bids in Class Action Settlements, 31 Hofstra L. Rev. 633, 633 (2003).
[4]  See Jean Wegman Burns, Decorative Figureheads: Eliminating Class Representatives in Class Actions, 42 Hastings L.J. 165 (1990).
[5]  See Macey & Miller, supra note 2.
[6]  Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified at 15 U.S.C. §§ 77, 78).
[7]  See F.R.C.P. 23(a)(4).
[8]  See In re Continental Illinois Securities Litigation, 962 F.2d 566, 572 (7th Cir. 1992).

that responsibility, he or she carry it out effectively. The costs and benefits of class representation outlined above are not, in themselves, optimally designed to achieve these goals. In some cases – consumer class actions being an example – a class member may even experience a net loss from acting as class champion because the small benefits expected from the case are not enough to cover the increased costs. In other cases, the class member's expected benefits may exceed her costs of acting as class representative, but free-rider effects make her unwilling to go forward. The class member may be better off staying on the sidelines in hopes that someone else will incur the costs of representing the class. At the limit, free rider effects can result in the litigation failing because no one is willing to act as class champion. Even if a class member does come forward, the costs and benefits outlined above do not create incentives for efficient work because the named plaintiff gains only a fraction of the value added by his or her efforts on behalf of the class.

The foregoing suggests the potential social value of compensating named plaintiffs for the full costs of their contributions to the litigation, and also rewarding them for good performance. But who should decide whether and how much the class representative should be paid? Class counsel might seem best situated for this role. Attorneys for the class pay the expenses of litigation in other respects. They are familiar with the case and, because of the attorney-client privilege, are the only parties who have a full opportunity to observe how the named plaintiff performs his or her responsibilities to the class. They also have a strong interest in the success of the litigation, and therefore are well-suited, at least in some respects, to determine whether and to what extent the named plaintiff receives compensation for his or her services. In fact, class attorneys typically do provide some compensation to the named plaintiff. Out-of-pocket costs may generally be reimbursed by class counsel as expenses of litigation.[9] But the representative plaintiff's *nonpecuniary* costs – the opportunity costs of time, the anxiety or stress incident to the case, or the risk of retaliation or harm to reputation – are not classifiable as "expenses." An attorney who paid for these items could be accused of paying the party to act as the named plaintiff. Such payments could provide a basis for the defendant to object to the named plaintiff's typicality or

---

[9] As parties, representative plaintiffs may not be compensable for costs normally paid to witnesses, such as the expenses of travel to and from a deposition. See Heverly v Lewis, 99 FRD 135, (D Nev 1983). However, ethics rules applicable in most states permit the class attorneys to pay the expenses of litigation with repayment to come, if at all, from the amount of any judgment or settlement. See A.B.A. Model Rule of Professional Conduct 1.8(e)(1) (providing that a lawyer "may advance court costs or expenses of litigation on behalf of the client.") The out-of-pocket costs of the representative plaintiff in participating in the litigation (e.g., transportation to the courthouse or meals during as deposition) can reasonably be included in the category of "expenses" of the litigation. Even in states where the lawyer's advances are subject to the caveat that the client must be "ultimately liable" for expenses, class counsel are typically not disabled from paying the client's out-of-pocket costs. See Geoffrey P. Miller, Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Rev. of Litigation 557 (2003) (discussing legal strategies for advancing expenses to the client in such jurisdictions on a contingent basis).

adequacy, or the adequacy of class counsel. They could also subject the attorney to sanction under ethics rules for providing impermissible financial assistance to a client.[10] Even if it were possible to fully compensate the named plaintiff for both pecuniary and non-pecuniary costs, moreover, such payments would not provide the named plaintiff with incentives to act as the best possible agent for the class. Because these payments would only be compensatory, the representative plaintiff would receive no reward for doing a good job and incur no penalty for doing a bad one. Moreover, performance-based payments by attorneys might not be in the interest of the class. The named plaintiff's expectation of compensation from the attorney can potentially interfere with rather than motivate adequate representation because the plaintiff may respond to the interests of the attorney rather than those of the class when the two conflict.

In the absence of an effective mechanism for compensating class representatives by class counsel (other than reimbursement for out-of-pocket expenses), the interests of the class and the purposes of class action litigation might be served by allowing the *court* the discretion to pay class representatives. The court is not limited by the ethical constraints on supporting litigation that may hamper counsel. Judges are not subject to the self-interest that may impair counsel's judgment. And the court has access to a convenient pool of funds – the amount of any judgment or settlement for the class. Perhaps for these reasons, courts do, in fact, frequently make incentive awards to named plaintiffs at the conclusion of class action litigation.

This article enhances our knowledge about such awards. Our data set is a sample of 374 opinions in class action settlements published from 1993 to 2002. We examine these data in light of four possible functions of incentive awards: (1) reimbursing some or all of the representative plaintiff's non-pecuniary costs; (2) rewarding the representative plaintiff for superior service; (3) compensating the representative plaintiff for complying with the attorney's wishes, even at the expense of the class; and (4) achieving proportionality between the incentive award and other outcomes in the case.

In brief, our findings are as follows. Incentive awards were granted in about 28 percent of the sample. The rate of awards varied by case category, with consumer credit class actions yielding awards in about 60 percent of the cases, employment discrimination actions 46 percent, and antitrust class actions resulting in awards in about one-third of the cases. Corporate derivative and mass tort class actions had incentive awards in less than 10 percent of the cases. Securities cases, in settlements believed to occur before the effective date of the PSLRA (which limited incentive awards[11]), displayed incentive awards in about 24 percent of the cases.

When given, incentive awards constituted a small fraction of total class recovery. In the 90 cases in which sufficient data were reported, the total incentive award to all representative plaintiffs constituted, on average, 0.16 percent of the class

---

[10] See A.B.A. Model Code of Professional Conduct 1.8(e) (generally prohibiting a lawyer from providing financial assistance to a client in connection with pending or contemplated litigation).

[11] Note 21 infra.

4

recovery. The median total incentive award constituted, on average, 0.02 percent of the class recovery. Across all case categories, when an incentive award was granted, the average total award was $128,803 and the median total award was $18,190. Awards were typically split between several representative plaintiffs. The average award per class representative was $15,992 and the median award per class representative was $4,357. The size of total incentive awards varied by the subject matter of class actions, with employment discrimination cases being statistically significantly associated with large percentage incentive awards. The size of total incentive awards was strongly associated with the size of the class recovery, the recovery per class member, the amount of attorneys' fees awarded, and the award of costs and expenses.

. We find support for the hypothesis that some incentive awards are designed to reimburse some or all of the representative plaintiff's non-pecuniary costs. For example, we interpret the high rate of incentive awards in consumer credit cases as reflecting courts' wish to ensure that class representatives with small damages do not incur a net loss from the litigation due to their service to the class. The substantial incentive awards observed in employment discrimination cases appear to reflect the courts' wish to make representative plaintiffs whole by compensating them for the high costs of their service to the class, including risks of stigmatization or retaliation on the job. We also find a significant, positive relation between the presence of incentive awards and the ratio of counsel's costs and expenses to the median recovery per class member. If counsel's costs and expenses are a reasonable proxy for the representative plaintiff's costs, then this relation is further evidence reproof the reimbursement hypothesis. We find no significant relation between the presence of incentive awards and another possible proxy for the representative plaintiff's costs, the time elapsed between filing and settlement.

We also find support for the hypothesis that incentive awards are calibrated to other aspects of the case. We find a strong positive relation between class recovery and aggregate incentive awards. Because, as shown in our prior work,[12] a strong association exists between class recovery and both attorneys' fees and the expenses of the litigation, incentive awards also display a significant correlation with both the attorneys' fee and the expenses awarded in the settlement. Further, as also shown in our prior work, the award of attorneys' fees and expenses displays a scaling effect, with awards decreasing as a percentage of the recovery as the recovery increases. We find a similar scaling effect with respect to incentive awards.

We find mixed support for the hypothesis that incentive awards serve as a means for rewarding class representatives for superior service to the class. Incentive awards are not higher or more frequent in cases where the attorneys' fee award is low, suggesting that courts are not compensating the representative plaintiff for monitoring counsel to keep fees under control. We find a positive, significant relation between the size of incentive awards and the presence of settlement objectors. Higher incentive

---

[12] Theodore Eisenberg & Geoffrey Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Studies 27 (2004).

awards in such cases would be in tension with the reward-for-service hypothesis if objectors appear when settlements are not advantageous to the class (admittedly a contestable proposition). On the other hand, we find a consistent, significant association between high risk litigation and the size of incentive awards, a finding that tends to support the reward-for-service hypothesis, because settlement of a high-risk case is some indication that the class representative has provided good service.

We find contradictory evidence that incentive awards for class representatives reflect the attorneys' self interest. No strong association exists between the presence of incentive awards and the size of the attorneys' fee. If attorneys were acting in their self-interest when they recommend awards to the court, we might expect to see the rate of awards increase with increased fees. We might also expect that self-interested attorneys would be disinclined to recommend incentive awards in large-scale, small-claim consumer cases because, given the very large number of potential clients, an attorney can easily find alternative class representatives and thus is not subject to hold-out threats from the named plaintiff. However, controlling for class recoveries, incentive awards did not vary significantly with class size. On the other hand, the evidence of significantly larger incentive awards for employment discrimination plaintiffs provides some evidence for the attorney self-interest hypothesis. The representative plaintiff in a "pattern or practice" employment case has significant bargaining leverage with class counsel, both because the damages are typically large enough to support an individual lawsuit and because the named plaintiff is often a key witness and an important liaison with absent plaintiffs. The hope for a generous incentive award at the end of the case could tend to counteract the representative plaintiff's hold-out threat and thus could serve the interests of class counsel even at the expense of the class.

Overall, the evidence suggests that incentive awards serve multiple goals. They compensate representative plaintiffs for costs and appear to reflect the court's assessment of reasonable proportionality between the incentive award and other case outcomes. They may also, to some extent, compensate class representatives for what the court perceives to be superior service to the class, and may sometimes serve the interests of the class attorneys though it would be hard to isolate that as their sole function. On balance, we find little evidence of systematic abuse of incentive awards. On the other hand, there are theoretical reasons for granting such awards in appropriate cases. Inability to grant incentive awards may deter lead participation by class representatives. This problem becomes acute when the representative plaintiff is an institutional investor which must take its fiduciary obligations to its investors into account.[13] Given the modest frequency and size of incentive awards, and their possible benefits, courts that flatly refuse to grant them in any cases, rather than supervise their scope in particular cases, and laws that forbid them, may generate inefficiencies in class action litigation.

---

[13] The problem here is analogous to the difficulty institutional investors face when acting as representative plaintiffs in jurisdictions that require, as a matter of legal ethics, that the client assume ultimate responsibility for litigation expenses. See Miller, supra note 9.

Part II of this paper reviews past incentive award practices and prior studies of incentive awards. Part III formulates testable hypotheses about the rate and level of incentive awards. Part IV describes the data and Part V reports the results. Part VI concludes.

## II. Incentive Award Practices and Studies

Courts once tended to limit incentive awards to cases where the representative plaintiff had provided special services to the class[15] – for example, providing financial or logistical support to the litigation or acting as an expert consultant.[16] Beginning around 1990 however, awards for representative plaintiffs began to find readier acceptance.[17] Cases approving incentive awards proliferated[18] and tests developed to identify the appropriate conditions for the grant of an award.[19] By the turn of the century some considered these awards to be "routine."[20]

---

[15] See Irwin H. Warren & Darla C. Stuckey, 1992 Recent Developments In Class Actions: Attorneys' Fees, Partial Settlements And Awards to Named Plaintiffs (Practicing Law Institute 1992).

[16] See id.

[17] Since our data commence in 1993, we cannot test a hypothesis about an increase around 1990. We do, however, find some evidence of growth in the rate of incentive awards from the earliest years in our data. In the two years before 1995, incentive awards were reported in 20.3 percent of cases. In 1995 through 2002, incentive awards were reported in 29.8 percent of cases, an increase of almost 50 percent. The difference is statistically significant at $p=0.12$. We find no evidence that the amount of incentive awards increased over time, a finding similar to the absence of increase in class recoveries and attorney fee awards reported in Eisenberg & Miller, supra note 12.

[18] E.g., In re U.S. Bancorp Litig., 291 F.3d 1035, 1038 (8th Cir.2002) (approving $2,000 incentive awards to five named plaintiffs out of a class potentially numbering more then 4 million in a settlement of $3 million); In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 463 (9th Cir.2000) (approving incentive awards of $5,000 each to the two class representatives of 5,400 potential class members in a settlement of $1.725 million); In re Cont'l Ill. Sec. Litig., 962 F.2d 566, 571 (7th Cir.1992) (approving incentive fees to compensate named plaintiffs for the risks they take and their vanguard role in the class action); In re Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir.1992) (add parenthetical); In re SmithKline Beckman Corp. Sec. Litig., 751 F.Supp. 525, 535 (E.D.Pa.1990) (approving $5,000 awards for one named representative of each of nine plaintiff classes involving more than 22,000 claimants in a settlement of $22 million)..

[19] These courts focus on factors such as the effort required by the particular plaintiff, Huguley v. General Motors Corp., 128 F.R.D. 81, 85 (E.D. Mich. 1989), aff'd, 925 F.2d 1464 (6th Cir. 1991), the burdens imposed by discovery, a reward for being the first to complain of a questionable practice, disruption caused by litigation, and representing the class when an individual claim might have been more easily resolved. See Golden v. Shulman, [1988-1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,060, at 90,954 (E.D.N.Y. 1988); Bogosian v. Gulf Oil Corp., 621 F. Supp. 27, 32 (E.D. Pa. 1985); In re Dun & Bradstreet Credit Servs. Customer Litig., 130 F.R.D. 366, 374 (S.D. Ohio 1990); Luevano v. Campbell, 93 F.R.D. 68, 90 (D.D.C. 1981).

[20] Ingram v. Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001) (quoting In re S. Ohio Corr. Facility, 175 F.R.D. 270, 272 (S.D. Ohio 1997) ("Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation").

Even as incentive awards were achieving recognition, however, the pendulum begun to swing against them. The PSLRA, enacted in 1995, prohibits incentive awards to representative plaintiffs in class actions subject to that statute.[21] Congress's most recent foray into the regulation of class action litigation, the Class Action Fairness Act of 2005 ("CAFA"),[22] also reflects misgivings about incentive awards. The congressional findings prefacing that statute characterize as one of the "abuses" of class action practice the situation in which "unjustified awards are made to certain plaintiffs at the expense of other class members."[23] Although the only operational provision of CAFA relevant to incentive awards pertains to extra compensation based on geographic location,[24] the spirit of this legislation is unfriendly to routine incentive payments.

Mirroring these shifting patterns in the legal treatment of incentive awards has been a vibrant normative debate. Some courts and commentators criticize incentive awards on the ground that they undermine the named plaintiff's incentives to monitor suboptimal or collusive settlements.[25] Incentive awards have been seen as providing inappropriate leverage to plaintiffs to threaten class action litigation in order to obtain a larger settlement in their individual lawsuits.[26] Others have expressed concern about the fairness of the named plaintiff receiving a larger award than the rest of the class.[27]

---

[21] 15 U.S.C. § 78u-4(a)(2)(A)(vi) requires a representative plaintiff in securities litigation to file a sworn certification with the complaint that:

> states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4).

15 U.S.C. § 78u-4(a)(4) states:

> The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class.

Under section 108 of Pub. L. No. 104-67, 109 Stat. 737, the PSLRA applies to actions filed after December 22, 1995.

[22] Pub. L. No. 109-2, 119 Stat. 4 (2005).

[23] Id. § 2(a)(3)(B).

[24] See 28 U.S.C. § 1714 ("The court may not approve a proposed settlement that provides for the payment of greater sums to some class members than to others solely on the basis that the class members to whom the greater sums are to be paid are located in closer geographic proximity to the court.")

[25] See, e.g., James N. Benedict & Martin L. Seidel, Special Compensation of Named Plaitiffs in Securities Class Actions, 24 Rev. of Securities & Commodities Regulation 195 (1991); Brown v. Steinberg, Fed. Sec. L. Rep. (CCH) ¶ 95680, 1990 WL 161023 (S.D. N.Y. 1990); Weseley v. Spear, Leeds & Kellogg, 711 F.Supp. 713, 720 (E.D.N.Y. 1989) Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co., 76 F.R.D. 173, 180 (S.D.N.Y. 1977) (observing that "if class representativex expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.").

[26] See Shelton v. Pargo, Inc., 582 F.2d 1298, 1315 (4th Cir. 1978).

[27] See, e.g., Plummer v. Chemical Bank, 91 F.R.D. 434, 442 (S.D.N.Y. 1981) ("additional benefits to the

Incentive awards have been stigmatized as a means for paying off "professional plaintiffs."[28] Some have noted the lack of specific authorization for incentive awards in the relevant statutes or court rules.[29]

Other observers have offered arguments in favor of incentive awards. Such awards are seen as necessary in order to provide adequate incentives to representative plaintiffs to step forward as champions for the class.[30] In the absence of appropriate incentives, the public policy objectives of the class action procedure may not be achieved. From a doctrinal perspective, incentive awards have been justified as a form of restitution for a benefit conferred on others.[31]

To date, this normative debate has not been grounded in data. In fact, little systematic information exists about the frequency and amount of incentive awards. Willging et al. studied all class actions terminated in four districts between July 1, 1992, and June 30, 1994. In the Eastern District of Pennsylvania, the Southern District of Florida, the Northern District of Illinois, and the Northern District of California, the authors found that incentive awards were granted in 26%, 46%, 40%, and 37% of the cases, respectively. The median amounts of all awards to class representatives ranged from $7,500 in two districts to $17,000 in the Northern District of California. The median award per representative in three courts was under $3,000 and was $7,560 in the Northern District. The median percentage of the settlement amount that was awarded to class representatives was not more than eleven-thousandths of 1% (0.011%) in all four

---

named plaintiffs . . . must be regarded as prima facie evidence that the settlement is unfair to the class.") In one leading case, Staton v. Boeing Co., 327 F.3d 938 (9th Cir. 2003), the Ninth Circuit rejected a consent decree in an employment discrimination case, in part, on the ground that certain plaintiffs – who were individual clients of class counsel – received much more in the settlement than other plaintiffs. Although the court did award small incentive bonuses to the representative plaintiffs, the tenor and reasoning of the opinion appears hostile to any such awards that are significantly disproportionate to the amounts received by the plaintiff class as a whole.

[28]    This was a major theme in the legislative history of the PSLRA. The Conference Report for that statute explained the rationale for prohibiting incentive awards as follows:

> Professional plaintiffs who own a nominal number of shares in a wide array of public companies permit lawyers readily to file abusive securities class action lawsuits. . . . These lead plaintiffs often receive compensation in the form of bounty payments or bonuses.    . . . Lead plaintiffs are not entitled to a bounty for their services. Individuals who are motivated by the payment of a bounty or bonus should not be permitted to serve as lead plaintiffs. These individuals do not adequately represent other shareholders—in many cases the "lead plaintiff" has not even read the complaint.

H.R. Conf. Rep. 104-369, at 32-33.

[29]    See Sofia C. Hubscher, Making it Worth Plaintiffs' While: Extra Incentive Awards to Named Plaintiffs in Class Action Employment Discrimination Lawsuits, 23 Colum. Human Rts. L. Rev. 463, 482 (1992).

[30]    See, e.g., id.; Clinton Krislov, Scrutiny of the Bounty: Incentive Awards for Plaintiffs in Class Litigation, 78 Ill. B.J. 286 (1990); Committee on Professional Responsibility, Association of the Bar of the City of New York, Financial Arrangements in Class Actions, and the Code of Professional Responsibility, 20 Fordham Urban L.J. 831 (1993).

[31]    See In re Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir.1992).

districts.[32]  Downs studied class action lawsuits that had been filed and resolved in the Northern District of California from 1985 through 1993.  He found that, of 24 settled class actions, "[p]references to the named representatives occurred in four cases (16%), and inequality in the plan of distribution appeared on the record in five lawsuits (20.8%)."[33]  Hensler et al. report incentive awards of $3,000, $10,000, and an unstated amount to various plaintiffs in three of ten class actions that the RAND Institute for Civil Justice studied in detail.[34]  The payments to representative plaintiffs in one case with figures available appear to have comprised 0.018% of the minimum payout amount,[35] and in the other case appear to have comprised 0.005% of the payout.[36]  These studies, although helpful, were based on limited data, focused on only a few jurisdictions, or, in the case of Hensler et al., were limited to ten cases.

### III. Hypotheses about the Pattern of Incentive Awards

Our study investigates four hypotheses about the pattern of incentive awards.  First, incentive awards may reimburse representative plaintiffs for some or all of the costs of their services to the class.  Second, incentive awards might be used to reward representative plaintiffs for superior service to the class.  Third, incentive awards may be used to further the attorney's self interest.  Fourth, incentive awards may be set so as to be proportional to other outcomes of the case.  The following discussion explains the rationale underlying these four hypotheses.

---

[32] Thomas E. Willging, Laural L. Hooper, and Robert J. Niemic, An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges, 71 N.Y.U.L.Rev. 74, 101 (1996).  The N.Y.U. Law Review article is based on Thomas E. Willging, Laural L. Hooper, and Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules (Federal Judicial Center 1996).

[33] Howard M. Downs, Federal Class Actions:  Diminished Protection for the Class and the Case for Reform, 73 Neb. L. Rev. 646, 710 (1994).  See also Krislov, supra note 30; Jerold S. Solovy, Laura A. Kaster, and Jeanine M. Jiganti, The Head of the Class, Nat'l L. J., Aug. 27, 1990, at 13.

[34] Deborah R. Hensler, Nicholas M. Pace, Bonita, Dombey-Moore, Beth Giddens, Jennifer Gross, and Erik K Moller, Class Action Dilemmas: Pursuing Public Goals for Private Gain 219, 359, 361, 388 (2000).

[35] In In re Louisiana-Pacific Inner-Seal Litigation, Civ. No. 95-879-JO (LEAD) (D. Or., filed June 19, 1995), as cited by Hensler et al., supra note 34, at 367 n.2, nine plaintiffs or couples initially received $3,000 each, and one condominium association received $10,000. Id. at 359.  Four additional intervenors received $3,000 after an appeal. Id. at 361.  The payments to representative plaintiffs thus totaled $49,000. The defendant's minimal funding obligation was $275 million. Id. at 358.

[36] In Cox v. Shell Oil Co., No. 18,844 (Tenn. Ch. Ct. Obion Cty. 1995) and related cases, Beeman v. Shell Oil Co., No. 93-047363 (Tex. Dist. Ct. Harris Cty., filed Sept. 1993); Spencer v. Shell Oil Co., No. CV-94-074 (Ala. Cir. Ct. Greene Cty. Filed Nov. 1994), as cited by Hensler et al., supra note 34, at 394 n.2, 16 reprsentative plaintiffs received $3,000 each., id. at 388, for a total of $48,000.  The settlement fund had a "soft cap" of $950 million. Id. at 387-88.

A. Cost Reimbursement

A minimum condition for an economically rational class member to step forward as class representative is that his benefits must exceed his costs. If R is the expected recovery from the litigation for a class member and C is his expected return from serving as a class representative (where C is defined generously to include out of pocket costs, opportunity costs, loss of reputation, and subjective litigation costs or benefits), the relation between R and C should influence his willingness to act on behalf of the class. A rational class member would not agree to be the representative plaintiff where R is less than C. The cost reimbursement hypothesis would predict incentive awards in such cases, with the size of the award increasing with the difference between R and C. The hypothesis therefore suggests that awards will be more common, and larger: (1) holding constant C, in cases with low R and, (2) holding constant R, in cases with high C.

Even when R exceeds C, an incentive award may still be warranted under the cost reimbursement hypothesis. Because representative class members incur all the non-pecuniary costs of representing the class but gain only a fractional share of the class recovery, they will receive less than other class members at the end of the day if no incentive award is given – a result that seems particularly unfair given that, by coming forward, they have conferred a benefit on the class. Further, knowing this fact, a rational class member may elect to sit on the sidelines and hope that some other class member will come forward, since he can thereby avoid the non-pecuniary costs of acting as class representative. These fairness and free-rider concerns suggest that incentive awards may be granted, under the cost reimbursement hypothesis, when C is substantial, even if R is also large. The size of the class may also be relevant in this regard. When the class grows very large, it becomes likely that some class member will come forward despite free rider effects. So the cost reimbursement hypothesis also predicts that awards will be more common, and larger: (3) in cases where C is large, regardless of R; and (4) in smaller as opposed to larger classes.

In some types of cases, the nature of the litigation itself provides evidence that C will be high. In "pattern or practice" employment discrimination cases, for example, representative plaintiffs will often be key witnesses and may also act as liaisons between the attorneys and members of the class. These additional responsibilities increase costs for representative plaintiffs. At the same time, representative plaintiffs in such cases may suffer retaliation on the job[37] or loss of employment prospects[38] --

---

[37] See, e.g., Roberts v. Texaco, Inc., 979 F. Supp. 185, 188 (S.D.N.Y. 1997) (authorizing incentive awards ranging up to $85,000 and noting that "the litigant who remains on the job can expect . . . that lower level co-workers and supervisors may perceive his or her actions as disloyalty and evidence of an attitude contrary to the common good.").

[38] See, e.g., Ingram v. The Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding $300,000 incentive payments to each of four representative plaintiffs, and observing that these individuals had agreed never to seek re-employment with the defendant).

consequences that may also significantly increase their costs. Accordingly, the cost reimbursement hypothesis suggests that incentive awards will be more frequent, and larger, in employment cases than in other types of class action.

In the more typical case, we cannot infer from the nature of the action whether the representative plaintiff's costs will be low or high. Here, our data about costs is necessarily indirect. The amount of costs and expenses claimed by counsel is one potential proxy for costs borne by representative plaintiffs. The cost reimbursement hypothesis thus predicts that the existence and amount of incentive awards will be a positive function of class counsel's expenses, holding other factors constant. Another proxy for the representative plaintiff's costs is the age of the case: the older the case, the more time and effort the representative plaintiff will have presumably expended in monitoring it. Thus the cost reimbursement hypothesis suggests that the grant and level of incentive awards will also be a positive function of the age of the case, holding other factors constant.

B. Reward for Performance

A second hypothesis is that incentive awards are used to reward representative plaintiffs for superior service to the class. Representative plaintiffs may be compensated based on the quality of their performance. Representative plaintiffs can serve a class in several ways.

First, representative plaintiffs might serve the class by exerting downward pressure on attorneys' fees and generating a greater net recovery for the class. If incentive awards are being used in this fashion, we expect that incentive awards will be more common, and larger, when attorney fees are lower, holding constant the size of the class recovery.

Second, representative plaintiffs might be rewarded for their performance in taking on risky litigation, since, if such litigation generates a settlement it may be inferred that the representative plaintiff has provided superior service to the class. We therefore might find a positive association between a high-risk case and the grant of an incentive award.

Third, service to the class, for both class representatives and attorneys, might be evaluated by the class's reaction to the settlement. The premise here is that class members will opt out or object if the deal struck by the attorneys and class representatives is insufficiently favorable.[39] On this view, incentive awards should be less frequent, and lower, in the presence of objection to a settlement.

One obvious measure of performance, the size of the class recovery, is initially an attractive candidate for measuring performance. And incentive awards are strongly correlated with the size of the class recovery – a matter we discuss below – but the

---

[39] This premise is contestable given the very low levels of dissent observed in most class action settlements. See Theodore Eisenberg & Geoffrey P. Miller, The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vand. L. Rev. 1529 (2004).

12

latter is not a good proxy for the quality of service provided by the class representatives because it does not measure what the class would have received if the class representative had done a worse (or better) job.

C. Attorney Self-Interest

Incentive awards may be used to further the attorney's self interest by rewarding malleable representative plaintiffs. Because attorneys are the ones who typically suggest the propriety and amount of an incentive award to the court, the attorneys have the ability to manipulate the process to serve their own objectives.

The attorney self-interest hypothesis generates several predictions. First, one might expect to find an association between the presence of an incentive award and the attorneys' fee. If attorneys reward representative plaintiffs for serving the attorney's interests at the expense of the class, we would expect holding other factors constant that incentive awards will be more frequent, and higher, as fees increase.

Second, if objectors appear more frequently in settlements that enrich the attorney at the expense of the class, this hypothesis would predict more frequent and higher awards when objectors are present. On the other hand, this factor must be assessed with caution as probative of the attorney self-interest hypothesis, since the presence of objection may be independently correlated with increased costs for representative plaintiffs, so higher awards in cases with objectors may sometimes be warranted.

Third, the attorney self-interest hypothesis predicts that incentive awards will be more frequent and larger in cases where the class member has significant bargaining leverage vis-à-vis the attorney. This would suggest a negative correlation between incentive awards and the size of the class (where the class is small, the attorney may have difficulty finding plaintiffs, and accordingly relies on the representative plaintiff not to drop out). It would also suggest that incentive awards will be more common, and larger, when the attorney relies on the class representative's active participation in the litigation – as, for example, when the class member is influential with other, absent class members, or whether the class claims are tried with evidence supplied by the representative plaintiff. A classic example of this situation is, again, the "pattern or practice" employment discrimination action, where because of the substantial individual damages and the named plaintiff's role in establishing proof of class-wide discrimination and in organizing the class members on the job, the attorney has an interest in buying that individual's support with the prospect of a substantial incentive award at the point of settlement.

Fourth, the attorney self-interest hypothesis might predict that incentive awards will be larger in state court than in federal court. For example, CAFA appears to have been premised on the assumption that federal courts are better than state courts at policing against "professional plaintiffs" who are little more than paid agents of class

counsel.[40]  If these premises are accurate,[41] one might expect that incentive awards will be less frequent, and smaller, in federal court than in state court.

D. Proportionality

Courts may grant incentive awards with a view towards achieving a degree of proportionality with other key case outcomes.  This theory suggests that the amount of the incentive award  should be positively associated with the recovery per class member and the class recovery as a whole.  The theory might also suggest a positive association between the incentive award the size of the attorneys' fee or the amount awarded to the attorney for costs and expenses.  Previous research reports evidence that the principal cost of bringing an action, the professional services of an attorney, decreases as class size increases due to economies of scale in class litigation.[42]  Scale effects are also observed for the award of counsel's costs and expenses.[43]  A principle of proportionality would suggest a similar scale effect for incentive awards, with such awards constitution a decreasing fraction of the class recovery as the recovery grows larger.

**IV. Data Description**

To explore incentive awards we used data previously compiled on all state and federal class actions with reported fee decisions between 1993 and 2002, inclusive, in which the fee and class recovery could be determined with reasonable confidence.[44]  The list of cases analyzed started with this previously gathered data base.  We searched in the WESTLAW™ "AllCases" data base using the search "settlement & 'class action' & attorney! w/2 fee! & date(=[1993-2002])."  This search's results were checked

---

[40]    Ses text accompanying note 23 supra.  This perception was part of a broader belief, on the part of some in Congress, that state courts are more favorably inclined towards class actions generally.  E.g., John H. Beisner & Jessica Davidson Miller, They're Making a Federal Case out of it ... in State Court, 25 Harv. J.L. & Pub. Policy 143 (2001); Thomas E. Willging & Shannon R. Wheatman, An Empirical Examination of Attorneys' Choice of Forum in Class Action Litig. 3 (Federal Judicial Center 2005) (referring to 2003 House version of CAFA which stated that state courts give less scrutiny to the merits of class action lawsuits.).

[41]    The currently best available information does not support substantial differences between state and federal courts in processing of class actions.  Willging & Wheatman, supra note 40, at 42-46 (little evidence of federal-state differences in treatment of class actions); Eisenberg & Miller, supra note 12 (finding that attorneys fees in settled class actions were not greater as a percentage of the recovery in state as opposed to federal court) . But cf. Kevin M. Clermont & Theodore Eisenberg, Exorcising the Evil of Forum Shopping, 80 Cornell L. Rev. 1507-35 (1995) (forum mattered in study of non-class action cases). CAFA's reliance on removal from federal to state court as a procedural mechanism is questionable in light of evidence of increasing abuse of the removal process.  Theodore Eisenberg & Trevor Morrison, Overlooked in the Tort Reform Debate: The Growth of Erroneous Removal, 2 J. Empirical Legal Studies 551 (2005).

[42] Eisenberg & Miller, supra note 12.

[43] Id.

[44] Id.

14

against a search of the LEXIS™ "Mega" data base using the same search terms. We also compiled lists of citations in the cases found by these search requests and included any additional cases meeting the basic search criteria. We further checked the list against the CCH™ Federal Securities and Trade Regulation Reporters.

For this article we supplemented our recovery and fees data base with information from a new search that focused more specifically on incentive awards. This new search also used the "AllCases" database and consisted of "settlement & 'class action' & incentive w /2 award & date(>1992) & date(<2003)." The search yielded three additional relevant opinions, two of which authorized incentive awards and one of which denied an incentive award. One of the new opinions was an additional opinion filed in a case previously included in our data base. Once cases had been identified by these methods, we sometimes gathered additional information about case characteristics from other sources – for example, information on the Internet or docket entries in the U.S. Courts PACER system. These searches yielded an initial list of 452 cases.

For cases filed after December 22, 1995, the PSLRA prohibits incentive awards in private securities cases.[45] Many opinions do not contain precise filing date information so we cannot prune the securities subset of cases to include only those eligible for incentive awards. To remove most post-PSLRA cases ineligible for incentive awards we omitted securities cases terminated after 1997. Inspection of the rate of incentive awards before and after that date yielded a noticeable drop in the rate of incentive awards for securities cases reported after 1997. Deletion of the post-PSLRA cases and a few cases with missing data yielded 374 cases for analysis of incentive awards.

Two key variables of interest are whether an incentive award was given and the size of the incentive award. Of the 374 cases, 104 (27.8 percent) reported incentive awards. Ninety-four of the 104 cases with an award reported the maximum amount of the incentive award. In cases with incentive awards for more than one class representative, we coded the incentive award that was the highest of any individual incentive award in a case, the sum of all incentive awards in a case, and the average incentive award in a case. Ninety of the 104 cases with an incentive award reported sufficient information to compute the sum of the incentive awards and 87 cases reported sufficient information to compute the average of the incentive awards.

Table 1 reports summary statistics for the variables available at the individual case level. Additional information about some of the variables used is available in a prior study.[46] A breakdown by case categories appears in tables later in this article as appropriate for the question being discussed.

---

[45] Note 21 supra.
[46] Eisenberg & Miller, supra note 12.

Table 1. Descriptive Statistics of Key Variables Used to Analyze Incentive Awards

| Variable | Mean | Median | Std. dev. | N |
|---|---|---|---|---|
| **A. Continuous variables** | | | | |
| Gross recovery (thousands $ 2002) | 98,200.56 | 11,208.72 | 406,783.39 | 304 |
| Gross recovery ($ 2002)(log 10) | 7.00 | 7.05 | 0.99 | 304 |
| Incentive award amount--maximum ($ 2002) | 17,626.52 | 5311.37 | 43,226.82 | 94 |
| Incentive award amount--maximum ($2002)(log 10) | 3.74 | 3.73 | 0.62 | 94 |
| Incentive award amount--total ($ 2002) | 128,803.93 | 18,190.72 | 689,958.24 | 90 |
| Incentive award amount--total ($2002)(log 10) | 4.20 | 4.26 | 0.77 | 90 |
| Incentive award amount—average ($ 2002) | 15,991.54 | 4357.44 | 42,448.96 | 87 |
| Incentive award amount—average ($2002)(log 10) | 3.70 | 3.64 | 0.63 | 87 |
| Attorney fees—($ 2002) | 8,870,101 | 1,709,997 | 31,400,000 | 346 |
| Attorney fees—($ 2002) (log 10) | 6.22 | 6.23 | 0.82 | 346 |
| Attorney costs and expenses—($ 2002) | 1,061,172 | 186,089.6 | 3,114,844 | 252 |
| Attorney costs and expenses—($ 2002) (log 10) | 5.19 | 5.27 | 0.95 | 252 |
| Number of plaintiffs receiving incentive award | 5.25 | 2 | 13.70 | 88 |
| Age of case (log years) | 1.08 | 1.10 | 0.68 | 331 |
| Year | 1997.73 | 1998.00 | 3.09 | 374 |
| **B. Dichotomous variables** | | | | |
| Incentive award granted | 0.28 | 0.00 | 0.45 | 374 |
| Federal case | 0.77 | 1.00 | 0.42 | 374 |
| High risk case | 0.18 | 0.00 | 0.38 | 374 |
| Low risk case | 0.11 | 0.00 | 0.31 | 372 |
| Objection to settlement | 0.37 | 0.00 | 0.48 | 372 |

Source. Reported class actions,1993-2002.

For some purposes we needed to know not only the fact or size of the incentive award but also of size of the class and the recovery per class member. The recovery per class member can be crucial in assessing the economics of class action litigation for representative plaintiffs. In other published work we reported, by case category, the recovery per class member and the mean and median number of class members in a database consisting of cases that reported opt-out and dissenting behavior.[47] These numbers, used here, are summarized in the Appendix. We make use of those numbers here but note that they are estimates not derived from actual class sizes in all the cases analyzed here.

As in our prior class action research, a qualification about using published opinions is in order. The data set analyzed does not contain cases that did not publish opinions. Although published opinions are not necessarily representative of the universe of all cases, they can lead to important insights. And opinions are in one

---

[47] Eisenberg & Miller, supra note 39.

important respect representative. For judges seeking to inform their incentive award decisions with knowledge of other cases, published opinions are the prime source of data[48] and systematic analysis of opinions should help inform decision-making. We discuss the implications of the published opinion filter for interpreting our findings after reporting the results.[49]

## V. Empirical Results

Two features of incentive awards are worth separating. One is the decision whether to grant representative plaintiffs an incentive award. The second is, given the existence of an award, what explains its amount. We first report on the frequency of incentive awards and then the size of incentive awards in those cases that grant awards.

A. The Frequency of Incentive Awards

Table 2 shows the rate at which incentive awards were given broken down by case categories. Across all case categories combined, incentive awards were given in 27.8 percent of the 374 class actions. But substantial variation exists across case categories. Consumer credit cases have the highest rate of incentive awards, 59 percent, followed by commercial cases (57 percent), insurance cases (47 percent), employment discrimination cases (46 percent), and antitrust cases (35 percent). Mass tort cases showed one only incentive award. One can reject the hypothesis of an equal rate of incentive awards across all case categories at p=.0002.[50] Previous work suggested strong differences in recovery and fee award patterns between cases involving statutory fee-shifting and other class actions.[51] In results not reported here, we find no statistically significant difference between rates of incentive awards in fee-shifting and non-fee-shifting cases.

---

[48] Cf. Theodore Eisenberg & Sheri Lynn Johnson, The Effects of Intent: Do We Know How Legal Standards Work?, 76 Cornell L. Rev. 1151, 1195 (1991).

[49] See text accompanying notes 74-80 infra.

[50] Because of sparse cells in the table, a simple chi-squared calculation might yield unreliable results. Fisher's exact test requires too much computational resources. The reported p-value is based on 1,000,000 Monte Carlo simulations using StatXact software version 6.2. A chi-squared test yields p = .0003.

[51] Eisenberg & Miller, supra note 12.

Table 2. Number and Percent of Cases with Incentive Awards by Case Category
Class Action Settlements 1993-2002

| Case category | No incentive award | Incentive award | Total |
|---|---|---|---|
| Antitrust | 26 | 14 | 40 |
| | 65.0% | 35.0% | 100% |
| Civil rights | 17 | 2 | 19 |
| | 89.5% | 10.5% | 100% |
| Commercial | 3 | 4 | 7 |
| | 42.9% | 57.1% | 100% |
| Consumer | 26 | 13 | 39 |
| | 66.7% | 33.3% | 100% |
| Consumer credit | 9 | 13 | 22 |
| | 40.9% | 59.1% | 100% |
| Corporate | 23 | 1 | 24 |
| | 95.8% | 4.2% | 100% |
| ERISA | 20 | 4 | 24 |
| | 83.3% | 16.7% | 100% |
| Employment | 10 | 3 | 13 |
| | 76.9% | 23.1% | 100% |
| Employment discrimination | 7 | 6 | 13 |
| | 53.9% | 46.2% | 100% |
| Insurance | 9 | 8 | 17 |
| | 52.9% | 47.1% | 100% |
| Mass tort | 13 | 1 | 14 |
| | 92.9% | 7.1% | 100% |
| Other | 22 | 9 | 31 |
| | 71.0% | 29.0% | 100% |
| Product liability | 5 | 2 | 7 |
| | 71.4% | 28.6% | 100% |
| Securities | 74 | 24 | 98 |
| | 75.5% | 24.5% | 100% |
| Tax refund | 6 | 0 | 6 |
| | 100% | 0.0% | 100% |
| Total | 270 | 104 | 374 |
| | 72.2% | 27.8% | 100% |

Source. Reported class actions, 1993-2002.

Table 2 demonstrates that incentive award rates vary across case categories. It is of interest to ascertain the reasons for these differences. Some information on that question can be derived from examining the average recoveries per class member in the different types of cases. We have elsewhere estimated the recovery amount per class member in a variety of case types.[52] Figure 1 shows the relation, by case category, between the rate at which incentive awards were given and the median class member recovery.

---

[52] Eisenberg & Miller, supra note 39; Appendix Table 1 infra.

18



Figure 1. Incentive Award Rate and Median Class Member Recovery

Sources. Reported class actions, 1993-2002.
Note. Median class member recoveries are from Eisenberg & Miller, 54 Vand. L. Rev. at 1549.
Amounts are inflation-adjusted 2002 dollars.

A few findings emerge from an analysis of this figure and Table 2. First, consumer credit cases display both the lowest median recoveries per class member and the highest incidence of incentive awards.[53] This result is consistent with the cost reimbursement hypothesis, since where per capita recoveries are low, the typical class member will require an incentive award to ensure that the costs of acting as class

---

[53]  This category of consumer credit cases consists of several consumer credit case categories that have statutory limitations on recoveries. It includes principally cases under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692k(a)(2), which account for 15 of the 22 cases in our consumer credit category. It also includes cases under the Truth in Lending Act, 15 U.S.C. § 1640(a)(2)(A)(i), § 1640(a)(2)(B), the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(f)(2), and the Competitive Equality Banking Act of 1987, 12 U.S.C. § 4010(a)(2). The low recoveries per class member are likely due to the presence of legislative caps on recovery amounts. For example, the FDCPA caps damages at the lesser of $500,000 or one percent of the net worth of the debt collector, and individual actions have damages capped at $1,000. 15 U.S.C. § 1692k(a)(2). Our source of information about recoveries per class member and class size, Eisenberg & Miller, supra note 39; Appendix 1 infra, did not separately account for consumer credit cases other than FDCPA cases. In the analyses reported in this article, we use the recovery-per-class-member and class size information for FDCPA cases for all 22 consumer credit cases. We have rerun all key models reported in this article and excluded the consumer credit cases that are not FDCPA cases. No material differences in results emerged.

representative are not greater than the recovery he or she can expect to receive from the litigation.

Second, employment discrimination cases differ from consumer credit cases in their high median recoveries per class member, but also have high rates of incentive awards. This finding is consistent with the cost-reimbursement theory. As Part III suggests, the costs to employment discrimination representative plaintiffs of bringing an action are likely higher than plaintiffs in other case categories. Without incentive awards, those high costs might make class action representation economically unattractive in employment discrimination cases. Other kinds of employment law class actions may lack the tangible and intangible costs of accusing one's employer of discrimination. This may explain the lower rate of incentive awards in the non-discrimination employment category. The high frequency of incentive awards in employment discrimination cases is also consistent with the attorney self-interest hypothesis. Since plaintiffs in employment discrimination cases may tend to have significant hold-out power vis-à-vis class counsel, the attorneys have an incentive to reward the representative plaintiff for compliant behavior by providing them with incentive awards at time of settlement.

The relatively high rate of incentive awards in antitrust cases is likely due to the presence in the antitrust category of several cases with recoveries per class member of less than $100. We previously reported class member recoveries based on 19 antitrust cases.[55] Review of those cases for purposes of this study revealed that seven of the 19 cases had recoveries of less than $100 per class member. But the antitrust category also has several cases with awards per class member of well over $1,000. Antitrust cases' heterogeneity in award levels distinguishes it from consumer credit cases, which have uniformly low recoveries per class member. The antitrust category's incentive award rate of 35 percent reflects its variance in the award distribution per class member.

Table 2 shows that insurance cases have a high rate of incentive awards. Insurance cases are reported in Table 2 but not in Figure 1. This is because the data set used in this article to assess rates of incentive awards allows separation of insurance cases. But our previous work in which the per class member recovery amounts are reported, and which we rely on here, did not segregate insurance cases as a separate category.[56] It is probable that the high rate of incentive awards in insurance cases results from the presence in the data of a low per capita recovery consumer class actions, where incentive awards may be needed to prevent the representative plaintiff from incurring a loss for representing the class.

Figure 1 and Table 2 show that commercial cases have high rates of incentive awards. But, in our sample, commercial cases are a small and likely heterogeneous case

---

[55] Eisenberg & Miller, supra note 39, at 1549.
[56] Id.

category so we do not seek to explain its high incentive award rate.  Indeed the median
class member recovery amount in Figure 1 is based on only two cases.[57]
  Table 3 explores the association between whether an incentive award was given
and the value of cases, both in the aggregate and on a per-class-member basis.  Table 2
and Figure 1 suggest the need to analyze the data with and without the consumer credit
cases to assess whether statistical findings are an artifact of the distinctive pattern of
consumer credit awards.

Table 3.  Relation between Recovery Amounts and Grant of An Incentive Award

| | No incentive award given | | Incentive award given | | Significance level |
|---|---|---|---|---|---|
| | Amount | N | Amount | N | |
| A. Total Class Recovery | | | | | |
| Median gross recovery (log 10 $) | 7.1 | 215 | 6.9 | 89 | .065 |
| Median gross recovery (log 10 $), excluding consumer credit cases | 7.1 | 208 | 7.1 | 77 | .630 |
| Median gross recovery ($ 000) | 13,300 | 215 | 7,283 | 89 | |
| Mean gross recovery (log 10 $) | 7.1 | 215 | 6.8 | 89 | .044 |
| Mean gross recovery (log 10 $), excluding consumer credit cases | 7.1 | 208 | 7.1 | 77 | .788 |
| Mean gross recovery ($ 000) | 116,000 | 215 | 54,200 | 89 | |
| B. Recovery Per Class Member | | | | | |
| Median class member recovery (log 10 $) | 2.7 | | 2.6 | | |
| Median class member recovery ($) | 1092 | | 1616 | | |
| Mean class member recovery (log 10 $) | 3.2 | | 3.1 | | |
| Mean class member recovery ($) | 3537 | | 3163 | | |
| C. Attorney Costs and Expenses | | | | | |
| Mean costs (log 10 $) | 5.1 | 170 | 5.3 | 82 | .282 |
| Mean costs ($) | 935,267 | 170 | 982,946 | 82 | |
| Mean costs (log 10 $)/ median recovery per class member (log 10 $) | 1.9 | 161 | 2.1 | 77 | .039 |

Sources. Reported class actions,1993-2002;.
Note. In panel B and the last row of panel C, each case was assigned the per-class-member recovery
amount for its case category based on Eisenberg & Miller, 54 Vand. L. Rev. at 1549.  No case-level
variation exists in the per-class-member data within case categories and no significance levels or
frequencies are reported.  See id. for the number of cases used to compute the mean and median class
member recoveries.  Amounts are inflation-adjusted 2002 dollars.

  Table 3's first and fourth rows show hints of statistically significant associations
between a class's aggregate  recovery and the existence of an incentive award.  But
these associations are attributable to the influence of the consumer credit cases.  With
consumer credit cases excluded from the analysis, Table 3's second and fifth rows show

---

[57] Id.

21

that the relation between incentive awards and recovery size is not close to statistically significant.

Panel B of Table 3 reports on the association between grants of incentive awards and recoveries per class member. Little difference in amounts emerges. We do not report tests of the statistical significance of the difference because the data come from two different sources. The recoveries per class member are from previously published results. Each case in the instant database was assigned the per-member recovery amount for its case category. No case-level variation exists within case categories. Nevertheless, the data suggest no striking pattern of differences in recoveries per class member based on whether an incentive award was given.

Panel C explores the relation between the award for counsel's costs and expenses and incentive awards. Attorney costs and expenses serve as a proxy for representative class member costs, which we assume are borne disproportionately by class representatives. Costs are modestly higher in cases with incentive awards. The relation among costs and recovery per class member is of prime interest. We define a "Cost-recovery ratio" to be the ratio of costs and expenses (log 10) to median class member recovery (log 10). Table 3's last row indicates a notable and statistically significant difference in the Cost-recovery ratio between cases with and without incentive awards. Cases with incentive awards tend to have a higher ratio—they have higher costs per class member dollar of recovery. If attorney costs and expenses are a reasonable proxy for costs borne disproportionately by representative plaintiffs, then Panel C supports a cost-recovery-based description of courts' incentive award practices. As class representatives disproportionately suffer costs per amount recovered, courts are more inclined to grant incentive awards.

Figure 2 is a box-and-whisker plot showing the ratio of costs to median class member recovery for cases with and without incentive awards. The plot includes a box designating the 25th and 75th quartiles of the distribution of the ratio. A horizontal line within the box indicates the median of the distribution. The "whiskers" extend to the farthest points that are within 1.5 times the interquartile range. Each point more than 3/2 times the interquartile range from the end of a box is indicated by a dot. The figure indicates that cases without incentive awards have lower cost-recovery ratios than cases with incentive awards.

22



Figure 2. Ratio of Costs to Class Median Class Member Recovery

Sources. Reported class actions,1993-2002.
Note. Costs are attorney costs and expenses. Median class member recoveries are from Eisenberg & Miller, 54 Vand. L. Rev. at 1549. Amounts are inflation-adjusted 2002 dollars.

Regression analysis confirms that increased costs are associated with greater likelihood of grant of incentive award. Table 4 reports logistic regression models in which the dependent variable is whether an incentive award was given. The models include all cases with non-missing data for the relevant variables but are limited to those in which an incentive award was approved.[58] In model (1), the ratio of costs to median class member recovery is the only explanatory variable. Model (2) adds a federal case dummy variable as an explanatory variable. The positive and statistically significant coefficient on the ratio variable in both models indicates that an increasing cost ratio is associated with an increase in the likelihood of an incentive award. Model (3) uses costs and median class member recovery as separate explanatory variables rather than combining them into a single ratio. In choosing among models, the Akaike Information Criteria (AIC) is a general model-fit index used to compare the fit of statistical models.[59] A lower AIC tends to indicate that a model fits the data better than a higher

---

[58] For a model that includes both cases with and without incentive awards, see Table 10 infra.
[59] Joop Hox, Multilevel Analysis: Techniques and Applications 45 (2002). H. Akaike, Factor Analysis and the AIC, 52 Psychometrika 317 (1987).

AIC.[60]  The AIC for model (3) is higher than in model (2), indicating that the ratio-based model fits the data better than the model using separate variables for costs and class member recoveries.  Model (4) uses the difference between costs and median recovery rather than the ratio.  It also has a higher AIC than model (2).  The ratio model best fits the data.  And the most important feature of costs and median recoveries is their relation, not their values as stand-alone variables.

Table 4. Logistic Regression Models of Whether Courts Granted an Incentive Award

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
|  | Dependent variable  = incentive award granted | | | |
| Ratio: costs to recovery | 0.728** | 0.751** |  |  |
|  | (3.75) | (4.02) |  |  |
| Federal case |  | 0.827+ | 0.816+ | 0.799+ |
|  |  | (1.90) | (1.80) | (1.77) |
| Costs (log 10) |  |  | 0.269+ |  |
|  |  |  | (1.79) |  |
| Difference: costs minus recovery |  |  |  | 0.316** |
|  |  |  |  | (3.28) |
| Median class member recovery (log 10) |  |  | -0.474 |  |
|  |  |  | (1.35) |  |
| Constant | -2.183** | -2.963** | -1.562 | -2.224** |
|  | (4.66) | (4.31) | (1.01) | (4.50) |
| Observations | 238 | 238 | 238 | 238 |
| Akaike Information Criteria | 296.10 | 294.84 | 299.57 | 298.24 |

Robust z statistics in parentheses
+ significant at 10%; * significant at 5%; ** significant at 1%

Sources. Reported class actions,1993-2002.
Note. The ratio of costs to recovery is the ratio of costs and expenses (log 10) to median class member recovery (log 10).  The difference is these two quantities' difference rather than ratio.  Standard errors are computed based on clustering by case category.  Median class member recoveries are from Eisenberg & Miller, 54 Vand. L. Rev. at 1549.  The clustering models fit the data better than models using dummy variables for case categories.  Amounts are inflation-adjusted 2002 dollars.

Models not reported here, using dummy variables for each case category, did not fit the data as well as models (1), (2), and (4).  In another model not reported here, model (2)'s basic finding does not change if we exclude from the sample consumer credit cases and employment discrimination cases.  Thus, these two relatively extreme categories are not driving the core relation between the cost-recovery ratio and approval of incentive awards.  Overall, Table 4 supports the hypothesis that the decision to award incentive payments is significantly influenced by costs to representative class members in relation to the class members' expected recoveries.

Although the preceding analysis is broadly confirmatory of the cost-recovery hypothesis, one result runs counter to the idea.  The age of a case, a possible measure of overall effort, was not associated with the grant of an award.

---

[60] Hox, supra note 59, at 46.

24

To the extent denial of incentive awards is regarded as hostile to class action activity, one might expect federal courts to be more reluctant to grant incentive awards than state courts. Yet Table 4 indicates, if anything, the opposite. Federal courts granted incentive awards in 91 of 287 cases, or 31.7 percent. State courts granted incentive awards in 13 of 87 cases, or 14.9 percent. The difference is statistically significant (p=.002 using Fisher's exact test). Some of this difference may be attributable to the different case category mix that the two court systems receive. For example, none of the high-incentive-award-rate consumer credit cases were state court cases. In Table 4's regression models, marginally statistically significant differences persisted in the rate at which federal and state courts granted incentive awards. This result is in tension with the attorney self-interest hypothesis, which (weakly) predicts that attorneys will have more power to influence courts to make awards to representative plaintiffs in state courts than in federal court.

Other factors were not associated with the grant of an incentive award. There was no stable, statistically significant relation between the award of incentive fees and the overall size of class recovery, or the size of the class attorneys' fee.[61] Nor did we find an association between the mean or median class member recovery and the presence of an incentive award or between the risk of a case and the presence of an incentive award. Nor was there a significant association between class size and the grant of an incentive award,[62] or between the presence of objectors to the settlement and the grant of an incentive award.

In summary, granting an incentive award is common in classes of cases with very low recoveries, mostly consumer credit cases and antitrust cases resembling consumer credit cases. Incentive awards are also common in employment discrimination cases, where we believe the costs to representative plaintiffs are unusually high. The data support the cost-recovery theory of incentive awards, but with the important caveat that it is the relation between costs and class member recovery, rather than costs alone, that best fits the data. The greater frequency of incentive awards to representative plaintiffs in employment discrimination cases is also consistent with the attorney self-interest hypothesis. Other hypotheses about the role of the decision to grant an incentive award find little support in these data.

---

[61] A Mann-Whitney test of whether the gross class recovery differs between incentive award cases and no-incentive-award cases yields p=.065. But this marginal statistical signficance fades if one excludes the consumer credit cases (p=.630). A Mann-Whitney test of whether attorney fees differ between incentive award cases and no-incentive-award cases yields p=.881. If one excludes consumer credit cases, p=.087.

[62] Class action recoveries vary substantially in cases involving statutory fee-shifting as compared to common funds. Eisenberg & Miller, supra note 12. In simple analysis, as reported at text following note 51, and in regression models, we found no meaningful association between the applicability of a fee-shifting statute and the grant of an incentive award.

25

## B. The Level of Incentive Awards

We first discuss absolute level of incentive awards and then address incentive awards as a fraction of the class recovery.

### 1. The Amount of Incentive Awards

Given an incentive award, what factors help to explain its level? The cost-reimbursement view of incentive awards forecasts that costs borne by representative plaintiffs, as proxied for by the attorneys' costs and expenses, should be positively associated with the size of the incentive award. High-risk cases should increase the level of incentive awards, and a negative association should exist between the number of class members and the level of incentive awards. The level of incentive awards should be positively correlated with the age of the case. In addition, a higher rate of objection to the settlement should correlate with lower incentive awards. Under the view that incentive awards promote the class attorneys' interests, higher awards may result when objectors are present and as the attorneys' fee increases, though objection might be correlated with increased costs for other reasons. A case's presence in federal rather than state court, under CAFA's assumptions, forecasts lower incentive awards. The attorney self-interest hypothesis also predicts higher awards in cases where the representative plaintiff has significant hold-out power, as in employment discrimination cases. Under the reward-for-service hypothesis, incentive awards should increase as attorney fees decrease, holding constant the size of the class recovery. This hypothesis also predicts higher incentive awards in high-risk cases and lower incentive awards when objectors to the settlement are present. Under the proportionality hypothesis, total incentive awards should increase as the award awards for attorneys' fees and for counsel's costs and expenses increase and as the total and median class recoveries increase.

Preliminarily, we note that aggregate incentive awards in a case vary across case categories. Table 5's total award columns, the first three numerical columns, show summary statistics for the total incentive award by case category. The median award ranges from about $546,000 in employment discrimination cases to about $1,000 in consumer credit cases. Table 5's average award columns show summary statistics for the average of incentive awards in a case. The median total award ranges from about $546,000 in employment discrimination cases (but note that there are only six cases) to about $1,100 in consumer credit cases. Case categories have similarly award patterns when the average incentive award in a case replaces the total incentive award. The analysis here focuses on the total incentive award in a case.

26

Table 5. Total and Average Incentive Award by Case Category

| Case category | Mean total award | Median total award | N | Mean average award | Median average award | N |
|---|---|---|---|---|---|---|
| Antitrust | 49,787.0 | 37,500.0 | 13 | 10,110.2 | 10,597.5 | 12 |
| Commercial | 35,841.1 | 39,058.6 | 4 | 23,918.7 | 16,770.1 | 4 |
| Consumer | 29,055.2 | 10,000.0 | 10 | 6358.8 | 2089.4 | 9 |
| Consumer credit | 1535.3 | 1079.8 | 11 | 1326.3 | 1044.7 | 11 |
| Corporate | 25,000.0 | 25,000.0 | 1 | 25,000.0 | 25,000.0 | 1 |
| ERISA | 16,164.5 | 16,598.2 | 4 | 14,890.7 | 15,197.1 | 4 |
| Employment | 50,225.8 | 54,853.8 | 3 | 12,121.0 | 13,058.9 | 3 |
| Employment discrim. | 1,481,962 | 545,626.3 | 6 | 69,850.2 | 31,081.1 | 6 |
| Insurance | 28,708.9 | 23,892.1 | 6 | 10,029.2 | 6770.8 | 6 |
| Mass tort | 295,111.6 | 295,111.6 | 1 | 19,674.1 | 19,674.1 | 1 |
| Other | 20,850.7 | 7940.7 | 6 | 14,227.1 | 3366.4 | 6 |
| Product liability | 160,498.0 | 160,498.0 | 1 | - | - | - |
| Securities | 25,385.1 | 11,971.7 | 24 | 16,552.7 | 2908.8 | 24 |
| Total | 128,803.9 | 18,190.7 | 90 | 15,991.5 | 4357.4 | 87 |

Sources. Reported class actions, 1993-2002.
Note. The "mean average award" is the average of incentive awards within a case, then averaged over all cases in the categoey. The "median average award" is the median of incentive awards within a case, then averaged over all cases in the categoey. No civil rights or tax refund case had useable total incentive award data. No civil rights, product liability, or tax refund case had useable average incentive award data. Amounts are inflation-adjusted 2002 dollars.

     The cost-reimbursement view suggests that incentive award levels increase with the representative plaintiff's costs. As noted above, our proxy for costs are the costs and expenses awarded to attorneys. The proportionality view suggests that incentive award levels will increase with the recovery per class member. Figure 3 shows the relationships between the total incentive award in a case and (1) the award to class counsel for costs and expenses, and (2) recovery per class member for that case's category. The figure shows a positive association between incentive awards and both costs and class member recoveries. Conditional on an incentive award having been granted, as recoveries per class member increase and as the award for costs and expenses increases, incentive awards increase.

Figure 3. Relation Between Incentive Awards, Recovery, and Costs



Sources. Reported class actions, 1993-2002; Eisenberg & Miller, 54 Vanderbilt L. Rev. at 1549.
Note. Amounts are inflation-adjusted 2002 dollars.

Under the reward-for-performance view, cases with high risk should have higher incentive awards than other cases. Cases with objectors to the settlement should have lower incentive awards under this view. Figure 4 is an interquartile plot showing the relation between total incentive awards and both case-risk and the presence of objection. High-risk cases are strongly and significantly associated with higher awards ($p<.001$). But cases with objectors to the class settlement also have higher incentive awards ($p<.001$). We do not find a similar, consistently significant association between the level of incentive awards and case age or the number of class members.[63]

---

[63] The correlation coefficient for total incentive awards in a case and the number of class members is small, .036, and insignificant ($p=.757$). The correlation coefficient for total incentive awards in a case and a case's age (log) is .311 ($p=.004$). But in regression models analogous to models (1) and (2) in Table 6, in which age (log) is used as explanatory variable instead of costs, the coefficient for age is not significant ($p=.126$ in the analog to model (1) and $p=.145$ in the analog to model (2)).

28

Figure 4. Relation Between Incentive Award and: (1) Risk, (2) Objection to Settlement



Sources. Reported class actions,1993-2002.
Note. Amounts are inflation-adjusted 2002 dollars.

Regression models again allow exploring simultaneously the influences of costs, class recovery, per-class-member recovery, risk status, and objector presence on the amount of incentive awards. Table 6 reports the results. All three models use each case's total incentive award (log) as the dependent variable.

Table 6. Regression Models of the Amount of Incentive Awards

| | (1) | (2) | (3) |
|---|---|---|---|
| | Dependent variable = total incentive award (log 10) | | |
| Median class member recovery (log 10) | 0.284* | | |
| | (2.42) | | |
| Attorney costs and expenses (log 10) | 0.256** | 0.033 | |
| | (3.27) | (0.24) | |
| High risk case | 0.360* | 0.407** | 0.518* |
| | (2.38) | (3.21) | (2.86) |
| Employment discrimination case | 0.499* | 0.945** | 0.906** |
| | (2.50) | (13.95) | (4.81) |
| Objection to settlement filed | 0.389** | 0.313* | 0.527** |
| | (3.16) | (2.49) | (3.15) |
| Gross recovery (log) | | 0.354* | |
| | | (3.02) | |
| Ratio--costs to recovery | | | -0.251 |
| | | | (1.16) |
| Constant | 1.777** | 1.287** | 4.287** |
| | (7.74) | (6.55) | (11.40) |
| Observations | 69 | 68 | 69 |
| Adjusted R-squared | 0.66 | 0.69 | 0.48 |

Robust t statistics in parentheses
+ significant at 10%; * significant at 5%; ** significant at 1%

Sources. Reported class actions, 1993-2002.
Note. Median class member recoveries are from Eisenberg & Miller, 54 Vanderbilt L. Rev. at 1549. Standard errors are computed based on clustering by case category. The clustering models fit the data better than models using dummy variables for case categories. Amounts are inflation-adjusted 2002 dollars.

Model (1) shows that each of attorney costs and expenses, median class member recovery, high-risk case status, the employment discrimination dummy variable, and the presence of an objection to settlement are associated with higher incentive awards. Risk, employment discrimination, and the presence of an objection are significant in all three models. Model (2) shows that the costs variable becomes insignificant when included in a model with gross recovery. This is due to the strong multicollinearity in the model that results from including highly correlated variables. The correlation coefficient for costs and gross recovery is 0.85 (p < .0001) compared to 0.52 (p <.0001) for the correlation between costs and median class member recovery. Model (1) thus may more precisely represent the influence of costs but the choice between model (1) and model (2) is not clear. A similar problem affects models, not reported here, that include costs and attorney fees (correlation coefficient 0.87 (p <.0001)).[64] Model (3), which uses the cost-recovery ratio variable featured in the logistic regression models of

---

[64] These strong correlations among class recovery, attorney fees, and costs support the use of multi-equation models, such as that reported in Table 9, infra. In that model, the significant effects reported in model (1) of Table 6 largely survive, with the exception of the significant coefficient on median class member recovery.

30

the decision to grant an award, is less satisfactory than the other models. The coefficient on the cost-recovery variable is insignificant and the model explains substantially less of the variance that models (1) and (2). In models not reported here, we found no significant effect of the case's federal or state court status or the age of the case.

Models (not reported) limited to median class member recovery and costs as explanatory variables suffer from violation of the assumptions of ordinary least squares regression.[65] Both theoretical and modeling considerations thus support adding employment discrimination, high risk, and objector presence variables. Employment cases likely have distinctive non-monetary costs and high risk cases may warrant a premium for representative plaintiffs as well as for class counsel.

Both the cost-recovery and proportionality hypotheses receive support from model (1)'s significant variable for attorney costs and expenses. The significant high-risk variable provides support for both the reward-for-performance and the cost-recovery hypotheses. The significant median recovery variable provides support for the proportionality hypothesis. The significance of the objector dummy variable supports the attorney self-interest hypothesis but is at odds with the reward-for-performance hypothesis (subject to the qualification that the presence of objection may correlated with increased costs for other reasons). The significant employment discrimination variable provides support for the cost-reimbursement and attorney self-interest hypotheses.

## 2. Incentive Awards as a Percent of the Class Recovery

The shares of total class recovery and of costs devoted to incentive awards is also of interest. Table 7 shows the percent of the total class recovery paid in incentive awards. The table shows that the total of incentive awards in a case comprises a mean of 0.16 percent of the total recovery across all case categories. The median is 0.02 percent. In many case categories the mean and median total of incentive awards is less than 0.01 percent of the class recovery. Only in employment discrimination cases does the total of incentive awards exceed 0.1 percent of the class recovery. The employment discrimination results are substantially influenced by four $300,000 awards in one of the cases in the sample.[66]

---

[65] Heteroskedasticity (non-constant variance) is a problem (p=.0007 for a model with total incentive awards (log) as the dependent variable) and an unsatisfactory pattern of residuals emerges. Addition of dummy variables for employment discrimination cases and high risk cases (model (1)) improve the model. A test for heteroskedasticity in model (1) yields p=.336 so one cannot reject the hypothesis of constant variance. In addition, one cannot reject the hypothesis of normally distributed residuals (Shapiro-Wilk test for normality yields p=.910).

[66] Ingram v. Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001). See note 38 supra.

Table 7. Total Incentive Awards as a Percent of Class Recovery

| Case category | Mean percent | Median percent | N |
|---|---|---|---|
| Antitrust | 0.016 | 0.016 | 13 |
| Commercial | 0.066 | 0.066 | 4 |
| Consumer | 0.008 | 0.008 | 10 |
| Consumer credit | 0.028 | 0.028 | 11 |
| Corporate | 0.009 | 0.009 | 1 |
| ERISA | 0.006 | 0.006 | 4 |
| Employment | 0.060 | 0.060 | 3 |
| Employment discrimination | 2.090 | 2.090 | 6 |
| Insurance | 0.004 | 0.004 | 6 |
| Mass tort | 0.006 | 0.006 | 1 |
| Other | 0.036 | 0.036 | 6 |
| Product liability | 0.003 | 0.003 | 1 |
| Securities | 0.024 | 0.024 | 24 |
| Total | 0.161 | 0.024 | 90 |

Source. Reported class actions, 1993-2002.

The cost-reimbursement and proportionality hypotheses suggest that incentive awards, like attorneys' fees, will consume a decreasing percentage of the class recovery as the class recovery amount increases and a decreasing percentage of costs as the costs increase. Figure 5 shows the relation between the portion of the recovery dedicated to incentive awards and the gross recovery and the award of counsel's costs and expenses.

32



Figure 5. Incentive Award Portion of Recovery &: (1) Gross Recovery, (2) Attorney Costs

Sources. Reported class actions, 1993-2002.
Note. The y-axis variable is a logit transformation $(\ln(y/(1 - y)))$ of the proportion of the recovery constituting incentive awards. Costs are attorney costs and expenses. Amounts are inflation-adjusted 2002 dollars.

The top graph shows a clear decline in the incentive award share as the recovery increases. Larger aggregated actions allow plaintiffs to receive increased shares net of costs. Figure 5 also shows the distinctive pattern in employment discrimination cases, the only cases textually labeled in the figure. Employment discrimination cases uniformly have high shares of the recovery dedicated to incentive awards. This is consistent with the theory that employment discrimination case class representatives bear unusually high costs. Similarly, the bottom graph in Figure 5 shows a decline in the incentive award share as the costs increase. It shows that employment discrimination cases tend to have incentive awards that constitute a relatively high share of costs.

Table 8 reports regression models that assess the relation between the portion of the recovery dedicated to incentive awards and (1) the total recovery, and (2) costs. The dependent variable in all models is the total of incentive awards in a case, transformed as appropriate for proportion data.[67] Models (1) and (2) use the class recovery as an

---

[67] The logit transformation of the dependent variable is $\ln(y/(1-y))$. See Raymond H. Myers, Classical

explanatory variable. Models (3) to (6) use the award of attorney costs and expenses as an explanatory variable. All six models show a negative and statistically significant coefficient on the gross recovery variable or the costs and expenses variable, as suggested by Figure 5. Models (2), (4) to (6) add an employment discrimination dummy variable and/or a high-risk-case dummy variable. As suggested by Figure 5, employment cases are positively and significant associated with incentive awards absorbing a larger share of the recovery. The high-risk dummy variable indicates that courts tend to enhance incentive awards in riskier cases. Additional models, not reported here, indicate that neither the presence of objectors nor the case being federal are associated with the percent of recovery going to incentive awards.

Table 8. Regression Models of Incentive Award as Percent of Class Recovery

| | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| | Dependent variable = incentive award proportion of recovery (logit transformation) | | | | | |
| Gross recovery (log) | -1.052** | -1.263** | | | | |
| | (5.13) | (9.65) | | | | |
| Employment discrim. case | | 2.330** | | | 2.753** | 2.573** |
| | | (11.46) | | | (11.91) | (12.05) |
| High risk case | | 0.989** | | 1.026** | | 0.848** |
| | | (3.90) | | (4.68) | | (3.36) |
| Attorney costs and expenses (log 10) | | | -0.977** | -1.092** | -1.137** | -1.222** |
| | | | (3.96) | (4.75) | (6.65) | (6.68) |
| Constant | 1.091 | 2.184* | -0.961 | -0.582 | -0.283 | -0.014 |
| | (0.90) | (2.73) | (0.80) | (0.51) | (0.31) | (0.02) |
| Observations | 80 | 80 | 68 | 68 | 68 | 68 |
| Adjusted R-squared | 0.39 | 0.57 | 0.28 | 0.33 | 0.42 | 0.45 |

Robust t statistics in parentheses
+ significant at 10%; * significant at 5%; ** significant at 1%

Sources. Reported class actions,1993-2002.
Note. The dependent variable is a logit transformation $(\ln(y/(1-y))$ of the proportion of the recovery constituting incentive awards. Standard errors are computed based on clustering by case category. The clustering models fit the data better than models using dummy variables for case categories. Amounts are inflation-adjusted 2002 dollars.

C. Additional Modeling Considerations

It is unrealistic to expect that a single equation captures the relations among the key variables studied here. For example, the incentive award level modeled in Table 6 is in part a function of the award of attorney costs and expenses. But these awards are not determined exogenously. They may be a function of the case's age and the recovery. Similarly, the median class member recovery, an explanatory variable in model (1) of Table 6, is likely related to the gross recovery and the number of class

and Modern Regression with Applications 198 (1986).

members. As in our earlier work on class action opt outs and objections, any single-equation model likely will suffer from endogeneity.[68] A system of equations may be more appropriate than single equation models. Such a model can at least serve as a check on the plausibility of our core results.

To address these issues, we use three-stage least squares[69] to estimate a system of three equations, as follows:

(1) a structural equation, modeling the incentive award level as a function of costs, median class member recovery, risk, objector presence, and employment discrimination case status (this is model (1) in Table 6);

(2) costs as a function of a case's gross recovery and age; and

(3) median class member recovery as a function of risk, employment discrimination case statusl gross class recovery, and number of class members. We recognize that many other formulations of the equation system may be reasonable.[70] Table 9 reports this system of equations simultanously estimated using three-stage least squares.

---

[68] Eisenberg & Miller, supra note 39.

[69] See generally William H. Greene, Econometric Analysis chs. 14-15 (5th ed. 2002). For a discussion of strengths and weaknesses of various simultaneous equations models, see id.

[70] A model replacing gross recovery with attorney fees in the second and third equations in Table 9 yields essentially the same results as the model reported in Table 9.

35

Table 9. Three Stage Least Squares Model of Incentive Awards

| | (1) | (2) | (3) |
|---|---|---|---|
| | | Endogenous variables = | |
| | Total incentive award (log 10) | Costs (log 10) | Median class member recovery (log 10) |
| Costs (log 10) | 0.479** | | |
| | (2.59) | | |
| Median class member recovery (log 10) | 0.072 | | |
| | (0.22) | | |
| High risk case | 0.331* | | |
| | (2.49) | | |
| Employment discrimination case | 0.849+ | | 0.795* |
| | (1.92) | | (2.47) |
| Objection to settlement filed | 0.288** | | |
| | (2.60) | | |
| Gross recovery (log) | | 0.764** | 0.530** |
| | | (13.06) | (6.64) |
| Age (log years) | | 0.216* | |
| | | (2.50) | |
| Number of class members (log 10) | | | -0.351** |
| | | | (3.27) |
| Constant | 1.181** | -0.168 | 0.555 |
| | (2.73) | (0.42) | (1.13) |
| Observations | 59 | 59 | 59 |
| R-squared | 0.68 | 0.77 | 0.58 |

Absolute value of z statistics in parentheses
+ significant at 10%; * significant at 5%; ** significant at 1%

Sources. Reported class actions,1993-2002.

Note. Costs are attorney costs and expenses. Median class member recoveries and number of class members are from Eisenberg & Miller, 54 Vand. L. Rev. at 1549. Amounts are inflation-adjusted 2002 dollars.

The results are largely consistent with earlier estimates of incentive awards. As in Table 6, costs, risk, employment discrimination status, and the presence of an objector to settlement are statistically significantly or marginally statistically significantly associated with increase incentive awards. The median class member recovery variable noticeably declines in strength and statistical significance but some of the influence of recovery-level and recovery-level per member is accounted for in the second and third equations in the system by the presence of the "Gross recovery" and "Number of class members" variables. In the middle equation, costs are, as expected, highly correlated with both a case's age and the gross class recovery. The median class member recovery is significantly associated with the gross class recovery, the number of class members, and employment discrimination case status.[71]

Another concern is that the selection of cases in which incentive awards are observed is not random. Only about one-quarter of reported cases report incentive

---

[71] Adding employment discrimination status to the middle equation (costs) yields an insignificant coefficient.

awards and the pattern of observed award levels might be influenced by the selection mechanism.[72] To address this concern, we evaluate a selection model, in which the decision to grant an incentive award is modeled simultaneously with the level of the incentive award. We used leading models from Table 4 (for whether an incentive award was granted) and Table 6 (for the level of the award). Table 10 reports the results. It indicates that all core results survive when a selection model methodology is used. [73]

Table 10. Heckman Selection Model of the Decision to Grant an Incentive Award & the Amount of the Incentive Award

|  | (1) Total incentive award (log 10) | (2) Incentive award granted |
|---|---|---|
| Median class member recovery (log 10) | 0.315** | |
| | (2.25) | |
| Attorney costs and expenses (log 10) | 0.242** | |
| | (3.60) | |
| High risk case | 0.356* | |
| | (2.47) | |
| Employment discrimination case | 0.479+ | |
| | (2.26) | |
| Objector to settlement filed | 0.392** | |
| | (3.50) | |
| Ratio--costs to recovery | | 0.396* |
| | | (2.54) |
| Federal case | | 0.525+ |
| | | (2.08) |
| Constant | 1.898** | -1.770** |
| | (6.08) | (3.85) |
| Observations | 161 censored, 69 uncensored | 230 |
| Wald test of indep. of equations ($\rho = 0$): chi-squared(1) = 0.14; prob. > chi-squared = 0.711 | | |
| + significant at 10%; * significant at 5%; ** significant at 1% | | |

Sources. Reported class actions,1993-2002.
Note. Median class member recoveries are from Eisenberg & Miller, 54 Vand. L. Rev. at 1549. Standard errors are computed based on clustering by case category. Amounts are inflation-adjusted 2002 dollars.

---

[72] James Heckman, Sample Selection Bias as A Specification Error, 47 Econometrica 153 (1979).

[73] The insignificance of $\rho$ (rho) (p=0.711) reported in the selection model indicates that it is reasonable to analyze the incentive award decision and the incentive award amount in separate models. Another possible modeling strategy is to include both cases with incentive awards and without incentive awards in a single equation and to enter the value of the incentive award in the many cases without awards as zero. Precedent exists for so modeling case outcomes but it is questionable in the face of lognormally distributed non-zero values and so many zero values. Catherine M. Sharkey, Dissecting Damages: An Empirical Exploration of Sexual Harassment Awards, 3 J. Empirical Legal Stud. (2006) (forthcoming). For the data in this article, the tobit model fits the cases with incentive awards poorly compared to: (1) Table 6's regression models, (2) Table 9's multiple equation models, and (3) Table 10's selection model.

D. Limitations

In interpreting our results, a first question is whether our findings should be regarded as limited to the published opinions studied or might be representative of the larger mass of class actions. This study's findings from published opinions are reasonably consistent with the findings by Willging et al. in a 1996 study of all class actions in four federal districts. They report finding incentive awards in 44 of 126 cases,[74] 34.9 percent, compared to our finding of awards in 104 of 374 cases, 27.8 percent. The difference in incentive award rates is not statistically significant (p=.143 using Fisher's exact test). Thus, while our sample of published opinions is not a random or complete sample of class actions, its rate of reported incentive awards does not materially differ from the rate in the most detailed report that does not depend on published opinion methodology. It may be that the actual rate of awards in our cases is somewhat higher than observed since courts need not always report the grant of an incentive award. If that is the case, then our sample likely understates the importance of incentive awards compared to the mass of class actions.

With respect to incentive award levels, Willging et al. report median awards of $7,500, $12,000, $7,500, and $17,000 for four districts.[75] The median total incentive award in our sample was $18,191. This figure is not strikingly different from Willging et al.'s findings. Willging et al. further report that the median percentage of the total settlement that was awarded to class representatives "was less than or equal to eleven thousandths of one percent (0.011%) in all four districts."[76] In our data the median percentage paid in incentive payments was 0.02 percent of the recovery. Again, our results, based on a sample three times the size of the earlier study and more diverse in time and locale, are reasonably consistent with the study of all filings in four districts. Based on the consistency with Willging et al., this study's findings appear to offer reasonable, cumulative evidence of the core pattern of incentive awards. Like the earlier study, we found a substantial rate of grants of incentive awards, median incentive awards in the low thousands, and incentive awards consuming a small fraction of total recoveries.

But there is a respect in which this study's sample is not representative of the mass of cases. The monetary stakes of disputes that result in published opinions likely exceed the stakes of the mass of cases.[77] Judges do not randomly decide what rulings to publish.[78] Presumably they choose their more important cases, and importance likely correlates with monetary stakes.

---

[74] Willging et al., FJC Report, supra note 32, at 120 (fig. 16).

[75] Id. at 121 (fig. 17).

[76] Id. at 26.

[77] E.g., Theodore Eisenberg & Martin T. Wells, Punitive Awards After *BMW*, a New Capping System, and the Reported Opinion Bias, 1998 Wisc. L. Rev. 387.

[78] Deborah Jones Merritt & James J. Brudney, Stalking Secret Law: What Predicts Publication in the United States Courts of Appeals, 54 Vand. L. Rev. 71 (2001).

Comparison of our data with the Willging and Wheatman 2005 FJC study indicates that the stakes of cases in our database are higher than the stakes of the mass of class actions. The median recovery for the 374 cases studied here was $11.2 million in 2002 dollars. Willging and Wheatman describe the recoveries in their large study of class actions, unfiltered by publication, as follows:

> Overall, 142 (23%) of the named cases led to a class-wide monetary recovery or settlement; attorneys estimated the amount of recovery in 120 of those cases. The typical recovery or settlement was $800,000; 25% of the attorneys reported recoveries and settlements of $5.2 million or more; and 25% reported $50,000 or less.[79]

Our database clearly has higher awards than the mass of class action cases. Since we find no association between class recovery size and the grant of an award, the similarity of the rate at which incentive awards were granted in the two databases is not surprising. But we do find that incentive awards increase with the size of class recoveries. One would therefore expect that the incentive awards should be higher in our data than in the Willging and Wheatman data.[80] Yet we find our median awards, if anything, lower than the Willging and Wheatman median award. The absolute level of the difference is not high but the results from the two studies suggest that the positive association between class recovery and incentive awards is not uniform throughout the entire distribution of class action recoveries.

Another limitation of our study is that some estimates for several case categories are based on relatively few cases. Estimates of recoveries per class member, of incentive award rates, and incentive award levels often have fewer than ten cases in a case category. While our aggregated results are likely to be stable, case-category-specific results likely are more variable and might not be expected to be uniformly replicated in other samples.

Notwithstanding these limitations, our results suggest a degree of coherence and modesty in the pattern of incentive awards. The awards are not always given but do tend to be given in cases where the economics of the case might most call for an award. The size of the award generally consumes a trivial portion of the class recovery and tends to be modest in the vast majority of cases, with some evidence of substantial awards in employment discrimination cases where large awards may be most justifiable. Courts' general performance in this area seems to support continued discretion to grant or deny incentive awards based on the facts of each case. A flat rule such as the PSLRA's ban on payments to class representatives not only is not clearly supported but may be counterproductive. The large-scale investors that Congress hoped to have serve as class representatives after the PSLRA may be the investors most sensitive to recovering their opportunity and other costs if they do serve. To the extent these sought-after representatives are discouraged from serving by the anti-incentive-award

---

[79] Willging & Wheatman, supra note 40, at 51.
[80] Incentive award amounts totaled $49,000 and $48,000 in the two class actions for which Hensler et al. report incentive award amounts. See notes 35-36 supra.

39

rule, the rule may compete with the perhaps more important goal of securing sophisticated and large representative plaintiffs.

## VI. Conclusion

Incentive awards are given in a nontrivial fraction, but still a minority, of class action settlements. Across all case categories, when an incentive award was granted, the average total award was $128,803 and the median total award was $18,190. Awards were typically split among more than one representative plaintiff.[81] The average award per class representative was $15,992 and the median award per class representative was $4,357. Overall, incentive awards constitute such a small fraction of class action settlements that their effect on distributions to class members is *de minimus*.

Award rates vary by case category. They are frequently granted in consumer credit and employment discrimination cases. The relation between the award of attorney costs and expenses and median class member recovery helps explain the decision to grant incentive awards across the full sample of cases, with the likelihood of an incentive award increasing as the ratio of costs and expenses to recovery increases.

The level of incentive awards varies with the awards for attorney costs and expenses, and also is positively related to the overall class recovery. Incentive awards are higher in high risk cases and higher when an objector is present. Awards are especially high in employment discrimination cases. Some evidence exists that incentive awards are more frequently made (but not higher), in federal court than in state court. Incentive awards decline as a percent of the class recovery as the class recovery increases.

The data support the hypothesis that courts determine the existence and level of incentive awards with a view to compensating the representative plaintiff for the un-reimbursed costs of acting as class champion. The data also tend to support the notion that courts seek to achieve a rough sense of proportion in case outcomes, with incentive fees varying with the size of the class recovery and also with the class counsel fee and the award of costs and expenses. The data provide some, but conflicting, support for the hypothesis that incentive awards serve the self-interest of class counsel or that they are adjusted to reward the representative plaintiff for superior service to the class.

With many courts granting incentive awards and little evidence of excessive or abusive awards, Congress's decision to ban incentive awards in private securities fraud cases may be poorly considered. Outside the private securities litigation context, courts seem to be policing the grants of incentive awards reasonably. The institutional investors that Congress hoped to lure as class representatives likely incur opportunity costs and may be discouraged from serving if they cannot receive adequate compensation.

---

[81] We could ascertain the number of plaintiffs dividing an incentive award in 89 cases. In 59 of those cases more than one plaintiff received an award. In 44 of the cases more than two plaintiffs received an award.

Appendix

Appendix Table 1, as previously reported,[82] shows, by case category, the mean and median recovery per class member in class action cases.

Appendix Table 1. Recovery Per Class Member, by Case Category
Reported Class Actions, 1993-2002

| | Mean recovery | Median recovery | N |
|---|---|---|---|
| Antitrust | 3555.6 | 1159.3 | 19 |
| Civil Rights | 25,557.0 | 1299.1 | 5 |
| Commercial | 9472.3 | 9,472.3 | 2 |
| Consumer | 481.5 | 99.7 | 30 |
| Corporate | 165.7 | 165.7 | 1 |
| ERISA | 5998.2 | 1092.6 | 9 |
| Employment | 1869.9 | 1907.5 | 6 |
| Employment discrim. | 20,080.6 | 16,299.2 | 5 |
| FDCPA | 44.3 | 24.3 | 9 |
| Mass tort | 5611.3 | 3739.4 | 8 |
| Product liability | 90.8 | 90.8 | 2 |
| Securities | 1728.3 | 668.4 | 53 |
| Other | 1188.4 | 498.1 | 3 |
| Total | 3520.7 | 476.1 | 152 |

Note. Amounts are inflation-adjusted 2002 dollars.
Source. Eisenberg & Miller, 54 Vand. L. Rev. at 1549.

Appendix Table 2. Number of Class Members, by Case Category,
Reported Class Actions, 1993-2002

| | Mean | Median | N |
|---|---|---|---|
| Antitrust | 1,200,000.0 | 51,578.5 | 20 |
| Civil rights | 8306.0 | 1500.5 | 8 |
| Commercial | 3566.0 | 2341.0 | 6 |
| Consumer | 1,800,000.0 | 510,000.0 | 45 |
| Corporate | 276,946.2 | 41,586.0 | 5 |
| ERISA | 140,689.3 | 7400.0 | 11 |
| Employment | 43,790.0 | 8703.0 | 6 |
| Employment discrim. | 3765.9 | 1013.0 | 8 |
| FDCPA | 9017.8 | 1917.0 | 9 |
| Mass tort | 162,106.1 | 29,530.0 | 9 |
| Product liability | 2,500,000.0 | 2,000,000.0 | 4 |
| Securities | 55,324.8 | 17,750.0 | 59 |
| Other | 587,495.9 | 27,883.0 | 9 |
| Total | 645,476.2 | 25,829.0 | 199 |

Source. Eisenberg & Miller, 54 Vand. L. Rev. at 1549.

---

[82] Eisenberg & Miller, supra note 39, at 1549 (tbl. 2). Table 2 in *id.* has a typographical error for the number of Mass tort cases included in the "Recovery per Class Member" column. The correct number, eight, is reported in Appendix Table 1 of this article.