**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 01-cv-1451-REB-PAC
(Consolidated with Civil Action Nos. 01-cv-1472-REB-PAC, 01-cv-1527-REB-PAC, 01-cv-1616-REB-PAC, 01-cv-1799-REB-PAC, 01-cv-1930-REB-PAC, 01-cv-2083-REB-PAC, 02-cv-0333-REB-PAC, 02-cv-0374-REB-PAC, 02-cv-0507-REB-PAC, 02-cv-0658-REB-PAC, 02-cv-755-REB-PAC, 02-cv-798-REB-PAC and 04-cv-0238-REB-PAC)

In re QWEST COMMUNICATIONS INTERNATIONAL, INC. SECURITIES LITIGATION

---

**REPLY BRIEF IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF
SETTLEMENT PROCEEDS AND LEAD COUNSEL'S MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

---

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    THE REACTION OF MEMBERS OF THE CLASS CONFIRM THAT THE
       SETTLEMENT, PLAN OF ALLOCATION AND REQUESTED AWARD OF
       ATTORNEYS' FEES ARE FAIR AND REASONABLE ......................................... 3

       A.     The Class Notice Is Adequate and Satisfies All of the Requirements
              of Due Process. ........................................................................................ 5

       B.     The Settlement Is Fair, Reasonable and Adequate ................................. 10

       C.     The Plan of Allocation Is Fair and Reasonable ....................................... 13

       D.     The Requested Fee Is Fair and Reasonable ........................................... 14

       E.     The Requested Fee When Cross-Checked Against Counsel's
              Lodestar Is Reasonable .......................................................................... 26

       F.     Lead Plaintiffs' Request for Reimbursement of Costs and Expenses
              Under the PSLRA Are Reasonable ......................................................... 31

       G.     Lead Plaintiffs' Counsel's Request for Reimbursement of Expenses
              Incurred in the Prosecution of the Litigation Should be Approved .......... 32

III.   THE NON-SETTLING DEFENDANTS' OBJECTIONS ARE WITHOUT
       MERIT AND SHOULD BE OVERRULED ......................................................... 33

       A.     The Objections by the Non-Settling Defendants that the Partial
              Settlement Is Unfair Because They Are Excluded Should Be
              Overruled ................................................................................................ 33

       B.     The Bar Order Provisions of the Stipulation Are Consistent With
              Applicable Law ....................................................................................... 35

IV.    CONCLUSION................................................................................................. 36

## TABLE OF AUTHORITIES

**Page**

*Brody, et al. v. U.S. West, et al.,*
   No. 00 CV 4142 (District Court, Denver County) .......................................... 20, 21

*Brown v. Phillips Petroleum Co.,*
   838 F.2d 451 (10th Cir. 1988).............................................................................. 26

*Class Plaintiffs v. Seattle,*
   955 F.2d 1268 (9th Cir. 1992).............................................................................. 13

*Cosgrove v. Sullivan,*
   759 F. Supp. 166 (S.D.N.Y. 1991)........................................................................ 27

*Cullen v. Whitman Med. Corp.,*
   197 F.R.D. 136 (E.D. Pa. 2000)............................................................................ 23

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
   989 F. Supp. 375 (D. Mass. 1997)........................................................................ 25

*Franklin v. Kaypro Corp.,*
   884 F.2d 1222 (9th. Cir. 1989).............................................................................. 35

*Gottlieb v. Barry,*
   43 F.3d 474 (10th Cir. 1994)................................................................................... 7

*Gottlieb v. Wiles,*
   11 F.3d 1004 (10th Cir. 1993)................................................................................. 5

*In re AOL Time Sec. Litig.,*
   No. 1:02-CV-05575 (S.D.N.Y. 2002) ..................................................................... 6

*In re AremisSoft Corp. Sec. Litig.,*
   210 F.R.D. 109 (D.N.J. 2002)............................................................................... 24

*In re Auction Houses Antitrust Litig.,*
   No. 00 Civ. 0648 (LAK), 2001 U.S. Dist. LEXIS 1713
   (S.D.N.Y. Feb. 22, 2001) ..................................................................................... 15

*In re Bristol-Myers Squibb Sec. Litig.,*
   361 F. Supp. 2d 229 (S.D.N.Y. 2005) .................................................................. 15

**Page**

*In re Brooktree Sec. Litig.*,
   915 F. Supp. 193 (S.D. Cal. 1996) ................................................................. 15

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ......................................................................... 17

*In re Cendant Corp. Prides Litig.*,
   51 F. Supp. 2d 537 (D.N.J. 1999) ............................................................... 15

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981) ....................................................................... 12

*In re Cylink Sec. Litig.*,
   274 F. Supp. 2d 1109 (N.D. Cal. 2003) ..................................................... 15

*In re DPL Inc. Sec. Litig.*,
   307 F. Supp. 2d 947 (S.D. Ohio 2004) ....................................................... 15

*In re Elan Sec. Litig.*,
   385 F. Supp. 2d 363 (S.D.N.Y. 2005) ......................................................... 15

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................. 17

*In re HPL Technologies, Inc. Sec. Litig.*,
   366 F. Supp. 2d 912 (N.D. Cal. 2005) ....................................................... 15

*In re Horizon/CMS Healthcare Corp. Sec. Litig.*,
   3 F. Supp. 2d 1208 (D.N.M. 1998) ............................................................. 15

*In re Ikon Office Solutions, Inc., Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000) ................................................................. 28

*In re Indep. Energy Holdings PLC*,
   No. 00 Civ. 6689 (SAS), 2003 WL 22244676
   (S.D.N.Y. Sept. 29, 2003) ........................................................................... 25

*In re Infospace, Inc. Sec. Litig.*,
   330 F. Supp. 2d 1203 (W.D. Wash. 2004) ................................................. 15

**Page**

*In re King Res. Co. Sec. Litig.*,
    420 F. Supp. 610 (D. Colo. 1976) .......................................................... 3

*In re Lucent Techs., Inc. Sec. Litig.*,
    327 F. Supp. 2d 426 (D.N.J. 2004) ............................................... *passim*

*In re MGM Grand Hotel Fire Litig.*,
    660 F. Supp 522 (D. Nev. 1987) ........................................................ 25

*In re Quantum Health Res., Inc. Sec. Litig.*,
    962 F. Supp. 1254 (C.D. Cal. 1997) ................................................... 15

*In re Qwest Commc'ns, Int'l, Inc. Sec.  Litig.*,
    243 F. Supp. 2d 1179 (D. Col. 2003) ................................................. 23

*In re RJR Nabisco Sec. Litig.*,
    No. 818 (MBM), 1992 U.S. Dist. LEXIS 12702
    (S.D.N.Y. Aug. 24, 1992) ................................................................... 27

*In re Rite Aid Corp. Sec. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa. 2001) .......................................... 20, 27

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005) ............................................. 4, 17, 19, 24

*In re Superior Beverage/Glass Container Consol. Pretrial*,
    133 F.R.D. 119 (N.D. Ill. 1990) .......................................................... 26

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) .............................................................. 24

*In re Twinlab Corp. Sec. Litig.*,
    187 F. Supp. 2d 80 (E.D.N.Y. 2002) .................................................. 15

*In re United States Oil & Gas Litig.*,
    967 F.2d 489 (11th Cir. 1992) ............................................................ 35

*In re Veritas Software Corp. Sec. Litig.*,
    C-03-0283 MMC, 2005 U.S. Dist. LEXIS 30880
    (N.D. Cal. Nov. 15, 2005) ................................................................... 15

**Page**

*In re WorldCom, Inc. Sec. Litig.,*
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ............................................................. 6, 12

*In re WorldCom, Inc. Sec. Litig.,*
    No. 02 Civ. 3288(DLC), 2005 U.S. Dist. LEXIS 23079
    (S.D.N.Y. Oct. 11, 2005)............................................................................. 12

*In re WorldCom, Inc. Sec. Litig.,*
    No. 1:02-CV-03288 (S.D.N.Y. 2002) ..................................................... 6

*In re Xcel Energy, Inc.,*
    364 F. Supp. 2d 980 (D. Minn. 2005) ................................................... 27

*Maley v. Del Global Techs. Corp.,*
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) ............................................. 3, 27

*Ressler v. Jacobson,*
    149 F.R.D. 651 (M.D. Fla. 1992) ........................................................... 3

*Rosenbaum v. MacAllister,*
    64 F.3d 1439 (10th Cir. 1995)............................................................... 26

*Vizcaino v. Microsoft Corp.,*
    290 F.3d 1043 (9th Cir. 2002)............................................................... 26

*Weiss v. Mercedes-Benz of N. Am.,*
    899 F. Supp. 1297 (D.N.J. 1995)........................................................... 27

*Zupnick v. Fogel,*
    989 F.2d. 93 (2d 1993) ......................................................................... 33

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
     §78u-4(a)(6) ................................................................................... 29, 31
     §78u-4(a)(7) ..................................................................................... 9, 10
     §78u-4(a)(7)(B)(i) .................................................................................. 9

Federal Rules of Civil Procdure
     Rule 23 ...................................................................................................... 5


**SECONDARY AUTHORITIES**

1 Alba Conte, *Attorney Fee Awards* (2d ed. 1993)
     §2.06 ...................................................................................................... 26

Deborah A. Wilburn, The Go-To Guy,
*Westchester Magazine*, August 2005 ............................................................. 29

Judith Burns, Cox Says SEC Lags in Returning 'Fair Funds,'
*The Wall Street Journal.Online*, November 22, 2005, http://online.wsj.com ................. 11

National Law Journal 2005 Billing Survey .................................................... 29

Wayne Schneider, Objections to Attorneys Fee Requests
in Federal Securities Class Actions, *The NAPPA Report*,
Vol. 19 No. 1, February 2005 ........................................................................ 15

## I.    INTRODUCTION

After almost five years of hard-fought litigation, Lead Plaintiffs entered into a partial settlement with certain defendants that guarantees a $400 million recovery for the Class and further provides for a mechanism that will allow the vast majority of Class Members to share in an additional $250 million recovered by the Securities and Exchange Commission ("SEC").  The mediator who oversaw the negotiations leading to this partial settlement, the Honorable Layn R. Phillips, a retired federal judge from this Circuit, believes that the "proposed settlement is not only fair and reasonable, but an excellent result for the Class." *See* paragraph 8 to the Declaration of Layn R. Phillips in Support of Motion for final Approval of Class Action Settlement ("Phillips Decl."), submitted herewith.  Despite this outstanding result, a handful of objectors out of 1.3 million potential Class Members, who sat on the sidelines as Lead Counsel battled defendants for 4-1/2 years, has emerged to criticize the settlement.    In addition, Non-Settling Defendants Joseph P. Nacchio ("Nacchio") and Robert S. Woodruff ("Woodruff"), unsatisfied with the damage that they have already caused the Class, also ask the Court to reject the settlement.  Nacchio and Woodruff's self-interested objection should also be overruled by this Court.

A handful of other objectors apparently welcome the settlement, but argue that Lead Counsel's application for attorneys' fees and expenses should be denied.    As the Honorable Jim R. Carrigan, a retired United States District Judge from this District and former Justice of the Colorado Supreme Court, in opining that the attorneys' fee request is reasonable, states:

> In my study of the objections, it became apparent that most of them criticized the fee request from the vantage of hindsight.  The objectors point to the

> request and say it is unreasonable, looking at it for the first time in 2006. Such hindsight analysis is grossly unfair. In fact, courts should look at the risks, disadvantages, and expenses faced by Lead Counsel as of the time when they filed the case in July 2001. At that time, there was no SEC investigation. The United States Attorney's office had not even begun to focus on Qwest. Rather, it was Lead Counsel who identified the fraud at Qwest. It was Lead Counsel who agreed to assume the enormous risk of undertaking this case on a purely contingent basis. There was no guarantee of ever being repaid for their extraordinary investment of time, talent, effort and money. The only certainty was that any payday was uncertain. Accepting those risks, with no guarantee of success, has resulted in the reward, almost five years later, after Lead Counsel has delivered for the Class.

*See* paragraph 15 to the Declaration of Jim R. Carrigan in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Carrigan Decl."), submitted herewith.

Similarly, the Honorable H. Lee Sarokin, a retired United States Circuit Court Judge for the Third Circuit, and the Chair of the Third Circuit Task Force on Court Awarded Attorney Fees, has also opined that the requested fee is reasonable in light of the tremendous result achieved and the effort expended in achieving it. As Judge Sarokin states:

> The financial risk of the litigation rested solely on the shoulders of plaintiff's counsel. From the outset, plaintiff's counsel took this case on a contingency basis and agreed to advance all costs without any guarantee of success. Given the prominence of Qwest and certain of the individual defendants in Colorado, and the excellent legal resources at defendants' command, plaintiffs had to expend substantial resources to pursue the case. By taking this case on a contingency, plaintiff's counsel had no guarantee that the case would settle or result in a judgment in favor of the plaintiff, thereby ensuring payment of their expenses or fees. Plaintiffs' counsel repeatedly faced the risk of having their case dismissed completely or stayed so as to make the costs prohibitive. The case was a gamble by plaintiff's counsel with an inherent risk that was not reduced until the time of the partial settlement.

*See* paragraph 32 to the Declaration of H. Lee Sarokin in Support of Plaintiff's Motion for Attorneys' Fees and Reimbursement of Expenses ("Sarokin Decl."), submitted herewith.

Lead Counsel respectfully submit that the settlement should be approved and their motion for attorneys' fees and expenses should be granted in its entirety.

## II.    THE REACTION OF MEMBERS OF THE CLASS CONFIRM THAT THE SETTLEMENT, PLAN OF ALLOCATION AND REQUESTED AWARD OF ATTORNEYS' FEES ARE FAIR AND REASONABLE

The Court should consider the reaction of the Class as a factor in approving the settlement, Plan of Allocation and attorney fee and expense request.[1]  An extensive notice program, by mail and by means of publication has been completed.  As a result, copies of the Notice of Pendency and Partial Settlement of Class Action ("Notice") describing the settlement terms, the Plan of Allocation and Lead Counsel's request for an award of attorneys' fees and expenses was mailed to over 1,300,000 potential Class Members and posted on the website of Gilardi & Co. LLC ("Gilardi"), the Claims Administrator appointed by the Court.  *See* paragraphs 3-8 to the Declaration of Carole K. Sylvester dated February 24, 2006, which was previously filed with the Court ("Sylvester Decl.").  The Notice explained the Litigation, the terms of the settlement, the Plan of Allocation, the fee and expense request, as well as the rights and options of Class Members.  The Notice also provided a toll-free telephone number and address to contact Lead Counsel if Class Members had any questions about the settlement or Litigation.  The Summary Notice which

---

[1]     *See In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 627 (D. Colo. 1976), *Ressler v. Jacobson*, 149 F.R.D. 651, 656 (M.D. Fla. 1992), *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002).

was published in the national edition of *Investor's Business Daily*, clearly and concisely provided information concerning the settlement and explained how to obtain a copy of the Notice and other related documents.

Despite the extensive notice program, only eight timely objections have been lodged by Class Members to the settlement, Plan of Allocation or Lead Counsel's request for an award of attorneys' fee and reimbursement of expenses.  In addition, Nacchio and Woodruff, the Non-Settling Defendants, also lodged an objection to the settlement and bar order.  Given the number of Notices mailed, "such a low level of objection is a 'rare phenomenon.'"  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (citation omitted).  As evidenced by the minimal number of objections, the Class's reaction overwhelmingly supports the settlement, Plan of Allocation and Lead Counsel's fee and expense request, and is strong evidence that they are fair and reasonable.  *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 435 (D.N.J. 2004).  Out of the eight Class Member objections, the objection filed by the New York State Teachers' Retirement System ("NYSTRS") solely to Lead Counsel's fee request and the objection filed by I. Walton Bader (on behalf of the Shriners Hospitals for Children and the Teachers' Retirement System of Louisiana) to the settlement have been withdrawn.  Moreover, the objection of Alan Henry ("Henry Objection") appears to be directed at a different case, and the objection of the Commonwealth of Pennsylvania State Employees' Retirement System ("PSERS") is simply

a "me too" to the NYSTRS' objection.[2]  As discussed below, all of the objections lack merit and should be overruled.

### A.    The Class Notice Is Adequate and Satisfies All of the Requirements of Due Process.

"The standard for settlement notice under Rule 23(e) is that it must 'fairly apprise' the class members of the terms of the proposed settlement and of their options." *Gottlieb v. Wiles*, 11 F.3d 1004, 1013 (10th Cir. 1993).  While the Notice mailed to Class Members, the form of which was approved by the Court in its January 5, 2006 Order, clearly meets the requirements of due process, Rule 23 and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), three objections lodge various complaints about the Notice, all of which are unfounded or irrelevant and should be rejected.

The Graham Objection claims that Lead Counsel attempted to "hamper class members" efforts to contact them by not providing "either a telephone number or email address" in the Notice.  This contention is just wrong.  The Notice provided a toll-free telephone number for both Lead Counsel and the Claims Administrator.[3]  The Graham and

---

[2]    The four additional objections are lodged by Cynthia R. Levin Moulton, Cynthia R. Levin Moulton as Custodian of Solomon Smith Barney IRA Rollover Account, and the Cynthia R. Levin Moulton-Solomon Smith Barney IRA Rollover Account (the "Moulton Objection"); Eldon Graham, Hazel Floyd, Mary M. Hull and the Association of U.S. West Retirees ("Graham Objection"); Brian Fitzpatrick ("Fitzpatrick Objection"); and Charles B. Reiner and Margaret M. Flanagan ("Reiner Objection").

[3]    *See* Notice at page 2, "For further information regarding this settlement you may contact: Rick Nelson, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, 655 West Broadway, Suite 1900, San Diego, California 92101, Telephone: 800/449-4900 or the Claims Administrator, Gilardi & Co. LLC at 800/516-6339."

Moulton Objections[4] also claim, without any authority, that the notice process is deficient because it did not provide for a dedicated website to provide access to court documents and answer frequently asked questions. However, a dedicated website is not standard, required or necessary. More importantly, the Notice provided numerous means for Class Members to obtain information about the settlement and have their questions answered, including the toll-free telephone numbers of both Lead Counsel and the Claims Administrator as well as the address to contact Lead Counsel. The Notice also provided the Court address where they could review the pleadings and the Stipulation of Partial Settlement dated as of November 21, 2005 ("Stipulation") filed with the Court and the website address for Gilardi where copies of the Stipulation, its exhibits, and additional copies of the Notice and Proof of Claim and Release form are available. Moreover, all of the settlement documents are available from the Court electronically. If a Class Member wanted additional information about the settlement or copies of documents, the Notice provided multiple means to obtain it. Lead Counsel have been available to answer questions and both shareholder relations employees at Lerach Coughlin Stoia Geller

---

[4]    Jeffrey D. Meyer, counsel for the Moulton objectors, is a professional objector who repeatedly raises vague boilerplate arguments, just as he has here, in opposition to class action settlements throughout the nation, oftentimes representing his own law partner as an alleged class member. *See In re WorldCom, Inc. Sec. Litig.*, No. 1:02-CV-03288 (S.D.N.Y. 2002) (attorney Meyer representing his law partner, objector Moulton); *In re AOL Time Sec. Litig.*, No. 1:02-CV-05575 (S.D.N.Y. 2002) (same). Mr. Meyer has been discredited for his frivolous objections. *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 340 (S.D.N.Y. 2005) (approving settlement over attorney Meyer's objections because, his client/law partner lacks standing to raise objections to the class settlement and, "[i]n any event, [the] objections are frivolous").

Rudman & Robbins LLP ("Lerach Coughlin") and the Claims Administrator have each responded to thousands of inquiries regarding the settlement.

The Graham Objection also claims that the Notice provides "misleading" and insufficient information with respect to the amount of attorneys' fees and expenses requested by Lead Counsel. Contrary to the Graham Objection assertion, the Notice clearly states that "Lead Counsel will request the Court to award attorneys' fees of up to 24% of the Settlement Fund, plus reimbursement of expenses, not to exceed $5.2 million, which were incurred in connection with the Litigation, plus interest thereon." Notice at p. 10. This language is clear and unambiguous; however, if a Class Member was confused or had questions, all he, she or it needed to do was call Lead Counsel at the toll-free telephone number provided in the Notice. Lead Counsel are applying for fees based on a percentage of the recovery, the preferred method of awarding fees from a common fund in the Tenth Circuit. *See Gottlieb v. Barry*, 43 F.3d 474, 483 (10th Cir. 1994) ("In our circuit, following *Brown* and *Uselton*, either [the percentage or lodestar] method is permissible in common fund cases; however, *Uselton* implies a preference for the percentage of the fund method."). Therefore, any concern by the Graham objectors about lodestar information not being included in the Notice is unfounded. Moreover, Lead Counsel filed their Motion for Award of Attorneys' Fees and Reimbursement of Expenses ("Fee Motion") on February 27, 2006, over three weeks before the due date for Class Members to object. The Fee Motion contained detailed information on the reasonableness of the requested fee, including the information the Graham Objection claimed should have been put in the Notice. There can

be no question that Class Members had sufficient information to object to the requested fee if they thought it was appropriate to do so.

Mr. Fitzpatrick complains that the Notice did not disclose that the attorneys may be paid before members of the Class.[5]  He claims that this provision is self serving, does not benefit the Class and therefore should be struck or a new round of notices should be sent to Class Members before the settlement is approved.  As an initial matter, Mr. Fitzpatrick does not cite a single case or any other authority that requires or even suggests that this provision be disclosed in the Notice despite the fact that he recognizes it is quite common in class action settlements.  This provision is common in class action settlements because it allows Lead Counsel, who have litigated a case on a contingency basis for years, investing enormous amounts of time and advancing millions to cover expenses, to recover these monies on award by the Court, subject to repayment if overturned on appeal.  Indeed, any other alternative would simply punish Lead Counsel for their efforts.  Although Mr. Fitzpatrick may have such a motive, it should not be countenanced by this Court.  Lead Counsel have worked for almost five years to obtain a tremendous result for Class Members.  There is no justifiable excuse for making them wait longer to be paid their fees or reimbursed for their expenses.

---

[5]     Of course the Notice stated:  "This Notice is a summary and does not describe all of the details of the Stipulation.  For full details of the matters discussed in this Notice, you may review the pleadings and Stipulation filed with the Court . . . .  Further, the Stipulation, its exhibits, and additional copies of this Notice and the Proof of Claim and Release are available on the Internet at www.gilardi.com."  Notice at p.12.

The Graham Objection also complains that the Notice did not adequately inform Class Members that their claims pursuant to the Plan of Allocation will be prorated. The Plan of Allocation set forth in the Notice clearly states that "Each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants." Notice at p.7. This is what proration means. Moreover, the Notice also informed Class Members that "[f]or all types of Qwest publicly traded securities, your actual recovery from the Settlement Fund will depend on a number of variables including the number of claimants and the types and amounts of securities they purchased, the type and number of Qwest publicly traded securities you purchased, the expense of administering the claims process and the timing of your purchases and sales, if any." Notice at p.1. Clearly, the Graham Objection is mistaken.

Finally, Mr. Fitzpatrick asserts that the Notice is deficient because it did not set forth the amount of value of the Class's claims. There is no such requirement here as the PSLRA only requires such a statement if the parties agree on the amount of damages. See §21D(a)(7)(B)(i) of the Securities Exchange Act of 1934, 15 U.S.C. §78u-4(a)(7)(B)(i). The parties certainly did not agree on damages in this case as the Settling Defendants contended that Lead Plaintiffs could not show loss causation or damages at the level Lead Plaintiffs' claimed. *See* paragraph 175 to the Declaration of Michael J. Dowd in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds, and Award of Attorneys' Fees and Reimbursement of Expenses filed with the Court on February 27, 2006 ("Dowd Decl."). Thus, under these circumstances, all that is

required is a statement of the issues on which the parties disagree.  *See* §21D(a)(7)(B)(ii), 15 U.S.C.§78u-4(a)(7)(B)(ii).  The Notice sets forth these issues.[6]

### B.   The Settlement Is Fair, Reasonable and Adequate

Only one Class Member has lodged an objection to the $400 million recovery for the benefit of the Class.  The Moulton Objection, in one sentence, claims without any authority or an analysis of the facts of this Litigation that the settlement is not fair.  However, as discussed in Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds ("Settlement Motion"), previously filed with the Court, the Phillips Declaration, the Dowd Declaration and herein, the settlement is an outstanding result for the Class and is clearly fair, reasonable and adequate.  The $400 million settlement is one of the largest settlements achieved after the passage of the PSLRA and likely the largest possible recovery – even if Lead Plaintiffs had overcome the significant risks in proving liability and damages and prevailed at trial – given Qwest's financial condition and the financial impact on Qwest that would accompany a large judgment.  In addition to the $400 million, the SEC has agreed to distribute the $250 million it received from Qwest to Class Members, who purchased Qwest common stock, bonds or options from July 27, 1999 through and including July 28, 2002, in accordance with the Plan of Allocation in this Litigation.  This is an excellent benefit for the Class.[7]

---

[6]     *See* Notice at pp.1-2.

[7]     The SEC was authorized by the Sarbanes-Oxley Act of 2002 to return money it collects from wrongdoers to investors.  While laudably the SEC has collected more than $5 billion, it has returned about 1% of eligible funds to investors according to a report issued

Perhaps the best evidence in support of the settlement is put forth by Judge Phillips, who mediated the settlement.  As set forth in his Declaration, Judge Phillips engaged in a long series of meetings and telephone conversations with the parties between March 2003 and October 2005 in an attempt to resolve the case.  Judge Phillips notes that this "was an extremely complex securities action involving numerous difficult and disputed legal and factual issues."  Phillips Decl., ¶5.  He also affirms that "continued litigation posed great risks for all parties."  *Id.*  Nevertheless, he confirms that "each party demonstrated a willingness to continue to litigate rather than accept a settlement that was not in their best interests."  Phillips Decl., ¶6.  Finally, Judge Phillips states that "if this litigation continued, plaintiffs prevailed at trial and a substantial judgment was ultimately affirmed by the appellate court, a real risk existed that the judgment would be uncollectible."  Phillips Decl., ¶7.  Based on this analysis, Judge Phillips concludes his declaration by stating:

> There is no question in my mind that the settlement was reached by counsel who are among the most capable and experienced lawyers in the country in securities class action litigation, who made a considered judgment that the proposed settlement is not only fair and reasonable, but an excellent result for the Class.  Based on the facts and circumstances presented by the parties and my experience in the mediation of securities class actions, I concur in that assessment.  Lead Counsel took on a risky and complicated

---

by the Government Accountability Office in the summer of 2005.  *See* Judith Burns, Cox Says SEC Lags in Returning 'Fair Funds,' *The Wall Street Journal.Online*, November 22, 2005, http://online.wsj.com, attached as Exhibit 1 to the Declaration of Jeffrey D. Light in Support of Reply Brief in Support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds and Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Light Decl."), submitted herewith.  Therefore, Lead Plaintiffs' efforts to work cooperatively with the SEC to provide that agency with an effective means of distributing the $250 million is a great benefit to the Class.

case, invested a great deal of time and resources, and achieved an outstanding result for the Class.  Therefore, I respectfully submit that this partial settlement should be approved by this Court.

Phillips Decl., ¶8.

The Moulton Objection also claims, without authority or analysis, that the release is overly broad because it releases parties and causes of action that were not pursued.  The release in this case corresponds to the allegations in the complaint and is specifically tailored to the "the purchase, acquisition, sale, or disposition of Qwest securities by any Lead Plaintiffs or any Class Member during the Class Period and the allegations that were made or could have been made in the Litigation."  *See* Stipulation, ¶1.26.  The fact that the release includes claims that were not asserted and parties that were not named does not render the release overly broad because it is well established that "a court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (citation omitted).  As the court stated in *WorldCom*, 388 F. Supp. 2d at 344: "Moulton's argument that the Release applies to claims against persons and entities uninvolved in the class action litigation is inaccurate," and does not render a release unfair. Moreover, Ms. Moulton or any other Class Member who did not wish to be bound by the release, could have opted out of the Class.  *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2005 U.S. Dist. LEXIS 23079, at *12 (S.D.N.Y. Oct. 11, 2005).

C.    The Plan of Allocation Is Fair and Reasonable

Assessment of a plan of allocation in a class action is governed by the same standards of review applicable to the settlement as a whole – the plan must be fair and reasonable. *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992). Mr. Fitzpatrick surmises that the Lead Plaintiffs may not have adequately represented the Class because some Class Members are not going to recover under the Plan of Allocation, but does not challenge the proposition that some Class Members should not recover under the Plan of Allocation. The Plan of Allocation was developed by an expert hired by Lead Counsel, Bjorn Steinholt, and reasonably distributes the settlement proceeds to those Class Members based on their provable damages under the federal securities laws. *See* Declaration of Bjorn I. Steinholt, CFA ("Steinholt Decl.") which was previously filed with the Court. The Plan of Allocation calculates a Class Member's claim, primarily based on the statistically significant price declines following disclosure of the alleged fraud as set forth in the complaint. Thus, some Class Members who purchased and then sold their securities prior to a statistically significant price decline related to the revelation of the alleged fraud will not recover under the Plan of Allocation. *See generally* Steinholt Declaration. Not a single Class Member has complained about this or any other aspect of how their claim is calculated. The fact that some Class Members are not entitled to recover under the Plan of Allocation does not render the Plan of Allocation unfair or make Lead Plaintiffs' representation inadequate.

The Reiner Objection claims that there is not a provision in the Stipulation for undistributed funds that remain in the Settlement Fund after distribution to Class Members.

- 13 -

The Reiner Objection is wrong.  The Stipulation clearly contains such provision.  The Stipulation provides that:

> 6.6    The Net Settlement Fund shall be distributed to the Authorized Claimants substantially in accordance with a Plan of Allocation to be described in the Notice and approved by the Court. If any funds remain in the Net Settlement Fund by reason of uncashed checks or otherwise, then, after the Claims Administrator has made reasonable and diligent efforts to have Class Members who are entitled to participate in the distribution of the Net Settlement Fund cash their distribution checks, any balance remaining in the Net Settlement Fund one (1) year after the initial distribution of such funds shall be re-distributed to Class Members who have cashed their checks and who would receive at least $10.00 from such re-distribution, after payment of any taxes, and unpaid costs or fees incurred in administering the Net Settlement Fund for such redistribution. If after six months after such re-distribution any funds shall remain in the Net Settlement Fund, then such balance shall be returned to Colorado-based non-sectarian, not-for-profit 501(c)(3) organization(s) providing legal services or otherwise in the appropriate public interest designated by Lead Counsel.

### D.    The Requested Fee Is Fair and Reasonable

The few objections (six, one of which has been withdrawn) to Lead Counsel's request for an award of attorneys' fees generally ignore or misstate the specific facts and circumstances of this particular case, rely on unsupported assertions, inapplicable law or cases that are easily distinguishable to support their position.  For all the reasons discussed below, in the Fee Motion, the Dowd Declaration, the Carrigan Declaration and the Sarokin Declaration, the objections are without merit and should be overruled.

NYSTRS filed its typical boilerplate objection to Lead Counsel's fee request and PSERS filed a "me too" objection, asserting without any analysis of the facts and circumstances of this Litigation, that Lead Counsel's fee should be reduced because some

federal courts in the Second and Ninth Circuit have awarded less than a 24% fee of the

settlement amount.[8]  In addition to the fact that none of the cases are from courts within the

Tenth Circuit, NYSTRS and PSERS rely on a small and cherry-picked selection of easily

distinguishable cases that had elements present which either reduced the risk or effort to

obtain a successful result, including the fact that most of these cases involved settlement at

the early stages of the litigation.[9]  NYSTRS and PSERS also assert that because some

---

[8]     To Lead Counsel's knowledge, in the last year or two NYSTRS has objected to no fewer than a dozen class action settlements, appearing at the end of a case to object to the fees of counsel who created a result for the class.  It appears to be the standard practice of NYSTRS, and the other public pension funds it recruits to file boilerplate "me too" objections that fail to address the facts and circumstances of the particular case. It should be noted that to Lead Counsel's knowledge, NYSTRS has never sought to be appointed a lead plaintiff in a securities fraud class action; instead it is of the view that "[b]eing a lead plaintiff invariably entails years of work toward an uncertain end; being an objector entails only a few hours of research and letter writing."  Wayne Schneider, Objections to Attorneys Fee Requests in Federal Securities Class Actions, *The NAPPA Report*, Vol. 19 No. 1, February 2005, at 11.  Light Decl., Ex. 2.

[9]     *See*, *e.g.*, *In re Veritas Software Corp. Sec. Litig.*, C-03-0283 MMC, 2005 U.S. Dist. LEXIS 30880, at *17-18 (N.D. Cal. Nov. 15, 2005) (settlement reached between parties while motion to dismiss was pending and no discovery had occurred); *In re Riverstone Networks, Inc. Sec. Litig.*, No.: CV-02-3581 PJH, at 4 n.2 (N.D. Cal. May 17, 2005) (reducing fee where "[t]he work actually performed was limited, and consisted principally of conducting the pre-filing investigation; drafting two complaints and an opposition to a motion to dismiss that was never heard by the court; preparing for and participating in the mediation; and preparing the settlement documents"); *In re HPL Technologies, Inc. Sec. Litig.*, 366 F. Supp. 2d 912, 920-21 (N.D. Cal. 2005) (finding counsel had dedicated only 3.8% of total time to discovery while 75% of time was devoted to investigation and settlement); *In re Cylink Sec. Litig.*, 274 F. Supp. 2d 1109, 1115-16 (N.D. Cal. 2003) (fee award based on the result of an auction, a practice now discredited); *In re Cendant Corp. Prides Litig.*, 51 F. Supp. 2d 537, 539-42 (D.N.J. 1999) (awarding fee after counsel agreed to fee schedule upon being named class counsel and the court found settlement was reached "very early on in the litigation"); *In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648 (LAK), 2001 U.S. Dist. LEXIS 1713, at *11 (S.D.N.Y. Feb. 22, 2001) (in antitrust case, counsel agreed upon being named lead counsel only to seek attorneys' fees representing

class counsel retained by public employee retirement unions have agreed in other cases to a fee below the fee requested in this Litigation, the fee requested here – and the agreement on which it is based – should be set aside.   However, what NYSTRS and the other objectors fail to consider or even discuss is that the requested fee was negotiated between the Court-appointed Lead Plaintiffs and Lead Counsel and therefore should be afforded a

---

25% of any recovery over $405 million); *In re Critical Path, Inc. Sec. Litig.*, No. C 01-00551 WHA, 2002 U.S. Dist. LEXIS 26399, at *32 (N.D. Cal. June 18, 2002) (Court stating that the settlement was reached after "counsel made a relatively brief investment of time in their cases. To the extent that their work conferred a real benefit to the classes, those efforts primarily occurred in a brief two-month period last fall. The work undertaken by counsel in this period (and throughout the cases) was not particularly complex. Few novel issues were raised."); *In re Quantum Health Res., Inc. Sec. Litig.*, 962 F. Supp. 1254, 1255 (C.D. Cal. 1997) (Court finding parties settled case only after "[d]uring the fourteen months between filing and settlement, Plaintiffs engaged in written discovery, consisting mainly of requesting the production of documents from Quantum and third parties. Other than a partly successful motion to compel production of certain documents, there was no law and motion practice."); *In re Infospace, Inc. Sec. Litig.*, 330 F. Supp. 2d 1203, 1216 (W.D. Wash. 2004) (case "never progressed beyond the pleading stage; counsel's efforts were limited to drafting complaints and conducting investigations"); *In re Brooktree Sec. Litig.*, 915 F. Supp. 193, 198 (S.D. Cal. 1996) (Court finding a reduced fee warranted where "this case required class counsel neither to engage in numerous motions nor to commit an extensive staff to the case for a period of many years. Indeed, with no analysis of the complexity of this case, and based upon the quick and apparent ease of settlement, this case does not appear to have been of even 'standard' difficulty.") (footnote omitted); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 367 (S.D.N.Y. 2005) (parties reaching settlement just after motion to dismiss and no formal discovery had occurred); *In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 232 (S.D.N.Y. 2005) (court awarding 4% fee to lead counsel after court dismissed plaintiffs' complaint with prejudice); *In re Twinlab Corp. Sec. Litig.*, 187 F. Supp. 2d 80, 86 (E.D.N.Y. 2002) (parties settled early in discovery process and plaintiffs had not taken one deposition); *In re Horizon/CMS Healthcare Corp. Sec. Litig.*, 3 F. Supp. 2d 1208, 1212, 1214 (D.N.M. 1998) (finding the parties entered into an "early settlement" and little discovery was completed); *In re DPL Inc. Sec. Litig.*, 307 F. Supp. 2d 947, 954 (S.D. Ohio 2004) (Court awarding fee after finding "Plaintiffs' counsel expended no time conducting discovery in this litigation. Thus, it can be seen that Plaintiffs' counsel devoted a relatively small amount of time to this litigation.") (footnote omitted).

presumption that it is reasonable. *Rite Aid*, 396 F.3d at 298, 301 n.10; *In re Cendant Corp. Litig.*, 264 F.3d 201, 284 (3d Cir. 2001); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004); *Lucent*, 327 F. Supp. 2d at 432. *See also* Sarokin Decl., ¶¶15-25. This presumption preserves the lead plaintiffs' role as "the class's primary agent vis-a-vis its lawyers" and absent unusual and unforeseeable changes, courts should honor that presumption. *Cendant*, 264 F.3d at 282, 283. Not only was the requested fee negotiated and agreed to, but Lead Plaintiffs, who were all actively involved in all aspects of the litigation, evaluating counsel's work after this partial settlement was reached, support the requested fee based on the outstanding result obtained.[10]  Importantly, the fee agreement negotiated by Lead Plaintiffs was intended to provide an incentive for Lead Counsel to obtain the largest recovery possible by increasing the percentage fee as the recovery increased. The incentive worked with excellent results in this Litigation. As Judge Sarokin states:

> Both the Third Circuit and the Seventh have recognized that higher percentages often can be better for class members than lower ones. The Third Circuit observed that "[t]he goal of appointment [of class counsel] should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, not to obtain the lowest attorney fee. The lawyer who charges a higher fee may earn a proportionately higher recovery

---

[10]     PSERS also without any authority suggests that the fee awarded be applied to the net recovery (after expenses). This unsupported suggestion should be rejected. The fee agreement negotiated with Lead Plaintiffs provided counsel would be entitled to its reimbursement of reasonable expenses incurred in prosecuting the litigation separate from any award of fees. Moreover, the Notice contemplated that the percentage of fees requested is based on the Settlement Fund without a reduction for expenses. This is customary practice, and the vast majority of courts across the country award fees based on the gross amount of the settlement.

for the class than the lawyer who charges a lesser fee." *Third Circuit Task Force Report*, 208 F.R.D. 340, 373 (January 15, 2002) (emphasis added). The Seventh Circuit agreed in *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). It rejected the so-called "megafund rule," according to which the fee percentage must be capped at a low percentage when the recovery is very large, noting that "[p]rivate parties would never contract for such an arrangement" because it would encourage cheap settlements. *Synthroid*, 264 F.3d at 718.

Sarokin Decl., ¶22.

      Here, the fee agreement contained a fee structure that incentivized Lead Counsel to achieve the best possible recovery. As the recovery increased, so did the percentage of the recovery that could be sought by Lead Counsel. This type of fee agreement rewards class counsel for rejecting low settlement offers in the early phases of the litigation. In so doing, Class counsel expose themselves to greater risks than they would face if they settled for fewer dollars at the outset of the litigation.

Sarokin Decl., ¶23.

      [T]he system envisioned by the PSLRA demands that courts place considerable weight on the fee structure negotiated by the Lead Plaintiffs at the outset of the litigation, when the outcome of this litigation was in grave doubt. Under the PSLRA, the risk that this case would be dismissed was real. Studies have indicated that 20-30% of all securities cases have been dismissed at the pleading stage since the enactment of the PSLRA. To avoid dismissal, Lead Counsel would have to expend a substantial amount of time and money investigating the case in an effort to satisfy the enhanced pleading requirements of the PSLRA. Assuming that the complaint was upheld, Lead Counsel would also have to expend substantial amounts of time and money in pursuing discovery from the defendants and third parties, overcome substantial hurdles at the class certification and summary judgment stages, and counter the many arguments that defendants would raise on loss causation and damages.

Sarokin Decl., ¶24.

      The settlement amount ($400 million) represents one of the larger cash settlements

of a securities class action and is believed to be in the top 15 settlements achieved after

- 18 -

the passage of the PSLRA and given Qwest's financial condition is likely the largest possible recovery that could be obtained for the Class.

Mr. Fitzpatrick, the Reiner Objection and the Graham Objection cite to a few select studies that conclude that the "average" fee awards for settlement amounts in class action cases over $100 million ranged from 10.1% to 19%. For every study cited by the objectors, there is another study and numerous cases that indicate the average fee award is consistent with or in excess of the requested fee award of 24%.[11] For example, the court in *In re Lucent Technologies, Inc. Securities Litig.* 327 F. Supp. 2d 426 (D.N.J. 2004), a case cited by the Graham Objectors, noted in awarding the requested fee of 17% of a $517 million settlement (a percentage that was negotiated between lead plaintiffs and lead counsel): "the requested 17% fee is considerably less than the percentages awarded in nearly every comparable case" and in cases involving comparable risks to those presented here which have settled for more than $100 million, courts typically award fees in the range of 25%-30%. *Id.* at 441, 442. Moreover, simply relying on a few select studies, violates the well-established principal that courts are urged not to be "formulaic" in the award of attorneys' fees and the circumstances of each case should be considered in awarding a

---

[11]     Lead Counsel in their Fee Motion, cited two studies and numerous cases that indicated the average fee award is consistent with or in excess of the requested award of 24% here. In addition, the Third Circuit recently approved of a district court's reliance on several studies demonstrating that fee awards in class actions ranged from 25%-31% and in settlements of between $100 million and $200 million, fee awards in the 25%-30% range were "'fairly standard.'" *Rite Aid*, 396 F.3d at 303 (citation omitted).

fee.  Here, there is nothing "average" about the risks involved, the level of skill or effort required or the result obtained by Lead Counsel in this case.

Contrary to the unsupported suggestion by the Graham objectors and PSERS, Lead Counsel did not piggy back on the government's efforts but instead were at the forefront of uncovering the alleged fraud at Qwest.  This Litigation was commenced six to nine months prior to any governmental action.  Also, the Lead Plaintiffs advanced claims that the SEC did not pursue which contributed to Lead Plaintiffs' success in obtaining a superior result for the Class.[12]  Indeed, the SEC presented most of its claims against the defendants in the months and years after Lead Plaintiffs had filed their complaints.  *See* Dowd Decl., ¶¶48-52.

In 2005, the Graham objectors, represented by Curtis L. Kennedy (who represents them here as well), filed similar objections to the settlement and fee application in *Brody, et al. v. U.S. West, et al.*, No. 00 CV 4142 (District Court, Denver County), another case litigated by Lead Counsel.  In rejecting their objections, Judge John Walker Coughlin pointed out that counsel for the class in that case, including Lerach Coughlin and Dyer & Shuman LLP, filed the case and litigated it for years, while counsel for the Graham objectors took no steps to pursue the claims.  Judge Coughlin stated:

---

[12]    *See In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (in awarding a 25% of a $193 million settlement fund, the court noted the skill of plaintiffs' counsel and the outstanding results "in a litigation that was far ahead of public agencies like the Securities and Exchange Commission and the United States Department of Justice, which long after the institution of this litigation awakened to the concerns that plaintiffs' counsel first identified").

Now, the issue comes of attorney's fees and costs. And I think one factor I'd like to point out from the start one of the *Johnson* factors is whether this was a desirable case to bring or was it an undesirable case to bring. We have Counsel for the retired – retired U.S. West workers here who represents their association. They didn't bring the claim. They knew all the facts. Everybody knew about the record date and then they changed the record date. They didn't bring the lawsuit. There wasn't any other lawyer in the United States that brought this lawsuit, these people did.

There wasn't any other lawyers in the United States that took the gamble that these people did. Not one other firm anywhere said I'm willing to take that on. I'll go five years. I'll pay out the expenses. I'll put my time and effort on the line. Nobody did.

\*         \*         \*

But the fact is they're asking for 30 percent after five years of struggling with the risk of getting zero. Do the shareholders want more? Absolutely. But they're fortunate they had some lawyers that had the guts to come forward and do it. It's easy to say that's too much money, but this is cash in the shareholder's pocket. This isn't a coupon you take to Blockbuster to get 50 cents off. This is cash. And that cash would not have been obtained without these people doing what they did for five years.

*Brody, et al. v. U.S. West, et al.*, No. 00 CV 4142, Transcript at 62:13-63:3, 64:24-65:8,

(District Court, Denver County Aug. 30, 2005). Light Decl., Ex. 3.

A similar analysis applies here. Mr. Kennedy, if he truly represents U.S. West

retirees,[13] was arguably in a more advantageous position to ferret out the fraud and lead

the charge to redress it – but he did not do so. Lead Counsel filed this case in July 2001,

---

[13]     According to the website for the Association of U.S. West Retirees ("AUSWR") cited by Mr. Kennedy in the Graham Objection, AUSWR "represents more than 40,000 Qwest Communications retirees and surviving spouses." *See* http://www.uswestretiree.org. According to recent correspondence from Mr. Kennedy, that was received by counsel for the Settling Parties on April 26, 2006, the Graham objectors have recruited approximately .002% (107) of the 40,000 retirees and surviving spouses to submit late joinders in their objections.

long before the government investigation commenced. As such, the Graham objectors' claim that Lead Counsel "are the mere jackels to the government's lions, feasting after . . . the kill" is preposterous. There may well be jackels at the kill, but Lead Counsel are not they.

Moreover, there was nothing "average" about the efforts of Lead Counsel in the prosecution of this Litigation. The Litigation was pending for over four years when an agreement-in-principle to partially settle was reached. By that time, Lead Plaintiffs' counsel had expended an enormous amount of time and money in a massive investigation, motion practice and discovery. Lead Plaintiffs' counsel largely defeated defendants' numerous attempts to dismiss Lead Plaintiffs' claims at the pleading stage, obtained and reviewed over 9 million pages of documents from defendants and third parties, conducted an extraordinarily detailed analysis of Qwest's financial statements and the multitude of underlying accounting transactions and principles at issue, successfully litigated numerous motions to compel, expended a substantial amount of time analyzing the fruits of these discovery efforts, interviewed dozens of witnesses, took or defended over 50 depositions, fully briefed the issue of class certification, litigated a motion for a temporary restraining order and conducted a two-day preliminary injunction hearing, litigated the United States Attorney's Office motion to stay the litigation, consulted with experts and participated in complex settlement negotiations that lasted several years (while Lead Counsel continued to vigorously prosecute the Litigation) including mediations with retired Judges Layn R. Phillips and Daniel Weinstein.

An important issue during the settlement negotiations was the financial ability of Qwest to fund a settlement with the Class or satisfy a significant judgment after trial and appeals.  As a result, Lead Counsel spent a considerable amount of time and effort in meeting with Qwest to discuss the financial limitations faced by Qwest in analyzing Qwest's ability to fund a settlement or significant judgment.  As discussed in the Fee Motion, courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in awarding attorneys' fees.  That risk was increased here because Qwest lacked significant assets to satisfy a substantial judgment.  *See Lucent*, 327 F. Supp. 2d at 438 ("the risk of nonpayment is 'acute' where a defendant lacks 'significant . . . hard assets against which plaintiffs could levy had a judgment been obtained.'") (quoting *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 150 (E.D. Pa. 2000)).

In addition to the substantial effort required to successfully prosecute this Litigation, the result obtained for the Class is far from "average."  In fact, as discussed above, the $400 million recovery is one of the larger securities class action settlements after the passage of the PSLRA.  Moreover, based on Qwest's financial condition, Lead Counsel believe that the $400 million recovered for the Class is likely the largest possible recovery because the financial impact on Qwest that would accompany a larger judgment would likely force Qwest into bankruptcy.  As this Court recognized in its order denying Lead Plaintiffs request for preliminary injunction, "freezing $400 million of the proceeds of the QwestDex sale would substantially disrupt Qwest's current business plan and would probably prompt Qwest's bankruptcy" which event would cause harm to a lot of constituents including Lead Plaintiffs and Class Members.  *See In re Qwest Commc'ns, Int'l, Inc. Sec.*

*Litig.*, 243 F. Supp. 2d 1179, 1188 (D. Col. 2003).  *See also In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 132 (D.N.J. 2002) ("In other words, rather than permitting litigation to destroy a business and shortchange investors, as securities class actions so often do, Plaintiffs' Counsel created a settlement that promotes a just result and furthers economic activity.").  In short, to say that the level of skill or effort required to prosecute this case and obtain the outstanding result for the Class is "average" simply belies the record.

Mr. Fitzpatrick, the Graham Objection and the Moulton Objection claim, citing to a few select cases, none from the Tenth Circuit, that the percentage of recovery for attorneys' fees should decrease as the size of the settlement fund increases.  While some judges have applied declining percentages, neither market transactions or economic reasoning provide much support for these practices.  Indeed, this practice "has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply."  *Rite Aid*, 396 F.3d at 302 n. 12 (citation omitted).  The Seventh Circuit rejected the objectors' argument there that a fee percentage must be capped at a low percentage when the recovery is very large, noting that "[p]rivate parties would never contract for such an arrangement" because it would encourage cheap settlements.  *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001).

Indeed, Judge Sarokin, the Chair of the Third Circuit Task Force which endorsed the declining sliding scale in 1985, now rejects that type of fee agreement since "it reduces the incentive of counsel to increase the amount of the settlement as their participation in it

diminishes." Sarokin Decl., ¶23. Further, Judge Carrigan points out that such an approach belies common sense, stating:

> Ironically, they [the objectors] seem to imply that if the recovery had been much smaller, the 24% fee would be fine. Thus, they would punish Lead Counsel for having been too successful. Fairness of a contingent fee agreement should be judged at the outset, not through hindsight.

Carrigan Decl., ¶16.

Moreover, most of the cases cited by the objectors are either inapplicable or easily distinguishable. For example, the Graham objectors claim that "[o]ne example where the trial court applied such a sliding scale is the case of *In re Lucent Techs.*" However, the court in *Lucent* did not apply such a sliding scale but instead approved the requested and agreed-to fee of 17% of a $517 million settlement and noted that the """requested . . . fee is considerably less than the percentages awarded in nearly every comparable case." *Lucent*, 327 F. Supp. 2d at 442.[14]

---

[14] The Graham objectors also cite to *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp 522 (D. Nev. 1987), claiming the court awarded 7% of a $205 million recovery. What the Graham objectors fail to mention is that *MGM* was a mass tort case and the court awarded 7% to the plaintiffs' legal committee who oversaw the litigation and 26-1/3% of the $205 million was awarded to counsel for each individual plaintiff, for a total of 33-1/3% of the $205 million recovery. In *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375 (D. Mass. 1997), the court approved the parties agreement on fees where no common fund was created. *See also In re Indep. Energy Holdings PLC*, No. 00 Civ. 6689 (SAS), 2003 WL 22244676, at *9 (S.D.N.Y. Sept. 29, 2003) (court in reducing a fee request award of 25% to 20% found that while the "case was brought under the securities laws, it better resembles a run-of-the-mill commercial litigation").

**E.    The Requested Fee When Cross-Checked Against Counsel's Lodestar Is Reasonable**

Lead Counsel make this application on a percentage-of-recovery basis pursuant to a fee structure that was negotiated with the Court-appointed Lead Plaintiffs.  While the time and labor required by Lead Counsel to successfully prosecute this Litigation and obtain the outstanding settlement for the benefit of the Class fully justifies the requested fee and is one of the *Johnson* factors the Court can consider in determining whether the requested fee is reasonable, the Tenth Circuit has found this *Johnson* factor to be of less importance in a common fund settlement such as this case.  *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988).   In any event, a lodestar analysis as a check on the reasonableness of the requested fee demonstrates that it is fair and should be awarded.  As set forth in the Fee Motion and the Declarations of counsel that were previously submitted to the Court, the aggregate lodestar of Lead Plaintiffs' counsel, their para-professionals and in-house experts totals $18,547,453.65.  The requested fee would result in a multiplier of approximately 5.1.  As the court noted in *In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 131 (N.D. Ill. 1990): "there should be no arbitrary ceiling on multipliers."  This is especially true here where a lodestar multiplier analysis is used merely as a cross-check on the reasonableness of a percentage.  1 Alba Conte, *Attorney Fee Awards* §2.06, at 39 (2d ed. 1993).  Without any support the Reiner, Graham and Moulton Objections claim that a 5.1 multiplier is excessive.[15]  Notably, none of

---

[15]    The Reiner Objection claims without citing a single case or any other authority that a 5.1 multiplier "is out of line with recent decisions where multiples of more than 2 on the

the objectors cite controlling authority that would require the Court to reduce the requested fee. In fact, as discussed in the Fee Motion, the 5.1 multiplier here falls within the range of multipliers found reasonable for cross-check purposes by courts in common fund cases and is fully justified given the effort required, the risks faced and overcome and the results achieved.[16]  Judge Carrigan has also opined that the multiplier is reasonable.  Carrigan Decl., ¶17.  Moreover, awarding Lead Counsel a fee lower than that negotiated with the Lead Plaintiffs simply because the multiplier is 5.1 undermines the rationale for using the

---

allowable lodestar amount are deemed suspect and cause for more inquiry." The Reiner Objection also claims that Lead Counsel did not make any references to the amount of the multiple in the Fee Motion.  However, the Fee Motion specifically noted the number of hours worked by Lead Plaintiffs' counsel and their para-professionals and in-house experts, the total lodestar and the resulting 5.1 multiple.  See Fee Motion at p. 25.  The Moulton Objection simply states the award is excessive using a lodestar cross-check without any support or analysis.  The Graham Objection cites to *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002), where the court noted that in common fund cases between 1996-2001 where the court awarded fees based on the percentage method the multipliers for cross-check purposes ranged from 0.6-19.6.  The Graham Objection also criticizes Lead Counsel for failing to cite *Rosenbaum v. MacAllister*, 64 F.3d 1439 (10th Cir. 1995), which the objectors incorrectly assert is the leading decision from the Tenth Circuit.  However *Rosenbaum* is inapplicable here because it was not a common fund case and the court found the benefits of the settlement to be questionable.

[16]    *See*, *e.g.*, *Rite Aid*, 146 F. Supp. 2d at 735-36 (25% fee representing 10.73 multiplier); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (awarded 25% fee of $80 million settlement representing a 4.7 multiplier); *Maley*, 186 F. Supp. 2d at 371 ("it clearly appears that the modest multiplier of 4.65 is fair and reasonable"). *In re RJR Nabisco Sec. Litig.*, No. 818 (MBM), 1992 U.S. Dist. LEXIS 12702, at *22, (S.D.N.Y. Aug. 24, 1992) (approving fees of over $17.7 million, notwithstanding objection that such an award of fees represented a multiplier of 6); *Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297, 1304 (D.N.J. 1995) (awarding fee resulting in 9.3 multiplier); *Cosgrove v. Sullivan*, 759 F. Supp. 166, 167 n.1 (S.D.N.Y. 1991) (multiplier of 8.74); *see also* Conte, *supra*, at 39 ("When a large common fund has been recovered and the hours are relatively small, some courts reach a reasonable fee determination based on large multiples of 5 or 10 times the lodestar.").

percentage method of awarding fees and encouraging lead plaintiffs to negotiate fee agreements with class counsel. It also improperly penalizes counsel for obtaining a very successful resolution of complex claims and provides a disincentive for counsel to take advantage of the opportunity to secure a good settlement without unnecessarily dragging the case on for years. *See In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 196 (E.D. Pa. 2000) ("[t]he court will not reduce the requested award simply for the sake of doing so when every other fact or ordinarily considered weighs in favor of approving class counsel's request of thirty percent").

In another effort to cast doubt on counsel's veracity and intentions, the Graham Objection claims that Lead Counsel have "cleverly hidden" in the information it submitted to the Court time for their in-house accountants, investigators and para-professionals. Nothing could be further from the truth. The Fee Motion specifically states that "[i]n total, Lead Plaintiffs' counsel and their para-professionals and in-house experts devoted 53,795.87 hours to this Litigation." Moreover, the previously filed Declaration of Michael J. Dowd Filed on Behalf of Lerach Coughlin Stoia Geller Rudman & Robbins LLP in Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses clearly sets forth the time spent on this Litigation by Lead Counsel's in-house accountants, investigators and para-professionals, their respective hourly rates and describes the services they performed.

Still not satisfied, the Graham objectors claim without any authority or citation that the "PSLRA does not consider accountant and investigator time the same as billable attorney time." The PSLRA, however, does not talk about attorney time but instead has

made the percentage method the standard for determining whether attorneys' fees are reasonable.  *See* 15 U.S.C. §78u-4(a)(6).[17]  The Graham objectors further claim without any authority that the accountants should not be charged at  "phantom" hourly rates but instead should be charged at the costs Lead Counsel incurred in employing them.  Here, like the attorneys,[18] the in-house accountants' time was billed at their usual customary rate; a rate that is less than it would cost to hire an outside accounting expert with similar background and experience.  Moreover, in common fund cases where the court conducts a lodestar cross-check, in-house experts and para-professionals are normally billed at their usual hourly rate that would be charged to a client who was being billed by the hour.  Additionally, Lead Counsel could have applied for the in-house accountants', investigators' and para-professionals' time as an expense which would have ***increased*** the overall amount of fees and expenses requested.  Thus, the inclusion of in-house accountants, investigators, and para-professionals in lodestar works to save Class Members' money as opposed to costing the Class money.

---

[17]    The PSLRA states that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount" recovered for the class.  *See* 15 U.S.C. §78u-4(a)(6).

[18]    Plaintiffs counsel's hourly rates are consistent with those reported in the National Law Journal's 2005 survey of partner and associate billing rates in more than 170 of the largest law firms in the United States.  Light Decl., Ex. 4.  In addition, David Boies of Boies, Schiller & Flexner, LLP, which represented defendants in this case for the first several years of the Litigation, charges an hourly rate of $750, as recently reported in an August 2005 *Westchester Magazine* article attached as Exhibit 5 to the Light Declaration. Plaintiffs' counsel's hourly rates are thus not "excessive" as argued by certain objectors, and are in line with rates charged by comparable lawyers and firms who litigate large, complex cases.

The use of in-house accountants in this case was instrumental in achieving the outstanding recovery for the Class. The gravamen of Lead Plaintiffs' case is that Qwest used a variety of accounting manipulations in violation of Generally Accepted Accounting Principles ("GAAP") that materially misrepresented Qwest's business and financial condition. The multitude of accounting transactions and principles that are at issue are extremely complex and in order to conduct effective discovery and properly prepare this case, Lead Counsel relied extensively on the forensic accounting services provided by their experienced in-house accountants. The vast majority of their time was spent assisting and preparing attorneys' for depositions and to compile the documentary evidence to support Lead Plaintiffs' accounting allegations.

These in-house accountants reviewed Qwest's SEC filings , press releases, financial statements and accounting records as far back as were publicly available and hundreds of boxes of documents of accounting related documents produced by Qwest and audit workpapers produced by Arthur Andersen LLP and KPMG, LLP, Qwest's auditors. The production of accounting documents from Qwest and audit workpapers from the auditors was initially deficient and the in-house accountants assisted counsel in identifying the deficiencies and obtaining the necessary documents from Qwest and its auditors. In addition, the in-house accountants performed extensive research of authoritative GAAP and SEC literature and industry trends relating to revenue recognition, accounting for IRUs, non-monetary exchanges, investment in subsidiaries, QwestDex directory revenue and the related impact on Qwest's financial and public statements. This information was used to demonstrate that Qwest's method of accounting for, and disclosure of, such transactions

were improper and inflated Qwest's financial condition.  In sum, Lead Counsel's in-house

accounting experts were extensively involved in, and necessary for, the successful

prosecution of this Litigation.

**F.    Lead Plaintiffs' Request for Reimbursement of Costs and Expenses Under the PSLRA Are Reasonable**

The Graham objectors and Mr. Fitzpatrick take issue with Lead Plaintiffs' request

pursuant to the PSLRA for their "reasonable costs and expenses (including lost wages)"

they incurred in representing the Class.  15 U.S.C. §78u-4(a)(4).  The Graham objectors

claim it is "special compensation" that presents an "obvious conflict of interest" and Mr.

Fitzpatrick claims that "absent class members are not adequately represented on this

point."  Here, the Lead Plaintiffs spent a significant amount of time representing the Class

and incurred such costs and expenses and have previously submitted Declarations in

support of reimbursement.  The amounts requested are reasonable in amount and are

allowed under the PSLRA.[19]  Accepting the objectors' argument would make every lead

---

[19]    Mr. Fitzpatrick also claims that the amounts requested are excessive, citing to a yet to be published study.  He is factually and legally incorrect.  First, Mr. Fitzpatrick's claim that each Lead Plaintiff is requesting $40,000 is not true.  That was the outer limit number provided in the Notice.  Instead, New England Health Care Employees Pension Fund, Clifford Mosher, Sat Pal Singh and Tejinder Singh are requesting $13,214.56, $11,280.00, $7,650.00 and $8,431.41, respectively.  Second, the amounts requested are based on their actual costs and expenses, as allowed by the PSLRA, are detailed in the Lead Plaintiffs' Declarations previously filed with the Court, and are reasonable in amount.  Third, the study that Mr. Fitzpatrick relies upon is inapplicable as it reports on "incentive awards" in all types of class actions and in order to remove post-PSLRA cases ineligible for "incentive awards," the study omitted securities cases terminated after 1997.  Finally, the amounts sought are not incentive awards, rather, Lead Plaintiffs seek reimbursement of their time and expenses as specifically authorized by the PSLRA, 15 U.S.C. §78u-4(a)(6).

plaintiff who requested his, her or its reasonable costs and expenses an inadequate class representative.

### G.    Lead Plaintiffs' Counsel's Request for Reimbursement of Expenses Incurred in the Prosecution of the Litigation Should be Approved

Lead Counsel have incurred $2,219,063.84 in expenses and costs in prosecuting this Litigation for nearly 5 years on behalf of the Class. These expenses, which are itemized in the individual declarations of Lead Plaintiffs' counsel, are reasonable in amount and were necessary for the successful prosecution of this Litigation. The Graham Objection, which is the sole objection to the requested expenses, claims there is insufficient documentation to justify the requested expenses of Lead Counsel. As the Court recognized in denying the Graham objectors' request to conduct discovery on the issue of attorney fees and costs, there is adequate information in the record to determine the reasonableness of the requested expenses. The claimed expenses are itemized in sworn declarations before the Court that indicate the expenses which counsel are seeking as well as provide detail regarding the specific category of expense. In addition, the Fee Motion provides additional detail on the necessity of some of the expenses to the successful prosecution of this Litigation. *See* Fee Motion at pp.38-41. Moreover, several attorneys at Lerach Coughlin, including Michael J. Dowd, Spencer A. Burkholz and Keith F. Park, painstakingly reviewed the expenses incurred by Lead Counsel on several occasions to make sure that all the expenses being requested by Lead Counsel are reasonable in amount and properly chargeable to this Litigation. As a result, the Court can be assured

the expenses for which counsel seek reimbursement were necessarily incurred, reasonable in amount and properly chargeable to this Litigation.

## III.     THE NON-SETTLING DEFENDANTS' OBJECTIONS ARE WITHOUT MERIT AND SHOULD BE OVERRULED

### A.     The Objections by the Non-Settling Defendants that the Partial Settlement Is Unfair Because They Are Excluded Should Be Overruled

Like the fox guarding the henhouse, the Non-Settling Defendants ask this Court to deny approval of the partial settlement on the novel grounds that Lead Plaintiffs failed to negotiate with them and thus, their exclusion from the partial settlement renders it unfair. [20] This self-serving objection is without merit and should be rejected.  As an initial matter, Lead Counsel absolutely explored the possibility of settling the case with Nacchio and Woodruff both in discussions with counsel for the Non-Settling Defendants and counsel for Qwest.  Nacchio and Woodruff, however, wanted to be folded into the current settlement without making any personal contribution to compromise the claims against them.  In light of the evidence developed during discovery against them, Lead Counsel advised defense counsel that any settlement with Nacchio and Woodruff would require them to make personal contributions to the settlement. In particular Lead Counsel believed that Nacchio and Woodruff engaged in massive insider selling, reaping proceeds of over $265,000,000 from their sale of Qwest stock while Qwest investors were left holding the bag.  Also,

---

[20]    The Non-Settling Defendants lack standing to assert any objection to the settlement other than the bar order provisions because they cannot demonstrate that they will suffer any legal prejudice other than remaining as defendants in the Litigation. *Zupnick v. Fogel,* 989 F.2d. 93, 98 (2d 1993).

because Nacchio and Woodruff were the Chairman/Chief Executive Officer and Chief Financial Officer, who spoke to investors on behalf of Qwest, Lead Plaintiffs and their counsel believed that they should use their ill-gotten gains to fund any settlement. Nacchio and Woodruff adamantly refused to do so and instead simply wanted to be folded into the current settlement. As a result, settlement negotiations ended with them. The Court should respect this strategic decision of the Lead Plaintiffs. Lead Plaintiffs and their counsel remain willing to negotiate with the Non-Settling Defendants but will not agree to a settlement that is not in the best interest of the Class.

The Non-Settling Defendants further claim that by not including them in the settlement, the Class is exposed to the same risks and delays on which they ask the Court to approve the partial settlement. What they don't mention is that the Class is getting $400 million for foregoing the risks and delays of continued litigation against the Settling Defendants. Nacchio and Woodruff also question the fairness and honesty of Lead Plaintiffs' decisions to settle with certain defendants and not them. However, the Court's inquiry is not the fairness of the settlement to the Non-Settling Defendants; but instead is directed to whether the settlement is fair, reasonable and adequate to absent Class Members, which it clearly is. More importantly, Lead Plaintiffs and their counsel believe that they have a strong case against Nacchio and Woodruff and were not and are not willing to simply fold them into this settlement or enter into a separate settlement without a significant monetary contribution. Nacchio and Woodruff flatly refuse to acknowledge that, as the CEO and CFO, running the company on a daily basis, they are in a difficult position to avoid responsibility for the allegations of wrongdoing. While this brief is not the correct

place to address the evidence against Nacchio and Woodruff, Lead Counsel believe that the evidence is compelling against these two defendants.  Apparently, as to Nacchio, the United State's Attorney's Office and a federal grand jury in Denver agree.  On December 20, 2005, after the partial settlement was reached, Mr. Nacchio was indicted for forty-two counts of insider trading.  As such, the Woodruff and Nacchio objection that the settlement is unfair because they are not included should be overruled.

**B.    The Bar Order Provisions of the Stipulation Are Consistent With Applicable Law**

The Non-Settling Defendants' objection to the bar order provisions of the Stipulation are similarly unfounded and should be overruled.  The importance of a comprehensive bar order in the partial settlement cannot be overstated.  As the Court of Appeals for the Eleventh Circuit noted, "Defendants buy little peace through settlement unless they are assured that they will be protected against codefendants' efforts to shift their losses through cross-claims for indemnity, contribution, and other causes related to the underlying litigation."  *See In re United States Oil & Gas Litig.*, 967 F.2d 489, 494 (11th Cir. 1992). Indeed, the Ninth Circuit stated that "'[a]nyone foolish enough to settle without barring contribution is courting disaster.  They are allowing the total damages from which their ultimate share will be derived to be determined in a trial where they are not even represented.'"  *Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1229 (9th. Cir. 1989) (citation omitted).  As a result, such provisions as provided in paragraphs 11.1-11.4 of the Stipulation are commonly included in partial settlements.  As fully discussed in the Reply of Qwest Communications International, Inc. to Objections to Final Approval of Settlement, the bar order provisions of this settlement are appropriate, consistent with applicable law, and

- 35 -

nearly identical to bar order  provisions that have been approved in other securities class action settlements.

## IV.    CONCLUSION

For all the foregoing reasons, Lead Plaintiffs and their counsel respectfully request that the Court approve the settlement, the Plan of Allocation and Lead Counsel's request for an award of attorneys' fees and reimbursement of expenses as fair and reasonable.

DATED:  April 28, 2006                    Respectfully submitted,

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MICHAEL J. DOWD
SPENCER A. BURKHOLZ
THOMAS E. EGLER
JEFFREY D. LIGHT
SCOTT H. SAHAM
X. JAY ALVAREZ
TRIG R. SMITH
TED MINAHAN
ANDREA N. SALOW


                              s/ MICHAEL J. DOWD
                            MICHAEL J. DOWD

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MICHELLE M. McCARRON
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210
Telephone:  310/859-3100
310/278-2148 (fax)

**Lead Counsel for Plaintiffs**

DYER & SHUMAN, LLP
ROBERT J. DYER III
KIP B. SHUMAN
JEFFREY A. BERENS


_____ s/ KIP B. SHUMAN
KIP B. SHUMAN

801 East 17th Avenue
Denver, CO  80218-1417
Telephone:  303/861-3003

**Liaison Counsel**

S:\Settlement\Qwest.set\FINAL BRF REPLY 00030209.doc

CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ KIP B. SHUMAN
KIP B. SHUMAN

DYER & SHUMAN, LLP
801 East 17th Avenue
Denver, CO 80218-1417
Telephone: 303/861-3003
303/830-6920 (fax)
E-mail: kshuman@dyershuman.com

# Mailing Information for a Case 1:01-cv-01451-REB-PAC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X. Jay Alvarez**
  JayA@lerachlaw.com

- **Timothy Granger Atkeson**
  Tim_Atkeson@aporter.com
  jeffrey_lewis@aporter.com;shelby_hunt@aporter.com;john_freedman@aporter.com;scott_schreiber@aporter.cor

- **Michael James Barry**
  mbarry@gelaw.com mhartman@gelaw.com;gfpulver@handf.com

- **Jeffrey Allen Berens**
  jberens@dyershuman.com

- **Terry W. Bird**
  twb@birdmarella.com dh@birdmarella.com

- **David Robert Boyd**
  dboyd@bsfllp.com jmessner@bsfllp.com

- **Jessica Brody**
  jessica_brody@aporter.com jeffrey_lewis@aporter.com;susan_cole@aporter.com;roleen_johnson@aporter.com

- **Spencer A. Burkholz**
  SpenceB@lerachlaw.com e_file_sd@lerachlaw.com

- **John K. Carroll**
  john.carroll@cliffordchance.com

- **Kwame A. Clement**
  Kwame_Clement@aporter.com kclement8688@comcast.net

- **David Lawrence Cook**
  david.cook@cliffordchance.com

- **Jennifer Lynn Coon**
  jlc@birdmarella.com lak@birdmarella.com

- **Merrill Gene Davidoff**
  mdavidoff@bm.net sleo@bm.net

- **Michael J. Dowd**
  MikeD@lerachlaw.com CHaney@lerachlaw.com

- **Mark T. Drooks**
  mtd@birdmarella.com lak@birdmarella.com

- **Stephanie Erin Dunn**
  sdunn@perkinscoie.com sdunn-efile@perkinscoie.com

- **Thomas E. Egler**
  TomE@lerachlaw.com HeatherH@lerachlaw.com

- **Kevin D. Evans**
  kdevans@s-elaw.com tbaksay@s-elaw.com

- **Clyde A. Faatz, Jr**
  cafaatz@handf.com gfpulver@handf.com;kjscholet@handf.com

- **Christopher James W. Forrest**
  cjforrest@handf.com gfpulver@handf.com;kjscholet@handf.com

- **Joshua David Franklin**
  jdf@denverda.org

- **John A. Freedman**
  john_freedman@aporter.com

- **Walter W. Garnsey, Jr**
  wgarnsey@khgk.com smiller@khgk.com

- **Terence C. Gill**
  tgill@sah.com efiling@sah.com;dsikes@sah.com

- **Michael W. Gross**
  mwgross@juno.com mgross@sgattorneys.com

- **Marcy Marie Heronimus**
  mheronim@sah.com efiling@sah.com;peckman@sah.com

- **Michael James Hofmann**
  michael.hofmann@hro.com jackie.delay@hro.com

- **Kevin Brent Huff**
  khuff@khhte.com

- **Shelby Hunt**
  shelby_hunt@aporter.com

- **Roberta A. Kaplan**
  rkaplan@paulweiss.com

- **Curtis L. Kennedy**
  CurtisLKennedy@aol.com

- **Gary Michael Kramer**
  gkramer@bw-legal.com amcarrillo@bw-legal.com

- **William J. Leone**
  William.Leone@usdoj.gov USACO.ECFCivil@usdoj.gov;Dorothy.Burwell@usdoj.gov

- **Alfred P. Levitt**
  alevitt@bsfllp.com jmessner@bsfllp.com

- **Vincent J. Marella**
  lak@birdmarella.com

- **David Meister**
  david.meister@cliffordchance.com

- **Jeffrey D. Meyer**
  jmeyer@moultonmeyer.com rhuron@moultonmeyer.com

- **Charles G. Michaels**
  michaels@cmichaelslaw.com

- **James D. Miller**
  james.miller@cliffordchance.com
  damien.morris@cliffordchance.com;salvatore.dziekan@cliffordchance.com;david.cook@cliffordchance.com

- **Robert Nolen Miller**
  rmiller@perkinscoie.com rmiller-efile@perkinscoie.com

- **Barbara C. Moses**
  bmoses@magislaw.com jlaing@magislaw.com

- **Edward S. Nathan**
  enathan@sgklaw.com lspecter@sgklaw.com

- **James E. Nesland**
  neslandje@cooley.com foutsdl@cooley.com;inghramjl@cooley.com;calendarreq@cooley.com

- **Sharan Nirmul**
  snirmul@gelaw.com dlohinetz@gelaw.com

- **Robin Lee Nolan**
  rnolan@handf.com gfpulver@handf.com;kjscholet@handf.com

- **Elissa J. Preheim**
  Elissa.Preheim@aporter.com

- **Kimberly Wolf Price**
  kimberly.wolf@cliffordchance.com

- **Thomas Vincent Reichert**
  tvr@birdmarella.com vmb@birdmarella.com

- **John M. Richilano**
  jmr@rglawoffice.net gmiller@rglawoffice.net;jduran@rglawoffice.net;dbrummett@rglawoffice.net

- **Eric Tolentino Rillorta**
  Eric_Rillorta@aporter.com

- **Kenneth F. Rossman, IV**

krossman@bsfllp.com

- **Ashley Elizabeth Rupp**
  arupp@magislaw.com

- **Scott Saham**
  scotts@lerachlaw.com

- **Scott B. Schreiber**
  scott_schreiber@aporter.com

- **Arthur M. Schwartz**
  aschwartz@sgattorneys.com dburton@sgattorneys.com

- **Paul Howard Schwartz**
  schwartzph@cooley.com
  foutsdl@cooley.com;colitigation@cooley.com;inghramjl@cooley.com;calendarreq@cooley.com

- **David L. Schwarz**
  dschwarz@khhte.com

- **Edward F. Siegel**
  efsiegel@efs-law.com

- **Joel M. Silverstein**
  jsilverstein@sgklaw.com

- **Jeffrey Allen Smith**
  jsmith1@cooley.com foutsdl@cooley.com;inghramjl@cooley.com;calendarreq@cooley.com

- **Jeffrey Speiser**
  jspeiser@sgklaw.com

- **Herbert J. Stern**
  dpenna@sgklaw.com

- **Jesus Manuel Vazquez, Jr**
  jvazquez@rothgerber.com tclanahan@rothgerber.com

- **James Gregory Waller**
  gregwaller@andrewskurth.com amyprasad@akllp.com;kpiccolo@akllp.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
I. Walton Bader
Bader & Bader, LLP
50 Main Street
#1000 PMB 1029
White Plains, NY 10601
```

**Fredric C. Clodius**
11015 Millbank Road
King George, VA 22485

**Brian Fitzpatrick**
87 Barrow Street
Apartment 6H
New York, NY 10014

**Geoffrey C. Jarvis**
Grant & Eisenhofer, P.A.
1201 North Market Street
#2100
Wilmington, DE 19801

**C. Mylett**
P.O. Box 1031
Coleman, FL 33521

**New York State Teachers' Retirement System**
Wayne Schneider
Joseph J. Indelicato
10 Corporate Woods Drive
Albany, NY 12211-2395

**Cleo J. Rauchway**
Rothgerber, Johnson & Lyons, LLP
United States District Court Box 11
1200 - 17th Street
#3000
Denver, CO 80202

**William M. Rogers**
606 S. Military Trail
Deerfield Beach, FL 33442

# MANUAL NOTICE LIST

*Defendants:*

David Boies
BOIES, SCHILLER & FLEXNER, LLP
333 Main Street
Armonk, NY 10504
Telephone: 914/749-8200
Fax: 914/749-8300

David W. Shapiro
John F. Cove, Jr.
BOIES, SCHILLER & FLEXNER, LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: 510/874-1000
Fax: 510/874-1460

Holly Stein Sollod
Jennifer H. Weddle
HOLLAND & HART
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Telephone: 303/295-8000
Fax: 303/295-8261

Frederick J. Baumann
James M. Lyons
ROTHGERBER JOHNSON & LYONS LLP
1200 17th Street, Suite 3000
Denver, CO 80202-5839
Telephone: 303/623-9000
Fax: 303/623-9222

Neil Peck
James D. Kilroy
SNELL & WILMER, LLP
One Tabor Center, Suite 1900
1200 Seventeenth Street
Denver, CO 80202
Telephone: 303/634-2000
Fax: 303/634-2020

Charles A. Stillman
Diana Nehro
STILLMAN & FRIEDMAN, P.C.
425 Park Avenue
New York, NY 10022
Telephone: 212/223-0200
Fax: 212/223-1942

*Objectors:*

Alan Henry
ANCHORMEDIA VENTURES
35 Franklin Court So.
St. Petersburg, FL 33711
Telephone: 727/866-3277
Fax: 727/577-7788
    - and –
3 Highfields Lane
Northport, ME 04849
Telephone: 207/338-6670

Michael A. Budin, Chief Counsel
COMMONWEALTH OF PENNSYLVANIA
STATE EMPLOYEES' RETIREMENT
SYSTEM
30 North Third Street, 5th Floor
Harrisburg, PA 17101
Telephone: 717/783-7317
Fax: 717/787-5751