# AnchorMedia Ventures
### 35 Franklin Court So. St. Petersburg Fl 33711
### Fax: (727) 577-7788
### Telephone: (727) 866-3277

March 3, 2006

Clerk of the Court
District of Colorado
United State Courthouse
901 19th Street, Room A-105
Denver, CO 80294

BOIES, SCHILLER & FLEXNER, LLP
Alfred Levitt, Esq.
5301 Wisconsin Avenue N.W., Suite 800
Washington, DC 20015

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
Keith F. Park, Esq.
655 West Broadway, Suite 1900
San Diego, CA 92101-3301

ARNOLD & PORTER LLP
John Freedman, Esq.
555 Twelfth Street N.W.
Washington, DC 20004-1202

Dear Sir:

As a Class Member, in the **Qwest/US West Merger** –acquiring Qwest stock (53,052 shares) in an exchange, as a US West shareholder - I am objecting to the Settlement, the Plan of Allocation, Lead Counsel's application for attorneys fees and expenses, and the Lead Plaintiff's request for reimbursement: The rationale follows.

Our objection is on three (3) **main** "settlement parameters":

1. Gross inadequacy of the Preliminary- Net Settlement Fund, as it pertains to the number of owned or previously owned (allocated) shares recognized, for this Class, - presently or previously owned- eligible for distribution in the exchange of shares of Qwest, for US West (merger), which is inconsistent with the applicable restated (fraudulent) earnings (as defined by the litigation) and the initial exchange multiple utilized to compute the merger price and therefore the "exchange ratio". **See attachment, written in 2003 to the prosecutor of this litigation – at that time:** No response. Without transparency, to the degree of the Quest fraudulent overstatement(s), appropriate evaluation is being denied this Class. Example: If (the) restated Quest earnings were reduced by 10%, the exchange ratio, required at the merger, would have been 1.9 shares; if by 15%, the exchange ratio should have been 2.035, and so forth. Simply put, there would be more shares to factor in the Plan of Settlement. So, conversely, the "net loss" restriction fails to factor the *real* losses accumulated by this Class, as Qwest, by failing to issue, and having available to this Class, for this redemption, the proper *factor* in shares, thusly, only making available the computation based on the (allocation of) shares distributed at the merger, regardless of any in place redemption plan, vs. entitled shares, as described above, based on "massive" fraudulent accounting, denies this Class a fair and proper analysis (redemption) and privileges.

Page 2
March 3, 2006

2.  Regardless, failure to recognize, in any meaningful settlement (attempt) computation, the financial impact of the real total impact of the fraud, which intermixed the US West dividend elimination, as a calculated and premeditated key element in part of the overall Qwest orchestrated fraud scheme: Besides, these funds were seemingly specifically earmarked, to be utilized by Qwest to "reimburse" itself, for a myriad of ongoing financial misuses, to help "prop up" their stock, to keep their stock price high enough so that US West could not exercise their right to terminate the merger. This was a coldly calculated derivative of the deceit embodied in the "massive" financial fraudulent merger plan, itself. This, after openly offering solace to the US West Board, its **Shareholders**, and in the media as well, saying elimination of same, would be "replaced by appreciation" in share value: <u>Qwest knew that any potential "appreciation" factor was criminally being represented, in lock step with the prepared fraudulent financial earnings statements, utilized and implemented specifically to conclude the merger</u>. Deceit or fraud, in this magnitude, doesn't just **happen**; it is a *scheme*, which takes planning, and cannot be rewarded by inaction, or heretofore-judicial Pablum.

For these applicable reasons, the settlement is grossly inadequate and needs to be reconstituted to a revised ("multiple") computation for the "merger" that includes a formulation for a dividend distribution factor, for each share of stock owned by this Class. In addition, as in the example above, a disbursement formula in the revised and correct amount of merger shares; i.e., based on the restated Qwest earnings, developed from the fraud investigation, should then be additionally disbursed, to this Class, in a cash distribution, or, in <u>Qwest redeemable intermediate term Notes, having a fixed face value, plus interest, i.e., a "Junk Bond</u>, embodying the value of the **new** merger multiple (exchange rate), and/or allowing for an *escalated allocation in the Plan for Redemption*, for the US West shares.

Parenthetically, it is somewhat puzzling, upon reflection, to note that Lead Counsel has requested reimbursement of certain expenditures including compensation for lost wages. Query? What about the lost (wages) dividends of this Class: Those are our lost wages. Many in this class have no income coming from any direct source, and in my personal case, my retirement expenses are met entirely by dividends. If the attorneys' are entitled to recover lost compensation, in addition to their recovery fee, then certainly our Class is entitled, in light of the fraudulent Qwest conduct, to recover certain lost dividends, which in our Class must be regarded as "direct compensation". In that instance, I would withdraw my objection to the Lead Counsel request.

Simply put, in summation, this is a woefully inadequate settlement. Importantly as well, in analytical retrospect, US West shares were *being critically marginalized and value compromised, because of the massive fraudulent Qwest accounting orchestration, putting into motion circumstances that screened the required and just merger shares, conversely denying proper and fair distribution from this Plan of Allocation and Redemption:* Further, dividends were eliminated, in a criminally inspired, calculated premeditated guise, by Qwest management, and promised appreciation never happened, i.e., tumbled.

3.  Therefore, in totality, this proposed settlement represents less than $1.00 per share (US West outstanding shares as of 9/99 = 505,306,000).

Page 3
March 3, 2006

I am prepared to appear when called, to offer my argument in person.

There are two contact locations.  If you contact me prior to May 1, 2006, please direct communication to 35 Franklin CT, S., St. Petersburg, FL. 33711 (727-866-3277)
If contacted after May 1, and thru October 28, please direct all correspondence to: 3 Highfields Lane, Northport Me. 04849 (207-338-6670)

I will communicate with appropriate parties if there is a further change in address.
Looking forward to being advised, appropriately

Yours very truly,

Alan Henry

Enclosures

cc:    The Honorable Christopher Cox
       Chairman, Security & Exchange Commission

       The Honorable Alberto Gonzales
       Attorney General of the United States

       The Honorable Susan W. Collins
       United States Senate

       The Honorable Richard Shelby
       United States Senate

       The Honorable Chuck Hagel
       United States Senate

Page 3
March 3, 2006

I am prepared to appear when called, to offer my argument in person.

There are two contact locations.  If you contact me prior to May 1, 2006, please direct communication to 35 Franklin CT, S., St. Petersburg, FL. 33711 (727-866-3277)
If contacted after May 1, and thru October 28, please direct all correspondence to: 3 Highfields Lane, Northport Me. 04849 (207-338-6670)

I will communicate with appropriate parties if there is a further change in address.
Looking forward to being advised, appropriately

Yours very truly,

Alan Henry

Enclosures

cc:    The Honorable Christopher Cox
       Chairman, Security & Exchange Commission

       The Honorable Alberto Gonzales
       Attorney General of the United States

       The Honorable Susan W. Collins
       United States Senate

       The Honorable Richard Shelby
       United States Senate

       The Honorable Chuck Hagel
       United States Senate



# AnchorMedia Corporation

35 Franklin Ct. So., St. Petersburg, Florida  33711
(813) 866-3277  Fax Phone  (813) 577-7788

Alan Henry
President & CEO

*Never Responded!*

January 1, 2003

Mr. Larry D. Thompson
Deputy Attorney General
U. S. Department of Justice
RFK Main Justice Bldg.
Washington, D. C.  20530

Dear Mr. Thompson:

I read with more than average interest your comments about Corporate fraud, and your intent to prosecute vigorously those not only on the corporate level who participated in such conduct, but also those who aided and abetted this conduct i.e., bankers, accountants, etc. As a "substantial" holder in Quest stock, you can well imagine why I would have such an interest: Toward that interest, several months ago, I began an interchange of conversations with the SEC and (an) associate of yours within your "department", in Denver. Those conversations have been followed up with correspondence between us, and I'm enclosing same for your review.

We would urge you to secure the appropriate remedies against those who have defrauded the shareholders, and conversely impacted our financial markets, but, where is it outlined on how the recovery for those who bore the real consequence of the fraud, will be addressed?

The bureaucracy, the Department of Justice, can secure fines, jail sentences, and the like, but there is only one way to right the "wrongdoing": My correspondence to the SEC addresses that, with specificity. It is only direct recovery, distributed by the government, for the shareholders, that can garner believability that the administration is truly concerned about those directly impacted, i.e., ENRON, WorldCom, Quest, AOL, etall, as well as restoring, in large part, the much needed confidence/stability to our financial markets. Fines (and jail sentences) for "participating" companies, executives and their associated "advisors" are fine, and, sound and look good; but monies (fines) being delivered to the State/Federal treasuries, doesn't, and cannot, right the gross wrong. For futures, yes: Setting a standard for executive behavioral conduct, with criminal charges, fines, and similar kinds of remedial responses will certainly aid, but that's in the future, and we are talking about now!

We are also talking about the VOTERS! Why should they (we) have to abdicate recoveries in a sharing arrangement with the Trial Lawyers Association – the 'moneybags' of our political process (as long as they can continue to share)? Our government is now there, and has undertaken a remedial campaign, and it is fair to offer, since the governments case was /is predicated on the harm perpetrated on the shareholders and the financial markets, that the major recovery effort (and distribution) needs to be for those that carried the burden (and loss), In so doing, the investor base and market place will react, and importantly, confidence will be restored.  Is this not what your activities and stated objective is all about?

Finally, my correspondence with the SEC, spells out, I believe, convincingly, that a very significant part of any remedy is a recovery process undertaken by the enforcement authorities, that sees to it that the shareholders, in the largest measure, participate, first, on any financial burden (fines, etc) and recovery from those persons and entities who were complicit in defrauding those same shareholders.

Larry D. Thompson, Esq.                    -2-

Permit me to give you an ( the) added dimension for your judgment, in pursuing your stated objective:

When Quest merged with *U.S. West* the price of the Quest stock was right at $50.00;the *U.S. West* price was $85.75. Now, we have learned that the earnings of Quest were manipulated ( not just my opinion – but based on the Quest's own admissions of "overstated" earnings, and subsequent resignations of their principal officers, as well as "investigative reports"). Conversely, the <u>multiple of their stock, the acquisition factor,</u> was significantly influenced, at that time, as were the "forecasts" of various analysts, projections garnered from the company's executive suite, and based on the company's announced (bogus) earnings (Morgan Stanley's analyst projected out a "medium term" $65.00 stock Price; it is now about $5.00, having dropped to low between $1.00-$2.00, recently–either the analyst was not paying attention, or the company lied to him).

The merger was accomplished at a stock swap "multiple" of <u>1.72932</u> shares of Quest for each (one) share of *U.S. West;* that's for starters. For the sake of this example, let's say I had 20,000 shares of *U.S. West* (we had more, in reality–but the number is easier to work with, arithmetically) at the merger date. When the recast earnings come out, a new multiple needs to factored, and you will see the impact and level of the fraudulently devised conduct.. If nothing else, just on me!

So, what does the overstated earnings, and recast balance sheet do to the merger multiple other than escalate it? What should it have been: 1.99x per share, maybe 2.5x per share? Clearly if the earnings were not bogus, at the time of the merger, and retroactively recast (as they now must be-or should be), the merger multiple would have not been anything other than HIGHER! And, that in my opinion, is where and how the shareholders got defrauded. <u>It is simple enough</u>. And, if SEC and the Department of Justice, has protecting the shareholders, as their primary concern- as stated, it's easy enough to conclude that the company and or its executives, needs to distribute, either cash, or additional stock, to those shareholders of record, on the merger date!

One can almost handle the ups and downs of the market place, but when the "base"of the investment is (so) significantly impacted, as in this case, it apparently was, it changes, significantly, the equation.

Hopefully, you will react positively from the intent and information contained in this letter. If you need any additional information, please feel free to contact me.

Sincerely,

cc: Ms. Joan E McKown
    Chief Counsel, SEC