**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 19, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

F I L E D
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUN 1 9 2006

GREGORY C. LANGHAM
CLERK

---

In re:  QWEST COMMUNICATIONS
INTERNATIONAL INC., Securities
Litigation,

        Petitioner.

No. 06-1070

---

NEW ENGLAND HEALTH CARE
EMPLOYEES PENSION FUND;
CLIFFORD MOSHER; TEJINDAR
SINGH; SAT PAL SINGH,

        Real-Parties-in-Interest,

and

ASSOCIATION OF CORPORATE
COUNSEL; CHAMBER OF
COMMERCE OF THE UNITED
STATES OF AMERICA,

        Amici Curiae.

---

## ON PETITION FOR WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO
### (D.C. No. 01-CV-1451-REB-CBS)

---

David R. Boyd, Boies, Schiller & Flexner, LLP, Washington, D.C., (Jonathan D. Schiller, Alfred P. Levitt, Kenneth F. Rossman IV, Boies, Schiller & Flexner, LLP, Washington, D.C.; Terrence C. Gill, Sherman & Howard LLC, Denver, Colorado, with him on the brief), for Petitioner.

Joseph D. Daley, Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, San Diego, California, (Eric Alan Isaacson, Michael J. Dowd, Spencer A. Burkholz, Thomas E. Egler, X. Jay Alvarez, Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, San Diego, California; Robert J. Dyer, III, Kip B. Shuman, Jeffrey A. Berens, Dyer & Shuman, LLP, Denver, Colorado, with him on the briefs), for Real-Parties-in-Interest.

William J. Leone, United States Attorney, Denver, Colorado; Catherine Y. Hancock, Michael S. Rabb, Appellate Staff, United States Department of Justice, Washington, D.C., on the brief for the United States Department of Justice.

Susan Hackett, Association of Corporate Counsel; Robin S. Conrad, Amar D. Sarwal, National Chamber Litigation Center, Inc.; W. Stephen Cannon, Todd Anderson, Jean Kim, Constantine Cannon, P.C., Washington, D.C., on the brief for Amici Curiae.

---

Before **HENRY, MURPHY,** and **HARTZ,** Circuit Judges.

---

**MURPHY,** Circuit Judge.

---

In this mandamus action, Qwest Communications International, Inc. (Qwest), presents an issue of first impression in this circuit, namely, whether Qwest waived the attorney-client privilege and work-product doctrine, as to third-party civil litigants, by releasing privileged materials to federal agencies in the course of the agencies' investigation of Qwest. Qwest urges us to adopt a rule of "selective waiver" or "limited waiver" which would allow production of attorney-client privileged and work-product documents to the United States Department of Justice (DOJ) and the Securities and Exchange Commission (SEC) without waiver of further protection for those materials. On the record before us,

we hold that the district court did not abuse its discretion in declining to apply selective waiver. Thus, we DENY the petition for a writ of mandamus.

## I. Background and District Court Proceedings

In early 2002, the SEC began investigating Qwest's business practices. In the summer of 2002, Qwest learned that the DOJ, through the United States Attorney's Office for the District of Colorado, had also commenced a criminal investigation of Qwest. During these investigations, Qwest produced to the agencies over 220,000 pages of documents protected by the attorney-client privilege and the work-product doctrine (the Waiver Documents). Qwest chose not to produce another 390,000 pages of privileged documents to the agencies.

The production of the Waiver Documents was pursuant to subpoena and pursuant to written confidentiality agreements between Qwest and each agency.[1] In relevant part, these agreements stated that Qwest did not intend to waive the attorney-client privilege or work-product protection. The SEC agreed to "maintain the confidentiality of the [Waiver Documents] pursuant to this Agreement and . . . not disclose them to any third party, except to the extent that the Staff determines that disclosure is otherwise required by law or would be in

---

[1]   At oral argument Qwest disclaimed any argument that its production of the Waiver Documents to the agencies was involuntary. Thus, we take it as settled that Qwest's production of the Waiver Documents was voluntary, and we do not address the effect of the subpoenas. We commend Qwest for its candor, which allows us to focus on material issues rather than extraneous matters.

furtherance of the Commission's discharge of its duties and responsibilities."
Pet'r Br., Ex. B at 1. Similarly, the DOJ agreed to maintain the Waiver
Documents' confidentiality and not disclose them to third parties, "except to the
extent that DOJ determines that disclosure is otherwise required by law or would
be in furtherance of DOJ's discharge of its duties and responsibilities." *Id.*, Ex. C
at 1. In addition, Qwest agreed that the DOJ could share the Waiver Documents
with other state, local, and federal agencies, and that it could "make direct or
derivative use of the [Waiver Documents] in any proceeding and its
investigation." *Id.* at 1-2. In other agreements with the DOJ, Qwest agreed that
the agency could

> make full use of any information it obtains under this agreement in
> any lawful manner in furtherance of its investigation, including,
> without limitation, analyses, interviews, grand jury proceedings,
> court proceedings, consultation with and support of other federal,
> state or local agencies, consultations with experts or potential
> experts, and the selection and/or retention of testifying experts.

DOJ Resp. Br., Ex. 3 at 1; *see also id.* Ex. 4 at 3 (same); *id.* Ex. 5 (same) at 1-2.

Even prior to the initiation of the federal investigations, plaintiffs had filed
civil cases against Qwest that involved many of the same issues as the
investigations. More such actions were filed after the federal investigations
began. Several of the cases were filed in the United States District Court for the
District of Colorado, and many were consolidated into a federal securities action
designated *In re Qwest Communications International, Inc. Securities Litigation*,

Case No. 1:01-CV-01451 REB-CBS (the Securities Case). The Real Parties in Interest before us (the Plaintiffs) are the lead plaintiffs in the Securities Case.

In the course of the Securities Case, Qwest produced millions of pages of documents to the Plaintiffs, but it did not produce the Waiver Documents. It argued the Waiver Documents remained privileged despite Qwest's production to the agencies. After the Plaintiffs moved to compel production of the Waiver Documents, the magistrate judge concluded Qwest had waived the attorney-client privilege and work-product protection by producing the Waiver Documents to the agencies and ordered Qwest to produce the Waiver Documents to the Plaintiffs. Qwest objected. The district court refused to overrule the magistrate judge's order compelling production and ordered Qwest to produce the Waiver Documents. The district court also ordered Qwest to produce certain reports prepared by its counsel Boies, Schiller & Flexner LLP (collectively, the BSF Report), redacted of attorney opinion work product.

Qwest filed a motion to reconsider the order to produce the Waiver Documents and to certify an interlocutory appeal. Granting the motion in part, the district court clarified its order to specify that Qwest could redact attorney opinion work product from the Waiver Documents, as well as from the BSF Report, before producing them to the Plaintiffs. The court, however, declined to certify an interlocutory appeal of the waiver issue. Consequently, Qwest filed a

petition for a writ of mandamus in this court. At Qwest's request, the district court stayed its order to produce pending our mandamus decision.

Neither the directive to redact the BSF Report nor the order to disclose the redacted version have been challenged in this proceeding. Moreover, the parties have not challenged the order to redact attorney opinion work product from the Waiver Documents. Thus, there is no issue concerning opinion work product before us, and our decision is not directed to waiver of opinion work product. For purposes of clarity, we also note that this decision involves no issues of inadvertent disclosure, *see, e.g., Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1417 (Fed. Cir. 1997), disclosure to a non-adverse party, *see In re M & L Bus. Mach. Co.*, 161 B.R. 689, 696 (D. Colo. 1993), or disclosure under a confidentiality agreement that prohibits further disclosures without the express agreement of the privilege holder.

## II. Analysis

### A. Mandamus

We must first decide whether it is appropriate for us to entertain Qwest's petition for an extraordinary writ. "The Supreme Court has required that a party seeking mandamus demonstrate that he has no other adequate means of relief and that his right to the writ is 'clear and indisputable.'" *Barclaysamerican Corp. v. Kane*, 746 F.2d 653, 654 (10th Cir. 1984) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35 (1980) (per curiam)).

> In a mandamus action in which petitioner seeks to have discovery
> orders involving a claim of privilege reviewed, we have held that
> review is appropriate when: (1) disclosure of the allegedly
> privileged or confidential information renders impossible any
> meaningful appellate review of the claim of privilege or
> confidentiality; and (2) the disclosure involves questions of
> substantial importance to the administration of justice.

*Id.* at 654-55 (quotations omitted).

Citing *Boughton v. Cotter Corp.*, 10 F.3d 746 (10th Cir. 1993), the

Plaintiffs first contend Qwest has adequate appellate remedies, in that the district

court's order can be reviewed on direct appeal after final judgment. In *Boughton*,

a company sought to bring an interlocutory appeal of an order to produce

allegedly privileged documents. In considering whether other avenues of relief

might be appropriate, this court held that it could not grant the defendant

mandamus relief because the district court's order requiring production would be

correctable on appeal. *Id.* at 751. Qwest replies that production would negate the

value of the attorney-client privilege and work-product protection. Qwest further

submits that appellate review after judgment would be meaningless because there

are numerous other cases pending across the country in which coordinated

discovery agreements would require it to disclose the Waiver Documents to other

plaintiffs if it discloses them to the Plaintiffs in the Securities Case.

In *Barclaysamerican*, this court held that "[i]n most cases disclosure makes

meaningful review impossible because after disclosure whatever privilege

attaches would be worthless." 746 F.2d at 655 (quotation omitted); *see also*

*United States v. West*, 672 F.2d 796, 799 (10th Cir. 1982) ("Whether disclosure is limited to a motion or granted in the course of the trial, the privilege is still rendered worthless. Any subsequent review, even after limited disclosure, would be for naught, because the damage would already be accomplished. Thus, appellate review of the claim would be meaningless."). *Boughton* did not address this principle. In this case, however, given the litigation pending outside this court's jurisdiction, normal appellate review could not return the parties to the status quo by ordering the return of any documents this court might determine were improperly ordered produced. As in *Barclaysamerican* and *West*, review after production would essentially be meaningless in terms of protecting the Waiver Documents.

The Plaintiffs also argue Qwest does not raise an issue of substantial importance to the administration of justice, and this case is instead merely a discovery dispute between private litigants. *See Barclaysamerican*, 746 F.2d at 655. To the contrary, it appears the issue of selective waiver is of considerable public interest.[2] In addition, in advocating the adoption of selective waiver,

---

[2]     Indicia of public interest in selective waiver include numerous commentaries and articles, the filing of the amicus brief in this action, a recent oversight hearing by a House subcommittee, and recent developments before the United States Sentencing Commission and the Advisory Committee on Evidence Rules to the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States (the Advisory Committee). The actions of Congress, the Sentencing Commission, and the Advisory Committee are discussed
(continued...)

Qwest primarily relies on the interests of law enforcement in ensuring voluntary cooperation of companies subject to investigation. To the extent this matter requires us to consider applying selective waiver, then, it presents an issue of substantial importance to the administration of justice.

Finally, other circuit courts considering selective waiver have decided it was appropriate to do so in the context of a petition for a writ of mandamus. *See In re Steinhardt Partners, L.P.*, 9 F.3d 230, 233 (2d Cir. 1993); *Westinghouse Elec. Corp. v. Republic of the Phil.*, 951 F.2d 1414, 1422 (3d Cir. 1991); *In re Chrysler Motors Corp.*, 860 F.2d 844, 845 (8th Cir. 1988); *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 607 (8th Cir. 1977) (en banc). Noting that the question remained open in the circuit, that the district courts of the circuit and other circuit courts had split, and the consequence that the privilege would be lost if review awaited final judgment, the Second Circuit went so far as to state, "[t]his dispute presents one of the very rare circumstances permitting the use of mandamus to review a district court order." *Steinhardt Partners*, 9 F.3d at 233. For these reasons, this court addresses the merits of Qwest's petition.

The issuance of the writ rests within the court's discretion. *Kerr v. United States Dist. Court*, 426 U.S. 394, 403 (1976). This court considers five nonconclusive factors to assist in determining whether to grant mandamus relief:

---

[2](...continued)
below.

(1) whether the party has alternative means to secure relief; (2) whether the party will be damaged "in a way not correctable on appeal"; (3) whether "the district court's order constitutes an abuse of discretion"; (4) whether the order "represents an often repeated error and manifests a persistent disregard of federal rules"; and (5) whether the order raises "new and important problems or issues of law of the first impression." *Pacificare of Okla., Inc. v. Burrage*, 59 F.3d 151, 153 (10th Cir. 1995). We have held that "[t]he right to the writ is clear and indisputable when the petitioner can show a judicial usurpation of power or a clear abuse of discretion." *West*, 672 F.2d at 799; *see also Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 699 (10th Cir. 1998) (holding that a district court's order compelling discovery is reviewed for abuse of discretion, legal questions are reviewed de novo and factual determinations for clear error). When the district court errs in deciding a legal issue, it necessarily abuses its discretion. *See Koon v. United States*, 518 U.S. 81, 100 (1996).

### B.  The Attorney-Client Privilege and Work-Product Doctrine

Federal Rule of Evidence 501 provides that privileges in federal-question cases generally are "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." The Advisory Committee Notes state that the rule "reflect[s] the

view that the recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis."[3]

The Supreme Court has cautioned that "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that the public . . . has a right to every man's evidence." *Trammel v. United States*, 445 U.S. 40, 50 (1980) (quotations omitted). The Court further has cautioned that such rules and privileges "must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)). "[A]lthough Rule 501 manifests a congressional desire not to freeze the law of privilege but rather to provide the courts with flexibility to develop rules of privilege on a case-by-case

---

[3]     Technically the work-product doctrine is distinguishable from the testimonial "true" privileges. *See* 1 Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges* § 1.3.11 (Richard D. Friedman ed., 2002). The work-product doctrine is embodied in Fed. R. Civ. P. 26(b)(3). It is therefore excepted from Rule 501, which applies except where "otherwise required . . . in rules prescribed by the Supreme Court pursuant to statutory authority." The principles of *Hickman v. Taylor*, 329 U.S. 495 (1947), continue to govern the application of Rule 26(b)(3). Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 479-81 (4th ed. 2001). Given that our analysis focuses on the common law, the fact that the work-product doctrine is not a true privilege is not material in this case.

basis, we are disinclined to exercise this authority expansively." *Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990) (citation and quotation omitted).

### 1. Attorney-Client Privilege

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* The privilege serves the client's need for legal advice, but it also serves the attorney's need to receive complete information in order to give the proper advice. *See id.* at 390; *see also* 8 John Henry Wigmore, *Evidence* § 2291 (John T. McNaughton rev. 1961); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 3 (4th ed. 2001). Under the common law, a critical component of the privilege "is whether the communication between the client and the attorney is made in confidence of the relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence." *United States v. Lopez*, 777 F.2d 543, 552 (10th Cir. 1985).

Because confidentiality is key to the privilege, "[t]he attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party." *United States v. Ryans*, 903 F.2d 731, 741 n.13 (10th Cir. 1990). This court has stated, "the confidentiality of communications

covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *Id.* (quotation and alteration omitted). This court has also held that "[c]ourts need not allow the claim of attorney-client privilege when the party claiming the privilege is attempting to utilize the privilege in a manner that is not consistent with the privilege." *United States v. Bernard*, 877 F.2d 1463, 1465 (10th Cir. 1989). "Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege." *Id.*

### 2. Work-Product Doctrine

In *Hickman v. Taylor*, the source of the work-product doctrine, plaintiffs sought the production of certain witness statements collected by defendants' attorney and memoranda concerning the attorney's interviews of other witnesses. 329 U.S. 495, 499-500 (1947). The Court held that plaintiffs had made no showing of need for the materials or justification for securing them from defendants' counsel. The requests thus "[fell] outside the arena of discovery and contravene[d] the public policy underlying the orderly prosecution and defense of legal claims. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." *Id.* at 510. "In performing his various duties . . . it is essential that a lawyer work

with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Id.*

The work-product doctrine subsequently was incorporated into Fed. R. Civ. P. 26(b)(3), which provides:

> [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another . . . party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Thus, the doctrine is interpreted under both the rule and *Hickman*. *See* Epstein at 479-81. "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). It "is an intensely practical [doctrine], grounded in the realities of the litigation in our adversary system." *Id.*

Work product can be opinion work product, which some courts have held to be absolutely privileged, or non-opinion work product, i.e., fact work product, which may be discoverable under appropriate circumstances. *See Frontier Ref.*, 136 F.3d at 704 n.12; *see also Hickman*, 329 U.S. at 511-12 (noting that, upon presentation of adequate reasons, non-privileged, relevant facts included in an

-14-

attorney's files may be subject to discovery); Fed. R. Civ. P. 26(b)(3) (providing

special protection for opinion work product). The protection provided by the

work-product doctrine is not absolute, and it may be waived. *See Nobles*,

422 U.S. at 239. This court has indicated that production of work-product

material during discovery waives a work-product objection. *Grace United*

*Methodist Church v. City of Cheyenne*, 427 F.3d 775, 801-02 (10th Cir. 2005);

*see also Foster v. Hill (In re Foster)*, 188 F.3d 1259, 1272 (10th Cir. 1999)

(indicating that the work-product doctrine is affected when a disclosure is to an

adversary).

### C.  Case Law on Selective Waiver

In light of this precedent, Qwest will have waived the attorney-client

privilege and work-product protection for the Waiver Documents by disclosing

them to the SEC and the DOJ, unless this court adopts a selective waiver rule.

This court has not yet considered the concept of selective waiver. Our review of

the opinions of other circuits, however, indicates there is almost unanimous

rejection of selective waiver. Only the Eighth Circuit has adopted selective

waiver in circumstances applicable to Qwest.

### 1.  Attorney-Client Privilege

### a.  Circuit Adopting Selective Waiver

The Eighth Circuit created the concept of selective waiver in *Diversified*

*Industries*, 572 F.2d at 611. There, a company defending a civil proceeding

sought to protect a memorandum and a report prepared by its counsel that it had previously produced to the SEC in response to an agency subpoena. *Id.* at 599.

The court's discussion of selective waiver is but a single paragraph:

> We finally address the issue of whether Diversified waived its attorney-client privilege with respect to the privileged material by voluntarily surrendering it to the SEC pursuant to an agency subpoena. As Diversified disclosed these documents in a separate and nonpublic SEC investigation, we conclude that only a limited waiver of the privilege occurred. To hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers.

*Id.* at 611 (citations omitted).

### b. Circuits Rejecting Selective Waiver

Most circuits have rejected selective waiver of the attorney-client privilege. The D.C. Circuit was the first circuit to consider the issue after *Diversified*. In *Permian Corp. v. United States*, the Department of Energy requested documents from the SEC, which had obtained them from the company. 665 F.2d 1214, 1216-17 (D.C. Cir. 1981). After considering the privilege's purpose of protecting the attorney-client relationship by shielding confidential communications, the court held that the company had "destroyed the confidential status of the seven attorney-client communications by permitting their disclosure to the SEC staff." *Id.* at 1219. It found the proposal of selective waiver "wholly unpersuasive." *Id.* at 1220.

> First, we cannot see how the availability of a "limited waiver" would serve the interests underlying the common law privilege for confidential communications between attorney and client. . . . Voluntary cooperation with government investigations may be a laudable activity, but it is hard to understand how such conduct improves the attorney-client relationship. If the client feels the need to keep his communications with his attorney confidential, he is free to do so under the traditional rule by consistently asserting the privilege, even when the discovery request comes from a "friendly" agency.

*Id.* at 1220-21. The court continued, "[t]he client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit." *Id.* at 1221. "We believe that the attorney-client privilege should be available only at the traditional price:  a litigant who wishes to assert confidentiality must maintain genuine confidentiality." *Id.* at 1222. The D.C. Circuit reiterated its position in *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1370 (D.C. Cir. 1984).

Using similar reasoning, the First, Second, Third, and Fourth Circuits all have joined the D.C. Circuit in rejecting selective waiver. *See United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 686 (1st Cir. 1997) ("Anyone who chooses to disclose a privileged document to a third party, or does so pursuant to a prior agreement or understanding, has an incentive to do so, whether for gain or to avoid disadvantage. It would be perfectly possible to carve out some of those

-17-

disclosures and say that, although the disclosure itself is not necessary to foster attorney-client communications, neither does it forfeit the privilege.  With rare exceptions, courts have been unwilling to start down this path–which has no logical terminus–and we join in this reluctance."); *Westinghouse*, 951 F.2d at 1425 ("[S]elective waiver does not serve the purpose of encouraging full disclosure to one's attorney in order to obtain informed legal assistance; it merely encourages voluntary disclosure to government agencies, thereby extending the privilege beyond its intended purpose."); *In re Martin Marietta Corp.*, 856 F.2d 619, 623-24 (4th Cir. 1988) ("The Fourth Circuit has not embraced the concept of limited waiver of the attorney-client privilege."); *In re John Doe Corp.*, 675 F.2d 482, 489 (2d Cir. 1982) ("A claim that a need for confidentiality must be respected in order to facilitate the seeking and rendering of informed legal advice is not consistent with selective disclosure when the claimant decides that the confidential materials can be put to other beneficial purposes.").

The most recent circuit to reject selective waiver of the attorney-client privilege is the Sixth Circuit, which issued a comprehensive opinion in *In re Columbia/HCA Healthcare Corp. Billing Practices Litigation*, 293 F.3d 289 (6th Cir. 2002).  As in this case, civil plaintiffs in *Columbia/HCA Healthcare* sought documents the company already had provided to the DOJ and other government agencies.  *Id.* at 292-93.  The court reviewed the available case law, which it characterized as falling into three categories: "selective waiver is

-18-

permissible; selective waiver is not permissible in any situation; and selective waiver is permissible in situations where the Government agrees to a confidentiality order." *Id.* at 295 (citations omitted). It concluded, "after due consideration, we reject the concept of selective waiver, in any of its various forms." *Id.* at 302. "First, the uninhibited approach adopted out of wholecloth by the *Diversified* court has little, if any, relation to fostering frank communication between a client and his or her attorney." *Id.* (footnote omitted). "Secondly, any form of selective waiver, even that which stems from a confidentiality agreement, transforms the attorney-client privilege into 'merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage.'" *Id.* (quoting *Steinhardt Partners*, 9 F.3d at 235). Although recognizing "[t]here is considerable appeal, and justification, for permitting selective waiver when the initial disclosure is to an investigating arm of the Government," the court stated there is "no logical terminus" and that private litigants serve a valuable purpose as private attorneys general which should not be thwarted by imposition of selective waiver. *Id.* at 303 (quotation omitted).

In dissent, Judge Boggs stated that "[a]s the harms of selective disclosure are not altogether clear, the benefits of the increased information to the government should prevail." *Id.* at 311. He characterized the court's choice as:

> [N]ot one whether or not to release privileged information to private parties that has already been disclosed to the government, but rather one to create incentives that permit voluntary disclosures to the

> government at all.  In the run of cases, either the government gets the disclosure made palatable because of the exception, or neither the government nor any private party becomes privy to the privileged material.

*Id.* at 312 (Boggs, J., dissenting).  Because of the greater importance of governmental investigations, the fact that "increased access to privileged information increases the absolute efficacy of government investigations," and the fact that "the government has no other means to secure otherwise privileged information," *id.* at 311, Judge Boggs "would have resolved this open question by holding that there is a government investigation exception to the third-party waiver rule," *id.* at 308.

### c. Other Illustrative Cases

In a case involving an asserted waiver of the law enforcement privilege, the Seventh Circuit did not foreclose adopting selective waiver.  In *Dellwood Farms, Inc. v. Cargill, Inc.*, the government played certain tapes for corporate defense counsel to persuade the company to plead guilty.  128 F.3d 1122, 1124 (7th Cir. 1997).  The plaintiffs in ensuing civil litigation against the company argued the government had waived its law enforcement privilege by playing the tapes.  *Id.* Any release to the plaintiffs would make the tapes available to individuals who were the targets of then-uncompleted grand jury investigations.  *Id.* The court adopted the government's selective waiver theory in the circumstances of that case, holding that "[s]ince there is no indication either that the government was

-20-

acting in bad faith or that the plaintiffs in the present suits were hurt–and, to repeat, the government is not trying to take advantage of an adversary–interfering with a criminal investigation would be an excessive punishment." *Id.* at 1127. The court specifically noted, though, that it might find waiver (or, more accurately, forfeiture) if there were "conduct that warranted declaring a forfeiture." *Id.*

The Federal Circuit rejected selective waiver in a case involving an entirely different means of waiving attorney-client and work-product protection, namely, the careless disclosure of inadequately screened materials directly to the adversary. *See Genentech, Inc. v. United States Int'l Trade Comm'n,* 122 F.3d 1409, 1417 (Fed. Cir. 1997) ("A small number of courts have recognized, in circumstances not present here, a limited waiver that enables the attorney-client privilege to survive certain breaches of confidentiality. This court, however, has never recognized such a limited waiver. Moreover, Genentech has presented no compelling arguments as to why we should apply such a limited waiver theory in this case." (citations omitted)).

In contrast is *In re M & L Business Machine Co.,* where the district court applied selective waiver of the attorney-client privilege where disclosures were protected by a confidentiality agreement. 161 B.R. 689 (D. Colo. 1993). There, a bank sought a protective order for its counsel's letters and memoranda that it had previously provided to the United States Attorney to assist in an investigation of

one of the bank's clients, M & L Business Machines Co. *Id.* at 691-92. "The Bank's cooperation was expressly made subject to the requirement that any information provided under the Letter Agreement be treated as privileged, subject to protection under Fed. R. Crim. P. 16(a)(2) and not be disseminated except as required under federal law or the rules of criminal procedure." *Id.* at 691. The trustee of M & L then sought production of the materials. After reviewing *Diversified, Permian*, and other selective waiver cases, the district court stated, "while I am wary of extending evidentiary privileges, in the unique circumstances of this case, the policies upon which the above decisions were based lead me to conclude that the Bank has not waived the attorney-client privilege as to the Letters and Memoranda." *Id.* at 696. Specifically, the court's decision rested on: (1) the "substantial steps" the bank took to ensure the confidentiality of the materials disclosed; (2) the fact that there was "no evidence that the Bank's cooperation with the U.S. Attorney was for the purpose of obtaining some benefit for itself"; and (3) the fact that "the Bank does not seek to protect the privilege in an investigatory or law enforcement proceeding brought by another federal regulatory agency," but in bankruptcy adversary proceedings "akin to one brought by a civil litigant." *Id.*

## 2. Work-Product Doctrine

### a. Circuits Adopting Selective Waiver

Only one circuit has specifically adopted selective waiver in the work-product arena. The Fourth Circuit has approved using selective waiver in relation to opinion work product. In *Martin Marietta*, the court concluded the company had made testimonial use of non-opinion work product by disclosing it to the government, and that the waiver was comprehensive. 856 F.2d at 625. Noting that opinion work product generally receives greater protection from the courts, however, and that Federal Rule of Civil Procedure 26(b)(3) "suggests especial protection for opinion work product," the court declined to hold that the company had waived work-product protection for opinion work product. *Id.* at 626.

In *Permian*, the D.C. Circuit upheld the district court's finding that the work-product doctrine had not been waived as to the majority of documents. 665 F.2d at 1222. This ruling, however, contains no analysis and may have been the product of the clearly erroneous standard of review applied in that case. Moreover, the D.C. Circuit has since rejected selective waiver of work-product protection in other circumstances, as discussed below.

### b. Circuits Rejecting Selective Waiver

Interestingly, the circuit that created selective waiver for attorney-client privilege rejected it in the context of non-opinion work product. In *Chrysler*

*Motors*, the company had produced a computer tape to its adversaries in civil litigation under a non-waiver/confidentiality agreement. 860 F.2d at 845. When the United States Attorney sought production of the computer tape from the plaintiffs, the company protested. *Id.* The Eighth Circuit determined that the tape was not opinion work product. *Id.* at 846. It then held that "Chrysler waived any work product protection by voluntarily disclosing the computer tape to its adversaries, the class action plaintiffs, during the due diligence phase of the settlement negotiations." *Id.* The company's requirement that the plaintiffs enter into the non-waiver/confidentiality agreement was irrelevant; the crucial fact was that the computer tape had not been kept confidential. *Id.* at 847.

As discussed above, the Fourth Circuit applied selective waiver to protect opinion work product, but it declined to apply it to protect non-opinion work product. *See Martin Marietta Corp.*, 856 F.2d at 623. The First Circuit has also rejected selective waiver for non-opinion work product, stating "it would take better reason than we have to depart from the prevailing rule that disclosure to an adversary, real or potential, forfeits work product protection." *Mass. Inst. of Tech.*, 129 F.3d at 687.

The Third Circuit held that, while work-product protection may be retained where a disclosure furthers the goals underlying the doctrine:

> When a party discloses protected materials to a government agency investigating allegations against it, it uses those materials to forestall prosecution (if the charges are unfounded) or to obtain lenient

-24-

> treatment (in the case of well-founded allegations). These
> objectives, however rational, are foreign to the objectives underlying
> the work-product doctrine. Moreover, an exception for disclosures to
> government agencies is not necessary to further the doctrine's
> purposes; attorneys are still free to prepare their cases without fear of
> disclosure to an adversary as long as they and their clients refrain
> from making such disclosures themselves.

*Westinghouse*, 951 F.2d at 1429.

Finally, the Sixth Circuit concluded that "[m]any of the reasons for disallowing selective waiver in the attorney-client privilege context also apply to the work product doctrine. The ability to prepare one's case in confidence . . . has little to do with talking to the Government." *Columbia/HCA Healthcare*, 293 F.3d at 306. It continued, "[e]ven more than attorney-client privilege waiver, waiver of the protections afforded by the work product doctrine is a tactical litigation decision. . . . [W]hether or not to 'show your hand' is quintessential litigation strategy." *Id.* at 306-07.

### c. Circuits Leaving Possibility of Selective Waiver Open

Unlike their treatment of the attorney-client privilege, a few circuits have rejected selective waiver of work-product protection in the particular cases before them, while simultaneously leaving room for applying the doctrine in other circumstances.

In *In Re Sealed Case*, the D.C. Circuit rejected work-product protection against discovery by a grand jury of documents a company had previously made available to the SEC. 676 F.2d 793, 824 (D.C. Cir. 1982). The record in that

case did not indicate whether the company had entered into a confidentiality agreement with the SEC. *Id.* at 820.  In rejecting selective waiver, the court indicated it was reluctant to supply any such agreement: "[t]he SEC or any other government agency could expressly agree to any limits on disclosure to other agencies consistent with their responsibilities under law.  But courts should not imply such agreements on a categorical basis." *Id.* at 824.

Shortly thereafter, in *In re Subpoenas Duces Tecum*, the D.C. Circuit applied *Sealed Case* to reject a claim of selective waiver for work-product material in circumstances similar to Qwest's case. 738 F.2d at 1371-72.  The court, however, did not definitively reject the selective waiver doctrine under all circumstances; rather, the decision rested on three factors: (1) the proposed use of work-product protection was not consistent with the doctrine's purpose, (2) "appellants had no reasonable basis for believing that the disclosed materials would be kept confidential by the SEC," and (3) applying waiver "would not trench on any policy elements now inherent in this [protection]." *Id.* at 1372.  Noting the company chose to participate in the SEC's voluntary disclosure program, the court stated:

> That decision was obviously motivated by self-interest.  Appellants now want work product protection for those same disclosures against different adversaries in suits centering on the very same matters disclosed to the SEC.  It would be unreasonable to suppose that litigation with these other adversaries was not anticipated at the time of disclosure to the SEC.  It would also be inconsistent and unfair to

> allow appellants to select according to their own self-interest to
> which adversaries they will allow access to the materials.

*Id.* The court emphasized that the company had failed to ensure the SEC would in turn not disclose the materials, stating that companies could protect their materials by not disclosing them, "[o]r the company can insist on a promise of confidentiality before disclosure to the SEC." *Id.* at 1375.

Similarly, in *Steinhardt Partners*, the Second Circuit denied mandamus relief to defendants claiming work-product protection for a memorandum previously disclosed to the SEC.   9 F.3d at 230.  "Examination of conflicting authority and of the purposes of the work product doctrine convinces us that Steinhardt waived any work product protection by voluntarily submitting the memorandum to the SEC." *Id.* at 235.  The court, however, continued, "[i]n denying the petition, we decline to adopt a *per se* rule that all voluntary disclosures to the government waive work product protection.  Crafting rules relating to privilege in matters of governmental investigations must be done on a case-by-case basis." *Id.* at 236.  It especially noted that a per se rule "would fail to anticipate situations . . . in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials." *Id.*

These decisions all involved situations in which the parties failed to enter into a confidentiality agreement before disclosing materials, not circumstances in

which the government agreed to strict confidentiality in exchange for disclosure of work product. *But see Columbia/HCA Healthcare*, 293 F.3d at 307 (rejecting selective waiver for work product, despite existence of confidentiality agreement); *Westinghouse*, 951 F.2d at 1430 (same). As a consequence, it remains an open question in those circuits whether a stringent confidentiality agreement limiting further dissemination by the government might support selective waiver.

### D. No Selective Waiver In This Case

Generally it is the nature of the common law to move slowly and by accretion; swift and massive movements are not impossible, but they are relatively rare. Justice Cardozo described the common law's modification process as "gradual. It goes on inch by inch. Its effects must be measured by decades and even centuries. Thus measured, they are seen to have behind them the power and the pressure of the moving glacier." Benjamin N. Cardozo, *The Nature of the Judicial Process* 24 (1921). The common law's methodology has been identified as both its strength and its weakness:

> [I]ts strength is derived from the manner in which it has been forged from actual experience by the hammer and anvil of litigation, and . . . its weakness lies in the fact that law guided by precedent which has grown out of one type of experience can only slowly and with difficulty be adapted to new types which the changing scene may bring.

Harlan F. Stone, *The Common Law in the United States*, 50 Harv. L. Rev. 4, 7 (1936); *see also* Richard B. Cappalli, *The American Common Law Method* 15 (1997) (stating that "[t]he accretional nature of the common law is a great strength").

Keeping these precepts in mind, and having considered the purposes behind the attorney-client privilege and the work-product doctrine as well as the reasoned opinions of the other circuits, we conclude the record in this case is not sufficient to justify adoption of a selective waiver doctrine as an exception to the general rules of waiver upon disclosure of protected material. Qwest advocates a rule that would preserve the protection of materials disclosed to federal agencies under agreements which purport to maintain the attorney-client privilege and work-product protection but do little to limit further disclosure by the government. The record does not establish a need for a rule of selective waiver to assure cooperation with law enforcement, to further the purposes of the attorney-client privilege or work-product doctrine, or to avoid unfairness to the disclosing party. Rather than a mere exception to the general rules of waiver, one could argue that Qwest seeks the substantial equivalent of an entirely new privilege, i.e., a government-investigation privilege. Regardless of characterization, however, the rule Qwest advocates would be a leap, not a natural, incremental next step in the common law development of privileges and protections. On this record, "[w]e are unwilling to embark the judiciary on a long

and difficult journey to such an uncertain destination." *Branzburg v. Hayes*, 408 U.S. 665, 703 (1972).

### 1. Cooperation with Law Enforcement

Qwest argues selective waiver is necessary to ensure cooperation with government investigations. Selective waiver may well be a means to encourage cooperation with law enforcement, an end with unquestioned benefits to the commonweal. *See, e.g.*, Andrew J. McNally, *Revitalizing Selective Waiver: Encouraging Voluntary Disclosure of Corporate Wrongdoing by Restricting Third Party Access to Disclosed Materials*, 35 Seton Hall L. Rev. 823, 825-27 (2005). The Sixth Circuit majority in *Columbia/HCA Healthcare* conceded that a selective waiver rule would further the search for truth, realize considerable investigative efficiencies, encourage settlements, and possibly increase corporate self-policing. 293 F.3d at 303.

The record before us, however, does not support the contention that companies will cease cooperating with law enforcement absent protection under the selective waiver doctrine. Most telling is Qwest's disclosure of 220,000 pages of protected materials knowing the Securities Case was pending, in the face of almost unanimous circuit-court rejection of selective waiver in similar circumstances, and despite the absence of Tenth Circuit precedent. These actions undermine its argument that selective waiver is vitally necessary to ensure companies' cooperation in government investigations. *See Steinhardt Partners*,

9 F.3d at 236 ("The SEC has continued to receive voluntary cooperation from subjects of investigations, notwithstanding the rejection of the selective waiver doctrine by two circuits and public statements from Directors of the Enforcement Division that the SEC considers voluntary disclosures to be discoverable and admissible."); *Westinghouse*, 951 F.2d at 1426 ("[W]e do not think that a new privilege is necessary to encourage voluntary cooperation with government investigations. . . . We find it significant that Westinghouse chose to cooperate despite the absence of an established privilege[] protecting disclosures to government agencies."); *see also Branzburg*, 408 U.S. at 693-94 (rejecting creation of reporters' privilege and stating "the evidence fails to demonstrate that there would be a significant constriction of the flow of news to the public if this Court reaffirms the prior common-law and constitutional rule regarding the testimonial obligations of newsmen").  The record is equally deficient concerning whether the DOJ and the SEC may have independently gained access to the Waiver Documents by invoking other means or theories, such as the crime or fraud exception to the attorney-client privilege.  The DOJ posed this very possibility in its response to Qwest's mandamus petition. *See* DOJ Resp. Br. at 2 n.1.

Further, if selective waiver were as essential to government operations as Qwest claims, it would seem the agencies would support Qwest's position.  At the

court's request, the DOJ responded to Qwest's petition.[4] Rather than urging the adoption of selective waiver, though, it carefully took no position on the parties' dispute. Additionally, the DOJ declined an invitation to participate in oral argument. It would appear, then, that the government's interest is not as Qwest portrays it.[5]

## 2. Confidentiality Agreements

Qwest also contends the key point distinguishing this case from the majority of the cases rejecting selective waiver is the fact that Qwest entered into confidentiality agreements with the agencies prior to disclosing the Waiver Documents. Some courts have held or indicated that the existence of a confidentiality agreement is irrelevant to a waiver of privileges. *See, e.g., Columbia/HCA Healthcare*, 293 F.3d at 303; *Chrysler Motors Corp.*, 860 F.2d at 847. Others, however, have indicated that the existence of a confidentiality agreement may justify adopting selective waiver. *See, e.g., Steinhardt Partners*, 9 F.3d at 236; *M & L Bus. Mach. Co.*, 161 B.R. at 696.

---

[4]   The court's order did not address the SEC. Unlike Association of Corporate Counsel and the Chamber of Commerce of the United States of America, the SEC did not file an amicus brief in this action.

[5]   Qwest's confidentiality agreements provided that the agencies would not assert that production of the Waiver Documents constituted a waiver, as to a third party, of the attorney-client privilege, the work-product doctrine, or any other applicable privilege. *See* Pet'r Br., Ex. B at 2; *id.* Ex. C at 2. This restriction, however, does not prohibit the agencies from arguing in *favor* of a theory of selective waiver.

The record does not support reliance on the Qwest agreements with the SEC and the DOJ to justify selective waiver. The agreements do little to restrict the agencies' use of the materials they received from Qwest. The agencies are permitted to use the Waiver Documents as required by law and in furtherance of the discharge of their obligations. The DOJ is specifically permitted to share the Waiver Documents with other agencies, federal, state, and local, and make use of them in proceedings and investigations. In its brief, the DOJ illustrates just how far some of the documents may have traveled, stating that, at a minimum, Waiver Documents have been introduced into evidence in a criminal trial, produced as discovery in three separate criminal proceedings, and used as exhibits to SEC investigative testimony. The DOJ also informs us it was not required to "segregate material obtained from Qwest, file it under seal, keep records of its use, or otherwise deal with the information in any special way," and it had made no effort to determine what information had been disseminated to third parties. DOJ Resp. Br. at 6.

The record does not indicate whether Qwest negotiated or could have negotiated for more protection for the Waiver Documents, or whether, as it asserted at oral argument, seeking further restrictions would have so diluted its cooperation to render it valueless. Be that as it may, the confidentiality agreements gave the agencies broad discretion to use the Waiver Documents as they saw fit, and any restrictions on their use were loose in practice. As Qwest

has conceded, it is unknown how many or which of the Waiver Documents the agencies have used or disclosed, how those uses or disclosures occurred, who might have had access to the Waiver Documents, and the extent of continuing disclosures. It is therefore not inappropriate to conclude that some undetermined number of Waiver Documents have been widely disseminated and have thus become public information.

At oral argument, Qwest essentially conceded that those widely distributed Waiver Documents have lost any protection they once enjoyed. In so conceding, Qwest is effectively advocating a rule that would place control of its attorney-client privilege and work-product protection in the hands of the agencies. Under this rule, the agencies would determine which documents would remain privileged or protected by limitation on further dissemination. The concession highlights a further record deficiency: the nature and severity of the burden placed upon the district court to sort through all 220,000 pages of Waiver Documents to determine what use the government made of each document, and whether any further disclosure had vitiated an otherwise applicable privilege or protection.

In short, Qwest's confidentiality agreements do not support adoption of selective waiver.

### 3. Purpose of Protections

The Supreme Court has required caution in the arena of testimonial privileges: "these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974). Because exceptions to the waiver rules necessarily broaden the reach of the privilege or protection, selective waiver must be viewed with caution. If the suggested exception advances the purpose of the privilege or protection, that exception should be viewed more favorably.

The generally recognized exceptions already in place tend to serve the purposes of the particular privilege or protection. When disclosure is necessary to accomplish the consultation or assist with the representation, as in the case of an interpreter, translator, or secretary, an exception to waiver preserves the privilege. *See Mass. Inst. of Tech.*, 129 F.3d at 684; *Westinghouse*, 951 F.2d at 1424. Similarly, when the disclosure is to a party with a common interest, the "joint defense" or "common interest" doctrine provides an exception to waiver because disclosure advances the representation of the party and the attorney's preparation of the case. *See Westinghouse*, 951 F.2d at 1424; *see also Grand Jury Proceedings v. United States*, 156 F.3d 1038, 1042-43 (10th Cir. 1998) (stating that establishing joint-defense privilege requires showing "(1) the documents

were made in the course of a joint-defense effort; and (2) the documents were designed to further that effort").

The record in this case does not indicate that the proposed exception would promote the purposes of the attorney-client privilege or work-product doctrine.[6] Rather than promoting exchange between attorney and client, selective waiver could have the opposite effect of inhibiting such communication. If officers and employees know their employer could disclose privileged information to the government without risking a further waiver of the attorney-client privilege, they may well choose not to engage the attorney or do so guardedly. Such reticence and caution could be heightened where, as here, further disclosures by the government mean that the information may be disclosed to countless others.

Moreover, the purpose of the work-product doctrine is to enable counsel to prepare a case in privacy. As other circuits have indicated, selective waiver does little to further this purpose and in some cases, may instead encourage counsel to conduct investigations with an eye toward pleasing the government. *See Columbia/HCA Healthcare*, 293 F.3d at 306; *Westinghouse*, 951 F.2d at 1429-30; *Steinhardt Partners*, 9 F.3d at 235.

---

[6]     Among the authorities advocating the adoption of selective waiver, including *Diversified*, Judge Boggs' dissent in *Columbia/HCA Healthcare*, and the SEC's position expressed in amicus briefs filed in other cases, none of their rationales appear to be premised on the purposes underlying the attorney-client privilege and work-product doctrine.

### 4. Unfairness to the Parties

Qwest argues that adopting selective waiver would avoid unfairness to Qwest while visiting no unfairness on the Plaintiffs. If companies do not have the assurance of protection, Qwest theorizes, they simply will not release privileged documents to federal authorities. Thus, civil plaintiffs will not have access to them anyway. *See Columbia/HCA Healthcare*, 293 F.3d at 312 (Boggs, J., dissenting) ("[T]he choice presented in this case is not one whether or not to release privileged information to private parties that has already been disclosed to the government, but rather one to create incentives that permit voluntary disclosures to the government at all."); *Westinghouse*, 951 F.2d at 1426 n.13 ("[I]n our view, when a client discloses privileged information to a government agency, the private litigant in subsequent proceedings is no worse off than it would have been had the disclosure to the agency not occurred."). Allowing Qwest to choose who among its opponents would be privy to the Waiver Documents is far from a universally accepted perspective of fairness. *See Permian Corp.*, 665 F.2d at 1221; *John Doe Corp.*, 675 F.2d at 489.

As discussed above, the record is silent on whether selective waiver truly is necessary to achieve cooperation. Qwest's fairness argument nevertheless rests on that very foundation. It is difficult to understand how a rejection of selective waiver will work an unfairness on Qwest when Qwest disclosed the Waiver Documents in the face of the known threat from Plaintiffs, the absence of Tenth

Circuit precedent, and a dearth of favorable circuit authority. It hedged its bets by choosing to release 220,000 pages of documents but to retain another 390,000 pages of privileged documents. Qwest perceived an obvious benefit from its disclosures but did so while weighing the risk of waiver.

In sum, the record does not support application of selective waiver as a matter of fairness.

### 5. Case Law

As a review of federal circuit case law has indicated, there is but one circuit that has applied the selective waiver doctrine to attorney-client material. All other circuits addressing the matter have refused to apply the doctrine. In the context of non-opinion work product, no circuit has adopted selective waiver and five circuits have rejected the doctrine. Some circuits have expressly not precluded the application of selective waiver but have limited that possibility to cases where the initial disclosure was not to an adversary or was accomplished under a confidentiality agreement strictly limiting further dissemination by the government. Here, Qwest disclosed to adversaries under agreements which did not realistically control further dissemination.

The only conclusion from the federal case law is that the federal circuits have not expanded either the attorney-client privilege under Federal Rule of Evidence 501 or the non-opinion work-product doctrine under Fed. R. Civ. P. 26(b)(3) or *Hickman v. Taylor* by applying selective waiver.

-38-

A review of state appellate decisions yields substantially the same conclusion.[7] *See McKesson Corp. v. Green*, 610 S.E.2d 54, 56 (Ga. 2005) (rejecting selective waiver of work-product protection where materials were disclosed to government, despite confidentiality agreement); *McKesson HBOC, Inc. v. Superior Court*, 9 Cal. Rptr. 3d 812, 819, 821 (Cal. Ct. App. 2004) (rejecting selective waiver of attorney-client privilege and work-product protection where materials were disclosed to government, despite confidentiality agreement); *State v. Thompson*, 306 N.W.2d 841, 843 (Minn. 1981) (finding "no occasion" to apply selective waiver and suppress testimony where the attorney-client privilege was waived through disclosure of investigation reports, notes, and statements to attorney-general and grand jury); *but see Danielson v. Superior Court*, 754 P.2d 1145 (Ariz. Ct. App. 1988) (adopting selective waiver of physician-patient privilege under the particular circumstances of that case). It is clear then that the common law of attorney-client privilege and the work-product doctrine in both state and federal courts has not embraced the doctrine of selective waiver.

---

[7]     The Supreme Court has "observed that the policy decisions of the States bear on the question whether federal courts should [ ] amend the coverage of an existing [privilege]." *Jaffee v. Redmond*, 518 U.S. 1, 12-13 (1996); *see also Trammel v. United States*, 445 U.S. 40, 48-50 (1980); *United States v. Gillock*, 445 U.S. 360, 368 (1980).

### 6. New Privilege

While Qwest has disavowed any intention of seeking to create a new privilege for materials surrendered in a government investigation, that does not necessarily foreclose the subject. There is a principled position that the breadth of the selective waiver doctrine advocated by Qwest is the substantial equivalent of a new privilege. Qwest justifies its proposed new rule on a policy of cooperation with government investigations. It does not ground its advocacy on the purposes underlying the attorney-client privilege. At least one court has indicated that such justification is suggestive of a new privilege, rather than gloss on an ancient one. *See Westinghouse*, 951 F.2d at 1425.

More often than not, the Supreme Court has declined to recognize new privileges. In *Branzburg*, for example, the Court rejected a proposed journalists' privilege against being compelled to testify before a grand jury. 408 U.S. at 667. In reaching its decision, the Court noted the proposed privilege was not recognized at common law, *id.* at 685; some states had adopted it, but the majority had not, and that no federal statute had adopted it, *id.* at 689; the evidence did not support the dire consequences the privilege's proponents predicted, *id.* at 693; even if the record had supported the need for the privilege, the public interest of pursuing and punishing criminal behavior would outweigh the interest in possible future news stories, *id.* at 695; and there were daunting logistical difficulties in implementing the proposed privilege, *id.* at 703-04. The

Court suggested other government bodies, such as Congress or the state legislatures and courts, could consider implementing the proposed privilege. *Id.* at 706.

In other cases, the Court has refused to adopt privileges for peer review materials, *see Univ. of Pa.*, 493 U.S. at 189; for state legislators in federal criminal proceedings, *see United States v. Gillock*, 445 U.S. 360, 374 (1980); for the editorial processes of the media in defamation action, *see Herbert v. Lando*, 441 U.S. 153, 175 (1979); for the President to refuse to produce materials in a criminal proceeding, *see Nixon*, 418 U.S. at 713; and for legislative aides to refuse to testify before a grand jury about actions not related to legislative activities, *see Gravel v. United States*, 408 U.S. 606, 627 (1972); *see also Rubin v. United States*, 525 U.S. 990, 119 S. Ct. 461, 464 (1998) (Breyer, J., dissenting from denial of certiorari in case in which the appellate court rejected a privilege for Secret Service agents for information learned while protecting the President).

A notable exception to this trend is *Jaffee v. Redmond*, where the Court recognized a federal psychotherapist-patient privilege under Rule 501. 518 U.S. 1, 9-15 (1996). Noting that the possibility of disclosure might impede successful treatment, it concluded the privilege promoted the important public interest in the treatment of mental and emotional problems. *Id.* at 11. The Court weighed the significant benefits of the rule with the "modest" evidentiary detriment, finding that in the absence of the privilege, much of the evidence that would otherwise be

discoverable would not come into existence. *Id.* at 11-12. Importantly, though, it also relied upon a consensus of "reason and experience" reflected in the adoption of a psychotherapist privilege, in some form, in all fifty states and the District of Columbia. *Id.* at 12 & n.11, 13. In addition, it noted that a psychotherapist privilege was among the nine privileges originally proposed to be included in the Federal Rules of Evidence. *Id.* at 14-15.

In this case, there are no grounds to buck the trend of declining to create a new privilege. There is no groundswell in the state legislatures for a privilege for materials produced in a government investigation.[8] Nor was such a privilege

---

[8]      It does not appear that any state has implemented, by statute or rule, a general government-investigation privilege, and this type of privilege does not appear in the Uniform Rules of Evidence (Uniform Rules). The closest equivalents recognized in the states appear to be a privilege for reports required to be made by law, which has been adopted by only a small minority of states, *see* Alaska R. Evid. 502; Haw. Rev. Stat. § 626-1, R. 502; Nev. Rev. Stat. § 49.025; N.M. R. Rev. Rule 11-502; Tex. R. Evid. 502; Wis. Stat. § 905.02, and self-critical analysis privileges recognized for specified situations in a minority of states, *see, e.g.,* Alaska Stat. § 09.25.450 (environmental audit); Colo. Rev. Stat. § 13-25-126.5 (environmental audit); 215 Ill. Comp. Stat. 5/155.35 (insurance compliance); Kan. Stat. Ann. § 60-3351 (insurance compliance); *id.* § 60-3333 (environmental audit); Miss. Code Ann. § 49-2-71 (environmental audit); N.D. Cent. Code §§ 6-13-02 to 6-13-04 (financial institutions); *id.* §§ 26.1-51-02 to 26.1-51-04 (insurance compliance); Or. Rev. Stat. § 731.761 (insurance compliance); Tex. Rev. Civ. Stat. Ann., art. 4447cc, § 5 (Vernon) (environmental audit); Utah R. Evid. 508 (environmental audit). Neither of these privileges is included in the Uniform Rules.

Notably, the Uniform Rules are hostile to both the creation of new common law privileges, *see* Unif. R. Evid. 501 (limiting the creation of privileges to constitution, statute, or state supreme court rule), and the idea of selective waiver,
(continued...)

among the nine originally proposed for inclusion in the Federal Rules of

Evidence. Further, the Supreme Court has indicated it is "especially reluctant to

recognize a privilege in an area where it appears that Congress has considered the

relevant competing concerns but has not provided the privilege itself." *Univ. of*

*Pa.*, 493 U.S. at 189. In 1984, Congress rejected a SEC-proposed amendment to

the Securities and Exchange Act of 1934 that would have established a selective

waiver rule. *See Westinghouse*, 951 F.2d at 1425 (citing 16 Sec. Reg. & L. Rep.

461 (Mar. 2, 1984)). More recently, the SEC withdrew a proposed regulation

---

[8](...continued)
*see* Unif. R. Evid. 510 (stating that a privilege is waived if a privilege holder "voluntarily discloses or consents to disclosure of any significant part of the privileged matter"). A majority of states have adopted forms of Uniform Rules 501 and/or 510. *See Uniform Rules of Evidence Locator*, http://www.law.cornell.edu/uniform/evidence.html (last visited May 31, 2006) (identifying states that have adopted the Uniform Rules).

In addition, our research indicates that where state legislatures have adopted selective waiver theories, they have done so not in the general law enforcement context, but in particularized circumstances not present here. *See, e.g.*, Cal. Gov't Code § 13954(h) (disclosures to verify claims on victims' compensation fund); Conn. Gen. Stat. § 19a-127o(f) (health providers' submission of patient safety work product to patient safety organization); Fla. Stat. § 633.175(6) (insurance company providing information to State Fire Marshal); La. Rev. Stat. Ann. § 40:31.66(D) (state Parkinson's Disease Registry); Neb. Rev. Stat. § 44-1107(5)(f) (examinations under Viatical Settlements Act); Ohio Rev. Code Ann. § 1753.38(A) (risk-based capital plans, reports and information). Most commonly, state legislatures have allowed selective waiver in connection with environmental self-audits, *see, e.g.*, Alaska Stat. § 09.25.455(b); Kan. Stat. Ann. § 60-3334(c); Tex. Rev. Civ. Stat. Ann., art. 4447cc, § 6(b) (Vernon), and reports to insurance commissioners, *see, e.g.*, Ind. Code § 27-1-15.6-15(e)(4); Ky. Rev. Stat. Ann. § 304.47-055(4); S.C. Code Ann. § 38-43-55(G)(4); Vt. Stat. Ann. tit. 8, § 4813m(f)(4); Wash. Rev. Code §§ 48.02.065(4), (6).

implementing selective waiver in light of questions about its authority to adopt

such a regulation under the Sarbanes Oxley Act. *See* SEC Release Nos. 33-8185,

34-47276, *Implementation of Standards of Professional Conduct for Attorneys*,

68 Fed. Reg. 6296, 6312 (Feb. 6, 2003) (explaining withdrawal of 17 C.F.R. Part

205.3(e)(3)).  All of these factors counsel against establishing a new government-

investigation privilege and correspondingly counsel against adopting Qwest's

proposed rule regardless of whether it be characterized as a new privilege or a

new rule governing waiver.

### 7.  Culture of Waiver

Amici curiae, Association of Corporate Counsel and the Chamber of

Commerce of the United States of America, support Qwest's position by

suggesting their employers and members, respectively, now litigate in a "culture

of waiver" instituted by federal prosecutors.  They argue that companies facing

federal investigations do not choose to waive their privileges; under current

enforcement standards, companies cannot risk being labeled as uncooperative; and

cooperation, as defined by federal officials, requires producing privileged

documents.[9]  Amici state that "the demand for privilege waivers by the

---

[9]     The DOJ's enforcement position stems from certain DOJ memoranda.  The
1999 "Holder Memorandum" written by Deputy Attorney General Eric Holder
directed federal prosecutors to consider the company's willingness to waive
privileges in evaluating cooperation.  The currently controlling memorandum is
the January 20, 2003 "Thompson Memorandum" authored by Deputy Attorney
(continued...)

government as a pre-requisite to fair treatment by prosecutors is now routine."
Amici Br. at 10.  They urge the court "to note with disapproval this culture of
waiver as a matter of policy that should be reversed." *Id.* at 8.

Amici's position is supported by commentators. *See, e.g.*, Ronald C.
Minkoff, *A Leak in the Dike: Expanding the Doctrine of Waiver of the
Attorney-Client Privilege*, 154 PLI/NY 165, 178 (2005); *see also* Kathryn
Keneally, *New Life for Selective Waiver*, 30 Champion 42 (2006).  It is not,
however, supported by the record.  Aside from the anecdotal material serving as
the foundation for the purported "culture of waiver," the record is silent regarding
its existence, significance, and longevity.  More specifically, the record is silent
about Qwest's particular dealings with the agencies and whether it experienced
the tactics deplored by amici.  Even though common sense and human nature

---

[9](...continued)
General Larry D. Thompson.  On October 21, 2005, Acting Deputy Attorney
General Robert D. McCallum, Jr. issued a memorandum supplementing the
Thompson Memorandum that directs United States Attorneys to establish a
written waiver review process prosecutors must follow in seeking privilege
waivers.

The SEC's position is encapsulated in the "Seaboard Report," Securities
Exchange Act of 1934 Release No. 44969 (Oct. 23, 2001).  That report listed a
company's desire to provide information as one of the criteria for assessing
cooperation, and it noted that such a desire may cause companies to waive the
attorney-client privilege, work-product doctrine, or other applicable privileges.
"In this regard, the Commission does not view a company's waiver of a privilege
as an end in itself, but only as a means (where necessary) to provide relevant and
sometimes critical information to the Commission staff." *Id.* at n.3.

suggest there is some level of pressure for companies to satisfy the government by disclosing as much as possible, including even privileged and protected material, this court cannot rely on such a sparse record to recognize a new doctrine of selective waiver or to create a new privilege for government investigations.

A similar argument has been unsympathetically received by at least one other circuit. The Second Circuit stated:

> Whether characterized as forcing a party in between a Scylla and Charybdis, a rock and a hard place, or some other tired but equally evocative metaphoric cliché, the "Hobson's choice" argument is unpersuasive given the facts of this case. An allegation that a party facing a federal investigation and the prospect of a civil fraud suit must make difficult choices is insufficient justification for carving a substantial exception to the waiver doctrine.

*Steinhardt Partners*, 9 F.3d at 236. In *Branzburg*, the Supreme Court found similar arguments about changing policies and practices insufficient to support the creation of a journalist's privilege:

> It is said that currently press subpoenas have multiplied, that mutual distrust and tension between press and officialdom have increased, that reporting styles have changed, and that there is now more need for confidential sources . . . . These developments, even if true, are treacherous grounds for a far-reaching interpretation of the First Amendment fastening a nationwide rule on courts, grand juries, and prosecuting officials everywhere.

408 U.S. at 699 (footnote omitted).

At least to the degree exhorted by amici, "the culture of waiver" appears to be of relatively recent vintage. Whether the pressures facing corporations in

federal investigations present a hardened, entrenched problem suitable for common-law intervention or merely a passing phenomenon that may soon be addressed in other venues is unclear. For example, certain language in Application Note 12 to Sentencing Guideline § 8C2.5 can be read to tie cooperation to a waiver of applicable privileges. The Sentencing Commission, however, recently promulgated an amendment deleting that language because "the sentence at issue could be misinterpreted to encourage waivers." *Sentencing Guidelines for the United States Courts*, 71 Fed. Reg. 28063, 28073 (May 1, 2006). This amendment will take effect on November 1, 2006 unless Congress intervenes. *Id.* at 28063. Congress also appears concerned about these issues; the House Judiciary Committee's Subcommittee on Crime, Terrorism, and Homeland Security recently took oral testimony at an oversight hearing on corporate privilege waivers. *White Collar Enforcement (Part I): Attorney-Client Privilege and Corporate Waivers: Oversight Hearing Before the H. Comm. on the Judiciary, Subcomm. on Crime, Terrorism and Homeland Security*, 109th Cong. D193 (Mar. 7, 2006). Finally, the Advisory Committee on Evidence Rules recently voted to recommend publication of a proposed Rule 502, providing for selective waiver to the Committee on Rules of Practice and Procedure (the Standing Committee) of the Judicial Conference of the United States. The Standing Committee is expected to take up the issue at its June 2006 meeting.

-47-

Rule 501 places responsibility for development of the common law of testimonial privilege on the federal courts. Each decision along the path of the common law is directed by the discrete, underlying facts developed in the record. As decisions accrue, the process is facilitated by the accumulation of experience, but it remains dependent on the factual foundation of each constituent decision. Legislative and rule-making processes, however, are not confined by the same gradual, brick-by-brick progression. Legislatures and rule-making bodies are endowed with tools to marshal evidence, facts, and experience from numerous and diverse sources that can support more dramatic and immediate creation of new rules or modifications of old rules. *Cf. In re Subpoena Duces Tecum*, 738 F.2d at 1375 ("If a change is to be made because it is thought that such voluntary disclosure programs are so important that they deserve special treatment, that is a policy matter for the Congress, or perhaps through the SEC (through a regulation). Courts are not the appropriate forum–for one thing, courts do not know enough–to decide on policy grounds to treat those programs (or others like them) in an exceptional way."); *see also Branzburg*, 408 U.S. at 706 ("Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned and, equally important, to refashion those rules as experience from time to time may dictate.").

Whether a rule-making or legislative venue is appropriate to address the issues raised by Qwest and amici is a question for the Standing Committee and Congress. The rule-making and legislative processes, however, need not proceed wholly independent of the common law. The accumulated experience of federal common law in the area of attorney-client privilege and work-product protection is but another source for the legislative and rule-making bodies to draw on to inform their deliberations concerning the need for and parameters of selective waiver or a new privilege.

### III. Conclusion

For the reasons discussed above, the record in this case does not justify adoption of selective waiver. Consequently, the district court did not abuse its discretion in ordering Qwest to produce the Waiver Documents to the Plaintiffs. Qwest has not shown a clear and indisputable right to a writ of mandamus, and therefore its petition is DENIED.