**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 01-cv-1451-REB-KLM
(Consolidated with Civil Action Nos. 01-cv-1472-REB-PAC, 01-cv-1527-REB-PAC, 01-cv-1616-REB-PAC, 01-cv-1799-REB-PAC, 01-cv-1930-REB-PAC, 01-cv-2083-REB-PAC, 02-cv-0333-REB-PAC, 02-cv-0374-REB-PAC, 02-cv-0507-REB-PAC, 02-cv-0658-REB-PAC, 02-cv-755-REB-PAC, 02-cv-798-REB-PAC and 04-cv-0238-REB-PAC)

In re QWEST COMMUNICATIONS INTERNATIONAL, INC. SECURITIES LITIGATION

---

**LEAD COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND
EXPENSES**

---

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................... 1

II.   THE REQUESTED FEE SHOULD BE AWARDED BASED ON A
      PERCENTAGE OF THE RECOVERY OBTAINED ............................................. 7

      A.    Lead Plaintiffs' Counsel Are Entitled to a Fee From the Common
            Fund They Created ................................................................... 7

      B.    Fees in Common Fund Cases Should Be Based on a Percentage
            of the Recovery ....................................................................... 8

            1.    The Supreme Court Has Repeatedly Held that Fees in
                  Common Fund Cases Are Properly Calculated Based on a
                  Percentage of the Recovery ........................................... 8

            2.    A Reasonable Percentage of the Fund Created Is the
                  Preferred Method of Awarding Attorneys' Fees in Common
                  Fund Cases in the Tenth Circuit ..................................... 10

III.  LEAD COUNSEL'S FEE REQUEST ENJOYS A "PRESUMPTION OF
      REASONABLENESS" ..................................................................... 15

IV.   THE REQUESTED PERCENTAGE IS FAIR AND REASONABLE AND
      CONSISTENT WITH OR LOWER THAN FEE AWARDS IN
      COMPARABLE CASES FROM THIS DISTRICT AND ELSEWHERE ............... 17

      A.    The Requested Fee Is at the Low End of the Range of Fees
            Awarded by District Courts in the Tenth Circuit in Common Fund
            Cases .................................................................................... 17

      B.    The Requested Fee Percentage is at the Low End of Fee Awards in
            Comparable Class Action Litigation ........................................ 19

V.    THE REASONABLENESS OF THE PERCENTAGE FEE REQUESTED IS
      CONFIRMED BY AN ANALYSIS OF THE *JOHNSON* FACTORS ............... 21

      A.    The Time and Labor Involved .................................................. 22

      B.    The Novelty and Difficulty of Questions Raised by the Litigation ............. 24

      C.    The Requisite Skill to Perform the Legal Services Properly .................... 28

- i -

**Page**

D.  The Preclusion of Other Employment by Attorneys Due to Acceptance of the Case............................................................................ 31

E.  The Customary Fee for Similar Work........................................................ 31

F.  Whether the Fee is Fixed or Contingent .................................................. 32

G.  Time Limitation Imposed by the Client or Circumstances ......................... 35

H.  The Amount Involved and the Results Obtained....................................... 35

I.  The Experience, Reputation and Ability of the Attorneys.......................... 36

J.  The Undesirability of the Case................................................................. 37

K.  The Nature and Length of the Professional Relationship with the Client......................................................................................................... 38

L.  Awards in Similar Cases .......................................................................... 39

M.  Lead Plaintiffs' Counsel's Expenses Are Reasonable and Were Necessarily Incurred in the Prosecution of the Litigation .......................... 40

VI.  CONCLUSION.................................................................................................. 42

## TABLE OF AUTHORITIES

**Page**

### CASES

*Abrams v. Lightolier Inc.*,
  50 F.3d 1204 (3d Cir. 1995) .................................................................................. 40

*Angres v. Small Worldwide PLC*,
  No. 99-K-1254 (D. Colo. June 17, 2003) .............................................................. 17

*Arenson v. Bd. of Trade*,
  372 F. Supp. 1349 (N.D. Ill. 1974) ........................................................................ 30

*Associated Builders & Contractors, Inc. v. Orleans Parish Sch. Bd.*,
  919 F.2d 374 (5th Cir. 1990) ................................................................................. 40

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985) ............................................................................................... 8

*Bee v. Greaves*,
  910 F.2d 686 (10th Cir. 1990) ............................................................................... 40

*Behrens v. Wometco Enters., Inc.*,
  118 F.R.D. 534 (S.D. Fla. 1988),
  *aff'd*, 899 F.2d 21 (11th Cir. 1990) ....................................................................... 36

*Blum v. Stenson*,
  465 U.S. 886 (1984) ....................................................................................... *passim*

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ..................................................................................... 7, 8, 9

*Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42*,
  8 F.3d 722 (10th Cir. 1993) ................................................................................... 40

*Brown v. Phillips Petroleum Co.*,
  838 F.2d 451 (10th Cir. 1988) ....................................................................... *passim*

*Bryant v. Avado Brands, Inc.*,
  100 F. Supp. 2d 1368 (M.D. Ga. 2000), *rev'd and remanded
  on other grounds sub nom. Bryant v. Dupree*, 252 F.3d 1161
  (11th Cir. 2001) ..................................................................................................... 27

**Page**

*Bryant v. Dupree*,
    252 F.3d 1161 (11th Cir. 2001)............................................................................ 27

*Camden I Condo. Ass'n v. Dunkle*,
    946 F.2d 768 (11th Cir. 1991).............................................................................. 11

*Cent. Bank, N.A. v. First Interstate Bank, N.A.*,
    511 U.S. 164 (1994) ............................................................................................ 34

*Cent. R.R. & Banking Co. v. Pettus*,
    113 U.S. 116 (1885) .............................................................................................. 8

*Cosgrove v. Sullivan*,
    759 F. Supp. 166 (S.D.N.Y. 1991)...................................................................... 23

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993) ............................................................................................ 27

*Dolgow v. Anderson*,
    43 F.R.D. 472 (E.D.N.Y. 1968) ............................................................................. 7

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................ 27

*Edmonds v. United States*,
    658 F. Supp. 1126 (D.S.C. 1987) ....................................................................... 29

*Florin v. Nationsbank, N.A.*,
    34 F.3d 560 (7th Cir. 1994).................................................................................. 11

*Goldstein v. MCI WorldCom*,
    340 F.3d 238 (5th Cir. 2003)........................................................................ 25, 34

*Gottlieb v. Barry*,
    43 F.3d 474 (10th Cir. 1994)......................................................................... 11, 40

*Gottlieb v. Wiles*,
    150 F.R.D. 174 (D. Colo. 1993), *rev'd and remanded on other
    grounds sub nom. Gottlieb v. Barry*, 43 F.3d 474 (10th Cir. 1994) .................... 40

*Harman v. Lyphomed, Inc.*,
    945 F.2d 969 (7th Cir. 1991)................................................................................ 38

**Page**

*Harris v. Marhoefer,*
   24 F.3d 16 (9th Cir. 1994)................................................................................ 40

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983) ................................................................................. 13, 36

*In re "Agent Orange" Prod. Liab. Litig.,*
   611 F. Supp. 1296 (E.D.N.Y. 1985), *aff'd in part and rev'd in part on
   other grounds,* 818 F.2d 226 (2d Cir. 1987)........................................................ 12

*In re Am. Bank Note Holographics,*
   127 F. Supp. 2d 418 (S.D.N.Y. 2001)................................................................. 14

*In re Cendant Corp. Litig.,*
   264 F.3d 201 (3d Cir. 2001)................................................................... 3, 15, 16

*In re Cont'l Ill. Sec. Litig.,*
   962 F.2d 566 (7th Cir. 1992)............................................................................ 8

*In re Coram Healthcare Corp. Sec. Litig.,*
   No. 95-N-2074 (D. Colo. Jan. 24, 1997) ............................................................ 18

*In re Crazy Eddie Sec. Litig.,*
   824 F. Supp. 320 (E.D.N.Y. 1993).................................................................... 30

*In re Diagnostek, Inc. Sec. Litig.,*
   No. 92-1274 JC/WWD (D.N.M. July 19, 1994) ................................................... 18

*In re Einstein Noah Bagel Corp. Sec. Litig.,*
   No. 97-N-1614 (D. Colo. June 4, 1999) ............................................................ 18

*In re Equity Funding Corp. Sec. Litig.,*
   438 F. Supp. 1303 (C.D. Cal. 1977) .................................................................. 30

*In re Global Crossing Sec. & ERISA Litig.,*
   225 F.R.D. 436 (S.D.N.Y. 2004)................................................................ 3, 16, 17

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
   55 F.3d 768 (3d Cir. 1995)......................................................................... 11, 12

**Page**

*In re Harrah's Entm't, Inc. Sec. Litig.*,
No. 95-3925, 1998 U.S. Dist. LEXIS 18774
(E.D. La. Nov. 25, 1998) .................................................................................... 23

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000).............................................................. 20, 21, 24

*In re Intelcom Group, Inc. Sec. Litig.*,
No. 95-D-1166 (D. Colo. Mar. 21, 1997)............................................................ 18

*In re King Res. Co. Sec. Litig.*,
420 F. Supp. 610 (D. Colo. 1976).................................................................. 30, 36

*In re Lucent Techs., Inc. Sec. Litig.*,
327 F. Supp. 2d 426 (D.N.J. 2004)..................................................................... 16

*In re M.D.C. Holdings Sec. Litig.*,
No. CV 89-0090 E (M), 1990 U.S. Dist. LEXIS 15488
(S.D. Cal. Aug. 30, 1990).................................................................................... 39

*In re Network Assocs., Inc., Sec. Litig.*,
76 F. Supp. 2d 1017 (N.D. Cal. 1999) ................................................................. 2

*In re Novell, Inc. Sec. Litig.*,
No. 2:99-CV-995 TC (D. Utah May 26, 2005)..................................................... 17

*In re Prudential-Bache Energy Income P'ships Sec. Litig.*,
No. 8881, 1994 WL 202394 (E.D. La. May 18, 1994)................................... 32, 33

*In re Prudential-Bache Energy Income P'ships Sec. Litig.*,
No. MDL 888, 1994 WL 150742 (E.D. La. Apr. 13, 1994)..................................... 9

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
396 F. Supp. 2d 1178 (D. Colo. 2004)................................................................ 25

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
No. 01-cv-01451-REB-CBS, 2006 U.S. Dist. LEXIS 71267
(D. Colo. Sept. 29, 2006) ............................................................................. passim

*In re Resort Income Investors, Inc. Sec. Litig.*,
No. 95-B-1665 (D. Colo. Mar. 13, 1998)............................................................. 18

**Page**

*In re Rite Aid Corp. Sec. Litig.,*
146 F. Supp. 2d 706 (E.D. Pa. 2001) ..................................................... 20, 23, 30

*In re Rite Aid Corp. Sec. Litig.,*
396 F.3d 294 (3d Cir. 2005)....................................................................... 3, 19, 20

*In re RJR Nabisco Sec. Litig.,*
No. MDL 818 (MBM), 1992 U.S. Dist. LEXIS 12702
(S.D.N.Y. Aug. 24, 1992). ..................................................................................... 23

*In re Storage Tech. Sec. Litig.,*
No. 92-B-750 (D. Colo. Dec. 1, 1995)................................................................. 18

*In re Sun Healthcare Group, Inc., Sec. Litig.,*
No. CIV-99-00269 JC/LCS-ACE (D.N.M. Dec. 13, 2004) ................................... 18

*In re Sun Healthcare Group, Inc. Litig.,*
No. 95-7005 JC/WWD (D.N.M. May 5, 1997)..................................................... 18

*In re Thirteen Appeals Arising out of the San Juan Dupont Plaza
Hotel Fire Litig.,*
56 F.3d 295 (1st Cir. 1995)................................................................................. 11

*In re United Telecomms. Sec. Litig.,*
No. 90-2251-O, 1994 U.S. Dist. LEXIS 9151
(D. Kan. June 1, 1994)........................................................................................ 19

*In re Warner Commc'ns Sec. Litig.,*
618 F. Supp. 735 (S.D.N.Y. 1985),
*aff'd,* 798 F.2d 35 (2d Cir. 1986)........................................................................ 28

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,*
19 F.3d 1291 (9th Cir. 1994)............................................................................... 11

*In re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.,*
364 F. Supp. 2d 980 (D. Minn. 2005) ................................................................ 23

*J.I. Case Co. v. Borak,*
377 U.S. 426 (1964) ............................................................................................. 8

*Johnson v. Georgia Highway Express, Inc.,*
488 F.2d 714 (5th Cir. 1974)........................................................................... *passim*

**Page**

*Johnston v. Comerica Mortgage Corp.*,
    83 F.3d 241 (8th Cir. 1996)................................................................ 11

*Jones v. Cent. Soya Co.*,
    748 F.2d 586 (11th Cir. 1984)........................................................... 33

*Kaufman v. Motorola, Inc.*,
    No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627
    (N.D. Ill. Sept. 19, 2000) .................................................................. 27

*Kirchoff v. Flynn*,
    786 F.2d 320 (7th Cir. 1986)....................................................... 12, 39

*Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*,
    487 F.2d 161 (3d Cir. 1973)................................................................ 9

*Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*,
    540 F.2d 102 (3d Cir. 1976).......................................................... 9, 10

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)........................................... 14, 23

*Miller v. Woodmoor Corp.*,
    No. 74-F-988, 1978 U.S. Dist. Lexis 15234
    (D. Colo. Sept. 28, 1978) .................................................................. 24

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) ........................................................................... 7

*Phemister v. Harcourt Brace Jovanovich, Inc.*,
    No. 77 C 39, 1984 U.S. Dist. LEXIS 23595 (N.D. Ill. Sept. 14, 1984) ................ 39

*Piambino v. Bailey*,
    610 F.2d 1306 (5th Cir. 1980)........................................................... 33

*Queen Uno Ltd. P'ship, et al. v. Coeur D'Alene Mines Corp., et al.*,
    No. 97-WY-1431-CB (D. Colo. Aug. 11, 1999) .................................... 18

*Rasner v. FirstWorld Commc'ns, Inc.*,
    No. 00-K-1376 (D. Colo. Jan. 19, 2005) ............................................. 17

**Page**

*Rawlings v. Prudential-Bache Props.*,
　　9 F.3d 513 (6th Cir. 1993)................................................................................ 11

*Ressler v. Jacobson*,
　　149 F.R.D. 651 (M.D. Fla. 1992) ............................................................... 29, 33

*Sardi v. Struthers Indus., et al.*,
　　No. 94-C-787-H (N.D. Okla. Oct. 21, 1996)...................................................... 18

*Schaffer, et al. v. Evolving Sys., Inc., et al.*,
　　No. 98-WY-1338-CB (D. Colo. Oct. 4, 1999)..................................................... 18

*Schwartz, et al. v. Celestial Seasonings, Inc., et al.*,
　　No. 95-K-1045 (D. Colo. Apr. 25, 2000)............................................................. 17

*Shaw v. Toshiba Am. Info. Sys.*,
　　91 F. Supp. 2d 942 (E.D. Tex. 2000)...................................................... 9, 12, 13

*Sonnenfeld v. Denver*,
　　No. 95-Z-468 (D. Colo. Dec. 8, 1997)................................................................ 18

*Sprague v. Ticonic Nat'l Bank*,
　　307 U.S. 161 (1939) ....................................................................................... 7, 8

*Sterling, et al. v. Cray Computer Corp.*,
　　No. 91-N-2261 (D. Colo. June 17, 1993) ........................................................... 18

*Swedish Hosp. Corp. v. Shalala*,
　　1 F.3d 1261 (D.C. Cir. 1993) ............................................................................ 11

*Trustees v. Greenough*,
　　105 U.S. 527 (1882) ....................................................................................... 7, 8

*Uselton v. Commercial Lovelace Motor Freight*,
　　9 F.3d 849 (10th Cir. 1993)......................................................................... 11, 21

*Vaszlavik v. Storage Tech. Corp.*,
　　No. 95-B-2525, 2000 U.S. Dist. LEXIS 21140 (D. Colo. Mar. 9, 2000)............... 17

*Venegas v. Mitchell*,
　　495 U.S. 82 (1990) ............................................................................................. 9

**Page**

*Walters v. Atlanta,*
   652 F. Supp. 755 (N.D. Ga. 1985)......................................................................... 33

*Weiss v. Mercedes-Benz of N. Am.,*
   899 F. Supp. 1297 (D.N.J. 1995).......................................................................... 23

*Wolf v. E.A. Breitenbach, et al.,*
   No. 95-D-2572 (D. Colo. May 29, 1997) ............................................................. 18

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78j(b) ..................................................................................................... 27, 34
   §78u-4 ............................................................................................................ 3
   §78u-4(a)(4).................................................................................................... 41
   §78u-4(a)(6).................................................................................................... 14

## SECONDARY AUTHORITIES

1 Alba Conte, *Attorney Fee Awards* (2d ed. 1993)
   §1.09.............................................................................................................. 37
   §2.02.............................................................................................................. 8
   §2.06.............................................................................................................. 24

Charles Silver, *Class Actions in the Gulf South Symposium: Due
Process and the Lodestar Method: You Can't Get There From Here,*
   74 Tul. L. Rev. 1809 (June 2000) ....................................................................... 14

Denise N. Martin, Vinita M. Juneja, Todd S. Foster, Frederick C.
Dunbar, *Recent Trends IV: What Explains Filings and Settlements
in Shareholder Class Actions?* (NERA Nov. 1996)........................................................ 19

**Page**

John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*,
  86 Colum. L. Rev. 669 (May 1986) ...................................................................... 15

*Manual for Complex Litigation* (3d ed. 1995)
  §24.12 ...................................................................................................................... 9

Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*,
  108 F.R.D. 237 (Oct. 8, 1985) ............................................................................ 8

Third Circuit Task Force Report, *Selection of Class Counsel*,
  208 F.R.D. 340 (Jan. 15, 2002) .......................................................................... 39

Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* (Federal Judicial Center 1996) ............................................ 19

## LEGISLATIVE HISTORY

H.R. Conf. Rep. No. 104-369 (1995) (Leg. Hist.)
  1995 WL 709276 ................................................................................................. 2

## I.    INTRODUCTION[1]

The two remaining defendants in this securities class action (the "Litigation"[2]), Joseph P. Nacchio and Robert S. Woodruff, have settled for $45 million. This settlement standing alone, is a significant recovery from the two remaining defendants.[3] It is in addition to the $400 million paid on behalf of the other defendants in this action, and, either by itself or in conjunction with the prior settlement, represents a very good recovery for the N&W Class. For their efforts in achieving this result, Lead Counsel and Liaison Counsel (collectively, "Lead Counsel") in the Litigation respectfully request an award of attorneys' fees of 15% of the N&W Settlement Fund plus payment of their expenses in the amount of $113,262.04. In addition, the Lead Plaintiffs have requested reimbursement for their time and expense in representing the N&W Class. The recovery obtained for the N&W Class by this settlement – a cash recovery of $45 million – was achieved through the substantial

---

[1]    All capitalized terms not defined herein shall have the same meanings as set forth in the Stipulation of Settlement dated as of August 4, 2008 (the "Stipulation").

[2]    Submitted in support of approval of the proposed settlement is Lead Plaintiffs' Motion for Final Approval of Class Action Settlement with all Remaining Defendants (the "Settlement Brief") and the Declaration of Michael J. Dowd in Support of Motion for Final Approval of Class Action Settlement with all Remaining Defendants and Award of Attorneys' Fees and Expenses (the "Dowd Declaration"), which more fully describes the history of the Litigation, the claims asserted, the investigation undertaken, the extensive litigation efforts, the negotiation and substance of the settlement, the substantial risks of the Litigation and the reasonableness of the fee request. Also submitted herewith are declarations from each firm which worked together with Lead Counsel setting forth the time and expenses committed in prosecuting the Litigation.

[3]    Pursuant to L. Civ. R. 7.1 the parties have conferred regarding this motion. The Settling Defendants and Qwest take no position with regard to it. However, they specifically deny many of the factual allegations asserted in the Dowd Declaration.

efforts and effective advocacy of Lead Counsel, the active participation by Lead Plaintiffs, and is an excellent result by any measure. The $45 million, when combined with the prior recovery of $400 million from the other defendants, represents one of the larger cash settlements of a securities class action and Lead Counsel believe it to be in the top 25 settlements achieved after the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA").

The requested 15% fee is the same percentage that this Court awarded in connection with the prior settlement with Qwest and other individuals and is almost 10% below the fee negotiated with and agreed to by the Court-appointed Lead Plaintiffs. It therefore should be afforded a presumption that it is reasonable. Using a lodestar cross-check, the fee represents approximately the same multiplier the Court previously awarded. Moreover, the requested percentage is less than the percentages typically awarded in class actions in this Circuit, and is the appropriate method of compensating counsel for obtaining this result. This is especially true in light of the extensive efforts undertaken by Lead Counsel, the significant risks involved in prosecuting the Litigation and the result achieved for the N&W Class.

The Court-appointed Lead Plaintiffs include a pension fund and three individual investors, each with a significant financial stake in the outcome of the Litigation, paradigm fiduciaries for the N&W Class envisioned by Congress when it enacted the PSLRA.[4] As

---

[4]     Congress enacted the PSLRA in large part to encourage institutional investors to assume control of securities class actions and "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of

- 2 -

several courts have held, "courts should afford a presumption of reasonableness to fee requests submitted pursuant to an agreement between a properly-selected lead plaintiff and properly-selected lead counsel." *In re Cendant Corp. Litig.*, 264 F.3d 201, 220 (3d Cir. 2001); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004) ("[I]n class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable.").[5]

The Litigation, which was filed nearly eight years ago, is subject to the provisions of the PSLRA and, therefore, was extremely risky and difficult from the outset.   15 U.S.C.

---

shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." *See* H.R. Conf. Rep. No. 104-369 (1995), 1995 WL 709276, at *32 (Leg. Hist.); *see also In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1020 (N.D. Cal. 1999).  Congress believed that institutions and other investors with a significant financial stake in the outcome of a securities class action would be in the best position to monitor the ongoing prosecution of the litigation, select counsel and to assess the reasonableness of counsel's fee request.

[5]   Lead Plaintiffs were actively involved in all aspects of the Litigation, including the protracted settlement negotiations and were familiar with the strengths and weaknesses of this case, including the risks of continued litigation as well as these defendants' financial condition.  Because of this involvement, Lead Plaintiffs are in a unique position to evaluate the work of counsel and the effort required to obtain the $45 million settlement and to determine, as they have, that the fee request is fair and reasonable and should be awarded.  The fact that they support a fee at the level initially negotiated by them, some 10% higher than the percentage requested here, should be given great weight. *Cendant*, 264 F.3d at 282.  This standard was recently reiterated: "In *Cendant*, 264 F.3d 201, we noted, under the Private Securities Litigation Reform Act, the aim of the fee award analysis 'is not to assess whether the fee request is reasonable,' but 'to determine whether the presumption of reasonableness has been rebutted.'" *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 n.10 (3d Cir. 2005) (quoting *Cendant*, 264 F.3d at 284).

§78u-4. As the Court noted in its Order Awarding Attorney Fees and Expenses (dated

September 28, 2006) ("Fee Opinion") in connection with the prior settlement:

> There is no doubt that the litigation of this case required a large investment of sophisticated expertise, time, labor, and other resources by lead counsel. Nothing in the record is contrary to this conclusion, and I will summarize very briefly the effort made by lead counsel. This case required extensive investigation to support allegations in highly fact specific complaints. Great specificity in a complaint is required under the pleading standards of the PSLRA. This investigation necessarily included interviews with many witnesses and detailed analysis of Qwest's financial statements and many underlying transactions. As the case progressed, plaintiffs' counsel litigated several complex motions to dismiss, a complex motion for temporary restraining order, many complex discovery motions, and the plaintiffs' motion for class certification. Discovery was voluminous and required sophisticated analysis. In addition, settlement and mediation efforts took place over an extended period of time, and negotiation of the final settlement terms clearly required substantial talent, time, and effort.

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, No. 01-cv-01451-REB-CBS, 2006 U.S. Dist.

LEXIS 71267, at *14-*15 (D. Colo. Sept. 29, 2006).

Importantly, Lead Counsel were at the forefront in uncovering the alleged fraud at

Qwest and especially the alleged role of defendants Nacchio and Woodruff. ***This***

***Litigation was commenced six to nine months prior to any governmental action***

***relating to Lead Plaintiffs' allegations and advanced claims that the Securities and***

***Exchange Commission ("SEC") never pursued. These claims contributed to Lead***

***Counsel's success in obtaining a superior result for the N&W Class.*** Despite

defendants' repeated attempts to dismiss Lead Plaintiffs' claims at the pleading stage, Lead

Counsel successfully defeated (in the main) their attempts to do so. The Settling

Defendants continued to deny all claims of wrongdoing or liability against them based on

the allegations of the Fifth Consolidated Amended Class Action Complaint and vigorously defended the Litigation.

As discussed in greater detail in the Dowd Declaration and Settlement Brief, Lead Plaintiffs faced very real obstacles in establishing the elements necessary to prove liability and damages if litigation were to continue against these defendants. The gravamen of Lead Plaintiffs' case is that defendants issued allegedly false or misleading statements and falsified Qwest's financial statements by engaging in a series of accounting manipulations in violation of Generally Accepted Accounting Principles ("GAAP"). While Lead Counsel conducted an extraordinarily detailed analysis of Qwest's financial statements as well as a multitude of underlying transactions and concluded that Qwest's financial statements violated GAAP, the accounting transactions and principles at issue are complex and the determination of many of the accounting issues would be the subject of expert testimony. Defendants would continue to deny any liability and, assuming that Lead Plaintiffs survived anticipated motions for summary judgment, presenting these complex issues to a jury posed a real risk to establishing liability at trial. Lead Plaintiffs would also have to prove that Nacchio and Woodruff acted with scienter. Proving these defendants' intent to make material representations and or/omissions, which they adamantly deny, is subject to considerable uncertainty.

There were also significant risks in proving loss causation and the amount, if any, of damages suffered by the N&W Class. Defendants' damage expert would likely opine that the N&W Class did not suffer any damages or that damages were significantly less than those claimed by Lead Plaintiffs because the price drops in Qwest's securities were due to

- 5 -

factors unrelated to the alleged fraud. While Lead Plaintiffs disagreed with defendants' contentions regarding loss causation and damages, at trial there would be a substantial risk that the jury would agree with the Settling Defendants' arguments resulting in a finding of no damages or only a fraction of the damages Lead Plaintiffs' claimed.

As this Court previously noted, with regard to the case efforts undertaken in the prior settlement:

> There is no doubt that the litigation of this case required a large investment of sophisticated expertise, time, labor, and other resources by lead counsel. Nothing in the record is contrary to this conclusion, and I will summarize very briefly the effort made by lead counsel. This case required extensive investigation to support allegations in highly fact specific complaints. Great specificity in a complaint is required under the pleading standards of the PSLRA. This investigation necessarily included interviews with many witnesses and detailed analysis of Qwest's financial statements and many underlying transactions. As the case progressed, plaintiffs' counsel litigated several complex motions to dismiss, a complex motion for temporary restraining order, many complex discovery motions, and the plaintiffs' motion for class certification. Discovery was voluminous and required sophisticated analysis. In addition, settlement and mediation efforts took place over an extended period of time, and negotiation of the final settlement terms clearly required substantial talent, time, and effort.

*Qwest*, 2006 U.S. Dist. LEXIS 71267, at *14-*15.

This investment of time and money has continued after the prior settlement. Lead Counsel defended this Court's order regarding the waiver of attorney-client privilege information when produced to government entities all the way to the United States Supreme Court; engaged and consulted with experts on the various issues of proof that surround this action; continued the review and analysis of documents produced by defendants and third parties to the action, took 18 depositions of Nacchio and Woodruff related witnesses, and other efforts described herein and in the Dowd Declaration.

In sum, in the face of the serious obstacles summarized above and the substantial efforts of Lead Counsel – in a case asserting claims predicated on complex legal and factual issues which were vigorously opposed by highly skilled and experienced defense counsel – Lead Counsel succeeded in securing an outstanding recovery for the N&W Class. For all of these reasons, Lead Plaintiffs' counsel submit that the 15% fee requested is fair and reasonable when considered under applicable legal standards and should be awarded.

## II. THE REQUESTED FEE SHOULD BE AWARDED BASED ON A PERCENTAGE OF THE RECOVERY OBTAINED

### A. Lead Plaintiffs' Counsel Are Entitled to a Fee From the Common Fund They Created

Courts have long recognized that attorneys who represent a class and achieve a benefit for class members are entitled to be compensated for their services, and that where a class plaintiff successfully recovers a fund the costs of litigation should be spread among the fund's beneficiaries. Under this "common fund" doctrine, established more than a century ago in *Trustees v. Greenough*, 105 U.S. 527 (1882), attorneys who obtain a recovery for a class in the form of a common fund are entitled to an award of fees and expenses from that fund as compensation for their work. *See Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939). Courts have also recognized that in addition to providing just compensation, awards of attorneys' fees from a common fund also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future misconduct of a similar nature. *See, e.g., Dolgow v.*

- 7 -

*Anderson*, 43 F.R.D. 472, 481-84 (E.D.N.Y. 1968).   Indeed, the Supreme Court has emphasized that private securities actions, such as the instant action, provide a "'most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).

**B.     Fees in Common Fund Cases Should Be Based on a
         Percentage of the Recovery**

**1.     The Supreme Court Has Repeatedly Held that Fees in
         Common Fund Cases Are Properly Calculated Based on
         a Percentage of the Recovery**

The Supreme Court has consistently held that where a common fund has been created for the benefit of a class as a result of counsel's efforts, the award of counsel's fee should be determined on a percentage-of-the-fund basis. *See, e.g.*, *Greenough*, 105 U.S. at 532; *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 124-25 (1885); *Sprague*, 307 U.S. at 166-67; *Boeing*, 444 U.S. at 478-79.   Indeed, by 1984 this notion was so well established that the Supreme Court needed no more than a footnote to make this point in *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class."). *See also* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 242 (Oct. 8, 1985) (hereinafter, the "*Task Force Report*") (fee awards in common fund cases have historically been computed based upon a percentage of the fund); 1 Alba Conte, *Attorney Fee Awards* §2.02, at 31-32 (2d ed. 1993) (same).   The percentage concept is intended to approximate the market by basing the fee award on what private counsel ordinarily would charge in a contingent fee contract. *See In re Cont'l Ill. Sec. Litig.*, 962

F.2d 566, 572 (7th Cir. 1992) ("The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client.").

Despite Supreme Court precedent approving percentage fees in common fund cases, many years ago some lower federal courts began employing an alternative method for calculating fee awards known as the "lodestar/multiplier" method.[6] However, the Supreme Court has *never* adopted the lodestar method in a common fund case. *See Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 942, 963 (E.D. Tex. 2000) (citing *Manual for Complex Litigation* §24.12, at 189 (3d ed. 1995)); *see also In re Prudential-Bache Energy Income P'ships Sec. Litig.*, No. MDL 888, 1994 WL 150742, at *3 (E.D. La. Apr. 13, 1994) ("*Prudential I*"). *See also Venegas v. Mitchell*, 495 U.S. 82 (1990) (holding that a plaintiff in a civil rights suit may be contractually bound to pay an attorney a percentage of the recovery even though the fee exceeds the statutory fee that the defendant must pay to the plaintiff).

Moreover, in the wake of the Supreme Court's decisions in *Boeing*, 444 U.S. 472, and *Blum*, 465 U.S. 886, which reaffirmed the appropriateness of the percentage method in

---

[6]     The lodestar approach entails two steps. First, to determine the lodestar, the court multiplies the number of hours spent on the case by each attorney's reasonable hourly rate. Second, the court adjusts that figure (by applying a multiplier) to reflect such factors as the risks faced and overcome, the contingent nature of the litigation, the result obtained, and the quality of the attorneys' work. *See, e.g., Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167-69 (3d Cir. 1973) ("*Lindy I*"), subsequently refined in *Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116-18 (3d Cir. 1976) (en banc) ("*Lindy II*").

common fund cases, in 1984, Judge Aldisert of the Third Circuit (the author of *Lindy II*) convened a task force of prominent judges and practitioners to reconsider *Lindy II* because "a number of difficulties [had] been encountered in applying the [lodestar method]." *Task Force Report*, 108 F.R.D. at 238. The Third Circuit Task Force, headed by Professor Arthur Miller of Harvard Law School, identified at least nine perceived deficiencies of the *Lindy II* "lodestar" approach, and found that there was a "widespread belief" that these deficiencies "either offset or exceed [the] benefits" of the lodestar method. *Task Force Report*, 108 F.R.D. at 246.

Accordingly, the Third Circuit Task Force concluded that although *Lindy II* continued to have merit in **statutory fee-shifting cases**, and should be followed in such cases, fee awards in **common fund cases** should be based on a percentage of recovery. *Task Force Report*, 108 F.R.D. at 254-59.

### 2.   A Reasonable Percentage of the Fund Created Is the Preferred Method of Awarding Attorneys' Fees in Common Fund Cases in the Tenth Circuit

The percentage method is the appropriate method to use to calculate and award fees in common fund cases because, among other things, it laudably aligns the lawyers' interest in being paid a fair fee with the interest of the class in obtaining a maximum recovery in the shortest amount of time.

In *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988), the Tenth Circuit affirmed the propriety of awarding attorneys' fees on a percentage basis in a

common fund case.[7]  Cases following *Brown* confirm a "***preference***" in the Tenth Circuit for

the percentage method.  In *Gottlieb v. Barry*, 43 F.3d 474 (10th Cir. 1994) the court stated:

> In our circuit, following *Brown* and *Uselton*, either [the percentage or
> lodestar] method is permissible in common fund cases; however, *Uselton*
> implies a preference for the percentage of the fund method.

*Id.* at 483.[8]

Supporting authority for the percentage method in other circuits and by

commentators is overwhelming.  Since the issuance of the *Task Force Report* in 1985,

virtually every circuit court has joined the United States Supreme Court in approving use of

the percentage-of-the-fund method in common fund cases.  *See, e.g.*, *In re Thirteen*

*Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st

Cir. 1995); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821-22 (3d

Cir. 1995); *Rawlings v. Prudential-Bache Props.*, 9 F.3d 513, 515-17 (6th Cir. 1993); *Florin*

*v. Nationsbank, N.A.*, 34 F.3d 560, 564-65 (7th Cir. 1994); *Johnston v. Comerica Mortgage*

*Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19

F.3d 1291, 1296 (9th Cir. 1994); *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774

(11th Cir. 1991) ("After reviewing *Blum*, the [Third Circuit] Task Force Report, and . . .

cases from other circuits, we believe that the percentage of the fund approach is the better

reasoned in a common fund case."); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271

---

[7]      *See Brown*, 838 F.2d at 454-55.

[8]      *See also Uselton v. Commercial Lovelace Motor Freight*, 9 F.3d 849, 853 (10th Cir.
1993).

(D.C. Cir. 1993) (percentage of the fund recovered is the **only** permissible measure of awarding fees in common fund cases).

As these and many other courts have noted, the percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for efficient prosecution, thereby benefiting both litigants and the judicial system. For example, in *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986), the Seventh Circuit succinctly summarized some of the benefits of the percentage method:

> The contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains. . . . The unscrupulous lawyer paid by the hour may be willing to settle for a lower recovery coupled with a payment for more hours. Contingent fees eliminate this incentive and also ensure a reasonable proportion between the recovery and the fees assessed to defendants.

Conversely, numerous courts have criticized the lodestar method for encouraging plaintiffs' attorneys to needlessly drag out complex litigation for years in order to run up "lodestar" hours, even when their clients' and the class's interests would be much better served by an earlier, more efficient, settlement of a case based on arm's-length negotiations conducted by experienced counsel.[9]

---

[9] *See, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1296, 1306 (E.D.N.Y. 1985), *aff'd in part and rev'd in part on other grounds*, 818 F.2d 226 (2d Cir. 1987) (criticizing lodestar approach as one that "tends to encourage excess discovery, delays and late settlements, while it discourages rapid, efficient and cheaper resolution of litigation") (Weinstein, C.J.); *GMC*, 55 F.3d at 821 (noting that lodestar method has been criticized for giving plaintiffs' counsel "the incentive to delay settlement in order to run up fees"); *Thirteen Appeals*, 56 F.3d at 307 (lodestar method creates "'a disincentive for the early settlement of cases'") (citation omitted); *Shaw*, 91 F. Supp. 2d at 964 ("Again, simply put, the lodestar method rewards plodding mediocrity and penalizes expedient success.") (Heartfield, J.).

The percentage approach is also the most efficient means of rewarding the work of

class action attorneys, since it avoids the wasteful and burdensome process of counsel

preparing, and courts evaluating, lodestar-based fee petitions, which the Third Circuit Task

Force has described as "cumbersome, enervating, and often surrealistic." *Task Force*

*Report*, 108 F.R.D. at 258; *see also Shaw*, 91 F. Supp. 2d at 964 ("The lodestar method

voraciously consumes enormous judicial resources, unnecessarily complicates already

complex litigation, and inaccurately reflects the value of services performed."); *Hensley v.*

*Eckerhart*, 461 U.S. 424, 437 (1983) (warning that a "request for attorney's fees should not

result in a second major litigation").

One of the nation's foremost scholars in the field of class actions and attorneys' fees,

Professor Charles Silver of the University of Texas School of Law, has also concluded that

– among its many other benefits – the percentage method is also far superior to the

lodestar method in aligning the interests of class counsel with the interests of absent class

members. Indeed, as Professor Silver notes:

> *The consensus that the contingent percentage approach creates a closer harmony of interests between class counsel and absent plaintiffs than the lodestar method is strikingly broad.* It includes leading academics, researchers at the RAND Institute for Civil Justice, and many judges, including those who contributed to the Manual for Complex Litigation, the Report of the Federal Courts Study Committee, and the report of the Third Circuit Task Force. Indeed, it is difficult to find anyone who contends otherwise. No one writing in the field today is defending the lodestar on the ground that it minimizes conflicts between class counsel and absent claimants.
>
> *In view of this, it is as clear as it possibly can be that judges should not apply the lodestar method in common fund class actions.* The Due Process Clause requires them to minimize conflicts between absent claimants and their representatives. The contingent percentage approach accomplishes this.

- 13 -

Charles Silver, *Class Actions in the Gulf South Symposium: Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tul. L. Rev. 1809, 1819-20 (June 2000) (emphasis added; footnotes omitted). This is particularly true in PSLRA cases such as this one where Congress empowered sophisticated lead plaintiffs with the ability to select counsel and negotiate the type and terms of their fee arrangement with class counsel.

Moreover, the PSLRA has made the percentage method the standard for determining whether attorneys' fees are reasonable. *See* 15 U.S.C. §78u-4(a)(6). The PSLRA states that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount" recovered for the class. 15 U.S.C. §78u-4(a)(6). Courts have concluded that, by drafting the PSLRA in such a manner, Congress expressed a preference for the percentage, as opposed to the lodestar, method of determining attorneys' fees in securities class actions. *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002); *In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001).

Indeed, Professor John C. Coffee, Jr., a distinguished scholar in the field, argues that a percentage of the recovery is the ***only*** reasonable method of awarding fees in common fund cases:

> If one wishes to economize on the judicial time that is today invested in monitoring class and derivative litigation, the highest priority should be given to those reforms that restrict collusion and are essentially self-policing. The percentage of the recovery fee award formula is such a "deregulatory" reform

- 14 -

because it relies on incentives rather than costly monitoring.  Ultimately, this "deregulatory" approach is the only alternative.[10]

## III.   LEAD COUNSEL'S FEE REQUEST ENJOYS A "PRESUMPTION OF REASONABLENESS"

Passage of the PSLRA "shift[ed] the underpinnings of our class action attorneys fees jurisprudence in the securities area." *Cendant*, 264 F.3d at 282.  In a PSLRA case, a fee request, which has been approved and endorsed by properly-appointed lead plaintiffs, enjoys a "presumption of reasonableness." *Id.* at 220, 283.  In *Cendant*, the Third Circuit Court of Appeals held that the district court abused its discretion by invalidating a fee agreement negotiated between counsel and three institutional investors in favor of a sealed-bid auction for legal services.  In so holding, the court explicitly recognized that, in enacting the PSLRA, Congress expressed its strong belief that an institutional lead plaintiff would be in a better position than the court to protect the interests of the class by monitoring lead counsel throughout the litigation and by negotiating a reasonable fee for counsel's representation.  *Id.* at 276 (holding that Congress believed that "institutional investors would likely do a better job than courts at selecting, retaining, and monitoring counsel than courts have traditionally done").  Accordingly, the court held that a fee agreement negotiated between a properly selected lead plaintiff and its counsel should be accorded a "presumption of reasonableness":

---

[10]     John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 724-25 (May 1986).

> [U]nder the PSLRA, courts should accord a presumption of reasonableness
> to any fee request submitted pursuant to a retainer agreement that was
> entered into between a properly-selected lead plaintiff and a properly-
> selected lead counsel. . . . This presumption will ensure that the lead
> plaintiff, not the court, functions as the class's primary agent vis-à-vis its
> lawyers.

*Id.* at 282.[11] *See also Global Crossing*, 225 F.R.D. at 466 ("[I]n class action cases under

the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement

negotiated at arm's length between lead plaintiff and lead counsel are reasonable."); *In re*

*Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 432 (D.N.J. 2004) (same).

Here, Lead Plaintiffs, including an institutional investor acting through its own

counsel, previously negotiated a graduated fee arrangement with Lead Counsel that results

in a fee of 25%. In fulfillment of their duties in accordance with the contemplation of

Congress and under the PSLRA, Lead Plaintiffs have worked with counsel throughout the

prosecution and partial settlement of the Litigation, are familiar with the work done by

counsel, and they not only negotiated the fee structure which would result in a higher fee

but also support the much lower fee request presently before the Court. *See* Declarations

of Christine Pane on behalf of the New England Health Care Employees Pension Fund,

Clifford Mosher, Tejinder Singh, and Sat Pal Singh, submitted herewith. The fee

agreement between the Lead Plaintiffs and counsel is "'precisely the type of bargaining that

the PSLRA anticipated and to which a court reasonably may give substantial deference.'"

---

[11]    The court stated that only if lead plaintiff and lead counsel were unable to agree on a
revised fee to account for the changed circumstances could a court be justified in holding
that the presumption of reasonableness had been abrogated and to review the fee request
using traditional standards. *Cendant*, 264 F.3d at 283.

*Global Crossing*, 225 F.R.D. at 468 (citation omitted).   Notwithstanding the fact that the negotiated fee is an appropriate fee as it reflects the exercise of the power and responsibility vested in lead plaintiffs by Congress, Lead Counsel, with the support of the Lead Plaintiffs, seek a 15% fee, consistent with the Court's prior award.

## IV.   THE REQUESTED PERCENTAGE IS FAIR AND REASONABLE AND CONSISTENT WITH OR LOWER THAN FEE AWARDS IN COMPARABLE CASES FROM THIS DISTRICT AND ELSEWHERE

### A.   The Requested Fee Is at the Low End of the Range of Fees Awarded by District Courts in the Tenth Circuit in Common Fund Cases

The requested fee percentage is also consistent with, and in fact less than, percentages awarded in many other securities class action cases from within this Circuit. Recent decisions (from within this Circuit and District) have consistently awarded attorneys' fees of 30% or more. *See, e.g.*, *In re Novell, Inc. Sec. Litig.*, No. 2:99-CV-995 TC (D. Utah May 26, 2005) (fee equal to 30% of recovery plus expenses);[12] *Rasner v. FirstWorld Commc'ns, Inc.*, No. 00-K-1376 (D. Colo. Jan. 19, 2005) (fee equal to 33% of recovery plus expenses); *Angres v. Small Worldwide PLC*, No. 99-K-1254 (D. Colo. June 17, 2003) (awarding fees of 33-1/3% of the recovery fund); *Vaszlavik v. Storage Tech. Corp.*, No. 95-B-2525, 2000 U.S. Dist. LEXIS 21140, *4 (D. Colo. Mar. 9, 2000) (awarding 30% fee, noting, "[f]ees for class action settlements generally range from 20% - 50%" and "class action fee awards are typically 30% of the fund created by the settlement"); *Schwartz, et al. v. Celestial Seasonings, Inc., et al.*, No. 95-K-1045 (D. Colo. Apr. 25, 2000) (awarding fees

---

[12]   All unpublished decisions referenced herein are attached hereto.

- 17 -

of 33-1/3% of the settlement fund); *In re Intelcom Group, Inc. Sec. Litig.*, No. 95-D-1166 (D. Colo. Mar. 21, 1997) (awarding fees of 33-1/3% of the recovery); *In re Sun Healthcare Group, Inc., Sec. Litig.*, No. CIV-99-00269 JC/LCS-ACE (D.N.M. Dec. 13, 2004) (fee equal to 30% of recovery plus expenses); *Schaffer, et al. v. Evolving Sys., Inc., et al.*, No. 98-WY-1338-CB (D. Colo. Oct. 4, 1999) (fee equal to 30% of recovery plus expenses); *Queen Uno Ltd. P'ship, et al. v. Coeur D'Alene Mines Corp., et al.*, No. 97-WY-1431-CB (D. Colo. Aug. 11, 1999) (fee of 30% plus expenses); *In re Einstein Noah Bagel Corp. Sec. Litig.*, No. 97-N-1614 (D. Colo. June 4, 1999) (fee equal to 30% of recovery plus expenses); *Sterling, et al. v. Cray Computer Corp.,* No. 91-N-2261 (D. Colo. June 17, 1993) (fee equal to 30% of recovery plus expenses); *In re Coram Healthcare Corp. Sec. Litig.,* No. 95-N-2074 (D. Colo. Jan. 24, 1997) (fee equal to 30% of recovery plus expenses); *In re Resort Income Investors, Inc. Sec. Litig.,* No. 95-B-1665 (D. Colo. Mar. 13, 1998) (fee equal to 30% of recovery plus expenses); *Sonnenfeld v. Denver,* No. 95-Z-468 (D. Colo. Dec. 8, 1997) (fee equal to 33-1/3% of recovery plus expenses); *In re Storage Tech. Sec. Litig.*, No. 92-B-750 (D. Colo. Dec. 1, 1995) (fee award of 30% of $55 million settlement fund in consolidated class and derivative action recovery plus expenses); *Wolf v. E.A. Breitenbach, et al.,* No. 95-D-2572 (D. Colo. May 29, 1997) (fee equal to 30% of recovery plus expenses); *In re Sun Healthcare Group, Inc. Litig.*, No. 95-7005 JC/WWD (D.N.M. May 5, 1997) (fee equal to 30% of recovery plus expenses); *In re Diagnostek, Inc. Sec. Litig.*, No. 92-1274 JC/WWD (D.N.M. July 19, 1994) (fee equal to 31.25% of recovery plus expenses); *Sardi v. Struthers Indus., et al.*, No. 94-C-787-H (N.D. Okla. Oct. 21, 1996) (fee equal to 30% of recovery plus

- 18 -

expenses); *In re United Telecomms. Sec. Litig.,* No. 90-2251-O, 1994 U.S. Dist. LEXIS 9151 (D. Kan. June 1, 1994) (fee of 33-1/3% of recovery).

### B.   The Requested Fee Percentage is at the Low End of Fee Awards in Comparable Class Action Litigation

The requested fee percentage also falls below the average of fee awards in a study of security class actions conducted in 1996 by National Economic Research Associates, an economics consulting firm.  Using data from 433 shareholder class actions, the study reports on the issue of attorneys' fees:   "Regardless of case size, fees average approximately 32 percent of the settlement."  Denise N. Martin, Vinita M. Juneja, Todd S. Foster, Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* at 12-13 (NERA Nov. 1996), attached hereto as Tab 19. These figures are in accord with a Federal Judicial Study that found in federal class actions generally (including non-securities actions) median attorney fee awards were in the range of 27% to 30%.  Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules*, at 69 (Federal Judicial Center 1996), attached hereto as Tab 20.  Even in cases where large recoveries have been obtained, percentage fees above the amount requested here have been consistently awarded:

| Case | Recovery | Percentage Awarded |
|---|---|---|
| *In re Rite Aid Corp. Sec. Litig.,* 269 F. Supp. 2d 603 (E.D. Pa. 2003), *vacated on other grounds,* 396 F.3d 294 (3d Cir. 2005) | $126 million | 25% |

- 19 -

| Case | Recovery | Percentage Awarded |
|------|----------|--------------------|
| *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) | $193 million | 25% |
| *In re Oxford Health Plans, Inc. Sec. Litig.*, No. MDL 1222 (S.D.N.Y. June 12, 2003) | $300 million | 28% |
| *In re Informix Corp. Sec. Litig.*, No. C 97-1289 CRB (N.D. Cal. Nov. 2, 1999) | $132 million | 30% |
| *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) | $111 million | 30% |
| *In re Prison Realty Sec. Litig.*, No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D. Tenn. Feb. 9, 2001) | $104 million | 30% |
| *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D. Tex. 1999) | $190 million | 25% |
| *Kurzweil v. Philip Morris Cos., Inc.*, No. 94 Civ. 2373(MBM), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 million | 30% |
| *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) | $127 million | 36% |
| *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393 (S.D.N.Y. 1999) | $116 million | 27.5% |
| *In re Home-Stake Prod. Co. Sec. Litig.*, No. MDL 153 (N.D. Okla. Jan. 2, 1990) | $185 million | 30% |
| *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 912 F. Supp. 97 (S.D.N.Y. 1996) | $110 million | 27% |
| *Dusek v. Mattel, Inc.*, No. CV 99-10864-MRP (CWx) (C.D. Cal. Sept. 29, 2003) | $122 million | 27% |

As the court observed in *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) in awarding a 30% fee and criticizing the use of any declining "sliding scale" fee regimen: "This court respectfully concludes that such an approach tends to penalize attorneys who recover large settlements.  More importantly, it casts doubt on the whole process by which courts award fees by creating a separate, largely unarticulated set of rules for cases in which the recovery is particularly sizable."  The sliding scale also "fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery.  Nor does it give sufficient weight to the fact that 'large attorneys' fees serve to motivate capable counsel to undertake these actions.'" *Id.* (citation omitted).  The *Ikon* court would not reduce the attorneys' fee award in a large settlement "simply for the sake of doing so when every other factor ordinarily considered weighs in favor of approving class counsel's request of thirty percent." *Id.* at 196.

## V.   THE REASONABLENESS OF THE PERCENTAGE FEE REQUESTED IS CONFIRMED BY AN ANALYSIS OF THE *JOHNSON* FACTORS

The Tenth Circuit has recognized that in determining the appropriate percentage to be awarded as attorneys' fees in common fund cases, the court should be informed by an analysis of the factors articulated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). *See Brown*, 838 F.2d at 454-55; *Uselton*, 9 F.3d at 853.  These factors are commonly referred to as the *Johnson* factors.  As shown below, application of the *Johnson* factors as a cross-check amply supports the fairness and reasonableness of the percentage fee requested.

As this Court previously noted, the twelve *Johnson* factors are:

(1)     the time and labor required;

(2)     the novelty and difficulty of the questions;

(3)     the skill requisite to perform the legal service properly;

(4)     the preclusion of other employment by the attorney due to acceptance of the case;

(5)     the customary fee for similar work in the community;

(6)     whether the fee is fixed or contingent;

(7)     time limitations imposed by the client or the circumstances;

(8)     the amount involved and the results obtained;

(9)     the experience, reputation, and ability of the attorneys;

(10)    the "undesirability" of the case;

(11)    the nature and length of the professional relationship with the client; and

(12)    awards in similar cases.

*Qwest*, 2006 U.S. Dist. LEXIS 71267, at *12-*13 (citing *Johnson*, 488 F.2d at 717-19). The Court properly noted, however, that "a court may assign different relative weights to the factors – that is, none of the factors is inherently equiponderant, preponderant, or dispositive." *Id.* at *13 (citing *Brown*, 838 F.2d at 456). As discussed below, consideration of the applicable *Johnson* factors confirms the reasonableness of the fee requested here.

## A.     The Time and Labor Involved

While the time and labor required to successfully prosecute this Litigation and obtain the outstanding settlement for the benefit of the N&W Class fully justifies the requested fee, the Tenth Circuit has found this *Johnson* factor to be of less importance in a common fund case, such as this case.

- 22 -

>   Although the *Johnson* factors are relevant in determining a reasonable
>   fee in a common fund case, the inherent differences between statutory fee
>   and common fund cases could justify a trial judge's decision to assign
>   different relative weights to those factors in the two types of cases.  For
>   example, the first factor – time and labor required – is an essential
>   touchstone for recovery in a statutory fee case where reasonableness is
>   measured in part by reference to the lodestar analysis.  In a common fund
>   case, however, although time and labor required are appropriate
>   considerations, the ninth *Johnson* factor – the amount involved and the
>   results obtained – may be given greater weight when, as in this case, the trial
>   judge determines that the recovery was highly contingent and that the efforts
>   of counsel were instrumental in realizing recovery on behalf of the class.[13]

The prosecution and resolution of this Litigation against Nacchio and Woodruff

required a substantial effort by Lead Counsel.  Lead Counsel estimate that they and their

paraprofessionals and in-house experts devoted 4,156.95 hours to the prosecution of this

Litigation as it relates to Nacchio and Woodruff with a resulting lodestar of $2,046,685.00.

The requested fee represents a multiple of approximately 3.33 times lodestar.  The

multiplier reflected here falls within the range of multipliers found reasonable for cross-

check purposes by courts in common fund cases and is fully justified here given the effort

required, the risks faced and overcome and the results achieved.[14]  It is approximately the

---

[13]     *Brown*, 838 F.2d at 456.  *See also In re Harrah's Entm't, Inc. Sec. Litig.*, No. 95-
3925, 1998 U.S. Dist. LEXIS 18774, at *15 (E.D. La. Nov. 25, 1998) ("Because counsel
prosecuted this action on a contingent fee basis, the Court would rather focus on results
obtained.").

[14]     *See, e.g.*, *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735-36 (E.D. Pa.
2001) (25% fee representing 10.73 multiplier); *In re Xcel Energy, Inc. Sec., Derivative &
"ERISA" Litig.*, 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (awarded 25% fee of $80 million
settlement representing a 4.7 multiplier); *Maley*, 186 F. Supp. 2d at 371 ("it clearly appears
that the modest multiplier of 4.65 is fair and reasonable"); *In re RJR Nabisco Sec. Litig.*, No.
MDL 818 (MBM), 1992 U.S. Dist. LEXIS 12702, at *22 (S.D.N.Y. Aug. 24, 1992) (approving
fees of over $17.7 million, notwithstanding objection that such an award of fees

same as the implied multiplier resulting from the Court's award in connection with the prior

settlement.

## B.     The Novelty and Difficulty of Questions Raised by the Litigation

The novelty and difficulty of the issues in a case is a significant factor to be

considered in making a fee award.   Courts have long recognized that securities class

actions present inherently complex and novel issues.   Retired Judge Finesilver noted in

*Miller v. Woodmoor Corp.*:

> The benefit to the class must also be viewed in its relationship to the
> complexity, magnitude, and novelty of the case. . . .
>
> Despite years of litigation, the area of securities law has gained little
> predictability.   There are few "routine" or "simple" securities actions.   Courts
> are continually modifying and/or reversing prior decisions in an attempt to
> interpret the securities law in such a way as to follow the spirit of the law
> while adapting to new situations which arise.   Indeed, many facets of
> securities law have taken drastically new directions during the pendency of
> this action.[15]

Judge Finesilver's comments ring even more true today.   The adoption of the

PSLRA has made the successful prosecution of securities cases even more complex and

uncertain.   *See Ikon*, 194 F.R.D. at 194 ("securities actions have become more difficult from

---

represented a multiplier of 6); *Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297, 1304
(D.N.J. 1995) (awarding fee resulting in 9.3 multiplier); *Cosgrove v. Sullivan*, 759 F. Supp.
166, 167 n.1 (S.D.N.Y. 1991) (multiplier of 8.74); *see also* Conte, supra §2.06, at 39
("When a large common fund has been recovered and the hours are relatively small, some
courts reach a reasonable fee determination based on large multiples of 5 or 10 times the
lodestar.").

[15]     *Miller v. Woodmoor Corp.*, No. 74-F-988, 1978 U.S. Dist. Lexis 15234, at *11-*12 (D.
Colo. Sept. 28, 1978).

plaintiff's perspective in the wake of the PSLRA"). This Litigation involved complex issues of law and fact that presented considerable risks to Lead Plaintiffs' case. From the outset, this post-PSLRA action was a difficult and highly uncertain securities case.

The gravamen of Lead Plaintiffs' case is that Qwest issued false or misleading statements and used a variety of accounting manipulations in violation of GAAP that materially misrepresented Qwest's business and financial condition. The accounting transactions at issue were complex and because "GAAP generally tolerates a range of reasonable treatments" would be difficult to plead and prove. *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1186 (D. Colo. 2004). Thus, when Lead Counsel undertook representation there was no assurance that the Litigation would survive defendants' attacks on the pleadings, motions for summary judgment, trial and appeal. Indeed, in *Goldstein v. MCI WorldCom*, 340 F.3d 238 (5th Cir. 2003), the Fifth Circuit affirmed a dismissal with prejudice of a securities fraud class action complaint against Bernard Ebbers and WorldCom arising out of a massive securities fraud which later was revealed and admitted to by the company and for which Ebbers was later convicted.

As this Court previously found in this action:

> There are few simple class action cases involving securities law. This area of law may not be novel, but it generally is complex and difficult. In this case, lead counsel pursued securities claims that involved a large and complex corporation and complex accounting issues. As discussed above, the PSLRA requires great specificity in pleading such claims. Simply investigating the facts in order to file a legally sufficient complaint under the PSLRA required substantial effort and expertise. In addition, as summarized above, many of the issues litigated by lead counsel were complex and difficult. Able defense counsel zealously and survigrously [sic] litigated on behalf of the defendants, and lead counsel were required to meet these challenges at most every turn. In short, the issues presented by this case were very difficult and complex. This factor, closely related to factor three,

below, carries significant weight, and tends to support a generous award of attorney fees.

*Qwest*, 2006 U.S. Dist. LEXIS 71267, at *17-*18.

The novelty and questions of law did not diminish after the prior settlement, and indeed became even more complex. For example, after the first settlement, Lead Counsel successfully defended this Court's order regarding the waiver of privilege to the United States Court of Appeals for the Tenth Circuit, and then to the Supreme Court, ultimately gaining access to the important documents at issue – in the face of a proposed change to the Federal Rules of Evidence which arguably would have barred access. Lead Counsel were also required to deal with the apportionment of responsibility provisions and other provisions of the PSLRA as they related to Nacchio and Woodruff, where most of the original defendants had settled, and the resulting dynamic that encourages the remaining defendants to use at trial an "empty chair" defense in their favor. Lead Counsel were also called on to coordinate the prosecution of this Litigation with the SEC's actions against Nacchio and Woodruff. Moreover, the government's cases were structured in a way that, at least in one respect, threatened to strengthen the Settling Defendants' defense to the Litigation.

As further detailed in the Dowd Declaration, Nacchio and Woodruff steadfastly maintained that they did nothing wrong and were successful in hearing some of Lead Plaintiffs' claims dismissed at the pleading stage. Lead Counsel addressed numerous difficult issues in opposing these defendants' motions to dismiss and there was no guarantee that Lead Plaintiffs' claims would survive the heightened pleading standards of the PSLRA. As one court has noted: "An unfortunate byproduct of the PSLRA is that

- 26 -

potentially meritorious suits will be short-circuited by the heightened pleading standard."

*Bryant v. Avado Brands, Inc.*, 100 F. Supp. 2d 1368, 1377 (M.D. Ga. 2000), *rev'd and remanded on other grounds sub nom. Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001).

Even though many of Lead Plaintiffs' claims survived the pleading stage challenges, Lead Plaintiffs would have the substantial burden of proving, *inter alia*, that Nacchio and Woodruff were responsible for an omission or a misstatement that was material, that the omissions or misstatements impacted the market price of Qwest securities and caused damage to the N&W Class, and, with respect to Lead Plaintiffs' §10(b) claims, that Nacchio and Woodruff acted with scienter. The complex factual and legal questions at issue would have continued to be the subject of substantial disagreement among the parties.

Even assuming Lead Counsel were able to prove liability, they still would also unquestionably have had to confront expert testimony offered by Nacchio and Woodruff that any damages the N&W Class suffered were not caused by any alleged misleading statements but instead by market factors unrelated to the fraud and that Lead Plaintiffs' models for calculating damages (even if liability were established) were invalid in the wake of Supreme Court cases such as *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005).[16] To the extent that the Settling Defendants could prevail on issues relating to liability or show that any assumptions made by Lead Plaintiffs' experts were incorrect or unreliable or could show that any portion of the

---

[16]    *See also Kaufman v. Motorola, Inc.*, No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627, at *5-*6 (N.D. Ill. Sept. 19, 2000) (granting defendants' motion in limine to strike testimony of plaintiffs' damages expert).

decline in Qwest's stock price was due to factors other than the alleged fraud, Lead

Plaintiffs' claimed damages could be significantly reduced.  Moreover, the reaction by a jury

to such complex testimony is highly unpredictable and there is a risk that a jury could have

sided with the Settling Defendants' experts.

Even if Lead Plaintiffs survived summary judgment and were successful against

Nacchio and Woodruff at trial, Lead Counsel's efforts to establish liability and damages in

the Litigation, in all likelihood would not end with a judgment in the District Court, but would

continue through one or more levels of appellate review.  In complex and substantial cases

such as this, it must be recognized that even a victory at the trial stage does not guarantee

ultimate success.  The results from both a trial and appellate review are unpredictable and

could seriously and adversely affect the scope of an ultimate recovery, if not the fact of

recovery itself.  Indeed, as the court observed in *In re Warner Communications Sec. Litig.*:

> Even a victory at trial is not a guarantee of ultimate success.  If
> plaintiffs were successful at trial and obtained a judgment for substantially
> more than the amount of the proposed settlement, the defendants would
> appeal such judgment.  An appeal could seriously and adversely affect the
> scope of an ultimate recovery, if not the recovery itself.[17]

Despite the novelty and difficulty of the issues raised, counsel secured an excellent

result for the N&W Class.  As a result, this factor supports the requested award.

## C.    The Requisite Skill to Perform the Legal Services Properly

Again, this Court has previously addressed this issue:

---

[17]    *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 747-48 (S.D.N.Y. 1985) (citing
numerous examples), *aff'd*, 798 F.2d 35 (2d Cir. 1986).

> This factor is closely related to the ninth factor – the experience, reputation, and ability of the attorneys. I consider factors three and nine together. If the issues in a case are complex and difficult, then obviously it will take great skill to address and resolve those issues successfully. Plaintiffs' lead counsel are highly skilled and specialized attorneys who use their substantial experience and expertise to prosecute complex securities class actions. The defendants were represented by lawyers of similar expertise and experience. Particularly in a case as complex as this case, lead counsel must have a very high level of experience and expertise if the plaintiffs are to have any chance of success. In this case, there is no serious challenge to the conclusion that lead counsel possesses a high level of skill and expertise in securities class action suits. This factor carries significant weight because the plaintiff class likely would not have obtained any relief without the assistance of counsel with a high level of skill and expertise. Further, lead counsel should be rewarded for their successful application of their skill and expertise. This factor augurs toward a substantial fee award.

*Qwest*, 2006 U.S. Dist. LEXIS 71267, at \*18-\*19.

The quality of the representation by Lead Counsel and the standing of Lead Counsel are important factors that support the reasonableness of the requested fee. *See Ressler v. Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992). As the court recognized in *Edmonds v. United States*, 658 F. Supp. 1126, 1137 (D.S.C. 1987), "prosecution and management of a complex national class action requires unique legal skills and abilities." Those unique skills were called upon here. The quality of Lead Counsel's work on this case was excellent and is ultimately reflected in the result. From the outset, Lead Counsel marshaled considerable resources in the research, investigation and uncovering of facts to plead detailed complaints that survived (in the main) defendants' attacks on the pleadings.

The substantial recovery obtained for the N&W Class is the direct result of our highly skilled and specialized efforts based on our substantial experience in the prosecution of complex securities class actions. Lead Counsel led the effort to expose the alleged financial fraud at Qwest. This Litigation was commenced prior to any governmental action

relating to Lead Plaintiffs' allegations and it was not until months and years later that the

SEC asserted its claims against Qwest. *See Rite Aid*, 146 F. Supp. 2d at 735 (in awarding

25% of a $193 million settlement fund, the court noted the skill and efficiency of plaintiffs'

counsel and the outstanding results "in a litigation that was far ahead of public agencies like

the Securities and Exchange Commission and the Untied States Department of Justice,

which long after the institution of this litigation awakened to the concerns that plaintiffs'

counsel first identified").[18]   This settlement represents an excellent result for the N&W

Class, one that is attributable to the diligence, determination, hard work and reputation of

Lead Counsel.

   The quality of opposing counsel is also important in evaluating the quality of Lead

Counsel's work.[19]   Nacchio and Woodruff were represented by highly experienced lawyers

from prestigious law firms, with well deserved reputations for vigorous advocacy in the

defense of complex civil cases such as this.   Settling Defendants' counsel's efforts were

aggressive and unrelenting.   The ability of Lead Counsel to obtain a favorable result in the

face of such formidable legal opposition confirms the quality of Lead Counsel's

representation.

---

[18]    *See In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 326 (E.D.N.Y. 1993) (The court
ruled that attorneys' fee request of 33.8% of the settlement fund was reasonable where
"class counsel exhibited sustained and admirable tenacity in unearthing facts needed to
develop these cases. They brought the first action some two years before the SEC initiated
its proceedings.").

[19]    *See, e.g., In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 634 (D. Colo. 1976); *In
re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977); *Arenson v.
Bd. of Trade*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974).

### D.     The Preclusion of Other Employment by Attorneys Due to Acceptance of the Case

Again, the Court has previously addressed this issue:

Without doubt, time spent by lead counsel on this case was at the expense of time that lead counsel could have spent on other cases. Lead counsel, however, does not cite any particular legal business that was turned away because of the demands of this case. It is fair to assume, however, that lead counsel's efforts on this case could have been devoted to other cases, which may have proven worthwhile.

*Qwest*, 2006 U.S. Dist. LEXIS 71267, at *19.

When Lead Counsel undertook to represent the Lead Plaintiffs in this Litigation, it was with the expectation that they would have to devote a significant amount of time and effort, and advance substantial expenses, to its prosecution.   The dedication of time needed to successfully prosecute this Litigation monopolized the resources of Lead Counsel on many occasions and precluded them from working on other matters.  Few law firms would be willing and able to make such a substantial investment of time and money, and to forego other work knowing that there was a substantial risk of loss.  The time spent by Lead Counsel on this case was at the expense of the time that counsel could have devoted to other matters.  Since the prior settlement, as this action has waited for the SEC and United States Attorney's actions to run their courses, Lead Counsel have dedicated their resources over an extended period of time.

### E.     The Customary Fee for Similar Work

This Court has previously addressed this issue:

This factor is very similar to factor number twelve – awards in similar cases.  I consider factors five and twelve together.   The lead plaintiffs analyze this factor in terms of the customary percentage fee for complex commercial cases that involve a contingent fee.

- 31 -

\* \* \*

> The customary fee factor carries significant weight in my analysis, but the
> fees awarded in other cases provide only a rough guide to reasonableness.

*Qwest*, 2006 U.S. Dist. LEXIS 71267, at \*21-\*22.

The requested fee is below the range normally awarded in cases of this nature.  In local, regional and national markets, complex commercial cases require a contingent fee between 30 and 40 percent of the gross recovery (even more when the attorney must bear the litigation expenses).  As Justices Brennan and Marshall observed in their concurring opinion in *Blum*: "'In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery.'" *Blum*, 465 U.S. at 903\*.  *See also In re Prudential-Bache Energy Income P'ships Sec. Litig.*, No. 8881, 1994 WL 202394, at \*2 (E.D. La. May 18, 1994) ("*Prudential II*") ("Were this not a class action, attorney's fees would range between 30% and 40%, the percentages commonly contracted for in contingency cases.").  Risky cases generally demand a higher percentage, and the factual and legal uncertainties here made this Litigation riskier than most.  Moreover, as discussed, *infra*, the requested fee is less than many awards in this Circuit.

## F.    Whether the Fee is Fixed or Contingent

This Court has previously addressed this issue:

> In many circumstances, a contingent fee will result in the payment of a higher
> total fee to counsel than the total fee an hourly fee would have generated.  Of
> course, if the litigation is not successful, a contingent fee often will leave
> counsel without any fee.  A contingent fee, and the potential for a relatively
> high fee, is designed to reward counsel for taking the risk of prosecuting a
> case without payment during the litigation, and the risk that the litigation may
> be unsuccessful.  These considerations are applicable here.  As noted

- 32 -

above, I accord a presumption of reasonableness to the 24 percent
contingent fee to which lead counsel and the lead plaintiffs agreed at the
outset of this case. In the context of this case, this factor carries significant
weight. However, as the *Johnson* court noted, the key "criterion for the court
is not what the parties agreed but what is reasonable." *Johnson*, 488 F.2d at
718.

*Qwest*, 2006 U.S. Dist. LEXIS 71267, at *22-*23.

Lead Counsel undertook this Litigation on a contingent fee basis, assuming a

substantial risk that they would have to devote a significant amount of time and incur

substantial expenses in prosecuting this Litigation without any assurance of being

compensated for their efforts. The contingent nature of Lead Counsel's fees should be

given substantial weight in assessing the requested fee award.[20] Courts across the country

have consistently recognized that the risk of receiving little or no recovery is a major factor

in awarding attorneys' fees. For example, in awarding counsel's attorneys' fees in

*Prudential II*, the court noted the risks that plaintiffs' counsel had taken:

Although today it might appear that risk was not great based on Prudential
Securities' global settlement with the Securities and Exchange Commission,
such was not the case when the action was commenced and throughout
most of the litigation. Counsel's contingent fee risk is an important factor in
determining the fee award. Success is never guaranteed and counsel faced
serious risks since both trial and judicial review are unpredictable. Counsel
advanced all of the costs of litigation, a not insubstantial amount, and bore
the additional risk of unsuccessful prosecution.

*Prudential II*, 1994 WL 202394, at *6.

---

[20]     *See Jones v. Cent. Soya Co.*, 748 F.2d 586, 591 (11th Cir. 1984); *Piambino v.
Bailey*, 610 F.2d 1306, 1328 (5th Cir. 1980); *Walters v. Atlanta*, 652 F. Supp. 755, 759
(N.D. Ga. 1985); *Ressler*, 149 F.R.D. at 656.

Indeed, the risk of no recovery in complex cases of this type is very real and is heightened when counsel, as they did here, press to achieve the very best result for those that they represent. There are numerous class actions in which plaintiffs' counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise. Subsequent to the passage of the PSLRA, many cases have been dismissed at the pleading stage in response to defendants' arguments that the complaints do not meet the PSLRA's pleading standards, including the securities fraud class action arising out of the WorldCom debacle. *See, e.g.*, *Goldstein*, 340 F.3d 238. Lead Plaintiffs' counsel were faced with that possibility in this case. Indeed, as noted above, securities cases have always been complex and difficult and the PSLRA has only increased the risk in successfully prosecuting a securities class action.

The risks of contingent litigation also are highlighted by the fact that a dramatic change in the law can result in the dismissal of a claim after a great deal of time and effort have been expended on the case. For example, the United States Supreme Court eliminated aiding and abetting liability under §10(b) of the Securities Exchange Act of 1934. *Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994). As a result, many courts then dismissed long pending cases that otherwise stated a proper cause of action at the time they were brought.

Indeed, because the fee in this matter was entirely contingent, the only certainties were that there would be no fee without a successful result and that such a result would be realized only after considerable and difficult effort. The contingent nature of Lead Counsel's representation strongly favors the requested percentage.

- 34 -

### G.     Time Limitation Imposed by the Client or Circumstances

This factor does not pertain to this case.  The Court agrees.

*Qwest*, 2006 U.S. Dist. LEXIS 71267, at *23.

### H.     The Amount Involved and the Results Obtained

This Court has previously addressed this issue:

> This factor may be given a greater weight in a common fund case when the
> court determines that the recovery "was highly contingent and that the efforts
> of counsel were instrumental in realizing recovery on behalf of the class."
> *Brown*, 838 F.2d at 456.  The *Brown* court indicated that the time and labor
> factor need not be evaluated using the lodestar formulation if the trial court
> determines that other factors are sufficient to determine a reasonable fee.  *Id.*
>
> In this case, I conclude that recovery for the class was contingent on
> many variables, and that the efforts of lead counsel were instrumental in
> overcoming those risks and realizing some recovery for the class.  From the
> outset, lead counsel faced substantial risks in prosecuting this case.  At the
> extreme, the risk was that lead counsel would expend substantial resources
> but end up with no recovery.  For example, the risk that Qwest would file
> bankruptcy frequently was present during the course of this litigation.   In
> addition, the risks inherent to litigation are legion, and need not be reviewed
> here.  However, in the context of this case, I conclude that the lodestar
> calculation outlined above remains a significant consideration in determining
> reasonableness.   This fundamental measure of value provides important
> context in balancing the other considerations.
>
> *     *     *
>
> It is important to note, however, that there probably would not have
> been any recovery for the plaintiff class absent the efforts of lead counsel.
> Many class members may perceive the recovery to be inadequate, compared
> to their claimed losses, but the class also faced a distinct risk of no recovery.
> Further, I conclude that lead counsel's efforts serve the broader purpose of
> creating an incentive for the defendants and others to comply with the
> securities laws in the future.  That incentive is another aspect of the success
> achieved by lead counsel.

*Qwest*, 2006 U.S. Dist. LEXIS 71267, at *23-*26.

- 35 -

In a common fund case, "the amount involved and the results obtained" is "decisive" and deserves more weight than "time and labor."[21] Courts consistently recognize that the result achieved is a major factor to be considered in making a fee award. The Tenth Circuit stated, in *Brown*, that "[i]n a common fund case . . . the amount involved and the results obtained – may be given greater weight when, as in this case, the trial judge determines that the recovery was highly contingent and that the efforts of counsel were instrumental in realizing recovery on behalf of the class."[22] The Supreme Court in *Hensley*, 461 U.S. at 436, recognized that in making a fee award the "most critical factor is the degree of success obtained." Here, the settlement provides a substantial monetary benefit to the N&W Class.

## I.      The Experience, Reputation and Ability of the Attorneys

The Court addressed this issue together with number 3 of the *Johnson* factors in its prior opinion. Lead Counsel's fee should reflect the degree of experience, competence and effort necessary to prosecute the Litigation. Lead Counsel are nationally known leaders in the fields of securities class actions and complex litigation. Courts have long recognized the importance of providing incentives to experienced counsel who accept complex litigation on a contingent fee basis, so that those cases can be prosecuted effectively. Lead Counsel's efforts in diligently protecting the N&W Class's interest and bringing this

---

[21]      *Brown*, 838 F.2d at 456.

[22]      *Brown*, 838 F.2d at 456. *Accord King Res.*, 420 F. Supp. at 630 ("the amount of the recovery, and end result achieved are of primary importance, for these are the true benefit to the client"); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 547-48 (S.D. Fla. 1988) ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."), *aff'd*, 899 F.2d 21 (11th Cir. 1990).

Litigation to a successful conclusion are the best indicator of the experience and ability of

the attorneys involved.  The experience of the law firms that represented Lead Plaintiffs in

the prosecution of this Litigation is set forth in the accompanying declarations of counsel.[23]

### J.      The Undesirability of the Case

As this Court previously stated:

> The risks presented to lead counsel who undertook this case were
> substantial. I summarized some of those risks in discussing factor eight,
> above. At a minimum, this case required lead counsel to advance large
> amounts of time, money, and other resources to determine if any recovery
> might be had. Quintessentially, the risk to lead counsel was financial. Most
> attorneys are unable or unwilling to take such a financial risk. There are other
> factors that may have made this case undesirable to counsel, but the
> financial risk stands out as the key factor. I note, however, that lead counsel
> long has been in the business of undertaking such risks in the realm of class
> action securities litigation. Thus, lead counsel had the ability to assess and
> assume the risk, and to make an informed judgment about the potential ratio
> between risk and reward in this case. This factor carries significant weight
> and weighs in favor of a substantial fee award.

*Qwest*, 2006 U.S. Dist. LEXIS 71267, at *27.

The issues presented in this case rendered the case inherently risky, if not

"undesirable," from the start.  This case involved a panoply of difficult issues of fact and

---

[23]      Professor Conte acknowledged the propriety of adequate fees in common fund
cases to encourage lawyers to prosecute such cases.

> [C]ourts have been careful to award a fully compensable reasonable fee
> based on the underlying economic inducement for class action lawyers to
> pursue potentially expensive or complex common fund class litigation.  These
> lawyers assume the risk of no compensation unless they successfully confer
> common fund benefits on the class, based on their reasonable expectation
> that they will share in the recovery in a fair proportion, in contrast to receiving
> a fee based initially on time-expended criteria that fail to give the ***results
> obtained*** factor primary consideration.

1 Alba Conte, *Attorney Fee Awards* §1.09, at 16 (2d ed. 1993) (emphasis in original).

law. The risks assumed by Lead Counsel in prosecuting this case on a contingent fee basis were substantial. When counsel undertook representation of Lead Plaintiffs and the class in this Litigation, it was with the knowledge that they would have to spend substantial time and money and face significant risks without any assurance of being compensated for their efforts. There is no question that this case was extremely risky when Lead Counsel accepted this retention, and the risks Lead Counsel faced should be assessed as they existed at the time counsel undertook the Litigation and not in light of the recovery ultimately achieved. *See, e.g.*, *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991) (the riskiness of a case must be judged *ex ante* not *ex post*). The "undesirability" of the Litigation supports the requested percentage.

## K. The Nature and Length of the Professional Relationship with the Client

The Court found that this factor has no application in this case. *Qwest*, 2006 U.S. Dist. LEXIS 71267, at *27-*28. However, as noted above, the Court-appointed Lead Plaintiffs negotiated the fee agreement with Lead Counsel and they also support the current request. This agreement provided for attorneys' fees on a graduating scale up to 25%, but the percentage requested for the recovery obtained here is substantially below what was agreed to here. With respect to this agreement and support for the requested fee, the Third Circuit Task Force concluded:

> The Task Force believes, however, that the deference to the empowered plaintiff's choice of **counsel** in PSLRA cases should extend to the *ex post* review of the fee agreement in those cases. The PSLRA establishes a model of client control that extends not only to appointment of counsel but also to monitoring of counsel and negotiation of the fee. The Task Force concludes, therefore, that strict scrutiny of the fee agreement is inconsistent with the client-driven litigation model established in the PSLRA. This means

that a court should presume that the fee is reasonable when it is the result of
an agreement between the "most adequate" plaintiff and chosen counsel.

Third Circuit Task Force Report, *Selection of Class Counsel*, 208 F.R.D. 340, 425 (Jan. 15,

2002) (emphasis in original).

## L.   Awards in Similar Cases

The Court considered this factor alongside *Johnson* factor number 5.   As

demonstrated by the decisions cited above, the percentage fee requested here is

consistent with (and actually less than) percentages customarily awarded in numerous

other cases by district courts within the Tenth Circuit and courts nationwide.

If this were a non-representative litigation, the customary fee arrangement would be

contingent, on a percentage basis, and in the range of 30% to 40% of the recovery. *Blum*,

465 U.S. at 903* ("In tort suits, an attorney might receive one-third of whatever amount the

plaintiff recovers.   In those cases, therefore, the fee is directly proportional to the

recovery."); *In re M.D.C. Holdings Sec. Litig.*, No. CV 89-0090 E (M), 1990 U.S. Dist. LEXIS

15488, at *22 (S.D. Cal. Aug. 30, 1990) ("In private contingent litigation, fee contracts have

traditionally ranged between 30% and 40% of the total recovery.").[24]   Thus, the customary

contingent fee in the private marketplace is 30% to 40% of the fund recovered.

---

[24]   *See also Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77 C 39, 1984 U.S. Dist.
LEXIS 23595, at *40-*41 (N.D. Ill. Sept. 14, 1984) ("Contingent fee arrangements in non-
class action damage lawsuits use the simple method of paying the attorney a percentage of
what is recovered for the client.   The more the recovery, the more the fee.   The
percentages agreed on vary, with one-third being particularly common."); *Kirchoff*, 786 F.2d
at 323 (observing that "40% is the customary fee in tort litigation" and noting, with approval,
contract providing for one-third contingent fee if litigation settled prior to trial).

**M.    Lead Plaintiffs' Counsel's Expenses Are Reasonable and Were Necessarily Incurred in the Prosecution of the Litigation**

Lead Plaintiffs' counsel also request payment of a portion of their expenses incurred in connection with the prosecution of the Litigation against Nacchio and Woodruff. Expenses are compensable in a common fund case if the particular costs are of the type typically billed by attorneys to paying clients in the marketplace.[25]   The categories of expenses for which counsel seek reimbursement here are the type routinely charged to paying clients and, therefore, should be reimbursed from the common fund.

Lead Counsel have incurred $113,262.04 in expenses in prosecuting this Litigation on behalf of the N&W Class after the prior settlement.  These expenses are itemized in the individual declarations of Lead Counsel submitted herewith.

A significant component of Lead Plaintiffs' counsel's expenses was the cost of preparing for, traveling to and taking depositions in this action, as well as preparing for the various hearings or litigation issues.  These activities were instrumental in assisting counsel to achieve the result obtained for the N&W Class.

---

[25]    *Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42*, 8 F.3d 722, 725-26 (10th Cir. 1993) (expenses reimbursable if such charges would normally be billed to client) (citing *Bee v. Greaves*, 910 F.2d 686, 690 (10th Cir. 1990)); *Gottlieb v. Wiles*, 150 F.R.D. 174, 185 (D. Colo. 1993), *rev'd and remanded on other grounds sub nom. Gottlieb v. Barry*, 43 F.3d 474 (10th Cir. 1994).  Decisions in other circuits confirm this practice. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (expenses normally charged to a fee-paying client approved); *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995) (expenses recoverable when customary to bill clients separately for them); *Associated Builders & Contractors, Inc. v. Orleans Parish Sch. Bd.*, 919 F.2d 374, 380 (5th Cir. 1990) (all reasonable out-of-pocket expenses recoverable because the costs are normally charged to fee-paying clients).

Other expenses include the costs of computerized research.  These are the charges
for computerized factual and legal research services including LEXIS, Westlaw, Dow
Jones, Disclosure, Inc., CDA Investment Technologies, Pacer Service Center and Choice
Point.   It is standard practice for attorneys to use these services to assist them in
researching legal and factual issues.  These services allowed counsel to access Qwest's
SEC filings, perform media searches on Qwest, obtain analysts' reports on Qwest, assist in
developing Lead Plaintiffs' damage analyses and allowed the investigators to locate and
obtain information on witnesses and defendants.

Other expenses that were necessarily incurred in the prosecution of this Litigation
include expenses for outside photocopying, filing and witness fees, postage and overnight
delivery, and telephone and fax expenses.

Finally, under the PSLRA, the Court may award "reasonable costs and expenses
(including lost wages) directly relating to the representation of the class to any
representative party serving on behalf of a class."   15 U.S.C. §78u-4(a)(4).   The Lead
Plaintiffs spent a significant amount of time representing the N&W Class throughout the
course of the Litigation and incurred such costs and expenses and have submitted
declarations in support of reimbursement.  The time, effort and expense they committed is
encouraged by Congress in enacting the PSLRA and was of great help in bringing about
this highly beneficial settlement.  *See* the accompanying declarations of Lead Plaintiffs,
which set forth the efforts of New England Health Care Employees Pension Fund, Clifford
Mosher, Tejinder Singh, and Sat Pal Singh spent on such representation and the expenses

and costs incurred.  The amounts requested are reasonable and should be approved by the Court.

## VI.   CONCLUSION

For all of the foregoing reasons, Lead Counsel respectfully request that the Court approve Lead Counsel's application for attorneys' fees and expenses as well as the reimbursement of expenses sought, as allowed by the PSLRA, by Lead Plaintiffs.

DATED:  December 23, 2008                  Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
KEITH F. PARK
MICHAEL J. DOWD
SPENCER A. BURKHOLZ
THOMAS E. EGLER
SUSAN G. TAYLOR
SCOTT H. SAHAM
X. JAY ALVAREZ
TRIG R. SMITH


_____ s/ Thomas E. Egler _____
THOMAS E. EGLER

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

**Lead Counsel for Plaintiffs**

THE SHUMAN LAW FIRM
KIP B. SHUMAN
885 Arapahoe Blvd.
Boulder, CO  80302
Telephone:  303/861-3003
303/830-6920 (fax)

**Liaison Counsel**

S:\Settlement\Qwest.set\BRF00056172_FEES.doc

- 42 -

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 23, 2008.

s/ Thomas E. Egler
THOMAS E. EGLER

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  TomE@csgrr.com

# Mailing Information for a Case 1:01-cv-01451-REB-KLM

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X. Jay Alvarez**
  JayA@csgrr.com,e_file_sd@csgrr.com

- **Timothy Granger Atkeson**
  Tim_Atkeson@aporter.com,jeffrey_lewis@aporter.com,tracey.davisson@aporter.com,susan.cole@ap

- **Michael James Barry**
  mbarry@gelaw.com,mhartman@gelaw.com,gfpulver@handf.com

- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net

- **Terry W. Bird**
  twb@birdmarella.com,dh@birdmarella.com

- **David Robert Boyd**
  dboyd@bsfllp.com

- **J. Patrick Bradley**
  jpb@greensfelder.com

- **Jessica Brody**
  jessica_brody@aporter.com,roleen_johnson@aporter.com,arthur_luk@aporter.com,jeffrey_lewis@ap

- **Spencer A. Burkholz**
  SpenceB@csgrr.com,e_file_sd@csgrr.com

- **David Lawrence Cook**
  david.cook@cliffordchance.com

- **Jennifer Lynn Coon**
  mem@birdmarella.com

- **Merrill Gene Davidoff**
  mdavidoff@bm.net,sleo@bm.net

- **Michael J. Dowd**
  MikeD@lerachlaw.com

- **Mark T. Drooks**
  mtd@birdmarella.com,lak@birdmarella.com

- **Stephanie Erin Dunn**

sdunn@perkinscoie.com,docketden@perkinscoie.com,sdunn-efile@perkinscoie.com

- **Thomas E. Egler**
  TomE@lerachlaw.com

- **Kevin D. Evans**
  kdevans@s-elaw.com,cmcnear@s-elaw.com

- **Clyde A. Faatz , Jr**
  cafaatz@handf.com,kjscholet@handf.com,gfpulver@handf.com

- **Christopher James W. Forrest**
  cjforrest@handf.com,kjscholet@handf.com,gfpulver@handf.com

- **Joshua David Franklin**
  jdf@denverda.org

- **John A. Freedman**
  john_freedman@aporter.com

- **Walter W. Garnsey , Jr**
  wgarnsey@kghllaw.com,smiller@kghllaw.com

- **Terence C. Gill**
  tgill@sah.com,efiling@sah.com

- **Michael W. Gross**
  mwgross@juno.com,mgross@sgattorneys.com

- **Marcy Marie Heronimus**
  mheronim@sah.com,efiling@sah.com,peckman@sah.com

- **Michael James Hofmann**
  michael.hofmann@hro.com,jackie.delay@hro.com

- **Kevin Brent Huff**
  khuff@khhte.com

- **Richard L. Jacobson**
  richard.jacobson@aporter.com,michael.hausenfleck@aporter.com

- **Roberta A. Kaplan**
  rkaplan@paulweiss.com

- **Curtis L. Kennedy**
  CurtisLKennedy@aol.com

- **Gary Michael Kramer**
  gkramer@bw-legal.com,amcarrillo@bw-legal.com

- **Alfred P. Levitt**
  alevitt@bsfllp.com

- **Vincent J. Marella**
  vjm@birdmarella.com,lak@birdmarella.com

- **David Meister**
  david.meister@cliffordchance.com

- **Jeffrey D. Meyer**
  jmeyer@moultonmeyer.com,rhuron@moultonmeyer.com

- **Charles G. Michaels**
  michaels@cmichaelslaw.com

- **James D. Miller**
  james.miller@cliffordchance.com,andrew.good@cliffordchance.com,yoko.nitta@cliffordchance.com,

- **Robert Nolen Miller**
  rmiller@perkinscoie.com,docketden@perkinscoie.com,rmiller-efile@perkinscoie.com

- **Barbara C. Moses**
  bmoses@maglaw.com,jlaing@maglaw.com

- **Edward S. Nathan**
  enathan@sgklaw.com,khoward@sgklaw.com,ejimenez@sgklaw.com

- **James E. Nesland**
  neslandje@cooley.com,foutsdl@cooley.com,calendarreq@cooley.com,inghramjl@cooley.com

- **Sharan Nirmul**
  snirmul@gelaw.com

- **Robin Lee Nolan**
  RNolan@bw-legal.com

- **Keith F. Park**
  keithp@lerachlaw.com

- **Elissa J. Preheim**
  Elissa.Preheim@aporter.com

- **Thomas Vincent Reichert**
  tvr@birdmarella.com,exg@birdmarella.com

- **John M. Richilano**
  jmr@richilanolaw.com,jjones@richilanolaw.com

- **Kenneth F. Rossman , IV**
  krossman@rothgerber.com

- **Ashley Elizabeth Rupp**
  arupp@maglaw.com

- **Scott Saham**

scotts@lerachlaw.com

- **Scott B. Schreiber**
  scott_schreiber@aporter.com

- **Arthur M. Schwartz**
  aschwartz@sgattorneys.com,dburton@sgattorneys.com

- **Paul Howard Schwartz**
  schwartzph@cooley.com,colitigation@cooley.com,foutsdl@cooley.com,calendarreq@cooley.com,ing

- **David L. Schwarz**
  dschwarz@khhte.com

- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com,lisa@shumanlawfirm.com

- **Edward F. Siegel**
  efsiegel@efs-law.com

- **Joel M. Silverstein**
  jsilverstein@sgklaw.com

- **Jeffrey Allen Smith**
  jsmith1@cooley.com,foutsdl@cooley.com,calendarreq@cooley.com,inghramjl@cooley.com

- **Jeffrey Speiser**
  jspeiser@sgklaw.com

- **Herbert J. Stern**
  hstern@sgklaw.com

- **Michael D. Trager**
  michael.trager@aporter.com,tisha.mccray@aporter.com

- **Kevin Thomas Traskos**
  Kevin.Traskos@usdoj.gov,andrea.hough@usdoj.gov,USACO.ECFCivil@usdoj.gov

- **Jesus Manuel Vazquez , Jr**
  jvazquez@rothgerber.com,tclanahan@rothgerber.com

- **James Gregory Waller**
  gregwaller@andrewskurth.com,kpiccolo@akllp.com,amyprasad@akllp.com

- **Ronald L. Wilcox**
  ronwilcox@hillandrobbins.com,raemcgaughey@hillandrobbins.com,janestoddart@hillandrobbins.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**AnchorMedia Ventures**
Attn: Alan Henry
35 Franklin Court So.
St. Petersburg, FL 33711

**I. Walton Bader**
Bader & Bader, LLP
50 Main Street
#1000 PMB 1029
White Plains, NY 10601

**Fredric C. Clodius**
11015 Millbank Road
King George, VA 22485

**Brian Fitzpatrick**
87 Barrow Street
Apartment 6H
New York, NY 10014

**Alan Henry**
3 Highfields Lane
Northport, ME 02870

**Geoffrey C. Jarvis**
Grant & Eisenhofer, P.A.
1201 North Market Street
#2100
Wilmington, DE 19801

**Donald Keller**
5507 Kerr Dr.
Helena, MT 59602

**Tim Myles**
254 Cass Street
Portsmouth, NH 03801

**C. Mylett**
P.O. Box 1031
Coleman, FL 33521

**New York State Teachers' Retirement System**
Wayne Schneider
Joseph J. Indelicato
10 Corporate Woods Drive
Albany, NY 12211-2395

**Pennsylvania State Employees' Retirement System**
Michael A. Budin
30 Noth Third Street
Suite 150
Harrisburg, PA 17101

**Cleo J. Rauchway**
Rothgerber, Johnson & Lyons, LLP
United States District Court Box 11
1200 - 17th Street
#3000
Denver, CO 80202

**William M. Rogers**

606 S. Military Trail
Deerfield Beach, FL 33442